Robert H. Tyler, Esq., CA Bar No. 179572
rtyler@tylerbursch.com
Nada N. Higuera, Esq. CA Bar No. 299819
nhiguera@tylerbursch.com
TYLER & BURSCH, LLP
25026 Las Brisas Road
Murrieta, California 92562
Tel:   (951) 600-2733
Fax:  (951) 600-4996

Dean R. Broyles, Esq., CA Bar No. 179535
dbroyles@nclplaw.org
NATIONAL CENTER FOR LAW & POLICY
539 West Grand Avenue
Escondido, California 92025
Tel:  (760) 747-4529
Fax: (760) 747-4505

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| **CALVARY CHAPEL SAN JOSE**, a California Non-Profit Corporation; **PASTOR MIKE MCCLURE**, an individual; **SOUTHRIDGE BAPTIST CHURCH OF SAN JOSE CALIFORNIA dba SOUTHRIDGE CHURCH**, a California Non-Profit Corporation; **PASTOR MICAIAH IRMLER**, an individual;<br><br>        Plaintiffs,<br><br>    vs.<br><br>**SARA H. CODY, M.D.**, in her official capacity as Santa Clara County Public Health Officer; **MIKE WASSERMAN**, in his official capacity as a Santa Clara County Supervisor; | Case No.:  20-cv-03794-BLF<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:  November 11, 2020<br>Time:  9:00 a.m.<br>Courtroom: 3 |

1  **CINDY CHAVEZ**, in her official capacity as
2  a Santa Clara County Supervisor; **DAVE CORTESE**, in his official capacity as a Santa
3  Clara County Supervisor; **SUSAN ELLENBERG**, in her official capacity as a
4  Santa Clara County Supervisor; and **JOE SIMITIAN**, in his official capacity as a Santa
5  Clara County Supervisor;
6
7          Defendants.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................1

BACKGROUND FACTS ...........................................................................................1

A.   Santa Clara County's Discriminatory Public Health Order ..........................1

B.   Santa Clara County COVID-19 Statistics ....................................................4

C.   Plaintiffs' Sincerely Held Religious Beliefs ................................................5

LEGAL STANDARD.................................................................................................5

ARGUMENT .............................................................................................................6

A.   The Order Violates Plaintiffs' First Amendment Rights. ............................6

    1.   Plaintiffs sufficiently allege that the County's Order requiring Plaintiffs to maintain a contact list of attendees at religious services for disclosure to the County upon its request is unconstitutional.....................................................................................6

    2.   Plaintiffs sufficiently allee that the County's Order banning *indoor* worship services and restricting *outdoor* worship services are not neutral and generally applicable..........................8

    3.   The Order fails strict scrutiny because it is not narrowly tailored to serve the government's interest in health and safety.................................................12

    4.   The differential standard established in *Jacobson* is not applicable here .................................15

B.   The Order Violates the Establishment Clause…………………………………16

C.   The Order Violates Plaintiffs' Privacy Rights. ...........................................19

D.   This Court has Jurisdiction Over Plaintiffs Claims. ..................................21

    1.   The State's recent order regarding *indoor* services does not render this case moot. ...............22

    2.   Plaintiffs have established a case or controversy as to the five County Supervisor Defendants. ....................................................................................24

i

CONCLUSION........................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. FEC,*
    333 F.3d 168, 175 (D.C. Cir. 2003) ........................................................................... 7

*Agostini v. Felton,*
    521 U.S. 203 (1997) ............................................................................................... 18

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................. 6

*Atkisson v. Kern County Housing Authority*
    59 Cal.App.3d 89 (1976) ........................................................................................ 20

*Bates v. City of Little Rock,*
    361 U.S. 516- 27 (1960) ........................................................................................... 7

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................................. 5

*Bernhardt v. City of Los Angeles,*
    279 F.3d 862,872 (9th Cir. 2002) ........................................................................... 23

*Buckley v. Valeo,*
    424 U.S. 1 (1976) .................................................................................................... 7

*Campbell–Ewald Co. v. Gomez,*
    136 S. Ct. 663, 193 L. Ed. 2d 571 (2016) .............................................................. 22

*Cousins v. Lockyer,*
    568 F.3d 1063 (9th Cir. 2009) ................................................................................. 6

*Church of the Lukumi Balalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1990) ................................................................................... 8, 9, 12, 13

*Davis v. Federal Election Comm'n*
    554 US 724 (2008) ................................................................................................. 23

*DeGregory v. Attorney General,*
    383 U.S. 825 (1966) ................................................................................................. 7

*DeSoto v. Yellow Freight Sys., Inc.,*
    957 F.2d 655 (9th Cir. 1992) .................................................................................... 6

*Doe v. Bolton,*
    410 U.S. 179 (1973) ............................................................................................... 21

*Eisenstradt v. Baird,*
    405 U.S. 438, 453 (1972) ....................................................................................... 20

i

*Employment Div. v. Smith,*
494 U.S. 872 (1990) ......................................................................................... 8

*First Baptist Church v. Governor Kelly,*
No. 20-1102-JWB (D.Ks. April 18, 2020) ................................................. 11,14

*Hernandez v. Hillsides, Inc.,*
47 Cal.4th 287 (2009) .................................................................................... 20

*Hill v. NCAA,*
7 Cal.4th 1 (1994) ......................................................................................... 20

*Jacobson v. Massachusetts,*
197 U.S. 11 (1905) ................................................................................... 15, 16

*Lee v. Weisman,*
505 U.S. 577 (1992) ................................................................................... 16-17

*Lemon v. Kurtzman,*
403 U.S. 602 (1971) ................................................................................. 17, 19

*Lokey v. Richardson,*
600 F.2d 1265,1266 (9th Cir. 1979) ............................................................ 23

*Los Angeles Cnty. Bar Ass'n v. Eu,*
979 F.2d 697 (9th Cir.1992) ......................................................................... 24

*Lynch v. Donnelly,*
465 U.S. 668 (1984) ...................................................................................... 17

*Masterpiece Cakeshop v. Colorado Civil Rights Comm'n,*
138 S. Ct. 1719 (2018) .................................................................................... 8

*McCreary Cnty. v. ACLU,*
545 U.S. 844 (2005) ................................................................................. 17, 18

*MedImmune, Inc. v. Genentech, Inc.,*
549 U.S. 118 (2007) ...................................................................................... 21

*NAACP v. State of Ala. ex rel. Patterson,*
357 U.S. 449,459 (1958) ............................................................................ 7, 20

*On Fire Christian Ctr., Inc. v. Fischer,*
No. 3:20-cv-264-JRW, 2020 U.S. Dist. LEXIS 65924 at *14 (W.D. Ky. Apr. 11, 2020) ............... 15

