Robert H. Tyler, Esq. CA Bar No. 179572
rtyler@faith-freedom.com
Nathan W. Kellum, Esq. (Pro Hac Vice)
nkellum@faith-freedom.com
Nada N. Higuera, Esq. CA Bar No. 299819
nhiguera@faith-freedom.com
Mariah Gondeiro, Esq. CA Bar No. 323683
mgondeiro@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone:     (951) 600-2733
Facsimile:      (951) 600-4996

Scott J. Street, State Bar No. 258962
sstreet@jwhowardattorneys.com
JW HOWARD ATTORNEYS, LTD.
777 S. Figueroa Street, Suite 3800
Los Angeles, California 90017
Telephone:     (213) 205-2800

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| **CALVARY CHAPEL SAN JOSE**, a California Non-Profit Corporation; **PASTOR MIKE MCCLURE**, an individual; **SOUTHRIDGE BAPTIST CHURCH OF SAN JOSE CALIFORNIA dba SOUTHRIDGE CHURCH**, a California Non-Profit Corporation; **PASTOR MICAIAH IRMLER**, an individual;<br><br>    Plaintiffs,<br><br>  vs.<br><br>**SANTA CLARA COUNTY**; **SARA H. CODY, M.D.**, in her official capacity as Santa Clara County Public Health Officer; **JAMES WILLIAMS**; in his official capacity as director of the Santa Clara County Emergency Operations Center; **MIKE WASSERMAN**, in his official capacity as a Santa Clara County Supervisor; **CINDY CHAVEZ**, in her official capacity as a Santa Clara County Supervisor; **DAVE CORTESE**, in his official capacity as a Santa Clara County Supervisor; **SUSAN ELLENBERG**, in her official capacity as a Santa Clara County | Case No.:  20-cv-03794<br><br>**FOURTH AMENDED COMPLAINT FOR:**<br><br>**1) DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 (FIRST AMENDMENT);**<br><br>**2) DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 (FOURTEENTH AMENDMENT);**<br><br>**3) DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 (EIGHTH AMENDMENT);**<br><br>**4) DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 (*MONELL*); AND**<br><br>**5) VIOLATION OF BANE ACT.** |

Supervisor; and **JOE SIMITIAN**, in his official capacity as a Santa Clara County Supervisor;

Defendants.

## INTRODUCTION

1.      Early in 2020, California public health officials became aware that a novel respiratory virus – dubbed COVID-19 – was spreading in the state and could trigger a pandemic. Despite those concerns, state officials repeatedly told Californians that the risk to the general public was low. They encouraged Californians not to panic and to use common sense measures to combat the virus.

2.      But, during March 2020, a group of local government officials in the Bay Area decided to disregard that advice and take matters into their own hands. This group was led by Defendant Sara Cody ("Dr. Cody"), Santa Clara County's public health officer, and Defendant James Williams, director of the Emergency Operations Center. Dr. Cody and Mr. Williams decided that COVID-19 would soon plague the country and cause millions of deaths, so they decided to issue a shelter-in-place order, effectively ordering all Santa Clara County residents under house arrest unless they left to do something the County had deemed "essential." Dr. Cody and Mr. Williams convinced every other county in the Bay Area to issue similar orders, garnering international media attention.

3.      The stay-at-home orders were unprecedented. The orders did not rely on any specific statutory authority but on vague language in the California Health and Safety Code that gives local health officers the power to issue "necessary" orders during a state of emergency.

4.      The Bay Area's COVID-19 orders prompted other counties and the State of California ("the State") to issue their own stay-at-home order. Soon other states and countries followed, and by May 2020, most of the global population was living under government rules that dictated who they could see, what they could do, and how they must do it. Although the lockdowns were a global phenomenon, they started in the Bay Area—and specifically, in the minds of Dr. Cody and Mr. Williams.

5.      Many governments chose not to enforce the orders strictly, leaving their edicts as guidelines that people could choose to follow or ignore. This was not so with Santa Clara County ("the County"). Dr. Cody and Mr. Williams vigorously enforced its stay-at-home order and subsequent

COVID-19 orders, despite a plethora of scientific literature and studies connecting the lockdowns with an unprecedented mental health crisis. Churches were among those most heavily punished by Dr. Cody's and Mr. Williams' actions.

6.      Under Dr. Cody's and Mr. Williams' express direction, the County consistently imposed even harsher restrictions on churches and adopted a fine system that authorized crippling fines on churches and other organizations that did not comply with their COVID-19 orders. At Dr. Cody's and Mr. Williams' express direction, the County singled out churches like Plaintiffs for punishment, doling out millions of dollars in "public health" fines, which were unprecedented and unrelated to any actual health risks. Then, during December 2020 and January 2021, at Mr. Williams' express direction, the County sent threatening letters to Plaintiff Calvary Chapel San Jose's ("CCSJ") bank, causing the bank to temporarily sever ties with CCSJ and forcing CCSJ to make several accelerated payments to avoid a default on its mortgage.

7.      Throughout this time, the United States Supreme Court admonished State and County officials that their restrictions placed upon churches violate the First Amendment. In February 2021, after losing in the Supreme Court, the State relented and finally began to treat churches in the same manner as similarly situated secular activities. The County, on the other hand, made no change to its orders. Rather, at Mr. Williams' direction, the County ignored the Supreme Court's rulings and continued singling out churches and church officials – like Plaintiffs – for punishment. The Supreme Court had to step in to enjoin the County's ban on indoor gatherings.

8.      Over a year into the pandemic, neither the State nor the County have explained why they treated houses of worship with disregard. County officials, led by Mr. Williams, are still trying to collect millions of dollars in fines they imposed on Plaintiffs. These fines are, on their face, grossly disproportional to the alleged harm Plaintiffs created. Indeed, Plaintiffs did no harm. The Defendants cannot trace a single COVID-19 case to Plaintiffs' services. The fines serve just one purpose: to punish Plaintiffs for standing up to the State and County's arbitrary and unlawful orders and to pressure others to pay their own fines instead of challenging the orders. The Constitution forbids such actions.

