1  Robert H. Tyler, Esq., CA Bar No. 179572
   rtyler@faith-freedom.com
2  Mariah Gondeiro, Esq. CA Bar No. 323683
   mgondeiro@faith-freedom.com
3  ADVOCATES FOR FAITH AND FREEDOM
   25026 Las Brisas Road
4  Murrieta, California 92562
   Telephone:      (951) 600-2733
5  Facsimile:      (951) 600-4996

6  Attorney for Plaintiffs

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11  **CALVARY CHAPEL SAN JOSE**, a California        Case No. 20-cv-03794
    Non-Profit Corporation; **PASTOR MIKE**
12  **MCCLURE**, an individual; **SOUTHRIDGE**
    **BAPTIST CHURCH OF SAN JOSE**
13  **CALIFORNIA dba SOUTHRIDGE**                     **PLAINTIFFS CALVARY CHAPEL SAN**
    **CHURCH**, a California Non-Profit Corporation;   **JOSE AND MIKE MCCLURE'S NOTICE**
14  **PASTOR MICAIAH IRMLER**, an individual;          **OF MOTION AND MOTION FOR**
                                                       **PARTIAL SUMMARY JUDGMENT;**
15              Plaintiffs,                            **MEMORANDUM OF POINTS AND**
                                                       **AUTHORITIES N SUPPORT THEREIN**
16         vs.
                                                       *[Filed Concurrently with Memorandum of Points*
17  **GAVIN NEWSOM**, in his official capacity as      *and Authorities; Declarations of Mariah R.*
    the Governor of California, **TOMAS ARAGON.**      *Gondeiro, Mike McClure, Bill Shepherd, Roger*
18  **M.D.**, in her official capacity as the Acting   *Gliebe, Megan Fraboni, and Anne Stenehjem;*
    California Public Health Officer; **SANTA**        *Request for Judicial Notice; and [Proposed]*
19  **CLARA COUNTY; SARA H. CODY, M.D.**, in           *Order in Support Thereof]*
    her official capacity as Santa Clara County
20  Public Health Officer; **MIKE WASSERMAN**, in his   Date        January 26, 2023
    official capacity as a Santa Clara County          Time:       9:00 a.m.
21  Supervisor; **CINDY CHAVEZ**, in her official      Dept:       3
    capacity as a Santa Clara County Supervisor;
22  **DAVE CORTESE**, in his official capacity as a    Complaint Filed April 15, 2022
    Santa Clara County Supervisor; **SUSAN**           Trial Date May 23, 2023
23  **ELLENBERG**, in her official capacity as a Santa
    Clara County Supervisor; **JOE SIMITIAN**, in
24  his official capacity as a Santa Clara County
    Supervisor; and **THE SANTA CLARA**
25  **COUNTY BOARD OF SUPERVISORS;**

26              Defendants.

27

28

1    **TO THE COURT, ALL PARTIES, AND THEIR RESPECTIVE ATTORNEYS OF**

2    **RECORD**:

3        **PLEASE TAKE NOTICE** that on January 26, 2023, at 9:00 a.m. or as soon thereafter as

4    counsel may be heard in Courtroom 3, 5th Floor, United States District Court, Northern District of

5    California, Plaintiffs Calvary Chapel San Jose and Pastor Mike McClure (collectively, "Calvary") will,

6    and hereby do, move this Court under Federal Rule of Civil Procedure 56 for a partial summary

7    judgement.

8        Calvary respectfully requests that the Court enter judgement in their favor because the

9    undisputed evidence establishes that Defendants Santa Clara County, Dr. Sara Cody, James Williams,

10   and the Board of Supervisors (collectively, "County") violated the First Amendment, Fourteenth

11   Amendment, and Eighth Amendment and Calvary is therefore entitled to nominal damages. Calvary is

12   also entitled to a declaratory judgement that the COVID-19 fines levied against them and the public

13   health orders that support the basis of the fines are unconstitutional. Finally, Calvary requests a

14   permanent injunction enjoining enforcement of the $2.87 million in fines because the fines violate

15   the constitution and cause irreparable harm.

16       This motion will be based on this notice of motion and motion for partial summary judgment,

17   memorandum of points and authorities, the accompanying declarations, request for judicial notice,

18   [proposed] order in support thereof, and other evidence or arguments as may be presented. This motion

19   does not include a separate or joint statement of undisputed facts, in accordance with Civil Local Rule

20   56.

21

22                       Respectfully submitted,

23

    Dated:  September 16, 2022         /s/ Mariah Gondeiro, Esq.
24                            Mariah Gondeiro

25                       Attorney for Plaintiffs

26

27

28

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................... 1

II. THE UNDISPUTED STATEMENT OF FACTS.................................................. 3

    A.    CALVARY CHAPEL SAN JOSE ......................................................................... 3

    B.    THE EARLY COVID-19 PANDEMIC .............................................................. 4

    C.    THE COUNTY'S COVID-19 CIVIL ENFORCEMENT PROGRAM ............................ 5

    D.    THE COVID-19 PUBLIC HEALTH ORDERS THAT FORM THE BASIS OF CALVARY'S FINES 7

    E.    THE COUNTY'S CONTRACT TRACING SYSTEM ............................................... 10

III. RELEVANT PROCEDURAL HISTORY ........................................................ 11

IV. LEGAL STANDARD .......................................................................................... 11

V. ARGUMENT ........................................................................................................ 12

    A.    THE COVID-19 PUBLIC HEALTH ORDERS VIOLATED CALVARY'S CONSTITUTIONAL RIGHTS ....................................................................................................... 12

        1.    The COVID-19 Orders Violated the Free Exercise Clause ................................ 12

        2.    The COVID-19 Orders Violated the Fourteenth Amendment ........................... 19

        3.    The COVID-19 Orders Violated Calvary's Right to Assembly ........................ 20

        4.    The Urgency Ordinance (i.e. fines) Discriminates against Religion in Violation of the Free Exercise Clause ........................................................................ 20

        5.    The Fines Levied by the County Violate the Excessive Fines Clause ............... 21

    B.    CALVARY IS ENTITLED TO RELIEF ............................................................... 23

        1.    Calvary is Entitled to Nominal Damages ........................................................ 23

        2.    Calvary is Entitled to Declaratory Relief ......................................................... 23

        3.    Calvary is Entitled to a Permanent Injunction .................................................. 24

VI. CONCLUSION .................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

*Cases*

*Ashaheed v. Currington*,
7 F.4th 1236 (10th Cir. 2021)................................................................19

*Bayer v. Neiman Marcus Grp., Inc.*,
861 F.3d 853 (9th Cir. 2017)................................................................23

*Bernhardt v. Cty. of Los Angeles*,
279 F.3d 862 (9th Cir. 2002)................................................................23

*Boy Scouts of America v. Dale*,
530 U.S. 640 (2000) ............................................................................17

*Carpenter v. City and County of San Francisco*,
93 F.3d 627 (1996)..............................................................................17

*Catholic Charities of Sacramento, Inc. v. Superior Court*,
32 Cal. 4th 527 (2004).........................................................................17

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1990)................................................................12, 18, 20

*City of Riverside v. Rivera*,
477 U.S. 561 (1986) ............................................................................23

*Denver Bible Church v. Azar*,
494 F. Supp. 3d 816 (2020) .................................................................15

*Dunn v. Blumstein*,
405 U.S. 330 (1972).............................................................................20

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006)........................................................................12, 24

*Elrod v. Burns*,
427 U.S. 347 (1976).............................................................................24

*Emp't Div., Dep't of Human Res. of Or. v. Smith*,
494 U.S. 872 (1990)................................................................12, 15, 17

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (2021).....................................................................17, 18

*Gateway City Church v. Newsom*,
141 S. Ct. 1460 (2021) ..........................................................................1

*Gish v. Newsom*,
141 S. Ct 1290 (2021) .........................................................................14

*Harvest Rock Church v. Newsom*,
141 S. Ct. 889 (2020)......................................................................13, 14

*Harvest Rock Church, Inc., v. Newsom*,
985 F.3d. 771 (9th Cir. 2020)..............................................................14

*High Plains Harvest Church v. Polis*,
141 S. Ct. 527 (2021) ..........................................................................13

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*,
565 U.S. 171 (2012) ............................................................................17

ii

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,
515 U.S. 557 (1995) ................................................................................................17