*Pennsylvania v. West Virginia,*
262 U.S. 553 (1923) ...................................................................................... 21

*Perry v. Schwarzenegger,*
591 F.3d 1147, 1159 (9th Cir. 2010) ............................................................. 7

ii

TABLE OF AUTHORITIES

*Phillips v. City of New York,*
   775 F.3d 538 (2d Cir. 2015) ............................................................................. 16

*Richmond Newspapers, Inc. v. Virginia,*
   448 US 555 (1980) ........................................................................................... 23

*Roberts v. Neace,*
   958 F.3d 409 (6th Cir. 2020) ........................................................................... 13

*Roe v. Wade,*
   410 US 113 (1973) ........................................................................................... 23

*Roemer v. Bd. of Public Works,*
   426 U.S. 736 (1976) ......................................................................................... 19

*Soos v. Cuomo,*
   No. 1:20-cv-651, 2020 U.S. Dist. LEXIS 111808 (N.D. N.Y. June 26, 2020) .............................. 11

*Spell v. Edwards,*
   No. 20-30358, 2020 U.S. App. LEXIS 19148 at *12 (5th Cir. June 18, 2020) ........................ 12, 13

*United States Parole Comm'n v. Geraghty,*
   445 US 388 (1980) ........................................................................................... 23

*United States v. Juvenile Male,*
   564 US 932 (2011) ........................................................................................... 23

*W. Va. State Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943) ........................................................................................... 6

*West v. Secretary of Dept. of Transp.*
   206 F3d 920 (9th Cir. 2000) ......................................................................... 22, 23

**Codes and Statutes**

California Constitution, Article 1, § 1 ...................................................................... 3

California Constitution, Article XI, § 1 .................................................................... 24

Santa Clara County Code of Ordinances, Article II, Section 302 ......................................... 24

**Rules**

Fed. R. Civ. P. 8 ................................................................................................. 5

Fed. R. Civ. P. 12 ............................................................................................ 1, 5

iii

## INTRODUCTION

Plaintiffs' allegations are based on three aspects of Santa Clara County's Public Health Order which are unconstitutional based on the First Amendment of the U.S. Constitution and Article One of the California Constitution. ***First***, Plaintiffs allege that the County's Order requiring Plaintiffs to maintain a contact list of attendees at religious services for disclosure to the County upon its request is unconstitutional. (Verified Complaint ("Doc. 1"), ¶ 20.) ***Second***, Plaintiffs allege that the County's Order restricting outdoor worship services to 25 or fewer persons (recently updated to 60 or fewer persons) is likewise unconstitutional. (Doc. 1, ¶¶ 47-50.) ***Finally***, Plaintiffs allege that the County's complete ban on indoor worship services is unconstitutional. (Doc. 1, ¶ 46.)

Defendants argue that Plaintiffs' case should be dismissed under Fed. R. Civ. P. 12(b)(1) on the grounds that Plaintiffs' claims fail to present a case or controversy, the County Board of Supervisor Defendants are not proper defendants, and Plaintiffs fail to state a claim. However, as discussed in detail below, the Complaint alleges facts sufficient to maintain each of the claims pleaded by Plaintiffs, and the claims are justiciable and asserted against the proper Defendants. Accordingly, the Court should deny Defendants' Motion to Dismiss. If the Court grants any part of Defendants' Motion, Plaintiffs respectfully request that the Court grant Plaintiffs leave to file an amended complaint.

## BACKGROUND FACTS

### A.    Santa Clara County's Discriminatory Public Health Order

Plaintiffs allege that the County's complete ban on *indoor* worship services violates Plaintiffs' constitutional rights, under both the First Amendment of the U.S. Constitution (Free Exercise and Establishment Clauses) and Article One of the California Constitution (Free Exercise). (Doc. 1, ¶ 46.) After the filing of the Complaint and subsequent to the County's earlier ban on indoor services, the State of California temporarily banned indoor worship services. (Defendants' RJN ("Doc. 17.1"), Ex. F (July 13, 2020 Statewide Public Health Officer Order).) However, it is inevitable that once the State's ban on

1   indoor worship services is lifted, the County's earlier ban on indoor worship services will remain in
2   effect.

3          Plaintiffs allege that the County Order allows individuals the unlimited ability to leave their
4   residence for in-store shopping at retail and shopping centers, television, radio, and other media services,
5   real estate offices, farmers' markets, bicycle supply shops, airports, grocery stores, recreational
6   institutions, summer camps, and summer school. (Doc. 1. ¶ 45.) However, the Order limits indoor
7   religious services to "email, video streaming, or teleconference." (Doc. 1. ¶ 46.)

8          Second, Plaintiffs allege that the County's Order restricting *outdoor* worship services to 25 or
9   fewer persons is unconstitutional because comparable secular businesses are not subject to such a
10  restriction. (Doc. 1. ¶¶ 47-50.) Like the indoor ban, this claim is also based on both the First Amendment
11  of the U.S. Constitution (Free Exercise and Establishment Clauses) and Article One of the California
12  Constitution (Free Exercise). As of July 13, 2020, the County's Order was amended to allow 60 or fewer
13  persons at outdoor worship services. Santa Clara County Novel Coronavirus (COVID-19) Data
14  Dashboard, Mandatory Directive for Gatherings (last visited July 28, 2020)
15  https://www.sccgov.org/sites/covid19/Pages/mandatory-directives-gatherings.aspx. The State of
16  California currently allows outdoor worship services with no such capacity limit. (Doc. 1 ¶ 40 & Ex. 4.)
17  Plaintiffs allege that restaurants in Santa Clara County are "open for outdoor dining and are not subject
18  to the restriction of [60] or fewer persons the County applies to outdoor religious services." (Doc. 1 ¶
19  48.) In fact, one restaurant in Santa Clara County boasted 186 reservations for Friday dinner with a
20  seating capacity of 200 persons.[1] Wineries and tasting rooms are likewise open for outdoor services

---

[1] Linda Zavoral, "Santa Clara County, site of nation's first COVID-19 death, reopens restaurants for
outdoor dining," MERCURY NEWS (June 6, 2020) https://www.mercurynews.com/2020/06/05/santa-
clara-county-restaurants-reopen-for-outdoor-dining/.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

without any arbitrary capacity limits.[2] Plaintiffs also allege that "'outdoor museums, historical sites, and gardens' are allowed to open without a limitation on the number of people." (Doc. 1 ¶ 47.) Likewise, Plaintiffs allege retail shopping "is now open and is not subject to the maximum restriction of [60] or fewer persons the County applies to outdoor religious services." (Doc. 1 ¶ 50.)