9.      The Plaintiffs ask this Court to find that the State and County COVID-19 orders violate their freedom of religion and assembly under the First Amendment and California civil rights law.

Plaintiffs contend the fines levied against them are unlawful because they are predicated upon unconstitutional State and County COVID-19 orders. The fines also violate the Eighth Amendment's prohibition on excessive fines. Finally, Plaintiffs seek damages, pursuant to the Bane Act, for the Defendants' violation of their civil rights.

**PARTIES, JURISDICTION AND VENUE**

10.    Plaintiff CALVARY CHAPEL SAN JOSE ("CCSJ"), a California non-profit corporation, is a Christian church organized exclusively for religious purposes. CCSJ is located in the city of San Jose, California. Calvary Christian Academy is a ministry branch of CCSJ that is operated separately from CCSJ.

11.    Plaintiff MIKE MCCLURE is a resident of Santa Clara County and serves as the lead pastor of CCSJ.

12.    Plaintiff SOUTHRIDGE CHURCH ("Southridge") is a domestic non-profit corporation Christian church organized exclusively for religious purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.  Southridge Church is located in the City of San Jose, California.

13.    Plaintiff MICAIAH IRMLER is a resident of Santa Clara County and serves as the lead pastor of Southridge.

14.    Defendant SARA H. CODY, M.D. is the Public Health Officer for Santa Clara County, California, and the final policymaker for the Santa Clara County Public Health Department. She is sued in her official capacity only. She promulgated Santa Clara County's health orders and guidelines.

15.    Defendants MIKE WASSERMAN, CINDY CHAVEZ, DAVE CORTESE, SUSAN ELLENBERG, and JO SIMITIAN are each sued in their official capacities as members of the Santa Clara County Board of Supervisors. The County Board of Supervisors are responsible for adopting the challenged Urgency Ordinance authorizing Santa Clara County to issue fines against the Plaintiffs.

16.    Defendant JAMES WILLIAMS is sued in his official capacity as the director of the Santa Clara County Emergency Operations Center. In that role, he shaped the regional, statewide and county response to the COVID-19 pandemic. Williams was charged with monitoring waves of COVID-19 cases and hospital capacity and coordinating with the Santa Clara County Public Health Department to effectively respond to the COVID-19 pandemic. As a final policymaker for the Emergency

Operations Center, he helped Dr. Cody promulgate the COVID-19 health orders and guidelines related to capacity restrictions, face masks and singing.

17.     Dr. Cody, Mr. Williams and the Santa Clara County Board of Supervisors are hereinafter collectively referred to as the "County Officials."

18.     Defendant SANTA CLARA COUNTY is a political subdivision of the State. It is sued herein based on the actions of the County Officials as final policymakers under *Monell v. Department of Social Services*.

19.     Plaintiffs' claims arise under the United States Constitution and 42 U.S.C. § 1983. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

20.     This Court has authority to grant the requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, implemented through Rule 57 of the Federal Rules of Civil Procedure. This Court is also authorized to grant injunctive relief and damages under 28 U.S.C. § 1343, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and award reasonable attorney's fees and costs under 42 U.S.C. § 1988.

21.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because all Defendants are situated in this judicial district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

## FACTUAL BACKGROUND

22.     In December 2019, the World Health Organization ("WHO") reported that a novel coronavirus had been detected in Wuhan, China. The WHO dubbed the virus COVID-19.

23.     On January 26, 2020, California public health officials announced the first COVID-19 positive test in California.

24.     Between January 26, 2020, and March 4, 2020, California state health officials said repeatedly that "the risk to the general public" from the coronavirus was "low."

25.     On February 26, 2020, the California Department of Public Health ("CDPH") released a statement that downplayed the risk of COVID-19 in the general population, stating that "[w]hile COVID-19 has a high transmission rate, it has a low mortality rate." The CDPH also noted that "of

those who have tested positive for COVID-19, approximately 80 percent do not exhibit symptoms that would require hospitalization."

26.     On March 3, 2020, the CDPH issued its first detailed guidelines for fighting COVID-19. Among other things, it said that healthy people should not wear masks because they were not effective. Sonia Angell, the State Public Health Officer at the time, also announced that the State had ramped up testing for the coronavirus, but she warned against reading anything into the expected increase in confirmed cases, saying they were "not necessarily a sign that the rate of infection is increasing, but that our ability to test more people more rapidly is leading to better detection."

27.     On March 4, 2020, Governor Gavin Newsom declared a state of emergency related to COVID-19. A true and correct copy of the Governor's emergency declaration is attached hereto as **Exhibit "1."**

28.     On March 11, 2020, the Governor announced that public health officials had decided to recommend canceling or postponing mass gatherings with 250 people or more until at least the end of March. State health officials also issued their first guidelines for "social distancing" and suggested other measures people could voluntarily undertake to slow the spread of the coronavirus.

29.     The Governor issued an executive order on March 12, 2020, that reflected the new guidelines ("the March 12 Executive Order"). Among other things, the order noted the "need to secure numerous facilities to accommodate quarantine, isolation, or medical treatment of individuals testing positive for or exposed to COVID-19…." Thus, the order cited the Governor's authority under the California Emergency Services Act "to ensure adequate facilities exist to address the impacts of COVID-19 …." A true and correct copy of the March 12 Executive Order is attached hereto as **Exhibit "2."**

30.     In issuing the March 12 Executive Order, the Governor said: "Changing our actions for a short period of time will save the life of one or more people you know."

31.     The March 12 Executive Order was not a criminal law. It did not require any businesses or schools to close. It did not tell people what they could and could not do, what was essential or non-essential. It was narrowly tailored to protect individual rights while promoting the State's interest in ensuring that it had enough hospital beds to treat COVID-19 patients.