*Jefferson v. City of Fremont*,
No. C-12-0926 EMC, 2013 WL 1747917 (N.D. Cal. Apr. 23, 2013) ..............................20

*Koontz v. St. Johns River Water Management Dist.*,
570 U.S. 595 (2013) ................................................................................................16

*Masterpiece Cakeshop, Ltd v. Colorado Civil Rights Comm'n*,
138 S. Ct. 1719 (2018) ............................................................................................17

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ....................................................................................24

*Newland v. Achute*,
932 F. Supp. 529 (S.D.N.Y. 1996) ............................................................................21

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................................................................24

*Nordlinger v. Hahn*,
505 U.S. 1 (1992) ....................................................................................................19

*People v. Lowery*,
43 Cal. App. 5th 1046 (2020) ..................................................................................21

*Perry v. Sindermann*,
408 U. S. 593 (1972) ..............................................................................................16

*Pimentel v. City of Los Angeles*,
974 F.3d 917 (9th Cir. 2020) ..............................................................................21, 22

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ................................................................................................20

*Robinson v. Murphy*,
141 S. Ct. 972 (2020) ..............................................................................................13

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020) ..........................................................................................passim

*S. Bay Pentecostal Church, v. Newsom*,
141 S. Ct. 716 (2021) ....................................................................................1, 14, 18

*S. Bay United Pentecostal Church v. Newsom*,
140 S. Ct. 1613 (2020) ..............................................................................................1

*S. Bay United Pentecostal Church v. Newsom*,
985 F.3d 1128 (9th Cir. 2021) ..................................................................................14

*San Antonio Indep. Sc. Dist. v. Rodriguez*,
411 U.S. 1 (1973) ..............................................................................................20, 22

*Sherbert v. Verner*,
374 U.S. 398 (1963) ......................................................................................16, 17, 18

*Stormans, Inc. v. Wiesman*,
794 F.3d 1064 (9th Cir. 2015) ..................................................................................20

*Tandon v. Newsom*,
141 S. Ct. 1294 (2021) ......................................................................................14, 20

*United States v. Bajakajian*,
524 U.S. 321 (1998) ................................................................................................21

*United States v. Mackby*,
339 F.3d 1013 (9th Cir. 2003) ..................................................................................21

*Whitney v. California*,
274 U.S. 357 (1927) ................................................................................................20

*Statutes*

28 U.S.C. § 2201(a) ...................................................................................................................................11

MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 20-cv-03794

1

2

### MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

3

4

5

6

7

8

In May 2020, four justices on the U.S. Supreme Court said that governments could not treat churches worse than secular places in the name of fighting COVID-19. *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020). They warned public health officials to tread carefully in attempting to regulate religious activities at all during the pandemic. *Id.* Around the same time, the United States Justice Department warned the State of California ("State") that their public health orders were likely unconstitutional because they discriminated against faith communities.

9

10

11

12

13

14

15

Nonetheless, Santa Clara County, James Williams, Sara Cody, and the Board of Supervisors (collectively, "County") and the State continued to enforce their arbitrary and discriminatory public health orders that allowed pet stores, liquor stores, and essential government entities to stay open but not churches. The County specifically targeted churches, cutting off a vital mental, emotional, and spiritual support system for so many. To add insult to injury, the County fined Plaintiffs Calvary Chapel San Jose and Mike McClure ("Calvary") over four million dollars for keeping their doors open to help the hurting. For no cognizable reason, the County did eventually drop the fines to $2.87 million.

16

17

18

19

20

21

22

These actions were unprecedented and unlawful. The County has never traced a single case of COVID-19 to Calvary's church services. The County went after Calvary because it thought the church was an easy target, a politically unpopular group that would cave in the face of government power. But Calvary did not bend the knee. Calvary filed a lawsuit (this case) to stop enforcement of the arbitrary COVID-19 public health orders. They vigorously defended themselves against a state court action in which the County sought – and continues to seek – to hold Calvary liable for violating unconstitutional public health orders.

23

24

25

26

27

28

On November 25, 2020, the Supreme Court intervened in *Roman Catholic Diocese of Brooklyn v. Cuomo,* 141 S. Ct. 63 (2020) ("Brooklyn Diocese")*,* enjoining New York's COVID-19 capacity restrictions as applied to churches. The Supreme Court has vindicated the Plaintiffs five times. *See, e.g.*, *S. Bay Pentecostal Church, v. Newsom*, 141 S. Ct. 716 (2021) ("South Bay"). Indeed, the Supreme Court specifically admonished the County for its unconstitutional restrictions on religious gatherings. *Gateway City Church v. Newsom*, 141 S. Ct. 1460 (2021) ("Gateway").

Despite this vindication, the County still will not drop the fines against Calvary. This Court urged the County to settle, warning them that "this is not the hill they want to die on." The County would rather die on their feet than live on their knees fighting an unworthy cause. Thus, Calvary asks this Court to intervene and grant their Partial Motion for Summary Judgement for the following reasons.

*First*, the challenged COVID-19 public health orders undisputedly violated Calvary's constitutional rights, including Calvary's right to assembly, religious exercise, and equal protection of the law. The Supreme Court has made clear that the State's and County's capacity restrictions imposed on churches violated the Free Exercise Clause. The singing ban, mask mandate, and social distancing requirements fair no better under the framework applied in *Brooklyn Diocese*, as they, too, treat secular entities and activities more favorably. For these reasons, the orders do not pass constitutional scrutiny under the Equal Protection Clause, and the COVID-19-related fines are similarly unconstitutional because they are predicated on unconstitutional public health orders. The $2.87 million in COVID-19 fines are grossly excessive, as they are based upon unconstitutional orders, and the County cannot attribute one COVID-19 case to Calvary.

*Second*, Calvary is entitled to nominal damages because the County violated its constitutional rights. Calvary is also entitled to a declaratory judgment that the fines and public health orders that form the basis of the fines are unconstitutional. Calvary also asks this Court to permanently enjoin the fines because they irreparably injure Calvary. The balance of hardships tip sharply in Calvary's favor because, as the County previously argued in favor of mootness, COVID-19 no longer poses an imminent threat considering more effective treatment protocols.

And while the County has likely spent hundreds, if not thousands, of hours trying to enforce the COVID-19 orders against Calvary, its harm is self-induced. After *Brooklyn Diocese*, the County chose to ignore the Supreme Court and continued to defend their unconstitutional orders while other counties and the State chose to settle other similar church-related cases. The County cannot claim the rule of law is on its side. There is a higher law. The Supreme Court preempts the County's orders. Accordingly, Calvary asks this Court to grant them nominal damages, declaratory relief, and a permanent injunction.

MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 20-cv-03794

## II. THE UNDISPUTED STATEMENT OF FACTS

**A.    Calvary Chapel San Jose**

Pastor Mike McClure is the senior pastor of Calvary Chapel San Jose, a church serving the people of Santa Clara County. (McClure Decl., ¶¶ 1-2). In March 2020, the church closed in-person worship services and immediately experienced a spiritual, emotional, and mental health decline. (*Id.*, ¶ 4). The church reopened in-person services on Pentecost Sunday, May 31, 2020. (*Id.*, ¶ 5). The sanctuary can fit over 1700 people, easily accommodating the 300-500 congregants that attend Sunday services. (*Id.*, ¶ 17).

Throughout the relevant time periods of the COVID-19 pandemic, from May 31, 2020 through May 2021, the church provided seating in the gym and entrance hallway. (*Id.*) About five to ten church staff and volunteers were working at the church on the workdays because they conducted essential services for the Church, such as providing counsel and prayer to visitors. (*Id.*, ¶ 18). Calvary accommodated church staff who wanted to work from home. (*Id.*) Calvary also held weekly prayer gatherings, which ranged from two to twenty congregants. (*Id.*)

The church building's heating, ventilation, and air conditioning (HVAC) system has superior air quality because the filters are maintained for optimized infiltration, and the system draws 10% of fresh air daily and circulates it back into the entire building and sanctuary when the building is occupied. (Shepherd Decl., ¶¶ 5-6). Dr. Sara Cody testified, on behalf of the County, that a building's ventilation and occupancy limits impact the spread of COVID-19. (Gondeiro Decl., Ex. 68, pp. 255-57).