Finally, Plaintiffs allege that the County's Order requiring worship services to maintain a contact list of attendees for disclosure to the County is unconstitutional based on the right to privacy in the California Constitution, Article 1, Section 1. (Doc. 1 ¶¶ 20, 146-147.) This requirement also violates the First Amendment of the U.S. Constitution under the Free Exercise, Assembly, and Establishment Clauses. Plaintiffs allege that comparable secular businesses are not subject to such a restriction. (Doc. 1 ¶ 20.)

Although outdoor protests are not allowed on the face of the County Order, the Santa Clara Department of Public Health has been unwavering in its support of massive protests in the County.  It described protests regarding racial injustice as a "fundamental right that is critical to the health of our democracy." (Doc. 1 ¶ 52.) The County also made the following statement:

> "We recognize that peaceful protest in response to the pain, anger and mourning due to deeply rooted inequities and systemic racism is a fundamental right that is critical to the health of our democracy. As residents of the County exercise this right, we respectfully remind everyone that our community is still facing a health crisis and fighting COVID-19." (Doc. 1 Ex. 14.)

---

[2] Santa Clara County Novel Coronavirus (COVID-19) Data Dashboard, Mandatory Directive for Outdoor Dining (last visited July 28, 2020) https://www.sccgov.org/sites/covid19/Pages/mandatory-directives-outdoor-dining.aspx.

Defendant Susan Ellenberg sent out a public invitation to three countywide protests on Juneteenth, June 19, 2020.[3] These Juneteenth demonstrations drew thousands of people together throughout the County.[4]

**B.    Santa Clara County COVID-19 Statistics**

Plaintiffs allege that Defendants have no compelling justification for their discriminatory treatment of places of worship. (Doc. 1 ¶ 21.) Approximately two million people live in Santa Clara County. (Doc. 1 ¶ 55.) As of June 5, 2020, the County had a cumulative total of 2,892 COVID-19 cases, which is 0.1% of the population. (Doc. 1 ¶ 54.)  The County had 144 deaths related to COVID-19, and long-term care facilities accounted for 61 of the 144 deaths. (Doc. 1 ¶ 54.) Discovery will presumably show that some, if not most, of these deaths were the result of one or more co-morbidities.

As of June 5, 2020, the County had a total of 165 unoccupied ICU beds, with only 14 beds occupied by ("confirmed and suspected") COVID-19 patients. (Doc. 1 ¶ 57.) The County had 840 available acute hospital beds with only 40 beds occupied by COVID-19 patients.  (Doc. 1 ¶ 57.) The County had an additional 1231 surge beds with COVID-19 patients occupying none of the surge beds. (Doc. 1 ¶ 57.)

Defendants improperly include purported facts alleging that places of worship are "super spreaders," citing anecdotal news articles from March 2020 and articles from other states and countries. Plaintiffs object to these allegations because they are not included in Plaintiffs' Complaint, nor are they

---

[3] https://twitter.com/SusanEllenberg?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor

[4] Leonardo Castaneda, "Juneteenth Live Blog: Thousands turn out for anti-racism protests at Port of Oakland, San Jose," MERCURY NEWS (June 20, 2020)

https://www.mercurynews.com/2020/06/19/juneteenth-live-blog-thousands-anti-racism-protests-port-of-oakland-san-jose-bay-area/.

judicially noticeable. Plaintiffs intend to engage in discovery regarding the rationale behind Defendants' decision (1) requiring Plaintiffs to maintain a contact list of attendees at religious services for disclosure to the County upon its request; (2) prohibiting indoor services; and (3) limiting places of worship outdoors to 60 persons.

Plaintiffs also plead facts regarding the negative effects of the pandemic, including a significant increase in clinical anxiety or depression, an increase in drug and alcohol addiction, and increased suicide rates. (Doc. 1 ¶¶ 5-13.) The spiritual services of Plaintiffs' houses of worship are essential to the health and welfare of the people of Santa Clara County. (Doc. 1 ¶ 15.) A study published on May 6, 2020, in JAMA Psychiatry found "that religious service attendance is associated with a lower risk of death from despair among registered nurses and health care professionals. (Doc. 1 ¶ 16.) According to a poll conducted by Plaintiff Southridge Baptist Church, 79% of 4,000 people who have attended Southridge Church stated that religious services would help their mental health. (Doc. 1 ¶ 17.)

**C.    Plaintiffs' Sincerely Held Religious Beliefs**

Plaintiffs are two evangelical Christian churches and two pastors committed to the teachings of the Bible. (Doc. 1 ¶¶ 22-25.) According to sincerely-held religious beliefs and the commands of the Bible, Plaintiffs' believe that it is essential for them as Christians to regularly gather and assemble in-person for the teaching of God's Word, prayer, worship, baptism, communion, and fellowship. (Doc. 1 ¶¶ 62, 79.) Plaintiffs also believe that the Bible requires them to keep one another's confidence and trust, to be discreet, and to refrain from sharing private information about others. (Doc. 1 ¶¶ 64, 81.)

## LEGAL STANDARD

Under Fed. R. Civ. P. 8(a) a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). On a Rule 12(b)(6) motion to dismiss, a district court must accept all factual allegations as true, construe the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If a motion to dismiss is granted, leave to amend should follow unless additional facts "could not possibly cure the deficiency." *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (internal citations and quotations omitted).

## ARGUMENT

Defendants fail to show why the allegations in the Plaintiffs' Complaint, if taken as true, are insufficient to state claims for relief.  Each of the causes of action plead by Plaintiff are supported by the allegations in the Complaint, and this Court has jurisdiction.

**A.      The Order Violates Plaintiffs' First Amendment Rights**

Plaintiffs sufficiently allege that the Order violates their First Amendment for three reasons: ***First***, Plaintiffs allege that the County's Order requiring Plaintiffs to maintain a contact list of attendees at religious services for disclosure to the County upon its request is unconstitutional. (Doc. 1 ¶ 20.) ***Second***, Plaintiffs allege that the County's Order restricting *outdoor* worship services to 25 or fewer persons (recently updated to 60 or fewer persons) is likewise unconstitutional. (Doc. 1. ¶¶ 47-50.) ***Finally***, Plaintiffs allege that the County's complete ban on *indoor* worship services is unconstitutional. (Doc. 1, ¶ 46.) Plaintiffs also sufficiently allege that the Order is subject to, and fails, strict scrutiny.