32.     A few days later, a group of government officials in the Bay Area—covering almost every Bay Area County – took a further step and ordered all their residents to "shelter in place" indefinitely. This group was spurred into action by Defendants Cody and Williams. A true and correct copy of the County's Shelter in Place Order is attached hereto as **Exhibit "3."**  James Williams, as the final policymaker for the Emergency Operations Center, and Dr. Cody, as the final policymaker for the Santa Clara County Public Health Department, made the joint decision to cancel all indoor gatherings. Williams told the OC Register that the County did not consider an airport as a large gathering place.

33.     On March 19, 2020, Governor Newsom ordered all Californians to stay inside their homes indefinitely, only allowing them to leave to perform activities that were necessary to maintain the "federal critical infrastructure." A true and correct copy of the Governor's "Stay at Home Order" is attached hereto as **Exhibit "4."**

34.     The Governor said during a televised speech that he issued this order because state officials had changed their assessment of the coronavirus and believed 56 percent of Californians – nearly 25 million people – would be infected with the virus between mid-March and mid-May 2020. The Governor also said during his March 19th speech that state officials believed between 250,000 and 500,000 people would die from the virus by June 2020.

35.     Upon information and belief, the ominous numbers the Governor cited in his "stay at home" speech came from Bay Area officials, including Defendants Cody and Williams. In fact, Mr. Williams publicly took credit for the issuance of the statewide stay-at-home-order.

36.     The lockdown orders were unprecedented. They dictated what people could do, designating certain activities as "essential" such as pet stores, marijuana stores and liquor stores, and allowed those to continue operating, while others were deemed "non-essential" and ordered to shut down. No American government had ever issued such an order in peacetime, not even during the 1918-19 influenza pandemic that some have compared COVID-19 to.

37.     There was no rhyme or reason to the distinctions the orders made between essential and non-essential activities. For example, pet supply stores were deemed essential because, according to government officials, pets provide comfort to people dealing with mental health issues. Churches have a long record of providing similar comfort to people in need, but they were deemed non-essential and

subjected to some of the strictest rules imaginable, even on holy days. The orders also made arbitrary distinctions between the numbers of people who could participate in certain activities. At one point, one Bay Area health official, communicating on a "Slack" message with others from the region, asked: "Do the numbers 100 and 35 have any basis in anything?" The San Benito County health officer responded: "No basis as I can see. The numbers are random."

38.     Equally unprecedented, the lockdown orders contained criminal penalties, including fines, to ensure enforcement. Most California governments took a lax approach to that. Even the Governor discouraged enforcement. He asked Californians to voluntarily comply with the orders, saying, "This is not a permanent state; this is a moment in time." The Governor added: "This is a dynamic situation. I don't expect this to be many, many months, but for the time being, we are recognizing the next eight weeks [as the key period]."

39.     Fortunately, the predicted facts did not occur. 25 million Californians did not become infected with the coronavirus between March and June 2020. Hospitals were not overrun with millions of COVID-19 patients. Hundreds of thousands of Californians did not die.

40.     By May 2020, State and County officials were also aware of antibody studies, including studies conducted in Santa Clara County, revealing the coronavirus was spreading at a faster rate and less deadly than they had predicted. The studies also revealed many Californians already had antibodies to the virus, further undermining the justification for stay-at-home orders.

41.     Indeed, the Centers for Disease Control and Prevention ("CDC") predicted that the confirmed case fatality rate for COVID-19 would fall to between 0.26 percent and 0.65 percent, far lower than the two to four percent fatality rate some believed back in March 2020. The CDC also reports that 94 percent of people who have died with COVID-19 had at least one co-morbidity, such as diabetes, cancer, obesity or heart disease.

42.     By May 2020, Governor Newsom knew that California was flattening the curve and protecting its health care system from being overwhelmed. Nonetheless, on May 4, 2020, he announced that he would continue the State's Stay at Home Order indefinitely, without considering whether there were less restrictive ways of controlling COVID-19. Santa Clara County followed suit. A true and

correct copy of the Governor's May 4 executive order extending the Stay-at-Home Order is attached hereto as **Exhibit "5."**

43.    In his May 4 executive order, the Governor gave the State Public Health Officer (at the time Dr. Angell and now Dr. Aragon) discretion to add exceptions to the activities permitted under the order based on individual counties' success in testing, controlling the virus, and having adequate resources to treat COVID-19 patients. However, this first reopening plan continued to discriminate against religious activities. Despite the constitutional protection for religious activities, the State's first reopening plan treated churches less favorably than similarly situated secular activities like dine-in restaurants, offices, schools, malls and retail stores. There was no basis for this discrimination. The State did not have any evidence that the coronavirus was spreading at a greater rate inside churches as compared to these indoor settings.

44.    During the early stages of the pandemic (from March to May 2020), many courts opted to stay out of COVID-19-related disputes, likely believing the government would lift the lockdown orders quickly, as Governor Newsom promised to do. Four justices on the United States Supreme Court warned against this, writing on May 29, 2020, that "California's discrimination against religious worship services contravenes the Constitution." The orders were not lifted, though, and the government continued to discriminate against religious activities.

45.    State and County officials said that churches were dangerous because people gathered close together for extended periods of time and sang together, thus increasing the risk of COVID-19 infection. That was pure speculation, though, unsupported by evidence and based on stereotypes of people who attend churches like CCSJ. More importantly, by June 2020, government officials knew where COVID-19 was spreading. It was spreading in areas that had never been shut down, like transportation and construction, things the government had decided were too important to shut down.

46.    The government's purported justification for shuttering churches took a further hit during the summer of 2020 as public officials allowed—and explicitly encouraged—people to engage in mass protests in response to the death of George Floyd. The government defended its actions as promoting "free speech," all the while trampling upon the right to religious free exercise protected by the very same First Amendment.

47.     Throughout the month of June 2020, Governor Newsom actively encouraged protestors by tweeting posts like "protestors have the right to protest peacefully."

48.     On or around July 2, 2020, when asked to explain the extent to which protestors should heed the COVID-19 orders, Governor Newsom explained "we have a Constitution, we have a right to free speech", and "we are dealing with a moment in our nation's history that is profound and pronounced…Do what you think is best…"

49.     On or around June 26, 2020, at a news conference, former State Health Officer Dr. Angell admitted that people who attend large protests have been affected by COVID-19: "We do not have the exact numbers, but we do know from speaking to our counties that it is a contributor."