Calvary's religious tenets require that the church regularly gather *in person* for the teaching of God's Word, prayer, worship, baptism, communion, and fellowship. (McClure, ¶ 6). These religious tenets find support in Hebrews 2:12 and 10:25, Ephesians 5:19, Acts 2:40-47 and Acts 5:40-42. (*Id.*) Calvary did host remote Sunday services from March 2020 to Pentecost Sunday, May 31, 2020, but the remote services prevented the church from performing essential religious functions like the laying of hands for prayer and baptism. (*Id.*, ¶¶ 4, 7). Scripture demands *in-person* fellowship for the upbuilding of the Body of Christ. (*Id.*, ¶ 11). In-person fellowship is vital for spiritual growth and sustainment. (*Id.*; Stenehjem Decl., ¶ 3; Gliebe Decl., ¶ 3).

Furthermore, Calvary chose to hold services at the church because they could not find another outdoor space large enough to accommodate 600-800 attendees on Sundays. (McClure, ¶ 10). Calvary's religion requires weekly fellowship with *all* church members, as fellowship represents the Body of Christ. (*Id.*, ¶ 9). There were also practical considerations that made it impossible to hold outdoor services like lack of adequate childcare, parking, electricity, and weather. (*Id.*, ¶ 10). Calvary did offer live streaming for congregants who did not want to attend in person. (*Id.*, ¶ 15).

The face-mask mandate and social distancing requirements also interfered with Calvary's religious tenets. (*Id.*, ¶ 12). Calvary did provide face masks and encouraged social distancing by posting signs throughout the church. (*Id.*, ¶ 15).  However, Calvary did not force congregants to abide by these requirements because they prevented some congregants from worshipping and seeking the laying of hands for prayer. (*Id.*, ¶¶ 12-15). Face masks caused severe discomfort for several congregants. (Stenehjem Decl., ¶¶ 3-5; Gliebe Decl., ¶¶ 4-6). Face masks also interfered with the belief that the congregants are to approach God with unveiled faces, beholding the glory of the Lord, and being transformed into the same image from one degree of glory to another, as outlined in 2 Corinthians 3:18. (McClure Decl., ¶ 12).

Finally, it is true that Calvary's congregation has expanded and therefore led more souls to Christ. (*Id.*, ¶ 10). Because Calvary chose to keep its doors open, individuals who were depressed and suicidal were able to find mental and spiritual counseling. (*Id.* ¶ 14). In fact, prior to May 2020, Calvary averaged around 50-100 baptisms per year. (*Id.*, ¶ 8). Since May 2020, Calvary has averaged 1,000 baptisms per year. (*Id.*)

**B.    The Early COVID-19 Pandemic**

In January 2020, Santa Clara County became a COVID-19 "hot spot," as it was a county experiencing more COVID-19 cases early on than other jurisdictions across the United States. (Gondeiro Decl., Ex. 68, pp. 255-57). Dr. Sara Cody was aware of a John Hopkins map showing the spread of COVID-19 and was concerned because COVID-19 appeared to be spreading quickly. (*Id.*, pp. 137-38; Ex. 69).

At the onset of the pandemic, on or around February 2020, the County activated the Emergency Operations Center to coordinate the countywide response to COVID-19, and James Williams was a

MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 20-cv-03794

1   director. (*Id.*, Ex. 68, pp. 83-86). As a director, James Williams worked with Dr. Cody to understand

2   the impact of COVID-19 and how to respond. (*Id.*, pp. 87-88).

3        The County did not issue the Nation's first shelter-in-place order until March 16, 2020, which

4   included an exemption for essential industries. (Request for Judicial Notice ("RJN"), Ex. 45). In-person

5   religious services were not considered essential, but the County did consider "behavior health services"

6   as essential to provide for mental health counseling. (Gondeiro Decl., Ex. 68, pp. 69, 109, 155-58, 161-

7   62). Essential government functions were given discretion to follow the order, including the Office of

8   the County Counsel. (*Id.*, pp. 102, 113-14; RJN, Ex. 45, p. 4). Hardware stores, professional services

9   like accounting and legal, and construction were also considered essential (*id.*, pp. 4-6), and Dr. Cody

10  was aware that COVID-19 outbreaks were occurring at construction sites (Gondeiro Decl., Ex. 68, p.

11  121).

12       In May 2020, the County extended the shelter-in-place order to prevent a COVID-19 resurgence,

13  and the County did not lift its second order until early July 2020. (*Id.*, pp. 129-30, 192, 196).

14  Nevertheless, around the beginning of June 2020, Santa Clara County started to experience a COVID-

15  19 resurgence. (*Id.*, p. 191). The events that transpired in June were "incredibly depressing" for Dr.

16  Cody because she had her heart "set on full containment." (*Id.*, p. 195).

17       Despite the County aiming for full containment, on June 2, 2020, the County issued a statement

18  declaring protests a "fundamental" right. (*Id.*, Ex. 86). The County encouraged, but did not require,

19  protestors to "keep in mind the important practices, such as using face coverings and, to the extent

20  possible, maintaining social distancing." (*Id.*) During the summer of 2020, large groups of protestors

21  gathered outside in the streets of Santa Clara County, some of whom were not wearing masks or social

22  distancing. (*Id.*, Ex. 68, pp. 318-320).

23  **C.   The County's COVID-19 Civil Enforcement Program**

24       In August 2020, the Santa Clara County Board of Supervisors adopted a COVID-19 urgency

25  ordinance, so the County could enforce the COVID-19 orders by issuing fines against entities that

26  violated the orders. (RJN, Ex. 64). The ordinance separated commercial and non-commercial activities

27  and their penalties (*id.*, p. 7), and the County classified a church as a commercial entity (*id.*, p. 4).  The

28  County never pursued violations of non-commercial activities like private graduation parties and

1    gatherings in homes because it had "limited staffing...." (Gondeiro Decl., Ex. 72, pp. 165-66). The

2    County internally investigated complaints received from the public regarding potential COVID-19

3    violations. (*Id.*, pp. 144-43). The County required enforcement officers to confirm there was a violation

4    before sending a notice of violation. (*Id.*, p. 162).

5    When determining the amount of a fine, the County would consider the potential for COVID-

6    19 spread. (*Id.*, p. 176). The County did not require its enforcement officers to ask alleged violators

7    about COVID-19 cases, nor did the County's enforcement team have access to the COVID-19 case

8    reports. (*Id.*, p. 177). The County prioritized super spreader events, which featured a crowded gathering,

9    no social distancing or face masks, people present for long periods of time, and poor ventilation. (*Id.*,

10   p. 99; Ex. 80). During enforcement, though, the County did not require enforcement officers ask entities

11   about their ventilation system. (*Id.*, Ex. 72, p. 109). The County's fine matrix also imposed a greater

12   base fine penalty against entities for failing to prohibit singing or impermissible gatherings than for

13   failing to require masks. (*Id.*, Ex. 79).

14   The County has levied over $4 million against Calvary. (*Id.* ¶ 25). From November 9, 2020 to

15   June 21, 2021, the County fined Calvary daily for failing to enforce face coverings even though an

16   enforcement officer did not observe Calvary violating the face covering mandate every day. (*Id.*, Ex.

17   83; Ex. 87, pp. 7-8, app. C). The fines for failing to enforce face coverings total $2,234,000. (*Id.*, Ex.

18   83). There was no specific reason the County chose to focus on face coverings instead of capacity

19   restrictions or singing by issuing continuing, daily fines. (*Id.*, Ex. 72, pp. 238-39).

20   The County also cited Calvary every day for failing to submit a completed social distancing

21   protocol, which totals $1,327,750. (*Id.*, Ex. 83). The protocol required Calvary to agree to enforce face

22   coverings and "any applicable capacity restrictions" and follow "any applicable industry-specific

23   directives issued by the County Health Officer and COVID-19 Industry Specific Guidance issued by

24   the California Department of Public Health." (*Id.*, Ex. 84, pp. 4-6). Starting on August 23, 2020, the

25   County also started to fine Calvary for holding unlawful Sunday gatherings, which combined violations

26   for not enforcing social distancing and mask requirements, permitting performers and congregants to

27   sing, and not following applicable capacity restrictions. (*Id.*, Ex. 82, p. 177). The County seeks to collect

28   $2.87 million in its state civil enforcement action. (*Id.*, ¶ 25).

MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 20-cv-03794

D.     **The COVID-19 Public Health Orders That Form The Basis Of Calvary's Fines**

The fines levied against Calvary are predicated on both County and State public health orders, including the following:

> The July 2, 2020 County Health Officer Risk Reduction Order ("Risk Reduction Order"), the October 5, 2020 County Health Officer Order Establishing Revised Risk Reduction Measures Applicable to All Activities and Sectors to Address the COVID-19 Pandemic ("Revised Risk Reduction Order"), the County Health Officer's Mandatory Directive for Gatherings ("Gatherings Directive"), the Statewide Public Health Officer Order dated August 28, 2020 ("State August 28 Order"), reflected in the California Department of Public Health Blueprint for a Safer Economy ("State Blueprint"), and the State's COVID-19 Industry Guidance: Places of Worship and Providers of Religious Services and Cultural Ceremonies issued on July 29, 2020 ("State Guidance").

(*Id.*, Ex. 82).

*Capacity Restrictions*. The Risk Reduction Order required that any directive subsequently issued by Dr. Sara Cody would be a mandatory component of the Order, as well as any industry-specific guidance issued by the State. (RJN, Ex. 46, p. 4). Thus, if the County did not issue a specific guidance for an industry, residents of Santa Clara County had to follow the State's guidelines. Residents also had to adhere to the State Blueprint unless the County had issued a more restrictive order. (*Id.*)

The Risk Reduction Order also imposed limitations on a "gathering." (*Id.*, p. 6). The County's definition of a gathering did not include areas where people were in transit, office spaces, childcare and day care facilities, retail stores, restaurants, and school classrooms. (*Id.*, p. 5). The Order was superseded on October 14, 2020 by the Revised Risk Reduction Order. (*Id.*, Ex. 47).

On July 8, 2020, the County issued its Gatherings Directive, which prohibited indoor gatherings. (RJN, Ex. 59). On November 16, 2020, the County revised this Directive and required all residents and businesses also adhere to the Mandatory Directive on Capacity Limitations. (*Id.*, Ex. 61, pp 3-4). The Directive on Capacity Limitations treated retail stores, shopping centers, construction sites, and personal care services more favorably than houses of worship. (*Id.*, Ex. 63, pp. 3-6).

*Singing Ban*. On or around July 29, 2020, the State required churches to refrain from singing and chanting. (RJN, Ex. 58). The County followed the State Guidance. (Gondeiro Decl., Ex. 68, pp. 216-17). The State did not forbid singing and chanting in television, film, or recording studios. (RJN, Ex. 65, pp. 4-5). Because the County did not have specific guidance for entertainment studios, the

7

County did not enforce the singing ban unless a studio was hosting a gathering, as defined by the County's Risk Reduction Order. (Gondeiro Decl., Ex. 77, p. 7). However, Dr. Cody testified on behalf of the County that generally, the singing ban did not apply to recording studios because they "would not have been gathering a number of people in the same place for an organized event." (*Id.*, Ex. 68, pp. 178-79).

The County also issued their own industry guidelines which provided exemptions. For instance, the County did not prohibit singing and chanting in day camps or childcare centers, as outlined in the County's Directive for Programs Serving Children or Youth. (*Id.*, Ex. 77, p. 6; RJN, Exs 6-7, 10, 38). The County's directives for collegiate and professional athletes and youth and adult recreational activities did not include a prohibition on singing or chanting either. (*Id.*, Exs. 2, 11-15, 35-37). In other words, teammates were not prohibited from chanting or shouting on the sidelines whether in a group, huddle, or dugout. (*Id.*)

***Face Coverings and Social Distancing***. The Revised Risk Reduction Order generally required individuals to follow social distancing and mask requirements unless they were exempt. The Order did not require individuals wear an N95 mask, even though these masks are superior to cloth masks and surgical masks. (Gondeiro Decl., Ex. 68, p. 279). The Order also included a significant and glaring exemption:

> Governmental entities must follow the requirements of this Order applicable to businesses, but governmental entities and their contractors are not required to follow these requirements to the extent that such requirements would ***impede or interfere with an essential government function, as determined by the governmental entity***, unless otherwise specifically directed in this Order or by the Health Officer.

(RJN, Ex. 41, p. 3). (emphasis added).

This exemption included, among others, law enforcement, health care, in-person educational instruction, and critical infrastructure. (Gondeiro Decl., Ex. 76, p. 5). The exemption gave governmental entities discretion to define essential governmental functions. (*Id.*, Ex. 68, p. 202-04). "[T]he Revised Risk Reduction Order did not establish a formal County review and approval process for governmental entities seeking to deem certain functions as essential governmental functions." (*Id.*, Ex. 76, p. 5). Thus,

entities like the San Jose Fire Department did not follow the mask mandate if it prevented them from performing an important job function such as performing an intense cardio workout. (Arata Decl., ¶ 2).

The County also exempted several industries from the mask mandate and social distancing requirements. For instance, the County's Directive for Programs Serving Children or Youth exempted children ages two through eight years old, children who could not tolerate a face mask, and children who experienced difficulty wearing a mask. (RJN, Exs. 6-7, 10, 38). The County's Mandatory Directive for Dining, Bars, Wineries, and Smoking Lounges allowed customers to remove their mask while eating and drinking at a restaurant (*id.*, Exs. 18-24), and personal care services like nail care, hair salons, cosmetology services, facial services, and massage therapy services did not have to adhere to social distancing and masks if doing so would prevent them from performing their service (*id.*, Exs. 28-34, Gondeiro Decl., Ex. 77, p. 8). Collegiate, professional, and youth athletes competing in sports like basketball, hockey, and football were exempt from social distancing and wearing masks. (*Id.*, p. 9; RJN, Exs. 2, 11-15, 35-37.)

The State's Face Covering Guidance exempted persons whom wearing a face covering would create a risk to the person related to their work. (*Id.*, Ex. 60, p. 2). The County's Directive for Construction mirrored this language. (*Id.*, Exs. 3, 16-17, p. 3; Gondeiro Decl., Ex. 77, p. 10). Thus, if construction workers were working in a manner making breathing difficult with a mask on, they were allowed to remove their mask. For instance, one construction owner recounts two occasions in June 2020 and September 2020 where his construction workers were working in trenches within six feet of distance and removed their masks because they could not breath. (Shepherd Decl., ¶ 2). The construction workers, who worked both indoors and outdoors, also had to remove their masks to shout and clearly communicate over the loud construction equipment. (*Id.*)

***Social Distancing Protocol***. The County's Risk Reduction Order and Revised Risk Reduction Order required all businesses, including churches, to sign a social distancing protocol. (RJN, Exs. 41, 47, pp. 6-7). The form required businesses to agree to all listed conditions, including the applicable public health orders. (Gondeiro Decl., Ex. 84, pp. 4-6). The County did not accept modified protocols. (*Id.*, ¶ 20-21). Pastor McClure filled out most of the form but did not agree to conditions that imposed

MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 20-cv-03794

1   a substantial burden on the church, like the singing ban, capacity restrictions, and requiring everyone to

2   wear a mask. (McClure Decl., ¶ 16).

3   **E.      The County's Contract Tracing System**

4           In January 2020, the County applied a manual system to keep track of COVID-19 cases.

5   (Gondeiro Decl., Ex. 75, pp. 27-29). In March 2020, the County stopped contract tracing because it did

6   not have the resources to record all COVID-19 cases. (*Id.*, pp. 28-30, 43). From March to May 2020, the

7   County used a state system to document what they did know about COVID-19 cases, but it did not

8   allow them to gather information about who might have been exposed to COVID-19. (*Id.*, pp. 31-33).

9           It was not until the end of May 2020 that the County implemented a more robust contract tracing

10  system and put together an expanded team to investigate COVID-19 cases. (*Id.*, pp. 37, 46-47). The

11  goal of the County's contract tracing system was to prevent more individuals from getting sick. (*Id.*, p.

12  61). It was "extremely rare" for the County to trace where individuals contracted COVID-19. (*Id.*, pp.

13  61-62). "[I]t was incredibly difficult, if not impossible, to understand what single modifiable factor

14  caused someone to get sick or could have prevented them to get sick." (*Id.*, pp. 72-73). It was not the

15  County's practice to ask individuals who contracted COVID-19 whether they were wearing a mask.

16  (*Id.*, pp. 62, 74).