**1.      Plaintiffs sufficiently allege that the County's Order requiring Plaintiffs to maintain a contact list of attendees at religious services for disclosure to the County upon its request is unconstitutional**

The First Amendment protects the "free exercise" of religion, and fundamental to this protection is the right to gather and worship. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943). The First Amendment also protects "privacy of association and belief guaranteed by the First

6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Amendment." *See AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) ("The Supreme Court has long recognized that compelled disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation."); *Bates v. City of Little Rock*, 361 U.S. 516, 525- 27 (1960) (same); *DeGregory v. Attorney Gen.*, 383 U.S. 825, 828-30 (1966) (prohibiting the state from compelling defendant to discuss his association with the Communist Party). This right against compelled disclosure of association is known as the First Amendment privilege. *Perry v. Schwarzenegger*, 591 F.3d 1147, 1159 (9th Cir. 2010) (prohibiting disclosure of political association).

The government may not abridge the exercise of fundamental First Amendment rights by compelling disclosure of the identity and contact information of religious worshippers. *NAACP*, 357 U.S. 449, 461-464 (1958) (prohibiting the compelled disclosure of the NAACP membership lists). Although the First Amendment Privilege is not a separate right guaranteed by the First Amendment, there is a vital relationship between, for example, freedom to religion and privacy in one's religious association. *Id.* at 462. Required disclosures of First Amendment privileged information have a "deterrent effect on the exercise of First Amendment rights" and are, therefore, subject to "exacting scrutiny." *Buckley v. Valeo*, 424 U.S. 1, 63-74 (1976). "The party asserting the First Amendment privilege must demonstrate a prima facie showing of arguable first amendment infringement." *Perry*, 591 at 1160 (internal quotations and citations omitted).

Here, the County is requiring places of worship to collect the name and contact information of individuals engaged in the protected activity of exercising their religion by attending church services. (Doc. 1. ¶ 97.)  This implicates privileged information inherent in exercising First Amendment rights, including Free Exercise. The Complaint alleges that the Bible requires Plaintiffs to keep the confidence and trust of its attendees, to be discreet, and to refrain from sharing private information about others, further showing the vital relationship between religion and privacy. (Doc. 1. ¶¶ 64, 81.) There also can

7

be no doubt that a government agency collecting attendees' personal information could discourage people from attending worship services, establishing a prima facie case for First Amendment privilege. Take, for example, a Muslim-born exchange student from Iran or Saudi Arabia attending a college in the County, privately attending a Christian church (a serious crime in his home country). Would that student continue going to church knowing the government will have record of his identity, contact information, and details of his church attendance? Arguably, he would not. The First Amendment privilege is applicable, and the Order is, therefore, subject to, and fails, strict scrutiny as discussed in Section (A)(3) below.

### 2. Plaintiffs sufficiently allege that the County's Order banning *indoor* worship services and restricting *outdoor* worship services are not neutral and generally applicable

The Plaintiffs' Complaint sufficiently alleges that the Order burdens Plaintiffs' First Amendment rights with respect to both the *indoor* ban and the *outdoor* limitation. Neutral laws of general applicability that incidentally burden religious activity are not subject to strict scrutiny, which requires that the government have a compelling governmental interest that justifies the extent of the law. *Employment Div. v. Smith*, 494 U.S. 872, 878 (1990). However, "[t]he principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Church of the Lukumi Balalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1990). Indeed, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral . . . and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Id.* at 533.

The Free Exercise Clause bars even "'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop v. Colorado Civil Rights Comm'n,* 138 S. Ct. 1719, 1731 (2018) (quoting

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Lukumi*, 508 U.S. at 534). Here, that means Defendants, even when addressing the COVID-19 pandemic, are obliged "to proceed in a manner neutral towards and tolerant of [Plaintiffs'] religious beliefs." *Id*. Yet, that is precisely what Defendants have failed to do. "[T]he minimum requirement of neutrality is that a law not discriminate on its face." *Id*. A law "lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Lukumi,* 508 U.S. at 533.

In *Lukumi*, the City of Hialeah's ban on animal sacrifice was not "neutral" or "generally applicable" because it banned the Church of Lukumi Babalu's ritualistic animal sacrifices, while at the same time allowing most other kinds of animal killing, including kosher slaughtering and killing animals for non-religious reasons. *Id.* at 536. Here, the Order is not neutral, especially with respect to the *outdoor* limitation. The Order limits places of worship to 60 or fewer persons, while at the same time allowing many other open outdoor establishments including, but not limited to, restaurants, museums, zoos, and wineries, to have an unlimited number of patrons outdoors.

As to the outdoor limitation, the Complaint alleges that the Order lacks facial neutrality and general applicability because it restricts places of outdoor worship to an arbitrary limit of 60 persons while not placing a capacity limit on outdoor restaurants which can host 200 or more patrons at one time. (Doc. 1 ¶ 48.) Based on the Order, people in Santa Clara County can gather in large numbers to eat, talk, and socialize at restaurants, retail stores, museums, zoos, and many other places. (Doc. 1 ¶¶ 47-50.) But places of worship are banned from admitting more than 60 worshippers at outdoor religious services no matter how carefully they follow CDC and state guidelines, how large the space, how spread out persons are, nor whether they wear masks the entire time. Likewise, churches, synagogues, and mosques are required to record the contact information of all attendees and be willing to report that information to Santa Clara County. (Doc. 1 ¶ 20.) Restaurants, museums, zoos, wineries, and the like are not required to maintain such information. (Doc. 1 ¶ 20.) Defendants merely assert, without citing

1
2
3

to any scientific or medical evidence, that activities such as in-store shopping, media services, real estate offices, summer camps, outdoor dining "are not similar to church services; and the dissimilar treatment of dissimilar activities does not establish [a] constitutional violation." (Doc. 17, p. 18:19-24.)

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Defendants argue that the disparity in treatment is based on the volume of overall activity, contact intensity, number of contacts, and modification potential. (Doc. 17, p. 17:12-17.) Yet, assuming social distancing is observed, it is difficult to understand how 100 people sitting outside eating dinner on a restaurant patio is different from 100 people sitting in a field listening to a church sermon. In fact, a restaurant arguably has higher contact intensity with individuals not wearing face masks once seated, talking to each other during the entire dinner, speaking loudly over others, chanting for their favorite sports team on screens, or singing happy birthday, all in close proximity. The amount of time one sits at a restaurant socializing eating an appetizer, main course, and dessert is comparable to or exceeds the duration of listening to a sermon. Plaintiff Southridge Church holds one service at 9:00am and another immediately after at 10:30am. (Doc. 1, ¶ 77.) The service lasts approximately one hour, only leaving time for congregants to be out of the 9:00am service in time for the next service to start at 10:30am. This is essentially the same amount of time one sits in a restaurant. (Doc. 1, ¶ 77.) Likewise, restaurant staff and patrons handle and hand-off dishes, menus, condiments, etc., increasing the contact intensity, as opposed to churchgoers who sit in the same spot and generally do not touch church staff, shared objects, or others outside their household. In this regard, Churches have more "modification potential" than a restaurant. At a church, individuals can wear masks the entire time which is not true for people eating at a restaurant. Churches, like restaurants, can socially distance, sanitize, and employ every other modification a restaurant can.  Therefore, the Order lacks facial neutrality and general applicability because it restricts places of worship to an arbitrary, unjustifiable and discriminatory limit of 60 persons.