50.     On or around this same time, COVID-19 cases surged across California, including in Santa Clara County.

51.     Dr. Cody was also aware that protests were likely contributing to the spread of COVID-19. Nevertheless, the County acknowledged that protestors had a fundamental right that was critical to the health of democracy. A true and correct copy of a Facebook post by the County is attached hereto as **Exhibit "6."** The County did not acknowledge the fundamental right to attend worship services.

52.     Many of the protestors walking the streets in the summer of 2020 were not wearing masks or practicing social distancing. The Defendants knew that although the protestors' activities posed a significant risk of COVID-19 transmission, their activity was protected speech. Thus, they did not punish them for violating COVID-19 orders. Needless to say, State and County officials did not show that same deference to churches and religious adherents.

53.     By June 1, 2020, the County and State officials knew, or should have known, that their lockdown of churches violated the First Amendment. In fact, on May 19, 2020, the U.S. Department of Justice sent Governor Newsom a letter that said exactly that. A true and correct copy of this letter is attached hereto as **Exhibit "7."** Similarly, on May 22, 2020, President Trump announced that the CDC would classify houses of worship as "essential," and he called on all governors to allow houses of worship to immediately reopen.

54.     On May 25, 2020, Governor Newsom announced the reopening of churches in California. This announcement was somewhat true, as churches were limited to 25% building capacity

or 100 attendees, whichever is lower. Other secular locations where people gather like schools, airports, train stations and bus stations, however, did not have building occupancy limits.

55.     The County Officials did not even try to heed the federal government's warning. Led by Dr. Cody and Williams, the County continued to ban indoor religious services after May 25, 2020. The County consistently imposed harsher restrictions on churches than similarly situated secular activities without any scientific basis or compelling justification for the disparate treatment.

56.     On or around the end of May 2020, Dr. Cody was concerned about the State's partial compliance with the federal government's warning and stated: "Gatherings are of course profoundly and personally important to all of us, but our ability to contain the virus from spreading if there's one COVID-positive individual at such a large event is quite limited….And it would rapidly exceed even our current ambitious and unprecedented effort to establish a large case investigation and contact tracing workforce here and elsewhere throughout the state." Despite her concern of large gatherings, as of June 5, 2021, the County allowed certain businesses where people can gather, such as retail, shopping centers, television, radio and other media services, grocery stores, airports, summer camps and summer schools, to re-open.

57.     The County also required the hosts of "Small Outdoor Ceremonies and Religious Gatherings" to "maintain a list with the names and contact information of all participants." Yet, no such requirement was asked of shopping centers, summer camps or summer schools.

58.     On July 2, 2020, Dr. Cody issued a Risk Reduction Order, requiring risk reduction measures to be in place across all business sectors and activities. A true and correct copy of the Risk Reduction Order is attached hereto as **Exhibit "8."** The Order prohibited indoor gatherings, unless the gathering involved no more than 20 people or 1 person per 200 square feet, whichever is fewer. It also prohibited outdoor gatherings unless the gathering involved no more than 60 people. Santa Clara County describes a gathering as an "event, assembly, meeting, or convening that brings people from separate households in a single space, indoors or outdoors, at the same time and in a coordinated fashion." A "gathering," by the County's definition, does not include normal operations in childcare settings, school settings, areas where people may transit, hospitals, offices, stores and restaurants.

59.     Dr. Cody issued the Risk Reduction Order despite no evidence (i.e., contract tracing studies) showing that entities, locations or events falling within her definition of a "gathering" were or are more likely to cause the spread of COVID-19 than gathering at malls, restaurants, public transit areas, stores, day camps and childcare facilities. Indeed, the County has traced more COVID-19 cases to retail stores, grocery stores, offices and restaurants than churches.

60.     On or around July 6, 2020, Plaintiffs became subject to State guidance ordering them to not engage in singing or chanting at indoor religious services.

61.     On August 3, 2020, the CDPH issued guidance for schools, a true and correct copy of which is attached hereto as **Exhibit "9."** The guidance cautioned that "activities that involve singing must only take place outdoors." The CDPH softened this language in January 2021 to permit band practice "provided that precautions such as physical distancing and mask wearing are implemented to the maximum extent possible."

62.     The CDPH did not ban singing and chanting in day camps or childcare centers.

63.     On August 28, 2020, the CDPH issued the Blueprint for a Safer Economy ("Blueprint") that established a procedure for assigning counties to one of four tiers based on the severity of the COVID-19 outbreak in each locality. A true and correct copy of the Blueprint Activity and Business Tiers is attached hereto as **Exhibit "10."** The Blueprint discriminated against houses of worship.

64.     On October 5, 2020, Dr. Cody issued a Revised Risk Reduction Order, a copy of which is attached hereto as **Exhibit "11."** The Revised Order allowed more businesses and activities to resume operations provided they followed precautions like wearing masks and social distancing but still banned indoor gatherings. The Order also expressly exempted government entities and their contractors "to the extent that such requirements would impede or interfere with an essential governmental function." On information and belief, such activities included construction, first responders, court personnel and law enforcement.

65.     On or around October 13, 2020, Dr. Cody issued a Revised Mandatory Gatherings Directive which was more restrictive than the State's Blueprint. The Directive only allowed religious gatherings of up to 25% the facility's capacity or 100 people, whichever was fewer, in Tier 3 of the Blueprint.

66.     On November 16, 2020, the CDPH issued an updated Guidance for the Use of Face Coverings ("Face Covering Guidance"). A true and correct copy of the Face Covering Guidance is attached hereto as **Exhibit "12."**

67.     The Face Covering Guidance required everyone to wear a mask and maintain 6 feet of distance from one another, with exceptions made for dining in restaurants.