17          In November through December 2020, the County conducted a quantitative retrospective

18  contract tracing survey to understand where individuals may have contracted COVID-19. (*Id.*, Ex. 68;

19  Ex. 75, pp. 112-15). During this limited period, the County did ask whether individuals were wearing a

20  mask when they contracted COVID-19. (*Id.*, pp. 116-17). However, because the County did not have a

21  comparison group of individuals who didn't get sick, it could not "say whether the people who got sick

22  were more or less likely to wear a mask than people who [did not]…." (*Id.*, p. 116). The survey did not

23  "meaningfully change" the County's understanding of the "science" regarding "what kinds of activities

24  were causing people to get sick or putting people at greatest risk of getting sick." (*Id.*, p. 120). Dr. Sarah

25  Rudman testified on behalf of the County that she was "not aware of any cases" attributed to Calvary's

26  church services and gatherings. (*Id.*, p. 138).

27

28

### III. RELEVANT PROCEDURAL HISTORY

Calvary, Southridge Baptist Church of San Jose, and Micaiah Irmler filed this lawsuit on June 9, 2020. ECF No. 1.  The Plaintiffs amended their complaint in November 2020, March 2021, and then on September 30, 2021. ECF Nos. 38, 81, 116. The Defendants filed motions to dismiss the Third Amended Complaint. ECF Nos. 121, 135.

On March 18, 2022, this Court granted the State Defendants' motion to dismiss without leave to amend and denied in part the County's motion to dismiss. ECF No. 156. As to the State, the Court held that, "due to religious organizations' success in obtaining injunctions that restrict the State's ability to reimpose COVID-19 restrictions against them, Plaintiffs' claims for declaratory and injunctive relief against the State are moot." *Id.* at 15. The Court held the injunctive and declaratory relief claims regarding the County's public health orders were moot for similar reasons. *Id.* at 16. The Court also concluded the damages claims against the County would move forward. *Id.* at 17, 25. The Court's order granted Plaintiffs leave to amend the state constitutional claims and the Bane Act with respect to the issue of presentation under the Government Torts Act. *Id.* at 26-27.

On June 9, 2022, the County filed a motion to strike and dismiss the Fourth Amended Complaint (FAC). ECF No. 179. The County seeks to dismiss the county officials as redundant parties and seeks to strike the allegations regarding James William's letters sent to Calvary's lender, Cass bank. *Id.* at 7-14. The hearing on the motion is set for September 21, 2021. ECF No. 203. The pending motion to dismiss the FAC has no effect on the relief requested. Although it could result in the dismissal of county officers named in this suit, Calvary will still be entitled to nominal damages, declaratory relief, and a permanent injunction against Santa Clara County.

Calvary reserves the right to bring a motion for summary as to the Bane Act. (Gondeiro Decl., ¶ 26).

### IV. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Declaratory relief is appropriate to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). A

11

1  plaintiff is entitled to a permanent injunction if it has "suffered an irreparable injury," "remedies

2  available at law are inadequate," "the balance of hardships between the plaintiff and defendant" supports

3  an injunction, and "the public interest would not be disserved." *eBay Inc. v. MercExchange, LLC,* 547

4  U.S. 388, 391 (2006).

## V. ARGUMENT

### A.   The COVID-19 Public Health Orders Violated Calvary's Constitutional Rights

The undisputed facts demonstrate several constitutional violations. *First*, the Shelter in Place Order, Risk Reduction Order, Revised Risk Reduction Order, State Guidance, State Blueprint, and Gatherings Directive[1] violated the Free Exercise Clause because they treated secular entities more favorably and, alternatively, substantially burdened Calvary's religious exercise. *Second*, the orders disparate treatment of religion renders them unconstitutional under the Equal Protection Clause. The $2.87 million in fines levied against Calvary also violate the First and Fourteenth Amendments because they are predicated on unconstitutional public health orders. *Third*, the Gatherings Directive violated the Assembly Clause because it restricted or limited Calvary's ability to gather in person. *Fourth*, the County's urgency ordinance (i.e. fines) discriminates against religion. *Finally*, the fines violate the Excessive Fines Clause because they are not proportionate to the harm. Calvary did no harm.

#### 1.   The COVID-19 Orders Violated the Free Exercise Clause

"The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1990) ("Lukumi"). Under the Free Exercise Clause, neutral laws of general applicability are subject to "rational basis" scrutiny if they only incidentally burden religious activity. *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 878 (1990). But, when burdensome laws are discriminatory against religious practices, i.e., not generally applicable or neutral, strict scrutiny applies, and the government's actions must be both justified by a compelling interest and narrowly tailored to advance that interest. *Lukumi*, 508 U.S. at 553.

[1] The Gatherings Directive incorporated the Mandatory Directive on Capacity Limitations.

Calvary's religious beliefs require that the church gather in person, worship with unveiled faces, take communion, and lay hands on one another in prayer. (McClure Decl., ¶¶ 6-16). The County burdened Calvary's religious tenets when it banned or limited Calvary's indoor gatherings, prohibited singing, and ordered congregants to wear masks and socially distance. The face-mask mandate interfered with congregants' ability to worship. (Stenehjem Decl., ¶¶ 3-5; Gliebe Decl., ¶¶ 4-6). The fines have also burdened Calvary because the church has had to postpone or cancel church-related projects and ministries. (McClure Decl., ¶ 19). For the reasons discussed below, the COVID-19 orders were neither neutral nor generally applicable and fail strict scrutiny.

(a)   The COVID-19 Orders were not Neutral and Generally Applicable

*Capacity Restrictions*. The capacity restrictions enforced against Calvary throughout the COVID-19 pandemic were not neutral and generally applicable in light of *Brooklyn Diocese*. On November 25, 2020, the Supreme Court enjoined New York's COVID-19 tier-based Cluster Action Initiative that subjected churches to harsher capacity restrictions than secular entities and activities. *Brooklyn Diocese*, 141 S. Ct. at 66-67. Notably, the Supreme Court did not consider whether houses of worship were treated less favorably than analogous secular entities and activities or entities the state deemed were comparable like movie theaters. *Id.* at 73. Rather, the Supreme Court emphasized the disparate treatment of non-analogous places such as transportation facilities, campgrounds, acupuncture facilities, and manufacturing plants. *Id.* at 66-67. Indeed, Justice Kavanaugh succinctly rejected New York's rationale for their disparate treatment of churches and explained the correct approach:

> [U]nder this Court's precedents, it does not suffice for a State to point out that, as compared to houses of worship, some secular businesses are subject to similarly severe or even more severe *restrictions*. . .. Rather, once a State creates a favored class of businesses, as New York has done in this case, the State must justify why houses of worship are excluded from that favored class.

*Id.* at 73.

In applying *Brooklyn Diocese*, the Supreme Court has been very consistent: every application for injunctive relief on behalf of churches has resulted in the vacatur of lower court opinions denying injunctive relief. *See, e.g., Harvest Rock Church v. Newsom*, 141 S. Ct. 889 (2020); *Robinson v. Murphy*, 141 S. Ct. 972 (2020); *High Plains Harvest Church v. Polis,* 141 S. Ct. 527 (2021).

The Ninth Circuit noted the Supreme Court's "seismic shift in Free Exercise law." *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1288, 1233 (9th Cir. 2021). On January 22, 2021, the Ninth Circuit granted an injunction against restrictions on religious gatherings imposed under tiers two and three of the State Blueprint. *S. Bay United Pentecostal Church v. Newsom*, 985 F.3d 1128, 1151-52 (9th Cir. 2021). The Ninth Circuit also granted a similar injunction in *Harvest Rock Church, Inc., v. Newsom*, 985 F.3d. 711 (9th Cir. 2020).

Importantly, the Supreme Court has admonished the Ninth Circuit five times because it upheld California's COVID-19 restrictions on capacity as applied to religious exercise. *See Harvest Rock*, 141 S. Ct.; *Gish v. Newsom*, 141 S. Ct 1290 (2021).; *South Bay*, 141 S. Ct. (enjoining California's ban on indoor gatherings at churches); *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (enjoining California's ban on private religious gatherings); *Gateway,* 141 S. Ct. (enjoining Santa Clara County's ban on indoor gatherings at churches). The County in *Gateway* attempted to distinguish its Gathering Directive from *South Bay*, but the Court repudiated the contention that the County's orders were materially different than the State's, holding: "This outcome is clearly dictated by this Court's decision in *South Bay United Pentecostal Church v. Newsom*, 592 U.S. ——, 141 S. Ct. 716, —— L.Ed.2d —— (2021)." *Id.*

These cases sound a deathknell on the State Blueprint, Gatherings Directive, and Shelter in Place Order and are therefore dispositive in this case.