27
28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Defendants' also illustrate a lack of neutrality towards religion by actively supporting and encouraging mass protests, sending an implied message that failing to social distance, not wearing masks, and chanting or singing during protests is deserving of preferential treatment. In *Soos v. Cuomo*, No. 1:20-cv-651, 2020 U.S. Dist. LEXIS 111808 (N.D. N.Y. June 26, 2020), the Governor of New York and the New York City Mayor openly encouraged protesters gathering in large numbers in New York, while continuing to prohibit in-person religious gatherings. *Id.* at *3-19. The court issued a preliminary injunction enjoining the enforcement of capacity limitations on religious worship, holding that the government's disparate treatment of protesters as compared to religious worship services likely violated the First Amendment. *Id.*, at *21-22, 37 ("[I]t is plain to this court that the broad limits of that executive latitude have been exceeded."). The court found that the restrictions on indoor worship services that were not applied to the protesters removes the law from general applicability and thus mandates strict scrutiny. *Id.* at *33. Here, Defendants have openly encouraged protesters gathering in large numbers, including by publicly inviting County residents to protests involving thousands of people gathered outdoors. (Doc. 1, ¶ 52.) This further evidences Santa Clara County's lack of neutrality toward religious gatherings.

As to the *indoor* ban, Plaintiffs plead sufficient facts that the County's complete ban on indoor worship services treats houses of worship very differently, and much more restrictively, than similarly situated commercial stores and other places where people are still permitted to gather. (Doc. 1, ¶¶ 44-46.) *See, First Baptist Church v. Governor Kelly*, No. 20-1102-JWB at *11 (D. Ks. April 18, 2020) (finding plaintiffs likely to succeed on the merits of their claim that the Kansas ban on indoor "mass gatherings" violated the free exercise of religion.) Plaintiffs allege that the County Order allows individuals the unlimited ability to leave their residence for in-store shopping at retail and shopping centers, television, radio, and other media services, real estate offices, farmers' markets, bicycle supply

shops, airports, grocery stores, recreational institutions, summer camps, and summer school. (Doc. 1. ¶ 45.) However, the Order limits indoor religious services to "email, video streaming, or teleconference." (Doc. 1. ¶ 46.)

### 3.   The Order fails strict scrutiny because it is not narrowly tailored to serve the government's interest in health and safety

Because the Order is not neutral or generally applicable, it "must undergo the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546. The requirements to satisfy this scrutiny are so high that the government action will only survive this standard in rare cases, and the government bears the burden of meeting this exceptionally demanding standard. *Id*.  Therefore, Defendants must prove that limiting places of worship meeting outdoors to 60 or fewer persons, banning indoor meetings, and requiring places of worship to maintain contact information of patrons (while not requiring the same of similar secular businesses) "advance[s] interests of the highest order and [is] narrowly tailored in pursuit of those interests." *Id*. Defendants cannot satisfy this highest level of review.

While enacting reasonable health and safety measures to curb the spread of COVID-19 may generally be considered a "compelling interest," Defendants' Order violates the Free Exercise Clause because it is not even close to being narrowly tailored to advance that interest. As in *Lukumi*, the government's "proffered objectives are not pursued with respect to analogous non-religious conduct, and those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree." *Id*. at 546. In other words, the Order is not narrowly tailored because it is both underinclusive *and* overbroad. *Id*.; *see also Spell v. Edwards*, No. 20-30358, 2020 U.S. App. LEXIS 19148 at *12 (5th Cir. June 18, 2020) (Ho, J., concurring) ("The [Louisiana] Governor no doubt issued those [stay-at-home orders restricting in-person church services] out of sincere public health concerns. To survive First

Amendment scrutiny, however, those concerns must be applied consistently, not selectively. And it is hard to see how that rule is met here if the record is developed to take account of the recent protests.").

The Order is underinclusive because it does not place similar limitations and requirements on comparable secular establishments. Hundreds of citizens can freely attend other open establishments. Worship services have an outdoor numerical capacity limitation (initially 25 persons with a recent increase to 60 persons), while similarly situated businesses do not. Defendants cannot reasonably argue that attending outdoor religious services poses unique health risks that do not arise with outdoor dining at a restaurant, shopping at a retail store, or going to a museum. *See Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020) (explaining that "a law that discriminates against religious practices usually will be invalidated because it is the rare law that can be 'justified by a compelling interest and is narrowly tailored to advance that interest'") (citing *Lukumi*, 508 U.S. at 553); *Spell*, 2020 U.S. App. LEXIS 19148 at *13-14 (Ho, J., concurring) (explaining in a COVID-related case, "[u]nderinclusive rules fail strict scrutiny just as overinclusive ones do. A 'law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited.'") (quoting *Lukumi*, 508 U.S. at 547). These other establishments also do not have a contact tracing requirement, unlike houses of worship.

The same is true with respect to open *indoor* establishments. A wide variety of indoor commercial and transportation-related activities are permitted, along with day cares, offices, summer camps, and the like. Permitted activities freely include going to a Walmart, Costco, Ross, and Home Depot. Furthermore, under the Order, people can rather freely assemble and congregate in train stations, bus stations and airports.  Upon entry to stores, shoppers at commercial facilities may roam the narrow aisles of retail establishments with no physical barriers between them so long as they purportedly maintain a distance of six feet from one another.  Indeed, in most stores, maintaining social distancing

1    with the existence of narrow aisles is virtually impossible.  Just like the indoor churches in Kansas,

2    Plaintiffs here are:

3         "likely to prevail on their assertion that the restriction on religious mass gatherings is not

4         narrowly tailored.  Specifically, Plaintiffs point to a number of other secular mass

5         gathering activities or locations that merely require certain safety protocols, including

6         social distancing. Given the similarities of physical proximity between these "essential"

7         secular gathering and Plaintiffs' religious gatherings…the court finds that Plaintiffs can

8         likely show that the broad prohibition against  in-person religious services of more than

9         ten congregants is not narrowly tailored to achieve the stated public health goals where

10        the comparable secular gatherings are subjected to much less restrictive conditions."

11   *First Baptist Church v. Governor Kelly*, No. 20-1102-JWB at *15-16 (D. Ks. April 18, 2020).