68.     The following categories of persons were exempted from the Guidance: persons younger than two years old; persons with a medical condition or disability; persons who are hearing impaired; and persons for whom wearing a face covering would create a risk to the person related to their work, such as persons competing in sports.

69.     Television, film and recording studios (i.e., Hollywood) have been encouraged - but not required - to follow COVID-19 face-covering and singing guidelines and restrictions.

70.     Other industries also did not have to fully adhere to the Face Covering Guidance at all times. For instance, barbershops and hair salons could remain within six feet of distance when "providing haircutting and other close contact services." At true and correct copy of the Guidance for Barbershops and Hair Salons is attached hereto as **Exhibit "13."**

71.     Public transit carriers were recommended to "reduce maximum occupancy onboard transit and rail services," and the State advised that "seats within six feet of the operator should be blocked off and unavailable if it does not impact the requirements for handicapped-accessible seating." A true and correct copy of the Guidance for Public Transit/Passenger Carrier Services is attached hereto as **Exhibit "14."** Similarly, passenger carrier services were advised, but not required, to encourage riders to sit in the back seat to maximize distance between the passenger and the driver.

72.     Further, persons were not required to wear a mask while receiving a facial or esthetic care, and workers performing esthetic and/or skin care could be within six feet of distance of their client. A true and correct copy of the Guidance for Personal Care Services is attached hereto as **Exhibit "15."**

73.     On or around November 16, 2020, the State announced that it was assigning Santa Clara County to Tier 1 of the Blueprint. Around the same time, Dr. Cody issued a Mandatory Directive on Capacity Limitations. The Directive completely banned indoor worship services but allowed shopping

centers, retail stores, grocery stores, public transit and construction sites to remain open at limited capacity.

74.     On November 24, 2021, the State also issued guidance for restaurants, which incorporated the Face Covering Guidance. A true and correct copy of the Guidance for Restaurants/Wineries is attached hereto as **Exhibit "16."** At this time, the State allowed "singing, shouting, playing a wind instrument, or engaging in similar activities" in restaurants and wineries.

75.     On November 25, 2020, the Supreme Court ruled that New York's COVID-19 restrictions on churches violated the First Amendment. It issued a similar ruling against Governor Newsom's orders on December 3, 2020.

76.     Nonetheless, the State and the County Officials repeatedly defied the Supreme Court's edicts.

77.     On December 3, 2020, the CDPH announced a Regional Stay at Home Order ("Regional Order") which banned all indoor religious worship services while allowing only essential businesses to remain open. A true and correct copy of the Regional Order is attached hereto as **Exhibit "17."**

78.     On February 5, 2021, the U.S. Supreme Court intervened once again and enjoined California's ban on indoor worship services.

79.     On February 12, 2021, in flagrant disregard of the Supreme Court's rulings, the County, at Mr. Williams' express direction, reinstated the County's ban on indoor worship services. On information and belief, the decision to reinstate this ban was made by Mr. Williams acting not as a lawyer but as a public health policymaker in tandem with Dr. Cody. Indeed, it was Mr. Williams who, acting like a policymaker, publicly justified the ban in the press by saying the County's COVID-19 orders were "even-handed" and therefore "fundamentally different from the State rules...." The Supreme Court disagreed and, on February 26, 2021, enjoined enforcement of the ban.[1] Even after the Supreme Court's ruling, the County did not stop interfering with Plaintiffs' First Amendment rights.

---

[1] All COVID-19 orders, guidelines and directives issued by the County during the pendency of this lawsuit are hereinafter referred to as "County Orders." The County Orders also encompass the Urgency Ordinance adopted by the Santa Clara County Board of Supervisors which authorized the fines. Thus, a challenge to the ordinance is a challenge to the fines. All COVID-19 orders, directives and guidelines issued by the State during the pendency of this lawsuit are hereinafter referred to as "State Orders."

Mr. Williams, acting as a policy maker, not a lawyer, publicly announced that "[i]ndoor gatherings of all kinds remain very risky, and we continue to urge all religious institutions to carefully follow the public health recommendations to avoid spread of COVID-19 among their congregations and the broader community…."

80.     The Defendants are still trying to collect more than $2.8 million in fines they have imposed on Plaintiffs for violating restrictions on indoor gathering, the face-covering mandate and the singing ban and for failing to sign the County's Social Distancing Protocol. The fines for holding unlawful gatherings combined violations of the capacity restrictions, face-covering mandate and singing ban. The fines were not issued until August 2020, when the Defendants knew that COVID-19 was not spreading *en masse* in churches and that indoor worshipping was not a menace to public health. The fines were authorized by an ordinance adopted by the County Supervisors on August 11, 2020, a true and correct copy of which is attached hereto as **Exhibit "18."**

81.     These fines are, on their face, grossly disproportional to the harm allegedly done by Plaintiffs' refusal to obey the unlawful orders, as no COVID-19 case has been traced to Plaintiffs' church gatherings. County officials, led by Mr. Williams, have taken extreme measures to collect the fines and to deter CCSJ and Pastor McClure from continuing to fight the orders in court. For example, in December 2020, Assistant County Counsel Tony Lopresti, as ratified by Mr. Williams, sent a letter to CCSJ's lender, Cass Commercial Bank ("Cass Bank"), telling it that CCSJ had been held in contempt and fined over $1 million for violating COVID-19 orders. A true and correct copy of the letter is attached hereto as **Exhibit "19."** On January 4, 2021, Mr. Lopresti, as ratified by Mr. Williams, sent another, similar letter to Cass Bank. A true and correct copy of that letter is attached hereto as **Exhibit "20."**

82.     There was no legitimate reason for Mr. Williams to send these letters. Upon information and belief, the County has not sent such letters to any other person or entity who has defied its COVID orders. Mr. Williams sent the letters to retaliate against Plaintiffs for pushing back against the unlawful mandates, and to deter them from pursuing further litigation. At this point, Pastor McClure and CCSJ were defending themselves in contempt proceedings a second time. Mr. Williams was aware that their letters would put pressure on Cass Bank to drop CCSJ and, in turn, force CCSJ and McClure to pay the

fines, comply with the State and County Orders and drop their legal challenges to not have their church building foreclosed on.