***Singing Ban.*** The singing ban (*i.e.*, State Guidance) also violated the Free Exercise Clause. In *South Bay*, the U.S. Supreme Court denied, without prejudice, an injunction "with respect to the singing and chanting prohibition at indoor services" with leave to present "new evidence to the District Court that the State is not applying…the prohibition…in a generally applicable manner." 141 S. Ct. at 716. The singing ban was not enjoined because the question was not properly before the Court. Even still, five concurring justices, in two separate concurrences, noted the potential or actual disparate effect of the singing ban. Indeed, Justice Gorsuch, joined by Justices Alito and Thomas, stated, "[i]f I have a quibble with the court's order, it is how it addresses California's final factor, singing." *Id.* at 719. Similarly, Justice Barrett, writing for herself and Justice Kavanaugh, said, "if a chorister can sing in a Hollywood studio but not in her church, California's regulations cannot be viewed as neutral." *Id.* at 717.

MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 20-cv-03794

The singing ban is properly before this Court. The County enforced the State Guidance on houses of worship but gave exemptions to several industries. For instance, the County did not prohibit childcare, day camps, and sporting events from singing or chanting. (RJN, Exs. 2, 6-7, 10-15, 35-38). The County did not forbid chanting or singing in television, film, or recording studios unless a studio was holding a gathering, as defined by the County in the Risk Reduction Order. (Gondeiro Decl., Ex. 77, p. 7). Since August 23, 2020, the County ordered Calvary to refrain from singing and chanting and even cited them hundreds of thousands of dollars for worshipping in church. (*Id.*, Ex. 82). This disparate treatment violates the Free Exercise Clause because the orders created a "favored class of businesses," while exempting Calvary from that favored class. *Brooklyn Diocese*, 141 S. Ct. at 73.

***Face Coverings and Social Distancing***. The orders and fines relating to social distancing and masks also violate the Free Exercise Clause because the County exempted several secular entities and activities from an otherwise generally applicable regulation. *Smith*, 494 U.S. at 884. *Denver Bible Church v. Azar* is instructive. 494 F. Supp. 3d 816 (2020). Therein, the court found that Public Health Order 20-35 treated houses of worship differently from other businesses and activities. *Id.* at 831. For instance, Colorado's face-covering mandate was seemingly neutral on its face but granted exemptions to individuals seated at a food service establishment, individuals receiving a personal service, and individuals whose job required they remove their face covering to perform a "necessary" part of their activity. *Id.* at 833.

Like Colorado's order, the County's Risk Reduction Order and Revised Order exempted government entities and their contractors at their own discretion from social distancing, wearing masks, or any other restriction "to the extent that such requirements would impede or interfere with an essential government function…." (RJN, Exs. 41, 46, p. 3). These orders also incorporated the County's specific directives, which exempted several industries, including youth programs, construction workers, sporting events, and personal care services like hair salons and cosmetology services. (*Id.*, Exs. 2, 6-7, 11-15, 28). Customers could also share a meal at a restaurant while seated facing one another in an intimate setting and frequently removing their mask (as proscribed). (*Id.*, Exs. 18-24). The County never allowed Calvary's congregants and visitors to remove their mask during essential religious functions,

MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 20-cv-03794

such as one-on-one prayer and worship. The Risk Reduction Order, Revised Risk Reduction Order, and fines for not enforcing face coverings and social distancing violate the Free Exercise Clause.

***Social Distancing Protocol.*** The County's social distancing protocol required all entities to agree to the aforementioned public health orders. Because the orders are unconstitutional, the form amounts to an unconstitutional infringement and condition. The unconstitutional condition's doctrine "vindicates the Constitution's enumerated rights by preventing the government from *coercing* people into giving them up." *Koontz v. St. Johns River Water Management Dist.*, 570 U.S. 595, 604 (2013) (emphasis added). Under this doctrine, "the government may not deny a benefit to a person because he exercises a constitutional right." *Id.* (internal quotation and citation omitted). For example, in *Perry v. Sindermann*, the Supreme Court held that a public college would violate a professor's freedom of speech if it declined to renew his contract because he was an outspoken critic of the college's administration. 408 U. S. 593 (1972).

The County has fined Calvary $1,327,750 for its failure to submit a *completed* social distancing protocol. (Gondeiro Decl., Ex. 83). The form required Calvary agree to all conditions, including unconstitutional public health orders like the Gatherings Directive and Risk Reduction Order. (*Id.*, Ex. 84, pp. 4-6). In other words, Calvary was required to choose between assenting to unconstitutional requirements that substantially burdened the church's religious exercise or incurring a daily fine that accrued to $5,000. This type of coercion is worse than the example provided in *Perry* because there, the government at least provided a benefit (*e.g.*, employment contract) in exchange of plaintiff waiving his constitutional rights. Here, the County did not offer any benefit to Calvary but instead threatened them with crippling fines if they did not waive their constitutional rights and agree to all conditions. The social distancing protocol and related fines are therefore unconstitutional.

(b)    In the Alternative, the COVID-19 Orders Substantially Burdened Calvary's Religious Exercise.

Government actions that substantially burden a religious practice must be justified by a compelling government interest. *Sherbert v. Verner*, 374 U.S. 398, 402-03 (1963). Penalizing an individual for engaging in a religious practice clearly constitutes a substantial burden, and even "indirect 'discouragements'" can qualify. *Id.* at 404 n.5. "[T]he religion clauses of the California Constitution are

16

read more broadly than their counterparts in the federal Constitution." *Carpenter v. City and County of San Francisco*, 93 F.3d 627, 629 (1996). Courts "therefore review [a] challenge…under the free exercise clause of the California Constitution in the same way [they] might have revied a similar challenge under the federal constitution after *Sherbert*. In other words, [they] apply strict scrutiny." *Catholic Charities of Sacramento, Inc. v. Superior Court*, 32 Cal. 4th 527, 562 (2004) (citations omitted).

Recent precedent appears to support the renewed application of *Sherbert* where religious practice is substantially burdened by neutral and generally applicable laws. In *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1882 (2021), Justice Barrett, joined by Kavanaugh and Breyer, held: "I find the historical record more silent than supportive on the question whether the founding generation understood the First Amendment to require religious exemptions from generally applicable laws in at least some circumstances. In my view, the textual and structural arguments against *Smith* are more compelling." Further, Alito, joined by Thomas and Gorsuch, emphasized the following: "*Smith* did not overrule *Sherbert* or any of the other cases that built on *Sherbert* from 1963 to 1990, and for the reasons just discussed, *Smith* is tough to harmonize with those precedents. The same is true about more recent decisions." *Id.* at 915.

For instance, the Court has provided exemptions from generally applicable laws in First Amendment cases. In *Boy Scouts of America v. Dale*, 530 U.S. 640, 656 (2000), the Court granted an exemption from an otherwise generally applicable state public accommodation law. Similarly, in *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 573 (1995), the parade sponsors' speech was exempted from a similar public accommodation law. Exemptions from generally applicable laws have been granted to religious schools. In *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012), the Court held the First Amendment entitled a religious school to a special exemption from the ADA.

More recently, the Supreme Court in *Masterpiece Cakeshop, Ltd v. Colorado Civil Rights Comm'n*, observed that "[w]hen it comes to weddings, it can be assumed that a member of the clergy who objects to gay marriage on moral and religious grounds could not be compelled to perform the ceremony without denial of his or her right to the free exercise of religion." 138 S. Ct. 1719, 1727

17

(2018). "The clear import of this observation is that such a member of the clergy would be entitled to a religious exemption from a state law restricting the authority to perform a state-recognized marriage to individuals who are willing to officiate both opposite-sex and same-sex weddings." *Fulton,* 141 S. Ct. at 1868.