12        The Order is overbroad because the County's interest in mitigating or preventing churchgoers

13   from spreading COVID-19 can be achieved by employing much narrower tailoring and applying far less

14   restrictive means.  This can easily be accomplished by permitting Plaintiffs to gather in a safe manner

15   indoors and outdoors while following CDC and state social distancing, mask-wearing, and other

16   guidelines. A church, temple, or mosque can certainly be trusted to carefully comply with social

17   distancing protocols just as any other open business establishment. With respect to the contact tracing

18   requirement, the County can obtain information from individuals themselves, through a consensual

19   process, rather than forcing Plaintiffs to collect and reveal private information without the consent of

20   others.

21        Defendants may suggest that Plaintiffs could participate in an online service or hold multiple

22   outdoor services to accommodate their congregations. But online services are not sufficient because, for

23   instance, some members may not have access to online resources, and some may not want to practice

---

14

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

their religious faith in that manner. *See On Fire Christian Ctr., Inc. v. Fischer*, No. 3:20-CV-264-JRW, 2020 U.S. Dist. LEXIS 65924 at *14 (W.D. Ky. Apr. 11, 2020) (explaining that the City may "suggest that On Fire members could participate in an online [religious] service [during the COVID pandemic] and thus satisfy their longing for communal celebration. But some members may not have access to online resources. And even if they all did, the Free Exercise Clause protects their right to worship as their conscience commands them.").

Likewise, multiple outdoor services may not be practical in the heat of summer. And even if Plaintiffs, and all those who worship with them, could participate solely online or through multiple outdoor services, the Free Exercise Clause protects their right to worship as their conscience commands them. It is not the role of the Defendants to dictate to religious believers the mode or manner of their worship, so long as their belief in the religious significance of their practice is sincere.

**4.  The differential standard established in *Jacobson* is not applicable here**

The Defendants' Motion to Dismiss erroneously cites *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) to support its extraordinary claim that the current emergency gives the County the power to restrict any and all constitutional rights, as long as it has not acted in an unreasonable and arbitrary manner. (Doc. 17, p. 13:20-21.) As explained above, Plaintiffs' Complaint alleges that the County has acted in an unreasonable and arbitrary manner, and the Complaint alleges facts showing the discriminatory treatment of places of worship. Moreover, nothing in *Jacobson* supports the view that an emergency displaces normal constitutional standards. Rather, *Jacobson* provides that an emergency may justify temporary constraints within those standards. As the Second Circuit has recognized, *Jacobson* merely rejected what we would now call a "substantive due process" challenge to a compulsory

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

vaccination requirement, holding that such a mandate "was within the State's police power." *Phillips v. City of New York*, 775 F.3d 538, 542 (2d Cir. 2015).

*Jacobson*'s deferential standard of review is appropriate in that limited context. It might have been relevant here if Plaintiffs were asserting a comparable substantive due process claim, but they are not. Instead, Plaintiffs assert a claim under the Free Exercise and Assembly Clauses – both which have well-established constitutional standards. *Jacobson* had no occasion to address a Free Exercise claim because that issue was not presented there. In fact, the Free Exercise and Assembly Clauses had not yet been held to apply to the States when *Jacobson* was decided in 1905. *See Phillips*, 775 F.3d at 543. Consequently, *Jacobson* says nothing about what standards would apply to a claim that an emergency measure violates some other, *enumerated* constitutional right; on the contrary, *Jacobson* explicitly states that other constitutional limitations may continue to constrain government conduct. *See* 197 U.S. at 25 (emergency public health powers of the State remain subject "to the condition that no rule . . . shall contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument").

The Order is therefore subject to, and does not pass, the strict scrutiny standard of review. Even if the *Jacobson* differential standard were applicable, which it is not, the Order still violates the First Amendment because it is discriminatory, arbitrary and unreasonable. Based on the facts set forth in Plaintiffs' Complaint, this claim should not be dismissed because Plaintiffs' have plead valid claims, and they may be entitled to relief.

**B.      The Order Violates the Establishment Clause**

As the Supreme Court has noted, the First Amendment recognizes "that religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State," and "the Establishment Clause is a specific prohibition on forms of state intervention in religious affairs." *Lee v.*

*Weisman*, 505 U.S. 577, 589, 591 (1992). The Supreme Court has interpreted the Establishment Clause to "mandate[] governmental neutrality between religion and religion, and between religion and nonreligion." *McCreary Cnty. v. ACLU*, 545 U.S. 844, 860 (2005). Additionally, the Supreme Court has observed that the Establishment Clause "affirmatively mandates accommodation, not merely tolerance, of all religions, and *forbids hostility* toward any. Anything less would require the 'callous indifference' we have said was never intended by the Establishment Clause." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984) (internal citation omitted) (emphasis added). Although the Court has applied different tests at various times, the most frequently cited one states that government action violates the Establishment Clause if (1) it lacks a primarily secular purpose, (2) the primary effect is to advance or inhibit religion (or a particular religious or anti-religious viewpoint), or (3) it creates an excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).

Here, as explained above, Defendants have sufficiently plead a violation of the Establishment Clause with facts showing the Defendants hostility toward religion with respect to all three aspects of the Order. For example, with the outdoor limitation, Plaintiffs allege that the County's Order restricting outdoor worship services to 25 (now 60) or fewer persons is unconstitutional because comparable secular businesses are not subject to such a restriction. (Doc. 1. ¶¶ 47-50.) Plaintiffs allege that restaurants in Santa Clara County are "open for outdoor dining and are not subject to the restriction of [60] or fewer persons the County applies to outdoor religious services." (Doc. 1 ¶ 48.) Wineries and tasting rooms are likewise open for outdoor services without an arbitrary capacity limit. Plaintiffs also allege that "'outdoor museums, historical sites, and gardens' are allowed to open without a limitation on the number of people." (Doc. 1 ¶ 47.) Likewise, Plaintiffs allege retail shopping "is now open and is not subject to the maximum restriction of [60] or fewer persons the County applies to outdoor religious services." (Doc. 1 ¶ 50.) By expressly interfering with places of worship during their religious services

and imposing restrictions of places of worship, while not applying the same limitations to similarly situated secular businesses, the Defendants have violated the Establishment Clause under all three prongs of the *Lemon* test.

That starkly unequal treatment of places of worship strongly suggests that the government's primary purpose was not secular or religion-neutral (i.e. merely to reduce the spread of COVID-19). To the contrary, "openly available data support[s] [the] commonsense conclusion" that the government has made a value judgment that political and social expression in the form of protests is substantially more important than religious expression in the form of worship, such that the former is effectively excluded from the capacity limitation along with restaurants, zoos, museums, and retail stores; this evidences an impermissible government purpose. *See McCreary Cnty.*, 545 U.S. at 862-63. Similarly, the intended, and primary, effect of the prohibition targeting places of worship is to inhibit religion and religious expression, by imposing arbitrary numerical limits outdoors, banning indoor services, and requiring disclosure of confidential information, while leaving comparable nonreligious activities and expression largely untouched. This is contrary to the First Amendment's command that the government cannot favor nonreligion over religion. *See id.* at 860.