83.     Cass Bank interpreted the letters as a threat that the County intended to take the church property to satisfy the fines. On January 21, 2021, Cass Bank sent a Notice of Default to CCSJ for noncompliance with governmental regulations and nonpayment of fines. Cass Bank only withdrew the default notice after it learned that CCSJ was contesting the fines (information Mr. Williams had intentionally omitted from the County's letters).

84.     Nevertheless, as a result of the County's actions, CCSJ had to make several accelerated payments, exceeding $800,000. These payments exceeded CCSJ's routine monthly loan payment and caused CCSJ to divert money that would have otherwise been invested into the church community and ministries.

85.     The County's actions also caused Pastor McClure great despair, anxiety and stress because he thought the bank was going to call the church's mortgage note and foreclose on the property. Pastor McClure was especially worried about what would become of his church family, who were already suffering from fear, depression and anxiety to a degree far beyond anything he had witnessed in his thirty years of pastoring.

86.     The Defendants' actions have had a chilling effect on Plaintiffs. CCSJ and Southridge serve hundreds of County residents. Plaintiffs have sincerely and deeply held religious beliefs that it is essential for Christians to assemble and regularly gather in person for the teaching of God's Word, prayer, worship, baptism, communion and fellowship. This is based on scriptures from the Bible, including Hebrews 2:12 and 10:25, Ephesians 5:19, Acts 2:40-47 and Acts 5:40-42. These activities are primarily fulfilled in the gathering of the Church body for worship services at the same location on Sunday mornings. The Plaintiffs also believe that the church is to approach God with unveiled faces, beholding the glory of the Lord, and being transformed into the same image from one degree of glory to another. 2 Corinthians 3:18.

87.     The State and County Orders have interfered with the Plaintiffs' religious practice. It is difficult for many congregants who are elderly or who have health problems to sing or sit for long periods while wearing a face mask. One-on-one prayer is another crucial component of the Plaintiffs'

religious practice. Social distancing rules hinder congregants' ability to pray for one another, lay hands on one another and partake of holy communion.

88.     Several congregants have also expressed to Pastor McClure they felt intimidated by the County enforcement officers' persistent surveillance of church services. Some congregants even believed the County was going to order the police to arrest them for attending church. They wore an extra set of clothes, so they were prepared in the event they were arrested.

89.     Plaintiffs' congregations are multi-racial and represent a cross-section of society and essential workers. Some of Plaintiffs' congregants do not have the technological ability or equipment necessary to watch church services online. Many in CCSJ's congregation are transplants from other states and countries who came to San Jose for economic opportunities, leaving behind family and friends. The COVID-19 orders interfered with church services at a time when County residents desperately needed a church community with the United States suffering the highest unemployment rate since the Great Depression and mental health problems soaring, including suicide rates in Santa Clara County. Indeed, the State and the County Officials often recognized these problems and they allowed certain secular activities, like pet groomers and marijuana shops, to continue operating because they opined those activities would help people cope with mental health issues. The State and the County Officials did not regard churches as highly.

90.     Presently, CCSJ holds two services each Sunday at 1175 Hillsdale Avenue, San Jose, California. Around 500 congregants attend each service. CCSJ provides seating in the congregation, in the gym next to the congregation, in the lobby, and in the cafe. CCSJ's building is 18,000 square feet and the sanctuary capacity is around 1,800 people. CCSJ has 10-20% of outside fresh air circulating into the building when the ventilation systems are operating. CCSJ has posted signs at all entrances encouraging the congregation to socially distance and wear masks. CCSJ also provides hand sanitizer and masks at the main church entrances. In other words, CCSJ followed the same generally applicable "social distancing" guidelines that entertainment studios have been following since March 2020.

91.     Similarly, Southridge began holding Sunday services at CCSJ in July 2020. Around 100 congregants attended Sunday services. Masks and hand sanitizer are also provided to Southridge's

congregants. Like CCSJ, Southridge has followed the same generally applicable "social distancing" guidelines that others in California have been following since March 2020.

92.     The County Officials have not been able to trace any outbreaks of COVID-19 to CCSJ or Southridge. The County Officials have known that churches are not sources of COVID-19 outbreaks since at least the Fall of 2020. Nevertheless, they have continued to punish and attack churches for disobeying their orders, while doing nothing to penalize the industries identified by the County as hotbeds of COVID-19 infection such as construction, retail and grocery stores and restaurants.

93.     The County has also misrepresented its data regarding the spread of COVID-19. The County recently reduced its reported COVID-19 death toll by more than 20 percent because it had previously included in its count people who actually died of other causes but were reported to have COVID-19 in their system at the time of death. Of course, the County Officials knew these numbers were inflated as early as last year because this practice was widely reported, the counts nationally revised and the error reported by the CDC, but the County Officials continued reporting the inflated numbers. They did so presumably to scare people and to justify the arbitrary and unlawful orders they imposed, especially on churches.

94.     America is recovering from the COVID-19 pandemic. But the recovery will not be complete until government officials have been held accountable for their flagrant violations of the Constitution. As the Reverend Martin Luther King, Jr., said: "One has a moral responsibility to disobey unjust laws." This case echoes that message.

**FIRST CAUSE OF ACTION**

**Deprivation of Civil Rights Under 42 U.S.C. § 1983 (First Amendment)**

95.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 94 of this Complaint as though set forth fully herein.

96.     This cause of action is brought pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United State Constitution.

97.     The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiffs' right to the free exercise of religion.

98.     Plaintiffs have sincerely held religious beliefs that the Bible is the infallible, inerrant word of God, and that they are to follow its teachings. They believe that followers of Jesus Christ are not to forsake the assembling of themselves together.

99.     The State and County Orders, on their face and as applied, are neither neutral nor generally applicable, but rather specifically and discriminatorily target the religious beliefs, speech, assembly and viewpoint of Plaintiffs. *See Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990). The Defendants have prohibited certain public and private gatherings including religious services, while exempting and/or treating a laundry list of industries and activities more favorably.