Just like in *Sherbert*, where the plaintiff was forced to choose between following her religion or forfeiting her job, the COVID-19 orders required Calvary abandon its religious tenets or incur enormous fines. 374 U.S. at 404. The orders imposed a substantial burden on Calvary's religious practices like singing, worshiping with unveiled faces, and one-on-one prayer. (McClure Decl., ¶¶ 6-16). Indeed, the burden here is arguably greater than the burden in *Sherbert*. In addition to requiring Calvary abandon its religious practices, the County has fined Calvary to the tune of $2.87 million. (Gondeiro Decl., ¶ 26). The fines burden the church's ability to pursue church-related projects and ministries aligned to its mission of fellowship and spreading the Gospel of Jesus Christ. (McClure Decl., ¶¶ 19-20). Thus, the capacity restrictions, singing ban, face-covering and social distancing requirements, and COVID-19-related fines enforced against Calvary violate the Free Exercise Clause of the United States and California Constitutions.

(c)     The COVID-19 Public Health Orders Cannot Survive Strict Scrutiny

Because the challenged public health orders were neither neutral nor generally applicable and, alternatively, substantially burdened Calvary's religious exercise, they must satisfy strict scrutiny, which means they must be "narrowly tailored" to serve a "compelling" interest. *Lukumi*, 508 U.S. at 546. The question before this Court is whether the County demonstrated "clearly that nothing short" of the measures it enforced "would reduce the community spread of COVID-19 at indoor religious gatherings to the same extent as do the restrictions [it enforced] with respect to other activities…." *South Bay*, 141 S. Ct. at 716.

The County will likely argue that Calvary's church services constituted a super spreader event and were therefore inherently more dangerous than the entities subject to less stringent requirements. This theory was already rejected by a majority on the Supreme Court. (*See Brooklyn Diocese*, 141 S. Ct. at 78 (Breyer, J., dissenting) (noting that "members of the scientific and medical communities tell us that the virus is transmitted" more easily in gatherings with features of religious worship services);

MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 20-cv-03794

1   *Id.* at 79 (Sotomayor, J., dissenting) (noting that "medical experts tell us . . . large groups of people

2   gathering, speaking, and singing in close proximity indoors for extended periods of time" pose a greater

3   risk of spreading COVID-19 than other gatherings).

4       The County cannot demonstrate that Calvary's Sunday gatherings or small prayer gatherings

5   and bible studies posed a greater threat of COVID-19 transmission than the entities and activities

6   exempt from the public health orders, like construction sites, essential governmental entities, day camps,

7   youth programs, sporting events, personal care services, and restaurants. Dr. Sarah Rudman has already

8   testified on behalf of the County that it was difficult, if not impossible, to determine the source of

9   COVID-19 transmission, and there is no evidence that Calvary's church services "contributed to the

10  spread of COVID-19…." *Brooklyn Diocese*, 141 S. Ct. at 67. In fact, with respect to masks, Dr. Rudman

11  testified that it was not clear "whether the people who got sick were more or less likely to wear a mask

12  than people who [did not]…." (Gondeiro Decl., Ex. 75, p. 116).

13      In sum, the public health orders and fines the County enforced against Calvary were neither

14  neutral nor generally applicable and, alternatively, substantially burdened Calvary's religious exercise.

15  And because the County cannot satisfy strict scrutiny's exacting standard, the orders and fines violated

16  the Free Exercise Clause.

17      Even if this Court does not find that all of the public health orders were unconstitutional, it

18  should still declare the fines related to holding unlawful Sunday gatherings unconstitutional, which total

19  $350,000. (Gondeiro Decl., ¶ 25). The County combined violations of the singing ban, gathering

20  restrictions, mask mandate, and social distancing requirements together such that it is impossible for

21  the Court to sever any constitutional fines from those that may be unconstitutional. (*Id.*, Ex. 82).

22      2.    The COVID-19 Orders Violated the Fourteenth Amendment

23      Because the COVID-19 public health orders violated Calvary's rights under the Free Exercise

24  Clause, the Court must conclude that the COVID-19 public health orders violated the Equal Protection

25  clause because they "jeopardized the exercise of a fundamental right." *Nordlinger v. Hahn*, 505 U.S. 1,

26  10 (1992); *accord Ashaheed v. Currington*, 7 F.4th 1236, 1251 (10th Cir. 2021) (equal protection claim

27  triggered strict scrutiny because it alleged "a deprivation of free exercise, a fundamental right," and a

28

MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 20-cv-03794

1    classification based on religion). As such, the public health orders and fines violated the Equal
2    Protection Clause.

3         3.    The COVID-19 Orders Violated Calvary's Right to Assembly

4         "The right of free speech, the right to teach, and the right to assembly, are, of course,
5    fundamental rights." *Whitney v. California*, 274 U.S. 357, 373 (1927). The right to peaceably assembly
6    ensures the freedom of individuals to associate for the purpose of engaging in protected speech.
7    *Jefferson v. City of Fremont*, No. C-12-0926 EMC, 2013 WL 1747917, at *5 (N.D. Cal. Apr. 23, 2013);
8    *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984) (recognizing right to associate "for the
9    purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition
10   for the redress of grievances, and the exercise of religion."). When a government practice restricts
11   fundamental rights, it is subject to "strict scrutiny." *See, e.g., San Antonio Indep. Sc. Dist. v. Rodriguez*,
12   411 U.S. 1, 16-17 (1973); *Dunn v. Blumstein*, 405 U.S. 330 (1972).

13        Calvary's religion requires it regularly gather in person for worship and the teaching of God's
14   word. *See supra*, at 3-4. The County violated Calvary's right to assembly when it banned religious
15   gatherings or tried to limit the amount of people that could attend Calvary's services. For the reasons
16   stated above, the County cannot survive strict scrutiny. The Shelter in Place Order, Gatherings
17   Directive, Mandatory Directive on Capacity Limitations, and State Blueprint violated the Assembly
18   Clause. The fines related to holding unlawful Sunday gatherings are also unconstitutional under the
19   Assembly Clause because they punished Calvary for holding gatherings.

20        4.    The Urgency Ordinance (i.e. fines) Discriminated against Religion in Violation of the
21              Free Exercise Clause.

22        A regulation is not a neutral burden on religion if it discriminates against a religious practice on
23   its face, or if in its real operation it targets a religious practice. *Lukumi*, 508 U.S. at 534. Additionally,
24   a regulation is not generally applicable where it "treat[s] *any* comparable secular activity more favorably
25   than religious exercise." *Tandon*, 141 S. Ct. at 1296 (emphasis in original). The County's urgency
26   ordinance "operate[s] in practice" in a way that "target[s] religious practice…." *Stormans, Inc. v.*
27   *Wiesman*, 794 F.3d 1064, 1076 (9th Cir. 2015) (quoting *Lukumi*, 508 U.S. at 535-37).

28

MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 20-cv-03794

1    The County never cited non-commercial activities like graduation parties or private gatherings

2    because it had "limited staffing...." (Gondeiro Decl., Ex. 72, pp. 165-66, 171-72). The County also

3    overlooked the large protests during the Summer of 2020 and instead actively encouraged them. (*Id.*,

4    Ex. 86). The County has no rational, much less compelling, justification for levying fines against

5    Calvary for holding church gatherings but not private gatherings or protests. The fines levied against

6    Calvary are therefore unenforceable.

7         5.    The Fines Levied by the County Violate the Excessive Fines Clause

8         A fine violates the Eighth Amendment's Excessive Fines Clause if it "is grossly disproportional

9    to the gravity of the defendant's offense." *United States v. Bajakajian,* 524 U.S. 321, 334 (1998). The

10   Supreme Court considers the following factors: (1) the defendant's culpability; (2) the relationship

11   between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's

12   ability to pay. *Id.* at 337-38. The California Supreme Court summarizes these factors when determining

13   whether fines are excessive. *People v. Lowery*, 43 Cal. App. 5th 1046, 1057 (2020). "Bajakajian does

14   not mandate the consideration of any rigid set of factors." *United States v. Mackby,* 339 F.3d 1013,

15   1016 (9th Cir. 2003).