As to *Lemon*'s final prong, the arbitrary 60-person limit, complete closure of indoor services, ban on indoor services, and the requirement of churches to maintain a contact list of attendees creates excessive, improper government entanglement with religion. *See Agostini v. Felton*, 521 U.S. 203, 233 (1997) (explaining that excessive entanglement can independently result in an Establishment Clause violation). Consider what monitoring and enforcing compliance with the Order would likely entail:

- Sending police officers or other government agents to places of worship to monitor and count the adults and children and church staff in attendance;

---

18

- Having government agents review list of attendees to check whether Plaintiffs adequately documented personal contact information of each and every attendee, including children;

- Investigating anonymous tips that a religious service at a place of worship had over 60 people in attendance or indoor services of any amount of attendees;

- Enforcement efforts (fines, criminal charges, etc.) against places of worship, religious leaders and/or congregants for allowing over 60 attendees or maintaining privacy of congregants, who for example, might not want to disclose their Christian faith for fear of persecution (such as a former Muslim from Iran who converted to Christianity).

The ban, and its enforcement, bear several hallmarks of impermissible entanglement: the institutions at issue (places of worship) are inherently religious in character; the activity that the government will be monitoring (the assembly of people for worship services) is quintessential religious activity that has no separable, distinct secular component; religious services occur frequently each week, year round, so compliance could not be monitored once a year as is the case with some school aid programs; and government monitoring of religious services occurring in places of worship is highly politically divisive. *See Roemer v. Bd. of Public Works*, 426 U.S. 736, 762-66 (1976).

The First Amendment prohibits this kind of entanglement between the government and places of worship. *Cf. Lemon*, 403 U.S. at 620-21 ("[T]he very restrictions and surveillance necessary to ensure that teachers play a strictly non-ideological role give rise to entanglements between church and state."). Accordingly, the Order violates the Establishment Clause.

## C.     The Order Violates Plaintiffs' Privacy Rights

Plaintiffs have sufficiently plead an injury to a legally protected privacy interest with respect to the mandatory, non-consensual obtaining and sharing of personal information of worshippers. Enshrined in the state Constitution, the California tort of invasion of privacy has three elements: (1) a legally

1   protected privacy interest; (2) a reasonable expectation of privacy; and (3) the intrusion must be so

2   serious as to constitute an egregious breach of social norms. *Hill v. NCAA*, 7 Cal.4th 1 (1994). Plaintiffs

3   allege facts to support all three elements.

4        The right to privacy is the right to be free from unwarranted government intrusion into

5   fundamental matters affecting a person. (*Atkisson v. Kern County Housing Authority* (1976) 59

6   Cal.App.3d 89, 98, citing *Eisenstadt v. Baird* (1972) 405 U.S. 438, 453.) A legally cognizable interest

7   includes "conducting personal activities without observation." *Hernandez v. Hillsides, Inc.*, 47 Cal.4th

8   287 (2009) (internal quotation marks omitted). The pastor Plaintiffs have a legally protected privacy

9   interest in both not disclosing personal information about themselves, including their personal phone

10  number and home address, and not being forced to disclose information about those that attend their

11  services. Moreover, the Plaintiff churches have standing to assert the privacy rights of its members along

12  with their own privacy rights. *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel.*

13  *Patterson*, 357 U.S. 449, 459, 78 S. Ct. 1163, 1170, 2 L. Ed. 2d 1488 (1958) ("The petitioner's rank-

14  and-file members are constitutionally entitled to withhold their connection with the Association despite

15  the production order, it is manifest that this right is properly assertible by the Association. To require

16  that it be claimed by the members themselves would result in nullification of the right at the very moment

17  of its assertion.").

18       Not only is contact information private but matters of religion and church attendance are also

19  fundamentally private and personal. *NAACP*, 357 U.S. 449, 461-461 (1958).  Under the Order, Plaintiffs

20  must collect and disclose this information even if they or church attendees do not consent. (Doc. 1 ¶

21  147.) Plaintiffs allege that the "Orders mandate that Plaintiffs record 'names and contact information'

22  of all people that attend religious services and use that information to 'assist the County Public Health

23  Department in any case investigation and contact tracing' associated with the religious gatherings."

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1
2
3

(Doc. 1 ¶ 147.) Plaintiffs further allege they have a reasonable expectation of privacy, and the Order constitutes an egregious breach of social norms. (Doc. 1 ¶¶ 64, 81, 146-148.) Plaintiffs have, therefore, alleged facts establishing the elements of their privacy claim.

4
5
6
7
8
9
10
11
12

Defendants claim that Plaintiffs have not suffered an "injury in fact." (Doc. 17, p. 21:21-21.) However, Plaintiffs generally do not have to go to jail or pay fines to challenge unconstitutional laws. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007). *See also Doe v. Bolton*, 410 U.S. 179, 188-89 (1973) (noting that litigants "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief"). As early as 1923, the Supreme Court noted that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923).

13
14
15
16
17
18
19

In this case, failure of Plaintiffs to gather and disclose personal information of each and every church attendee constitutes a "threat and menace to public health, constitutes a public nuisance, and is punishable by fine, imprisonment, or both." (Doc. 1 ¶ 147.) The County's creation, defense, and endorsement of this Order expressly declares the penalty for failing to abide by the Order is punishable by a fine and imprisonment. The criminal penalty is expressly threatened and is "impending", entitling Plaintiffs to seek relief.

20

## D.    This Court has Jurisdiction Over Plaintiffs Claims

21
22
23
24
25
26
27
28

Plaintiffs have established a case or controversy giving the Court jurisdiction over this matter. Defendants first contend that there is no case or controversy because "Plaintiffs claims have been superseded by the State Health Officer's recent order" banning indoor church services in Santa Clara County. (Doc. 17, p. 11:17-18.) Their next contention is that this Court lacks jurisdiction because Plaintiffs fail to establish any case or controversy against the five County Supervisor Defendants. (Doc. 17, p. 12:4-5.) Both of those claims are factually and legally incorrect.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1. **The State's recent order regarding *indoor* services does not render this case moot.**

As an initial matter, the Plaintiffs' challenges to the privacy issues with contact tracing and the outdoor limitation of the County's Order remain unimpacted by the State's action. Therefore, at the very least, there remains a case or controversy regarding the constitutionality of the arbitrary 60-person capacity limit on houses of worship and requirement to collect personal information from worshippers on behalf of the government. Even as to the indoor ban, Plaintiffs have a valid and continuing Article III case and controversy. *Campbell–Ewald Co. v. Gomez*, 136 S.Ct. 663, 669, 193 L.Ed.2d 571 (2016).