100.     In the alternative, the State and County Orders, on their face and as applied, impose a substantial burden on Plaintiffs' free exercise of religion. *See Sherbert v. Verner*, 374 U.S. 398 (1963). The Orders put substantial pressure on Plaintiffs to violate their sincerely held religious beliefs by ignoring the fundamental teachings and tenets of their religious texts including those tenets requiring assembly, worship with unveiled faces, one-on-one prayer, singing and communion.

101.     In addition to relegating Plaintiffs to a third-class status, the Defendants have threatened criminal penalties for holding in-person church services. The Defendants have in fact levied bankruptcy-inducing fines on Plaintiffs for holding church gatherings and have thus substantially burdened Plaintiffs' religious exercise.

102.     The Defendants did not have a compelling interest that justified their discrimination against and/or imposition of substantial burden upon religious activities. Even if they did, the Defendants did not employ the least restrictive means available to fulfill the interest.

103.     In engaging in the actions alleged above, the County Officials acted under color of law and within the course and scope of their employment at the County.

104.     Plaintiffs seek a judicial declaration that the State and County Orders violated the Free Exercise Clause and nominal damages. Such a determination will resolve the constitutionality of the fines levied against the Plaintiffs, which are predicated upon the State and County Orders. Plaintiffs also seek to enjoin enforcement of the fines. Plaintiffs are entitled to recover their costs and attorneys' fees under 42 U.S.C. § 1988.

1

**SECOND CAUSE OF ACTION**

2

**Deprivation of Civil Rights under Article 1, Section 4 of the California Constitution**

3      105.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs 1 through

4    104 as if fully set forth herein.

5      106.    Article I, Section 4 of the California Constitution states, "Free exercise and enjoyment

6    of religion without discrimination or preference are guaranteed."

7      107.    "[T]he religion clauses of the California Constitution are read more broadly than their

8    counterparts in the federal Constitution." *Carpenter v. City and County of San Francisco*, 93 F.3d 627,

9    629 (1996).

10      108.    For the reasons stated in Plaintiffs' First Cause of Action, the State and County Orders

11    constitute a substantial burden on Plaintiffs' free exercise of religion under the California Constitution

12    because they have prohibited indoor gatherings, singing, communion and one-on-one prayer and have

13    criminalized Plaintiffs for exercising their religion. This burdening cannot satisfy strict scrutiny because

14    California permits other industries and activities to proceed unhindered or under less stringent

15    conditions.

16      109.    Plaintiffs seek a judicial declaration that the State and County Orders violated Article 1,

17    Section 4 of the California Constitution and nominal damages. Such a determination will resolve the

18    constitutionality of the fines levied against the Plaintiffs, which are predicated upon the State and

19    County Orders. Plaintiffs also seek to enjoin enforcement of the fines. Plaintiffs are entitled to recover

20    their costs and attorneys' fees under California Code of Civil Procedure Section 1021.5. The

21    Government Claims Act does not bar the relief requested.

22

**THIRD CAUSE OF ACTION**

23

**Deprivation of Civil Rights Under 42 U.S.C. § 1983 (First Amendment)**

24      110.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 109 of this

25    Complaint as though set forth fully herein.

26      111.    The First Amendment to the United States Constitution, as applied to the states by the

27    Fourteenth Amendment, prohibits the government from abridging the right of the people to peaceable

28    assembly.

FOURTH AMENDED COMPLAINT

112.    "The right of free speech, the right to teach, and the right to assembly, are, of course, fundamental rights." *Whitney v. California*, 274 U.S. 357, 373 (1927). When a government practice restricts fundamental rights, it is subject to "strict scrutiny" and can be justified only if it furthers a compelling government purpose and, even then, only if no less restrictive alternative is available. *See, e.g.*, *San Antonio Indep. Sc. Dist. v. Rodriguez*, 411 U.S. 1, 16-17 (1973); *Dunn v. Blumstein*, 405 U.S. 330 (1972).

113.    By denying Plaintiffs the ability to conduct indoor church services, the Defendants have violated the Freedom of Assembly Clause to the United States Constitution.

114.    The State and County Orders, on their face and as applied, are unconstitutionally vague and overbroad as they chill and abridge Plaintiffs' right to peaceably assemble.

115.    The State and County Orders, on their face and as applied, constitute an unconstitutional prior restraint on Plaintiffs' right to assemble.

116.    The State and County Orders, on their face and as applied, do not leave open ample alternative channels for assembly or communication for Plaintiffs.

117.    The Defendants do not have a compelling, legitimate or rational interest in treating Plaintiffs differently than other secular businesses or activities or for substantially burdening their religious practices.

118.    The State and County Orders, on their face and as applied, do not pass strict scrutiny because they are not narrowly tailored to serve the government's purported interest. Imposing more restrictive requirements that target churches while allowing numerous entities and activities to remain open is not the least restrictive means of achieving the Defendant's purported interest in curbing the spread of COVID-19.

119.    Plaintiffs seek a judicial declaration that the State and County Orders violated the Assembly Clause and nominal damages. Such a determination will resolve the constitutionality of the fines levied against the Plaintiffs, which are predicated upon the State and County Orders. Plaintiffs also seek to enjoin enforcement of the fines. Plaintiffs are entitled to recover their costs and attorneys' fees under 42 U.S.C. § 1988.

**FOURTH CAUSE OF ACTION**

**Deprivation of Civil Rights Under 42 U.S.C. § 1983 (Fourteenth Amendment)**

120.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 119 of this Complaint as though set forth fully herein.

121.    This cause of action is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United State Constitution.

122.    The Fourteenth Amendment's Equal Protection Clause guarantees all Americans the equal protection of the law. The Equal Protection Clause bars the government from treating Americans differently based on certain immutable characteristics, including their religious beliefs.

123.    The Defendants violated Plaintiffs' Fourteenth Amendment rights by creating COVID-19 health orders that, as alleged above, treated indoor religious services as less essential and more dangerous than similarly situated secular activities. Defendants had no rational basis for this disparate treatment, much less a compelling justification for it, and their orders were not narrowly tailored to serve a compelling interest.

124.    In engaging in the actions alleged above, the County Officials acted under color of law and within the course and scope of their employment at the County.

125.    Plaintiffs seek a judicial declaration that the State and County Orders violated the Equal Protection Clause and nominal damages. Such a determination will resolve the constitutionality of the fines levied against the Plaintiffs, which are predicated upon the State and County Orders. Plaintiffs also seek to enjoin enforcement of the fines. Plaintiffs are entitled to recover their costs and attorneys' fees under 42 U.S.C. § 1988.

**FIFTH CAUSE OF ACTION**

**Deprivation of Civil Rights Under 42 U.S.C. § 1983 (Eighth Amendment)**

126.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 94 of this Complaint as though set forth fully herein.

127.    This cause of action is brought pursuant to 42 U.S.C. § 1983 and the Eighth Amendment to the United State Constitution.

128. The Eighth Amendment, as incorporated against the County through the Fourteenth Amendment, prohibits the government from imposing excessive fines on Americans.

129. The Urgency Ordinance, on its face and as applied, violates the Eighth Amendment.

130. The $2.87 million in fines the Defendants have imposed on Plaintiffs are grossly disproportionate to the harm allegedly done by Plaintiffs' refusal to follow all of the County's COVID-19 orders since last fall. Thus, they violate the Eighth Amendment.

131. In engaging in the actions alleged above, the County Officials acted under color of law and within the course and scope of their employment at the County.

132. Plaintiffs lack an adequate remedy at law and will be irreparably harmed if the Court does not enjoin the Defendants from collecting $2.87 million in unlawful fines. Therefore, Plaintiffs seek declaratory relief and injunctive relief enjoining the Defendants from enforcing the fines. Plaintiffs also seek nominal damages. Plaintiffs are also entitled to recover their costs and attorneys' fees under 42 U.S.C. § 1988.

## SIXTH CAUSE OF ACTION

### Deprivation of Civil Rights Under Article 1, Section 7 of the California Constitution

133. Plaintiffs incorporate by reference the allegations in paragraphs 1 through 94 of this Complaint as though fully set forth herein.

134. Article 1, Section 7 of the California Constitution protects against cruel and unusual punishment and excessive fines.

135. For the reasons stated in Plaintiffs' Fifth Cause of Action, the County Ordinance and excessive fines violates Article 1, Section 7 of the California Constitution.

136. Plaintiffs lack an adequate remedy at law and will be irreparably harmed if the Court does not enjoin the Defendants from collecting $2.87 million in unlawful fines. Therefore, Plaintiffs seek declaratory relief and injunctive relief enjoining the Defendants from enforcing the fines. Plaintiffs also seek nominal damages. Plaintiffs are entitled to recover their costs and attorneys' fees under California Code of Civil Procedure Section 1021.5. The Government Claims Act does not bar the relief requested.

**SEVENTH CAUSE OF ACTION**

**Deprivation of Civil Rights Under 42 U.S.C. § 1983 (*Monell*)**

137.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 136 of this Complaint as though set forth fully herein.

138.    This cause of action is brought pursuant to 42 U.S.C. § 1983 and the First, Eighth and Fourteenth Amendments to the United State Constitution.

139.    The unlawful actions carried out by County Officials, as alleged in the First through Sixth Causes of Action, were carried out by individuals who sit at the top of their departments within the County and who thus qualify as final policymakers under *Monell v. Department of Social Services*. Furthermore, the County Officials' actions, alleged above, were enabled and ratified by the COUNTY SUPERVISORS and thus constituted a municipal custom, policy or practice.

140.    Plaintiffs seek a judicial determination that the County Officials qualify as final policymakers. Plaintiffs are also entitled to nominal damages and costs and attorneys' fees under 42 U.S.C. § 1988.

**EIGTH CAUSE OF ACTION**

**Violation of the Bane Act – Cal. Civil Code § 52.1**

141.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 140 of this Complaint as though set forth fully herein.

142.    The Bane Act allows a person whose rights have been interfered with by means of threats, intimidation, or coercion to sue for damages, injunctive, and other equitable relief. Civ Code §52.1(b).

143.    The Defendants' draconian orders and threats of criminal penalty interfered with the Plaintiffs' constitutional rights, as set forth in the United States and California Constitutions, including the right to free exercise of religion and assembly and equal protection of the law.

144.    The Defendants' persistent surveillance, crippling fines and threatening letters to CCSJ's bank also interfered with the Plaintiffs' constitutional rights, as set forth in the United States and California Constitutions, including the right to free exercise of religion and assembly, equal protection of the law and right against excessive fines.

145.     Plaintiffs only seek declaratory and injunctive relief and nominal damages in this lawsuit. The damages Plaintiffs seek against Defendants pursuant to California Civil Code Sections 52 and 52.1 are ancillary or incidental. In addition to damages, Plaintiffs are also entitled to attorneys' fees and costs pursuant to Sections 52 and 52.1. The Government Claims Act does not bar the relief requested.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.     Nominal damages for violation of civil rights under the California and United States Constitutions;

2.     For a Declaratory Judgement that the State and County Orders and fines levied against the Plaintiffs are unconstitutional;

3.     For injunctive relief enjoining Defendants from enforcing $2.87 million in fines against Plaintiffs;

4.     For damages pursuant to California Civil Code Sections 52 and 52.1;

5.     For costs, attorneys' fees and interest, as allowed by law; and

6.     For such other relief the Court determines is proper.

Respectfully submitted,

ADVOCATES FOR FAITH & FREEDOM

Dated: April 15, 2022

/s/ Mariah Gondeiro, Esq.
Mariah Gondeiro
Nathan W. Kellum
Attorneys for Plaintiffs


JW Howard Attorneys, Ltd.

Dated: April 15, 2022

/s/ Scott Street
Scott Street
Attorney for Plaintiffs