16        As a matter of law, the *Bajakajian* factors weigh in Calvary's favor. First, Calvary did not exhibit

17   a high degree of culpability. It did not have any nefarious or even reckless motives but acted in

18   adherence with its sincerely held religious beliefs, beliefs the Supreme Court has vindicated numerous

19   times, and reopened in-person services to serve the needs of the church's congregants. (McClure Decl.,

20   ¶¶ 4-16; *See, e.g.*, *South Bay*, 141 S. Ct.). As a matter of law, that is not culpable conduct. *Cf. Newland*

21   *v. Achute*, 932 F. Supp. 529, 534 (S.D.N.Y. 1996) (explaining that, in Eighth Amendment excessive

22   force context, culpable conduct does not include behavior carried out in good faith).

23        Second, the County's fines are not proportionate to the harm caused by Calvary's church

24   services. To be clear, "if culpability is high or behavior reckless, the nature and extent of the underlying

25   violation is more significant. Conversely, if culpability is low, the nature and extent of the violation is

26   minimal." *Pimentel v. City of Los Angeles*, 974 F.3d 917, 923 (9th Cir. 2020). Thus, Calvary's low

27   degree of culpability reduces the significance of the underlying conduct. In any event, the Court must

28   "review the specific actions of the violator rather than by taking an abstract view of the violation." *Id.*

21

That is fatal to the County's case. After two years of litigation and over ten depositions, the County cannot trace one COVID-19 case to Calvary. (Gondeiro Decl., Ex. 75, p. 138). Indeed, Dr. Rudman testified that that it was "extremely rare" for the County to determine the source of COVID-19. (*Id.*, pp. 61-62). This fact may seem irrelevant to the County, but it is not. In *Pimentel*, the Ninth Circuit recognized that the "right to be free from excessive governmental fines is not a relic relegated to the period of parchments and parliaments, but rather it remains a crucial bulwark against government abuse." 974 F.3d at 925. Thus, the court required that there be at least "'some relationship'" between "the gravity of the offense" and the fine imposed. *Id.* at 924. No such relationship exists here. In fact, Calvary's supposed "offense" has lead thousands of souls to Jesus Christ – far more than the church has ever experienced since reopening in May 2020. (McClure Decl., ¶ 8).

Moreover, based upon the County's own civil enforcement procedure, the continuing, daily fines levied against Calvary for not enforcing face coverings are excessive. The County prioritized "super spreaders" events, and the County's fine matrix imposed a greater base fine penalty for failing to limit gatherings or singing than for failing to require face coverings. (Gondeiro Decl., Ex. 72, pp. 98-99; Exs. 79-80). The fines had nothing to do with singing or Calvary's Sunday gatherings.[2] The County levied a $10,000 daily fine during the week, even though an enforcement officer did not investigate Calvary every day. (*Id.*, Ex. 83; Ex. 87, pp. 7-8; app. C). The fines are also duplicative because the County had already levied a continuing, daily $5,000 fine against Calvary for not agreeing to all conditions in the social distancing protocol, which required the church agree to enforce face coverings. (*Id.*, Ex. 83; Ex. 84, pp. 4-6). Considering the County's arbitrary enforcement against Calvary and the lack of evidence of actual harm, the $2.87 million in fines are grossly excessive.

*Finally*, the County's fine system far exceeds the maximum amount of fines levied against other non-commercial entities in surrounding counties. For instance, Contra Costa County's COVID-19 ordinance authorized up to $1,000 a day in fines against commercial activities and $500 a day against non-commercial activities. (RJN, Ex. 44, p. 4). San Mateo County's ordinance authorized up to $500

---

[2] The County levied a separate $5,000 fine against Calvary for unlawful Sunday gatherings.

MEMORANDUM OF POINTS AND AUTHORITIES
Case No. 20-cv-03794

in daily fines against non-commercial entities like religious entities and $3,000 in daily fines against commercial entities. (*Id.,* Ex. 42, pp. 8-9). Sonoma County levied up to $10,000 in fines against commercial entities operating for the purpose of commercial gain but only assessed $100 in daily fines against non-commercial entities. (*Id.,* Ex. 43, pp. 9, 11).

The County could have assessed the maximum $500 daily fine against Calvary, which applies to non-commercial entities like Calvary. (*Id.,* Ex. 64, p. 12; McClure Decl., ¶ 20.) Instead, the County classified Calvary as a commercial activity, so it could assess the maximum $5,000 daily fine against the church. The enormous fines have and will burden Calvary. The church operates to serve the public, and if Calvary has to pay any amount of fines, it will have less money to spend on the church community and mission of expanding the gospel of Jesus Christ. (*Id.*, ¶¶ 19-20).

In sum, enforcing $2.87 million against a harmless church under the classification of a commercial activity would be fundamentally improper and an outrageous miscarriage of justice. The County's conduct violates the Excessive Fines Clause of the California and United States Constitutions.

**B.      Calvary Is Entitled To Relief**

1.      <u>Calvary is Entitled to Nominal Damages</u>

Calvary is entitled to nominal damages against the County because it enforced unconstitutional public health orders and fines. *See Bernhardt v. Cty. of Los Angeles*, 279 F.3d 862, 872 (9th Cir. 2002) (citing cases). Nominal damages are especially important in civil rights cases. "Unlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms." *City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986). The County's Shelter in Place Order, Risk Reduction Order, Gatherings Directive, Mandatory Directive on Capacity Restrictions and COVID-19-related fines violated the Free Exercise Clause, Equal Protection Clause, and Assembly Clause. The $2.87 million dollars in fines also violate the Excessive Fines Clause. Thus, Calvary is entitled to nominal damages against the County.

2.      <u>Calvary is Entitled to Declaratory Relief</u>

Declaratory relief requires that a plaintiff "show that the policy has adversely affected and continues to affect a present interest." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 868 (9th Cir. 2017) (cleaned up) Calvary is entitled to declaratory relief because the County seeks to collect $2.87

23

million from Calvary in the state court enforcement action for violating the Risk Reduction Order, Revised Risk Reduction Order, Gatherings Directive, Mandatory Directive on Capacity Limitations, State Blueprint, and State Guidance. A judgement declaring these orders and the related fines unconstitutional is therefore necessary to afford Calvary complete relief.

        3.    <u>Calvary is Entitled to a Permanent Injunction</u>

Calvary satisfies the requirements for a permanent injunction: (1) irreparable harm; (2) balance of hardships; and (3) public interest. *See eBay Inc.*, 547 U.S. at 391.

Calvary can demonstrate irreparable harm because the loss of a constitutional right, "for even [a] minimal period [] of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The COVID-19 fines and public health orders violated Calvary's right to free exercise of religion, assembly, and equal protection of the law. The fines are also unconstitutionally excessive. Because the County still seeks to collect $2.87 million against Calvary, a permanent injunction enjoining enforcement of the fines is necessary to prevent irreparable harm.

The last two factors merge when the government is the opposing party. *Nken v. Holder,* 556 U.S. 418, 435 (2009). The County's interest in protecting the health and safety of the community is a laudable goal, but this argument has lost its teeth because the challenged COVID-19 public health orders have been rescinded. In fact, several months ago, the County argued COVID-19 was no longer an imminent threat in light of "more effective treatment protocols for COVID-19…." ECF No. 135 at 4.

The County's interest in collecting the fines is certainly not in the public's interest. The COVID-19 public health orders and related fines violated Calvary's constitutional rights, and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod*, 427 U.S. at 373). The fines have and will continue to substantially burden Calvary if this Court does not enjoin the County from collecting the fines. (McClure Decl., ¶¶ 19-20). Thus, the balance of hardships tip in Calvary's favor.

## VI. CONCLUSION

The COVID-19 health orders restricting religious gatherings, banning singing and chanting, forcing face masks and social distancing, and requiring Calvary to sign a social distancing protocol were unconstitutional. Therefore, Calvary is entitled to (1) a declaratory judgement declaring these

restrictions and mandates unconstitutional and declaring the COVID-19-related fines unconstitutional; (2) a permanent injunction prohibiting enforcement of the fines; and (3) nominal damages resulting from the County's unconstitutional actions.

Respectfully submitted,

Dated:  September 16, 2022

/s/ Mariah Gondeiro, Esq.
Mariah Gondeiro

Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2022, I electronically filed the **PLAINTIFFS CALVARY CHAPEL SAN JOSE AND MIKE MCCLURE'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES N SUPPORT THEREIN** with the clerk of the Court by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on September 16, 2022, at Murrieta, California.

/s/ Mariah R. Gondeiro
Mariah R. Gondeiro