"[T]he question is not whether the precise relief sought at the time the [the Complaint] was filed is still available. The question is whether there can be ***any*** effective relief." *West v. Secretary of Dept. of Transp.* (9th Cir. 2000) 206 F3d 920, 925 (emphasis added; internal quotes omitted).  First, the County's indoor gathering ban is completely separate from and operates independently of the State's recent regulations on indoor religious gatherings.  The County indoor gathering ban was put in place *before*, and remained in effect *after*, the State allowed churches to start meeting indoors on May 25, 2020. (Doc. 1 ¶¶ 40-43.) Second, the new State indoor gathering ban is presumably temporary.  It began on July 15, 2020 and will be lifted as soon as the County is not "on the State's monitoring List for three or more days," as Defendants themselves concede.  (Doc. 17, p. 11:17-18; RJN, Ex. F at p.4.)  Third, the State Order does not in any way supersede the County Order; it is merely a temporary parallel order. To "supersede" is to "obliterate, set aside, annul, replace, make void…repeal." *Supercede*, Black's Law Dictionary (6th ed., 1990).   In fact, the very opposite is true.  Here, the State has expressly delegated to counties like Santa Clara the leeway to implement stricter regulations than the State (Doc. 17, p. 5:1.), and that is precisely what the County did here when it adopted its indoor gathering ban.  Fourth, a case or controversy still exists because the Churches can still obtain some meaningful and effective relief

against the County Defendants, even if that relief is not complete. *See West v. Secretary of Dept. of Transp.* (9th Cir. 2000) 206 F3d 920, 925.  This is true because the recent State ban is temporary and, if Plaintiffs prevail here against the County, Plaintiffs would be able to meet indoors as soon as the provisional State ban is lifted. If the County ban is not invalidated, Plaintiffs will still be prohibited from indoor worship services even after the State ban is lifted. In summary, an actual controversy exists because the Santa Clara County's indoor ban challenged by Plaintiffs is still in place and has not been obliterated, set aside, annulled, replaced, made void, or repealed by the State.

Moreover, even if the Court were inclined to agree that the County indoor gathering ban is superseded by the State's temporary indoor ban, the issue is certainly "capable of repetition, yet evading review," and the litigation should "continue notwithstanding the named plaintiff's current lack of a personal stake." *See United States Parole Comm'n v. Geraghty* (1980) 445 US 388*; Richmond Newspapers, Inc. v. Virginia* (1980) 448 US 555, 563; *Davis v. Federal Election Comm'n* (2008) 554 US 724, 735.  Here, Plaintiffs can show that the challenged action (the County indoor ban without an overlapping State ban) was too short in duration to be fully litigated while in existence; and that there is a reasonable expectation that the Plaintiffs will be subject to the same action again in the future. *See Roe v. Wade* (1973) 410 US 113, 125; *United States v. Juvenile Male* (2011) 564 US 932, 938.

Finally, Plaintiffs assert monetary damages directly resulting from the County's ban on indoor worship services. (Doc. 1, p. 26:4-5.)  A case is not rendered moot even if injunctive relief is no longer a remedy available to a plaintiff. *Lokey v. Richardson*, 600 F.2d 1265, 1266 (9th Cir.1979) (per curiam) (holding that, although claim for injunctive relief was mooted, case was not moot because plaintiff prayed for damages and, regardless of actual damages, plaintiff could be entitled to nominal damages); *Bernhardt v. Cty. of Los Angeles*, 279 F.3d 862, 872 (9th Cir. 2002) ("A live claim for nominal damages

will prevent dismissal for mootness."). Therefore, this case is not moot based on the State's ban on indoor services.

### 2.    Plaintiffs have established a case or controversy as to the five County Supervisor Defendants.

Defendants also claim that this Court lacks jurisdiction because Plaintiffs fail to establish any case or controversy against the five County Supervisor Defendants. (Doc. 17, p. 12:4-5.) The basis of this claim is their unsupported statement that "the Supervisors do not in fact oversee, appoint, or supervise the County Public Health Officer, not [sic] do they have any control whatsoever over the exercise of her duties…."  (Doc. 17, p. 12:17-19.) However, the Board of Supervisors does in fact appoint and have the power to regulate and discharge a Public Health Officer and, as a result, oversees the Public Health Officer.

The state Constitution expressly vests in the board of supervisors the power to prescribe the "number, compensation, tenure, and appointment of employees." Cal. Const. art. XI, § 1. "The Board of Supervisors shall have power to: (a) Consolidate, segregate, transfer, abolish, or reassign the powers, duties, and functions of any appointed county office, commission, department, or division thereof, whenever the respective duties thereof are not inconsistent.  The Board shall have similar power as to elected county officers to the extent authorized by general law." *See* Santa Clara County Code of Ordinances Article II, Section 302.[5] The County Supervisors' connection to a plaintiff's injury may be sufficiently direct based on duties the law places on them related to the challenged law or enforcement thereof. *See, e.g., Los Angeles Cnty. Bar Ass'n v. Eu,* 979 F.2d 697, 704 (9th Cir.1992) (governor proper

---

[5] Available online at

https://library.municode.com/ca/santa_clara_county/codes/code_of_ordinances?nodeId=COCH_ARTII BOSU.

party in suit challenging statute limiting the number of judges the governor could appoint to any county due to his ability to appoint judges).

Here, the County Supervisors oversee all appointed county offices and elected county officer. Dr. Sara Cody is an appointed County Officer, and the County Supervisors ultimately oversee her. The County Supervisors also approve the Public Health officer that the County Executive appoints. Here, County Executive Jeffrey V. Smith, who himself is appointed by the County Supervisors, appointed Dr. Sara Cody as the County Health Officer, and the appointment was announced and ratified by the Santa Clara County Board of Supervisors. Therefore, Plaintiffs have established a case or controversy as to the five County Supervisor Defendants.

## CONCLUSION

Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss in its entirety. Plaintiffs have sufficiently plead causes of action under the United States and California Constitutions. Neither the State's temporary ban on indoor service, nor the pandemic itself excuse Santa Clara's discriminatory, unconstitutional conduct. Plaintiffs should have a full and fair opportunity to engage in discovery and seek full relief from the Court. Should any additional allegations be required to cure any pleading defects, Plaintiffs' should be granted leave to amend their Complaint.

Respectfully submitted,

TYLER & BURSCH, LLP

Dated:  August 3, 2020

/s/ Robert H. Tyler, Esq.
Robert H. Tyler
Attorney for Plaintiffs

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS