UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

-oOo-

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| CALVARY CHAPEL SAN JOSE, a ) | Case No.: |
| California Non-Profit Corporation; ) | 20-cv-03794-BLF |
| PASTOR MIKE MCCLURE, an individual; ) | |
| SOUTHRIDGE BAPTIST CHURCH OF ) | |
| SAN JOSE CALIFORNIA dba ) | |
| SOUTHRIDGE CHURCH, a California ) | |
| Non-Profit Corporation; PASTOR ) | |
| MICAIAH IRMLER, an individual, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| GAVIN NEWSOM, in his official ) | |
| capacity as the Governor of ) | |
| California; TOMAS ARAGON, M.D., in ) | |
| his official capacity as the Acting ) | |
| California Public Health Officer; ) | |
| SANTA CLARA COUNTY; SARA H. CODY, ) | |
| M.D., in her official capacity as ) | |
| Santa Clara County Public Health ) | |
| Officer; MIKE WASSERMAN, in his ) | |
| official capacity as Santa Clara ) | |
| County Supervisor; CINDY CHAVEZ, in ) | |
| her official capacity as a ) | |
| Santa Clara County Supervisor; ) | |
| DAVE CORTESE, in his official ) | |
| capacity as a Santa Clara County ) | |
| Supervisor; SUSAN ELLENBERG, in her ) | |
| official capacity as a Santa Clara ) | |
| County Supervisor; and JOE SIMITIAN,) | |
| in his official capacity as a ) | |
| Santa Clara County Supervisor, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

VIDEOTAPED DEPOSITION OF
SANTA CLARA COUNTY'S PERSON MOST KNOWLEDGEABLE
PURSUANT TO RULE 30(B)(6) - SARA H. CODY, M.D.

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

```
1    DATE:              Thursday, August 18, 2022

2    TIME:              9:04 A.M. to 6:52 P.M.

3    LOCATION:          Remote Via Zoom Videoconference

4

5    REPORTED BY:
     Michelle D. Knowles,
6    CSR No. 8979, RPR, CRR, CRC, CCRR
     File No. 22-0818
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

```
 1   If you want to ask her about comments she made about

 2   the County's rules, I guess you can ask her about

 3   that.

 4            MS. GONDEIRO:  Okay.  Well, her -- her

 5   capacity regarding whether she was at a social        10:31:14

 6   gathering or -- or it was during the workday is the

 7   same.  It -- you know, she's -- she's talking about

 8   her response to COVID-19 --

 9            MR. WALL:  Look, Ms. Gondeiro, there's a --

10   there's a -- there's a critical --                    10:31:27

11            MS. GONDEIRO:  -- that leads with her role

12   as capac- -- her -- her role once she's outside of

13   the building.

14            MR. WALL:  The critical distinction here is

15   that Dr. Cody is appearing as a designee of the       10:31:39

16   County to testify on behalf of the County.  She's not

17   here in her personal capacity to testify about her

18   social con- -- her social life.

19            And if you want to expand the scope of this

20   deposition to her personal capacity, we can -- we can 10:31:54

21   designate, say, until noon to talk about her personal

22   capacity and close any further deposition in that

23   capacity.  If you want to talk to her as the designee

24   of the County, please ask questions about the County

25   and what it did and the basis for its actions during  10:32:12
```

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1   the COVID-19 pandemic.

2          MS. GONDEIRO:  Okay.  What we'll do is --

3   we'll talk about this, Robin, over lunch because I

4   don't want to waste any more time, and we will --

5   we'll talk about this, and perhaps you can have          10:32:24

6   someone in your -- in your county office provide me

7   the case law that is warranting you precluding her

8   from -- from answering these questions.

9          MR. WALL:  I'm not precluding her from

10  answering.  I'm just saying that if we're going to       10:32:38

11  discuss private third-party identities and

12  information, we need appropriate confidentiality

13  protection.

14         MS. GONDEIRO:  Well, I also need to know the

15  case law that requires that.  She's already given me     10:32:50

16  other third-party information names.  So I don't want

17  to waste any more time, so we're going to have to

18  talk about this over lunch break.

19  BY MS. GONDEIRO:

20     Q.   Dr. Cody, what scientific literature did you      10:33:02

21  rely on, starting in January of 2020, to learn about

22  COVID-19?

23     A.   There would have been multiple sources.

24     Q.   Okay.  Well, what were those -- what were

25  the sources you relied upon, starting in January of      10:33:24

1   2020, to learn about COVID-19?

2       A.   I can give you examples.  This will not be

3   exhaustive.

4       Q.   Okay.

5       A.   So official publications by the Centers for          10:33:39

6   Disease Control and their morbidity and mortality

7   reports, articles published in the medical literature

8   by medical journals, articles published in the

9   literature by other public health journals, articles

10  published in the literature from epidemiology             10:34:06

11  journals, and -- and other publications and -- and

12  preprints.

13      Q.   Were there any specific studies you relied

14  upon regarding COVID-19 starting in January of 2020?

15      A.   And what time period?                             10:34:33

16      Q.   Starting in January of 2020.

17           MR. WALL:  Objection.  Vague.  Overbroad.

18           THE WITNESS:  January 2020 through present?

19  BY MS. GONDEIRO:

20      Q.   Let's say January of 2020 through -- through     10:34:43

21  March of 20- -- of 2020, what specific studies did

22  you rely upon?

23      A.   Between January 2020 and March 2020?

24      Q.   Yes.

25      A.   I -- I don't recall which specific studies        10:34:59

 1    for that -- that time period.  It was quite a while

 2    ago.

 3        Q.   Okay.  What about after -- from -- from

 4    March 2020 to the present, what specific studies did

 5    you rely upon regarding COVID-19?                        10:35:12

 6             MR. WALL:  Objection.  Vague.  Overbroad.

 7             THE WITNESS:  I -- I -- I wouldn't be able

 8    to give you specific citations for specific studies.

 9    BY MS. GONDEIRO:

10        Q.   You don't recall any specific studies you     10:35:25

11    relied upon regarding COVID-19 at all since January

12    of 2020 to the present?

13        A.   There were many studies, as I mentioned, and

14    there were studies regarding clinical studies,

15    epidemiological studies, wastewater studies,            10:35:45

16    long-term COVID outcome studies, vaccination studies.

17    So there were -- there were -- there were many.  And

18    there were studies in the CDC's MMWR.  So there

19    were -- there were many.

20        Q.   Well, let's start with the CDC.                10:36:13

21             So starting from January of 2020 to the

22    present, what CDC studies did you rely on?

23        A.   I would have relied on many.

24             Do you want to know which -- some examples?

25        Q.   Yes.                                           10:36:36

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    A.   So one example would be there was a report

2  of a event in, I believe it was, Washington -- of a

3  super-spreader event at a choir in Washington.  I

4  remember that one fairly well.

5    Q.   Do you remember any other studies and the          10:37:02

6  details of those studies conducted by the CDC

7  regarding COVID-19 starting in January of 2020?

8         MR. WALL:  Objection.  Misstates testimony.

9         You can answer the question, Dr. Cody.

10        THE WITNESS:  The CDC published many studies       10:37:17

11  of experiences from around the country with COVID-19

12  that were relevant and of interest to us.

13  BY MS. GONDEIRO:

14    Q.   Okay.  That didn't answer my question.

15         I asked you, can you explain to me what --        10:37:35

16  what other studies you relied upon from the CDC

17  starting from January of 2020 to the present?

18    A.   So I don't -- I don't re- -- I can't bring

19  up specific citations of studies.

20    Q.   I'm not asking for specific citations.  I'm       10:37:58

21  just asking you to just give me a brief overview of

22  what you remember about that study.

23    A.   Of -- of types of studies that I would have

24  relied on?

25    Q.   Yes.  Relat- -- regarding COVID-19 --             10:38:09

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1   regarding COVID-19.

2        So let me -- let me restate the question:

3   What other studies did you rely upon from the CDC

4   regarding COVID-19 starting in January of 2020?

5        MR. WALL:  Objection.  Asked and answered.        10:38:28

6        You can answer the question, Dr. Cody, if

7   you understand it.

8        THE WITNESS:  Yeah.

9        Yeah, your question is broad.  The CDC would

10  regularly publish in MMWR experiences from other        10:38:40

11  jurisdictions across the country around COVID.  Many

12  of their articles were around COVID.  Those would

13  have been studies that I would likely have read

14  because they would have been relevant.

15  BY MS. GONDEIRO:                                        10:38:58

16      Q.   Okay.  Can you name the studies that you

17  remember from the CDC, starting in January of 2020?

18      A.   I remember the study of the super-spreader

19  event in Washington from -- in a choir.

20      Q.   Okay.  Do you recall any other study from    10:39:20

21  the CDC?

22      A.   There were volumes of studies from the CDC.

23  If you ask me about a specific one, I can tell you if

24  I can recall that specific one.

25      Q.   I'm asking you, aside from the study of the   10:39:36

1   Washington choir, do you recall the contents of any

2   other study from the CDC, starting in January of

3   2020?

4           MR. WALL:  Objection.  Asked and answered.

5   Argumentative.                                      10:39:50

6           You can answer the question, Dr. Cody.

7           THE WITNESS:  I can't remember a -- a

8   specific study.  What I can remember is publications

9   around evidence for masking.  I can remember studies

10  regarding multiple super-spreader events and the      10:40:11

11  circumstances.  I can remember studies regarding --

12  or reporting out around vaccination coverage later in

13  the pandemic.

14  BY MS. GONDEIRO:

15      Q.   Okay.  Well, let's start with the studies     10:40:31

16  regarding the masks from the CDC.  Can you please

17  explain to me -- or list those studies from the CDC

18  that you relied upon starting in January of 2020?

19          MR. WALL:  Objection.  Asked and answered.

20          THE WITNESS:  I can't recall enough to list    10:40:51

21  studies for you.

22  BY MS. GONDEIRO:

23      Q.   Can you recall the contents of any of those

24  studies regarding masks from the CDC starting in

25  January of 2020?                                      10:41:04

1    A.    I can't recall any specific studies during

2  that time period from the CDC.  If you presented it

3  to me, I could tell you if I recognized it and

4  recalled it.

5    Q.    Do you recall any of the publications you --    10:41:20

6  you had reviewed from the CDC regarding COVID-19

7  starting in January of 2020?

8    A.    Can you be a little bit more -- so can you

9  restate and be a little bit more specific so I can

10  make sure I answer your question?                     10:41:42

11    Q.    Well, earlier you testified that you had

12  reviewed publications from the -- from the CDC.

13       Do you remember that?

14    A.    Yes.

15    Q.    Okay.  When you said "publications," what      10:41:53

16  publications did you review regarding COVID-19 from

17  the CDC starting in January of 2020?

18    A.    So, as I mentioned, the CDC regularly

19  publishes in their MMWR various public health reports

20  of experiences.  Many of these were regarding         10:42:13

21  COVID-19 during the pandemic; and they would come

22  out, depending on the publication, sometimes weekly.

23  And I would have been look- -- been looking at those

24  as well as other publications.

25    Q.    Okay.  So you're -- so what were those other   10:42:33

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1   publications you're referring to from the CDC?

2       A.   Right.   So there would have been other --

3   the other -- when I say "other publications," I meant

4   other publications in the medical literature.

5       Q.   So other pub- -- other publications outside      10:42:54

6   of the CDC?

7       A.   Correct.

8       Q.   Okay.   So starting in January of 2020, what

9   other publications did you rely upon outside of the

10  CDC regarding COVID-19?                                    10:43:08

11      A.   There were many.

12      Q.   Okay.   Well, what were those publications

13  about, starting in January of 2020, regarding

14  COVID-19 that you can remember?

15          MR. WALL:   Objection.   Vague.   Overbroad.      10:43:25

16          You can answer the question, Dr. Cody.

17          THE WITNESS:   So I -- I cannot give you a

18  comprehensive answer.   I -- I can remember a

19  particular study around masking evidence that was a

20  large study from Bangladesh that had cases -- it was    10:43:48

21  a large retrospective cohort study that demonstrated

22  the efficacy of community-wide masking.   I can't

23  remember exactly where it was published.   It was not

24  published by the CDC.

25  /////                                                     10:44:14

1   BY MS. GONDEIRO:

2       Q.   So earlier I believe you had testified that

3   you didn't recall any mask studies.

4           Do you remember that?

5       A.   No.                                              10:44:20

6           MR. WALL:  Objection.  Misstates testimony.

7   BY MS. GONDEIRO:

8       Q.   Okay.  So you -- that was just limited to

9   the CDC?  You don't recall -- you don't recall any

10  mask studies from the CDC?                               10:44:28

11      A.   That's not correct.

12      Q.   Okay.  So you do recall mask studies from

13  the CDC starting in January of 2020?

14      A.   The CDC would likely have published studies

15  regarding masking between January 2020 and present.      10:44:43

16      Q.   And do you recall those studies?

17      A.   What I -- what I'm telling you is I can't

18  specifically recall the details of a particular study

19  to recite for you.

20      Q.   Sure.  I'm not asking for specific details;     10:44:58

21  I'm just asking generally.

22          What do you recall about those studies from

23  the CDC?

24      A.   The -- so I don't recall specific details

25  about the studies.  What I -- what I do recall is        10:45:12

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1  that the CDC published studies regarding masking.

2      Q.   Okay.  Regarding the study on the Bang- --

3  of Bangladesh, was that a randomized controlled

4  study?

5      A.   That was a randomized controlled trial.          10:45:30

6      Q.   Okay.  Did that Bangladesh study show

7  that -- demonstrate that surgical masks are effective

8  at curtailing the spread of COVID-19?

9      A.   I don't believe that was a specific question

10  that was asked in the study.                              10:45:51

11      Q.   You don't believe it was?

12      A.   I don't -- I don't think that was a specific

13  question asked in the study.

14      Q.   So did the study -- was the study just

15  limited to N95 masks?                                     10:46:04

16      A.   No.

17      Q.   Okay.  So the study did include surgical

18  masks as well?

19      A.   As I recall, yes.

20      Q.   Okay.  And how effective were the masks at     10:46:19

21  curtailing the spread of COVID-19 in this -- in this

22  Bangladesh study?

23          MR. WALL:  Objection.  Vague.

24          THE WITNESS:  I -- I can't -- I can't recall

25  the statistics well enough to recite them for you.  I    10:46:38

1    can recall the bottom line.

2    BY MS. GONDEIRO:

3        Q.    Okay.   What was the bottom line?

4        A.    The bottom line was a randomized controlled

5    trial looking at large groups.   Communities with          10:46:51

6    masking use and masking reinforcement and masking

7    messages had lower rates of COVID as compared to

8    those without those interventions.

9        Q.    And what was the difference?   Can you recall

10   the general percentage of how much the masks              10:47:10

11   prevented the spread of COVID-19?

12       A.    It was a significant difference

13   demonstrating the protectiveness of community

14   masking.

15       Q.    Okay.   You don't recall the specific           10:47:28

16   percentage, though?

17       A.    I don't.

18       Q.    Even the general?   Can you --

19       A.    I wouldn't want to -- to hazard -- to hazard

20   a guess.                                                  10:47:39

21       Q.    Okay.   Was it more than 10 percent?

22       A.    That -- that's not the way the study would

23   have -- can you restate your -- that's not the way

24   the study was designed.   Like, 10 percent of what?   I

25   don't know your question.                                 10:47:57

1    Q.    Did it -- did it reduce the -- the -- did

2  the people who wore masks in the study reduce the

3  spread of COVID-19 by more than 10 percent compared

4  to the individuals who were not wearing masks in the

5  Bangladesh study?                                    10:48:15

6    A.    So I don't think that's how the question was

7  asked in the study, so I don't think I can accurately

8  answer your question.

9    Q.    Okay.  So how was --

10   A.    It's all cov- -- it's covered in the study,   10:48:26

11  though.  It's published.  It's available.

12   Q.    Okay.  When did this study come out?

13   A.    It came out in the fall, and I -- I don't

14  recall exactly when.

15   Q.    Were you aware of any masking studies from    10:48:52

16  any source regarding COVID-19 before the fall of

17  2020?

18   A.    Yes.  I believe there were studies prior to

19  that, yes.

20   Q.    And what were those studies?                  10:49:10

21   A.    I can't give you specifics.  I -- I don't

22  recall specifics.

23   Q.    Well, just generally, what can you recall

24  about those studies?

25   A.    They would have been studies by -- around    10:49:23

1    aerosols and the behavior of aerosols and masks.  I

2    recall a group of studies in that neighborhood.

3            There would have been studies around --

4    population-based studies.  There would have been

5    studies around use and prevalence of mask use.          10:49:55

6    Q.   I'm going to come back to these -- these

7    questions later.

8            Can you -- but, first, before I get onto the

9    next topic, can you please provide me the -- the

10   publications of the super-spreader events that you      10:50:28

11   relied upon regarding COVID-19 starting in January of

12   2020?

13           MR. WALL:  Objection.  Vague.  Overbroad.

14           THE WITNESS:  Do you want me to list the

15   studies that I relied on?                                10:50:45

16   BY MS. GONDEIRO:

17   Q.   That you recall, yes.

18   A.   So I -- I don't -- without referring to

19   notes, I can't go back and list studies for you.

20   Q.   Do you recall any details, anything about        10:50:58

21   those studies regarding super-spreader events,

22   starting in January of 2020?

23   A.   What I recall is that there were multiple

24   reports of super-spreader events, all reaching the

25   same conclusion.                                        10:51:17

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1     Q.   Okay.  And what -- and what was -- what was

2   that conclusion?

3     A.   That indoor events where people were not

4   masked had risk of -- of sup- -- super-spreading

5   where multiple people became ill from a single          10:51:39

6   infected person.  I also recall that those

7   super-spreader events would then have an impact on

8   the surrounding community and spread to others in the

9   community, including people in long-term care

10  facilities who then died.                               10:52:01

11    Q.   So you refer to long-term care facilities.

12         Where were those long- -- long-term care

13  facilities located?  Do you recall?

14    A.   I do remember a report from -- this was in a

15  state in the Midwest where there were outbreaks at a    10:52:29

16  university, and then the same -- the virus with the

17  same genomic sequence was then found in long-term

18  care facility residents in the community, some of

19  whom had very bad outcomes.

20         So it essentially was important because it       10:52:55

21  showed that the behavior in one part of the community

22  can have very, very serious adverse consequences in a

23  more vulnerable part of the community even though

24  there's not known contact between the, for example,

25  university students and residents in the long-term     10:53:19

1   care facility.

2          So what I remember -- I remember this

3   because it demonstrated how important it is to keep

4   the overall community prevalence low in order to

5   protect people who are most vulnerable.                10:53:35

6          Q.   Okay.  Did you ever read Tomas Pueyo's

7   argument -- or article called "The Hammer or Dance"

8   around March of 2020?

9          A.   That does sound familiar.

10         Q.   And what do you recall about this "Hammer or    10:53:51

11  Dance" article?

12         A.   Not a lot of detail apart from that I --

13  I -- I know that I read it, and it was early in the

14  pandemic, as I recall.

15         Q.   Okay.  What do you remember about that         10:54:13

16  article generally?

17         A.   I -- I would have to review it to -- to tell

18  you.

19         Q.   You don't remember anything about that

20  article --                                              10:54:26

21         A.   I re- --

22         Q.   -- related to COVID-19?

23         A.   I remember it was an article -- what do I

24  remember about that article?  I wish -- I don't -- I

25  just -- I don't remember much about the article.  I    10:54:47

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    re- -- I remember that I -- that -- I remember that I

2    read it.  I remember his name.  I remember that

3    others had read it.

4        Q.   Do you know who Tomas Pueyo is?

5        A.   I don't know much about Tomas Pueyo, no.          10:55:08

6        Q.   Oh.  Does Tomas Pueyo have a medical degree?

7        A.   I don't know.

8        Q.   Well, when you reviewed this article that

9    he -- he wrote, did you look to see if -- or did you

10   research whether he had a medical degree?            10:55:27

11       A.   I don't recall.

12       Q.   Okay.  Did you know that Tomas Pueyo is

13   the -- is the vice president of growth for an online

14   educa- -- education company called "Course Hero"?

15       A.   No.                                         10:55:48

16       Q.   Okay.  Did you -- did -- did you ever review

17   any other article from Tomas Pueyo regarding COVID-19

18   starting in March of 2020?

19       A.   I don't recall.

20       Q.   Did the public -- did the County Public      10:56:05

21   Health Department activate the department's

22   operations center in preparation for COVID-19 in

23   January of 2020?

24       A.   Yes.

25       Q.   And who was director of the department's      10:56:20

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1   operations center at -- starting in January of 2020?

2            MR. WALL:  Objection.  Assumes facts.

3            THE WITNESS:  So who was the director of the

4   department's operations center in January 2020?

5   BY MS. GONDEIRO:                                        10:56:38

6       Q.   Yes.

7       A.   Who -- so this -- I can't remember who our

8   first incident commander would have been.  I don't --

9   I don't remember who our first incident commander

10  was.  And this was the -- Medical Health Joint          10:56:58

11  Operations Center was the correct title.

12      Q.   Starting in January of 2020, what role did

13  James Williams have in the de- -- department

14  operations center?

15           MR. WALL:  Objection.  Beyond the scope.       10:57:13

16           THE WITNESS:  James is County Counsel.

17  His -- his --

18  BY MS. GONDEIRO:

19      Q.   Are you aware that he also had a role in the

20  department operations center starting in January        10:57:26

21  2020?

22           MR. WALL:  Objection.  Assumes facts and

23  beyond the scope.

24           THE WITNESS:  Oh, the initial activation was

25  the Public Health Department's Medical Health Joint      10:57:36

1  Operations Center, which was just within the Public

2  Health Department.  It was not a countywide

3  activation in January.

4  BY MS. GONDEIRO:

5      Q.   Okay.  Well, at any time during the COVID-19      10:57:51

6  pandemic, from -- from January of 2020 to the

7  present, did James Williams work in the department

8  operations center?

9      A.   No.  James Williams did not work in the

10 department operations center.  James Williams did not      10:58:09

11 work in the Medical Health Joint Operations Center,

12 which is part of the Public Health Department.

13     Q.   Okay.  Well, outside of his role as County

14 Counsel, did James Williams ever have any other role

15 related to COVID-19 starting in January of 2020?      10:58:25

16          MR. WALL:  Objection.  Beyond the scope.

17          You can answer, Dr. Cody.

18          THE WITNESS:  Yes.

19 BY MS. GONDEIRO:

20     Q.   And what was that role?      10:58:35

21     A.   The Emergency Operations Center of the

22 County had directors.  James was one of those

23 directors.

24     Q.   Okay.  Did the County also activate the

25 Emergency Operations Center starting in January of      10:58:56

1    2020 in response to COVID-19?

2        A.    No.

3        Q.    When did they activate the Emergency

4    Operations Center regarding COVID-19?

5        A.    February of 2020.                        10:59:09

6        Q.    Okay.  And in -- what was the role of the

7    Emergency Operations Center starting in February of

8    2020 as it relates to COVID-19?

9        A.    To coordinate the countywide response to

10   COVID-19.                                           10:59:30

11       Q.    What were -- what was the specific tasks of

12   the Emergency Operations Center starting in January

13   of 2020 as -- or February as it related to COVID-19?

14            MR. WALL:  Objection.  Beyond the scope.

15            But you can answer, Dr. Cody.              10:59:45

16            THE WITNESS:  The -- the tasks changed

17   throughout the pandemic.  They would change

18   frequently depending on what was going on.

19   BY MS. GONDEIRO:

20       Q.    Okay.  What were the tasks at the beginning 10:59:57

21   of the pandemic, starting in February of 2020?

22            MR. WALL:  Same objection.

23            THE WITNESS:  What were the specific tasks

24   of the Emergency Operations Center --

25   /////                                               11:00:17

1    BY MS. GONDEIRO:

2         Q.   Yes.

3         A.   -- in February of 2020?

4         Q.   Yes.

5         A.   You know, I don't recall our specific tasks          11:00:20

6    and objectives at that point in the pandemic.  I

7    would just be -- I would -- it would be -- I would be

8    speculating.

9         Q.   Okay.  Well, what specific tasks do you

10   recall the Emergency Operations Center conducting          11:00:33

11   after February 2020 as it relates to COVID-19?

12             MR. WALL:  Objection.  Beyond the scope.

13             THE WITNESS:  Tasks?  Objectives?  Goals?

14   Can you restate your question?

15   BY MS. GONDEIRO:                                          11:00:58

16        Q.   Do you know what I mean when I say "task"?

17        A.   Not -- no, I don't.

18        Q.   Okay.  I mean, what was their job duty?

19   What was -- what did they -- what were their -- were

20   their daily activities as it related to COVID-19?          11:01:11

21   That -- that's what I mean when I say -- when I say

22   "task."  And so let me -- let me repeat this

23   question.

24             What were the -- what was the job duty of

25   the Emergency Operations Center at -- after February          11:01:26

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1   of 2020 as it relates to COVID-19?

2           MR. WALL:  Objection.  Beyond the scope.

3           THE WITNESS:  There were many -- there were

4   many, many jobs; so I don't -- I can't answer your

5   question because I don't --                              11:01:46

6   BY MS. GONDEIRO:

7       Q.   What job --

8       A.   -- it doesn't make sense.

9       Q.   What job duties do you remember?

10      A.   Whose job?                                       11:01:53

11      Q.   Let's start with James Williams.  What was

12  his job duties at the Emergency Operations Center as

13  it related to COVID-19?

14          MR. WALL:  Objection.  Beyond the scope.

15          THE WITNESS:  James served as one of the         11:02:13

16  directors of the EOC.

17  BY MS. GONDEIRO:

18      Q.   Okay.  What was his job duties as director

19  of the Emergency Operations Center starting in

20  February of 2020?                                        11:02:24

21          MR. WALL:  Same objection.

22          THE WITNESS:  The job of the director is to

23  oversee all of the various components of the

24  response.

25  /////                                                    11:02:41

1    BY MS. GONDEIRO:

2        Q.    How often did you consult with James

3    Williams in his capacity as the director of the

4    Emergency Operations Center starting in February of

5    2020 regarding COVID-19?                                    11:02:50

6        A.    It would depend on the time.

7        Q.    Okay.

8        A.    James Williams was not always the director,

9    so it would have depended on whether he was serving

10   as director or not.                                         11:03:11

11       Q.    Was James Williams director of the Emergency

12   Operations Center in February?

13       A.    Not for all of February, no.

14       Q.    Okay.

15       A.    For some days.                                    11:03:22

16       Q.    Okay.  Was he -- was he the Emergency Op- --

17   director of the Emergency Operations Center during

18   the summer of 2020?

19       A.    At -- at -- on some days, yes.

20       Q.    Well, on the days that he was director of     11:03:36

21   the Emergency Operations Center, from February

22   through the summer of 2020, how often did you consult

23   with him regarding COVID-19?

24       A.    On the days that he was director, I would

25   have consulted with him on those days.                      11:03:55

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1     Q.    Okay.  And what were those discussions

2   about?

3           MR. WALL:  Objection.  Vague.

4           You can answer the question, Dr. Cody.

5           THE WITNESS:  They would have been about all        11:04:08

6   manner of the County's COVID response.

7   BY MS. GONDEIRO:

8     Q.    Can you -- can you get -- be a little bit

9   more specific when you say "matters of the" -- "of

10  the COVID-19 response"?                                     11:04:25

11    A.    The -- we were looking at data to understand

12  the impact.  We were in contact with hospitals

13  regarding the impact.  There were many components of

14  the response to -- to ensure the safety of the

15  community.                                                  11:04:52

16          MS. GONDEIRO:  Okay.  I'm going to pull up

17  Exhibit 8, Dan.

18          (Exhibit 8 was marked for identification.)

19          THE VIDEOGRAPHER:  All right.  Stand by.

20          MR. WALL:  I'm sorry.  Mr. -- was that          11:05:13

21  Mr. DeFrank?  We can't --

22          THE VIDEOGRAPHER:  Yeah.

23          MR. WALL:  -- hear you.

24          I'm sorry.  You -- you were -- you didn't --

25  I didn't hear what you said.  Could you please repeat     11:05:18

1   yourself?

2           THE VIDEOGRAPHER:  Yeah.  I -- I -- I just

3   said, "Stand by."

4           MR. WALL:  Okay.  Thank you.

5           THE VIDEOGRAPHER:  Yep.                          11:05:24

6           There you go.

7   BY MS. GONDEIRO:

8       Q.   Do you recognize this order, Dr. Cody?

9       A.   I can't see the date on the order.

10          MR. WALL:  Is there a way that we can drop      11:05:42

11  the exhibit into the chat so that Dr. Cody can open

12  it locally?

13          THE WITNESS:  I can just see about --

14          THE VIDEOGRAPHER:  Yeah, yeah.

15          THE WITNESS:  -- half a -- half a page.         11:05:56

16          THE VIDEOGRAPHER:  Right.

17          THE WITNESS:  That's better.

18          MS. GONDEIRO:  And then --

19          MR. WALL:  Again, can we -- if we're going

20  to ask the witness questions about the exhibit, I'd    11:06:14

21  like to drop a copy into the chat --

22          THE VIDEOGRAPHER:  All right.

23          MR. WALL:  -- so she can open it locally and

24  look at all the pages so she's familiar with what the

25  document is.                                           11:06:22

```
 1            MS. GONDEIRO:  Okay.

 2            THE VIDEOGRAPHER:  All right.

 3            MS. GONDEIRO:  I can actually just go to the

 4    specific page, but...

 5            THE VIDEOGRAPHER:  Let me get out of share     11:06:27

 6    so I can put it in the chat, and then I'll open it.

 7    So just -- it's going to take an extra step.  That's

 8    all.

 9            MR. WALL:  No.  Thank you.  I appreciate it.

10            THE VIDEOGRAPHER:  No problem.                 11:06:35

11            MR. WALL:  Thanks, Mr. DeFrank.

12            THE VIDEOGRAPHER:  Yeah, no problem.

13            Okay.  And it's in chat, and it's on the

14    screen.

15            MR. WALL:  Thank you.                          11:07:14

16            Dr. Cody, can you -- can you find the

17    document in chat?  You can open it there.

18            THE WITNESS:  Whoops.

19            MR. WALL:  I don't -- I don't want to hear

20    "oops."                                                11:07:26

21            THE WITNESS:  No.  I -- I'm not --

22            MR. WALL:  If you -- if you click on the

23    chat icon at the bottom of your window --

24            THE WITNESS:  Right.

25            MR. WALL:  -- for me, it pulls up a window     11:07:36
```

1   that has Exhibit 8.pdf.

2           THE WITNESS:  Right.

3           MR. WALL:  You can --

4           THE WITNESS:  And I have opened it, and

5   then -- whoops.  I'm not -- this is -- this is a          11:07:44

6   little bit of a difficult interface.  If you'd just

7   give me a minute.

8           MR. WALL:  Sure.  We'll get it right the

9   first time, and it will be easier every time after

10  that.                                                    11:08:00

11          THE WITNESS:  Okay.  I now have it available

12  from the chat.

13          MS. GONDEIRO:  Okay.

14          MR. WALL:  Oh, it's not opening.

15          THE WITNESS:  I have it on -- on my screen      11:08:18

16  where I can --

17  BY MS. GONDEIRO:

18      Q.   Okay.  Do you recognize this order,

19  Dr. Cody?

20      A.   Yes.                                            11:08:25

21      Q.   What was the purpose of this order?

22      A.   To protect the public.

23      Q.   To protect the public?

24      A.   To protect the public from infection and

25  hospitalization and death.                               11:08:44

1    Q.   Why did you believe, starting in March of

2   2020, that a shelter-in-place order was necessary?

3    A.   We had evidence of exponential growth of the

4   virus and infections.

5    Q.   And where did you get this evidence from                11:09:03

6   that demonstrated this -- this exponential growth of

7   COVID-19?

8    A.   From reports of cases.

9    Q.   Reports of cases -- when you say "reports of

10   cases," are you talking about reports of cases in           11:09:22

11   Santa Clara County?

12    A.   Yes.

13    Q.   Okay.  What entities were considered

14   essential pursuant to this shelter-in-place order?

15         MR. WALL:  Objection.  The document speaks            11:09:37

16   for itself.

17         THE WITNESS:  Do you want me to read from

18   the document?

19   BY MS. GONDEIRO:

20    Q.   Well, I don't -- I don't believe it lists             11:09:47

21   all -- all the entities that were essential.

22         I'm just asking you, what -- what entities

23   were essential -- did you declare were essential

24   in -- in this shelter-in-place order?

25         MR. WALL:  Same objection.                            11:10:07

| | |
|---|---|
| 1 | THE WITNESS:  We -- we didn't -- we had | |
| 2 | definitions of essential business and essential | |
| 3 | infrastructure, and there was one other definition. | |
| 4 | BY MS. GONDEIRO: | |
| 5 | Q.   It says in the title that this order | 11:10:33 |
| 6 | prohibited nonessential gatherings. | |
| 7 | What was an essential gathering pursuant to | |
| 8 | this shelter-in-place order? | |
| 9 | A.   I'm just reviewing the title of the order. | |
| 10 | Just one moment. | 11:10:51 |
| 11 | MR. WALL:  Objection to the extent it calls | |
| 12 | for a legal conclusion. | |
| 13 | But, Dr. Cody, you can answer the question | |
| 14 | if you understand it. | |
| 15 | THE WITNESS:  The title of this order does | 11:11:10 |
| 16 | not refer to gath- -- no.  Pardon me.  I -- can you | |
| 17 | ask your question one more time? | |
| 18 | BY MS. GONDEIRO: | |
| 19 | Q.   Yes. | |
| 20 | You'll see in the title there that it -- | 11:11:22 |
| 21 | that it prohibits all nonessential gatherings of any | |
| 22 | numbers of individuals. | |
| 23 | You see where it says that -- | |
| 24 | A.   Yes. | |
| 25 | Q.   -- at the end? | 11:11:33 |

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1      Okay.  What --

2   A.   Yes.

3   Q.   What did the County consider to be an

4   essential gathering at this time?

5      MR. WALL:  Same objection.                    11:11:41

6      THE WITNESS:  The -- the purpose of the

7   order was to limit contact between people to the

8   greatest degree possible; however, I also -- I did

9   understand that people needed food, shelter, and

10  basic medical care.  And that -- that was really how  11:12:04

11  this was organized.

12  BY MS. GONDEIRO:

13  Q.   Okay.  You didn't answer my question.

14      I'm asking, what constituted an essential

15  gathering pursuant to this order?                 11:12:19

16      MR. WALL:  Objection.  Asked and answered,

17  to the extent it calls for a legal conclusion, and

18  argumentative.

19      THE WITNESS:  I'm going to look in the order

20  so I can be precise and look for the definition.    11:12:33

21      So number 4, "All public and private

22  gatherings for any number of people occurring outside

23  a household or living unit are prohibited, except for

24  the limited purposes as expressly permitted in

25  Section 10.  Nothing in this Order prohibits the    11:13:14

1    gathering of members of a household unit or living

2    unit."

3         And Section 10.  So Section 10 -- Section 10

4    would detail the -- the limited pur- -- the limited

5    purposes for which people could come together outside          11:13:50

6    of their household.

7    BY MS. GONDEIRO:

8         Q.   Okay.  Why did the County determine that

9    critical infrastructure -- infrastructure was

10   essential in this order?                                        11:14:11

11        A.   Which section are you looking at?  Just -- I

12   want to make sure that I'm precise.

13        Q.   Okay.  Well, it just says that in the -- in

14   the title.  It says that critical infrastructure was

15   essential.                                                      11:14:29

16        What included -- what did critical

17   infrastructure -- infrastructure include?

18        MR. WALL:  Objection.  The order speaks for

19   itself.

20        THE WITNESS:  I'm trying to look at the                    11:14:43

21   definition so that I can be precise for you.

22        The -- the general idea would be that there

23   were services that everyone in the community would

24   need.  For example, have their electricity on, to

25   have water come into their place of habitation, to be          11:15:09

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1  able to access food.  Food, shelter, medical care,

2  and anything necessary to have, you know, a safe -- a

3  safe place to live.

4       MS. GONDEIRO:  Uh-huh.

5       THE WITNESS:  So -- and to the extent that          11:15:29

6  something supported or is needed to ensure food,

7  shelter, and medical care would have been included.

8  BY MS. GONDEIRO:

9     Q.  Why did the County not consider religious

10  services to be essential?                                11:15:42

11     A.  We were thinking about really basic services

12  that everyone living in the County would need, and

13  that would include food, shelter, medical services,

14  and anything to support that, would apply to everyone

15  living in the County.                                    11:16:07

16     Q.  Okay.  Why did the County then include

17  government agencies as essential in this order?

18       MR. WALL:  Objection.  The order speaks for

19  itself.

20       MS. GONDEIRO:  No.  I'm asking her why.        11:16:22

21       MR. WALL:  No, I understand.  The question

22  has embedded an interpretation or -- of the order.

23  That's just for the purposes of preserving the

24  objection.  I apologize.

25       Go ahead.  You can answer the question,        11:16:33

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    Dr. Cody.  The objection stands.

2            THE WITNESS:  Sure.

3            So government agencies, for example, provide

4    health and safety, law enforcement; so they would be

5    necessary to continue.  Fire --                          11:16:49

6    BY MS. GONDEIRO:

7        Q.   What else would you --

8        A.   Fire, law, you know, bas- -- sort of, again,

9    within the realm of basic health and safety.

10       Q.   Okay.  So you -- you -- you determined that    11:17:00

11   County -- when you say "law," what do you mean?

12       A.   Law enforcement.

13       Q.   Okay.  What about the legal department?

14       A.   To the extent that that's needed to support

15   food, shelter, medical care, basic health and safety,   11:17:21

16   and law, then -- then -- then -- then yes.

17       Q.   Why didn't the County consider the spiritual

18   benefits of attending a religious service in this

19   shelter-in-place order?

20            MR. WALL:  Objection.  Assumes facts.          11:17:43

21            THE WITNESS:  The shelter-in-place order was

22   to protect people from hospitalization and death,

23   which was extremely important to protect -- to

24   protect people from dying.

25            MS. GONDEIRO:  Uh-huh.                          11:18:08

1        THE WITNESS:  And I wanted, and felt it was

2   necessary, to limit contact between people from

3   different households to prevent spread and prevent

4   death.

5   BY MS. GONDEIRO:                                    11:18:22

6        Q.   Sure.

7        Are there people from different households

8   contacting -- that were con- -- within -- within

9   contact of one another in these essential government

10  agencies that were deemed essential pursuant to this  11:18:33

11  health order?

12        MR. WALL:  Objection.  Assumes facts.

13        THE WITNESS:  Can you restate your question?

14  BY MS. GONDEIRO:

15       Q.   You said that you -- that this -- the goal   11:18:45

16  was to prevent hospitalizations; correct?

17       A.   (Nodding head.)

18       Q.   And you also said that that was by

19  preventing contact between people with different

20  households; correct?                                 11:19:02

21       A.   Yes.

22       Q.   Okay.  Well, do people within gover- -- are

23  there people from different households who work for

24  government -- the essential government agencies

25  pursuant to this order?                              11:19:12

1      MR. WALL:  Objection.  Vague.  Assumes

2  facts.

3      THE WITNESS:  Yes.  As -- as I stated, some

4  activities have to continue to ensure that people

5  have their basic needs met.                          11:19:25

6  BY MS. GONDEIRO:

7      Q.   Okay.

8      A.   Yeah.

9      Q.   So you were determining that what was

10  important -- you -- so you determined that church or   11:19:33

11  religious services were not important enough to be

12  considered essential?

13      MR. WALL:  Objection.  Vague.  Misstates

14  testimony.

15      You can answer the question, Dr. Cody.          11:19:46

16      THE WITNESS:  Yeah.  The purpose of the

17  order -- the top-level purpose of the order was to

18  present -- prevent spread of infection and resulting

19  hospitalization and death.  And everyone -- however,

20  everyone in the County still needs to eat, have        11:20:04

21  shelter, and -- and obtain health care for -- you

22  know, broadly.

23      And any other activity that didn't support

24  that and might contribute to community spread and

25  exponential spread, we didn't want to occur because    11:20:28

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    we wanted to protect everyone in the County from

2    hospitalization and death.

3    BY MS. GONDEIRO:

4        Q.   Are you aware that religious services have

5    religious functions outside of religious gatherings?    11:20:45

6             MR. WALL:  Objection.  Vague.

7             THE WITNESS:  Can -- can you ask your

8    question a bit more specifically?

9    BY MS. GONDEIRO:

10       Q.   Yeah.                                            11:20:56

11            I'm just asking, are you aware that, you

12   know, religious services, you know, have functions in

13   addition to church -- in addition to religious

14   gatherings?  Like, there are other ways that people

15   exercise their religion outside of religious            11:21:14

16   gatherings?

17       A.   Yes.

18       Q.   Okay.  What are those ways that you're aware

19   of?

20            MR. WALL:  Objection.  Beyond the scope.        11:21:25

21            You can answer, Dr. Cody.

22            THE WITNESS:  A sense -- sense of community.

23            Are you talking about times -- ask your

24   question again.

25   /////                                                   11:21:43

CANYON LAKE REPORTING, INC.                    100
(951) 660-8007

1    BY MS. GONDEIRO:

2        Q.   Sure.

3            Are you aware that religious services have

4    functions -- religious functions outside of religious

5    gatherings such as a prayer meeting?                    11:21:56

6            MR. WALL:  Objection.  Vague.  Outside the

7    scope.

8            But you can answer, Dr. Cody.

9            THE WITNESS:  Yeah.  I'm still not sure I --

10   I'm not quite sure about your question.                 11:22:08

11           So religious -- a church might gather for a

12   prayer meeting or inside a church building.  Is that

13   your question?

14   BY MS. GONDEIRO:

15       Q.   Yes.                                            11:22:22

16           Are you -- are you aware that -- that there

17   are religious services that will con- -- that -- that

18   conduct prayer services or prayer meetings?

19           MR. WALL:  Objection.  Beyond the scope.

20           THE WITNESS:  Are you asking if -- if I'm       11:22:39

21   aware that churches would conduct services outside of

22   a church building?

23   BY MS. GONDEIRO:

24       Q.   No.  Prayer meetings, whether in -- in the

25   meeting -- in the church or outside the church.         11:22:49

1      A.   Yes, I'm aware that -- that some churches

2   might conduct prayer meetings outside of their church

3   building.

4      Q.   Okay.  Can we go to Section (d)?

5           So it says -- in Section (d), starting on          11:23:24

6   line 4, it says, "Further, nothing in this Order

7   shall prohibit any" -- "any individual from

8   performing or accessing 'Essential Government

9   Functions,' as determined by the governmental entity

10  performing those functions.  Each governmental entity    11:23:39

11  shall identify and designate appropriate employees or

12  contractors to continue providing and carrying out

13  any Essential Government Function."

14          Why did the County give governmental

15  entities discretion to follow the shelter-in-place      11:23:59

16  order?

17          MR. WALL:  Objection to the extent it calls

18  for a legal conclusion.  The document speaks for

19  itself.

20          You can answer the question, Dr. Cody.          11:24:10

21          THE WITNESS:  And can you repeat your

22  question?

23  BY MS. GONDEIRO:

24      Q.   Yes.

25          Based upon what I read, I'm asking, why did      11:24:16

1   the County give essential government -- or

2   governmental offic- -- government -- governmental

3   entities discretion to follow the shelter-in-place

4   order?

5          MR. WALL:  Same objections.                    11:24:33

6          THE WITNESS:  We can't possibly know the

7   details of operations to be able to give more

8   specific direction.

9   BY MS. GONDEIRO:

10         Q.   So it says here that each government -- that  11:24:50

11   the essential government function is determined by

12   the governmental entity performing those functions.

13         So I'm just trying to figure out how -- how

14   did that work?  Did the -- did -- did the

15   government -- governmental entities have to reach out  11:25:06

16   to the County and explain why they believed they were

17   essential?

18         A.   No.

19         Q.   Okay.  So how is this applied, then?

20         MR. WALL:  Objection.  Vague.  And objection     11:25:24

21   to the extent it calls for a legal conclusion.

22         Dr. Cody, you can answer the question if you

23   understand.

24         THE WITNESS:  So, for example, city law

25   enforcement --                                         11:25:38

1        MS. GONDEIRO:  Uh-huh.

2        THE WITNESS:  -- would know better than the

3    County about what they needed -- what they could and

4    couldn't do.  Like, how -- how to perform an arrest,

5    for example, is one of their functions.  We couldn't    11:25:53

6    know what they could -- what they could and couldn't

7    do in order to perform an arrest.  So that would be

8    one of their functions.

9        MS. GONDEIRO:  Uh-huh.

10        THE WITNESS:  Right?                                11:26:11

11   BY MS. GONDEIRO:

12    Q.   Were they required, though, to follow up

13   with you to let you know -- to explain why they

14   believed that they could not fully comply with this

15   order to do this -- to perform their job function,     11:26:20

16   or -- or did you just give the government officials

17   discretion to determine whether they had that -- they

18   need -- they -- they needed to abide by this order

19   without the need to follow up with the County?

20        MR. WALL:  Objection.  Vague.  Objection to        11:26:42

21   the extent it calls for a legal conclusion.

22        You can answer the question, Dr. Cody.

23        THE WITNESS:  Right.  So "nothing in this

24   Order shall prohibit any individual from performing

25   or accessing 'Essential Government Functions,' as       11:26:50

1  determined by the governmental entity performing

2  those functions."

3  BY MS. GONDEIRO:

4       Q.   Okay.  So aside from enforcement, what other

5  governmental functions were essential in the County          11:27:03

6  starting in March of 2020?

7            MR. WALL:  Objection.  Vague.  Objection to

8  the extent it calls for a legal conclusion.

9            THE WITNESS:  Yeah.  So I -- I can't

10 define -- you want me -- what is it that you want me          11:27:20

11 to define?

12 BY MS. GONDEIRO:

13      Q.   I want you to -- that you can recall, what

14 governmental functions were determined to be

15 essential starting in March of 2020, that you can           11:27:33

16 recall?

17      A.   So these would have been governmental

18 entities within the County, which would largely have

19 included city governments, portions of county

20 governments, or other, you know, other -- other          11:27:54

21 governments; right?  So the idea was scope down as

22 much as you can, no -- you know, as few interactions

23 as possible; however, governments have to perform

24 some functions such as law enforcement that's

25 essential to the functioning of society.                   11:28:18

1    Q.    Sure.

2          Okay.  You didn't answer my question.

3          So I'm asking, in addition to law

4    enforcement, what specific government functions were

5    determined to be essential starting in March of 2020?        11:28:30

6    I'm asking for specific government functions.

7    A.    Right.

8          MR. WALL:  Objection to the extent it calls

9    for a legal conclusion.  Objection.  The order speaks

10   for itself.                                                   11:28:44

11         Dr. Cody, you can answer.

12         THE WITNESS:  Yeah.

13         Essential governmental functions as

14   determined by the governmental entity performing

15   those functions.                                              11:28:51

16   BY MS. GONDEIRO:

17   Q.    Yes.  I'm asking you, though, to -- to

18   explain to me what -- what government -- what

19   government functions were determined to be essential,

20   that you can recall, starting in March of 2020.              11:29:03

21   A.    Right.

22         MR. WALL:  Same objections.  Also objection

23   on the basis to the extent it calls for speculation.

24         THE WITNESS:  We did not define the

25   essential governmental functions; they were                  11:29:17

1    determined by the governmental entity performing the

2    function.

3    BY MS. GONDEIRO:

4        Q.   No.   I -- I understand that.   I'm just --

5    you -- you recall that that -- law enforcement.   You          11:29:26

6    gave an example of law enforcement.

7        A.   Uh-huh.

8        Q.   So -- so you're aware that they were

9    determined to be -- that they determined that they

10   were essential; correct?                                       11:29:38

11            MR. WALL:   Objection.   Misstates testimony.

12   Calls for speculation.   To the extent it calls for a

13   legal conclusion as well.   And the order speaks for

14   itself.

15            You can answer, Dr. Cody.                              11:29:48

16            THE WITNESS:   Right.   So the governmental

17   entity would determine what services they had to

18   provide for health and safety.

19   BY MS. GONDEIRO:

20       Q.   Okay.   So in addition to law enforcement,            11:30:03

21   I'm asking for specific government functions that

22   were determined to be essential by those governmental

23   entities, that you can recall.

24            MR. WALL:   Same objection -- same

25   objections.   Excuse me.                                       11:30:22

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1      THE WITNESS:  I recall that most cities

2  would have preserved the fire, their capacity to

3  respond to fire or other emergencies.

4  BY MS. GONDEIRO:

5      Q.   What about the County?  What County          11:30:39

6  government -- governmental functions were determined

7  to be essential starting in March of 2020?

8          MR. WALL:  Objection.  Same objections.

9          THE WITNESS:  It wouldn't have been my -- I

10  wouldn't have determined the County functions.  I      11:31:01

11  don't run the County.

12  BY MS. GONDEIRO:

13     Q.   I'm not asking you if you determined.

14         I'm asking, what -- what governmental

15  entities, that you can recall, were determined to be   11:31:13

16  essential from -- by the County regardless of whether

17  that decision was made by you?

18         MR. WALL:  Objection.  Asked and answered.

19  Otherwise, same objections as stated before.

20         THE WITNESS:  Our Emergency Operations          11:31:32

21  Center and the -- the County resources needed to

22  staff the Emergency Operations Center to respond to

23  the COVID pandemic --

24  BY MS. GONDEIRO:

25     Q.   Okay.                                          11:31:46

1       A.    -- would be one example.

2       Q.    What other examples do you remember?

3       A.    Within the Public Health Department, we

4  continued to register births and deaths.  You know,

5  our -- like our very, very, very core                     11:32:12

6  responsibilities to serve the community were

7  preserved.

8       Q.    Okay.  What other examples do you remember?

9       A.    County fire, county sheriff, county

10 hospital --                                               11:32:39

11      Q.    Okay.

12      A.    -- a subset of county clinics, parts of

13 behavioral health services.

14      Q.    When you say "behavioral health services,"

15 what type of services do you mean?                        11:32:59

16      A.    They oversee provision of mental health care

17 and care for persons with substance use disorders.

18      Q.    And did you determine -- or did the County

19 determine that these behavioral services were

20 essential because you -- because they predicted that     11:33:28

21 there were going to be people who needed these

22 services during the COVID-19 pandemic?

23            MR. WALL:  Objection.  Misstates testimony.

24            THE WITNESS:  Yeah.

25            MR. WALL:  Assumes facts.  Calls for           11:33:40

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1   speculation.  The order speaks for itself.  And I'd

2   object to the extent it calls for a legal conclusion.

3           You can answer, Dr. Cody.

4           THE WITNESS:  Many of the services that I

5   have described, if not most, were not performed in          11:33:52

6   person.  So many of these services, to the greatest

7   extent possible, were performed remotely.

8   BY MS. GONDEIRO:

9       Q.   Sure.  But if the gov- -- if the

10  governmental entity determined that they needed to be      11:34:07

11  in person, based upon this order, could they meet in

12  person?

13          MR. WALL:  Objection to the extent it calls

14  for a legal conclusion, objection based on the fact

15  that the order speaks for itself, and objection on       11:34:20

16  the grounds of speculation.

17          You can answer, Dr. Cody.

18          THE WITNESS:  Could you restate your

19  question?

20  BY MS. GONDEIRO:                                          11:34:29

21      Q.   Yes.

22          If -- if the behavioral services department

23  determined that they needed to be in person, pursuant

24  to this order, would they have the permission to meet

25  in person?                                                11:34:41

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    MR. WALL:  Same objections.

2    THE WITNESS:  So I don't recall how

3  behavioral services went.  I -- I do recall that most

4  of the work that they did, wherever possible, was

5  done remotely, and that would be true throughout the      11:34:58

6  County, to protect the workforce and the community.

7  BY MS. GONDEIRO:

8    Q.   Okay.  So you don't recall --

9    MR. WALL:  Ms. Gon- -- Ms. Gondeiro, just

10  when you finish this line of questioning, can we take      11:35:10

11  a break, please?  It's been -- it's been more than an

12  hour.

13    MS. GONDEIRO:  Yes.  I just want to get

14  through just one really quick exhibit.

15    MR. WALL:  Well, I think an exhibit is      11:35:20

16  actually the perfect point for a break.

17    THE WITNESS:  I would love a break.

18  BY MS. GONDEIRO:

19    Q.   Okay.  But one -- one last question.  I just

20  want to make sure we went through all the examples.      11:35:29

21    Do you recall any other examples of

22  essential government functions starting in March of

23  2020?

24    MR. WALL:  Objection.  Misstates testimony.

25  Vague.  The order speaks for itself.  Calls for      11:35:42

1    speculation.

2            You can answer the question, Dr. Cody, if

3    you understand it.

4            THE WITNESS:  Yeah.  The essential

5    government function would have been determined by the          11:35:54

6    governmental entity within the bounds of doing

7    everything possible to do things remotely to limit

8    interactions between people to prevent spread and

9    protect the community.

10   BY MS. GONDEIRO:                                               11:36:13

11       Q.   Okay.  You didn't answer my question.

12           I'm aware of what the order says now.  I'm

13   asking you to provide me specific examples, other

14   examples that you can recall of essential government

15   functions starting in March of 2020.                          11:36:25

16           MR. WALL:  Same objections.  Additionally,

17   argumentative and asked and answered.

18           THE WITNESS:  And you're asking me about

19   within the County government?

20   BY MS. GONDEIRO:                                               11:36:37

21       Q.   Yes.  Within -- within the County

22   government, yes.

23       A.   Those -- those are the examples that -- that

24   I can think of.  I would not have been -- and I don't

25   recall detail of, you know, exactly how                        11:36:50

1    departments -- I can tell you more about my

2    department than other departments.

3         Q.   Okay.  What about the County Counsel's

4    office, were they determined to be a essential

5    government function starting in March of 2020?          11:37:09

6              MR. WALL:  Same objection.  The order speaks

7    for itself.  To the extent it calls for -- excuse

8    me -- a legal conclusion and to the extent it calls

9    for speculation.

10             THE WITNESS:  To -- to the extent that        11:37:26

11   County Counsel was needed to advise regarding the

12   pandemic response, they -- yes.  We needed counsel to

13   help advise in the pandemic response.

14   BY MS. GONDEIRO:

15        Q.   And do you recall, starting in March of       11:37:44

16   2020, that they provided advice in person to the

17   Department of Public Health?

18             MR. WALL:  Ob- -- objection to the

19   relevance.  The order speaks for itself.  To the

20   extent it calls for speculation.                        11:38:02

21             You can -- and outside the scope.

22             But you can answer the question, Dr. Cody.

23             THE WITNESS:  As I recall, most County

24   Counsel were remote and were not in person.

25   /////                                                   11:38:15

1    BY MS. GONDEIRO:

2       Q.   Okay.  So you said "most."  Were there some

3    times where -- that you can recall where officials

4    from the County Counsel's office met in person to

5    provide advice to the County Public Health Department        11:38:26

6    starting in March of 2020?

7            MR. WALL:  Objection to the extent it calls

8    for speculation.  Relevance.

9            You can answer the question, Dr. Cody.

10           THE WITNESS:  Yes.                                    11:38:39

11           MS. GONDEIRO:  Okay.  We can stop there.

12           THE VIDEOGRAPHER:  All right.  This marks

13   the end of Volume I, Media 1, in the deposition of

14   Dr. Sara Cody on August 18th, 2022.

15           Going off the record.  The time is 11:38.            11:38:58

16           (Recess taken.)

17           THE VIDEOGRAPHER:  All right.  This marks

18   the start of Volume I, Media 2, in the deposition of

19   Dr. Sara Cody on August 18th, 2022.

20           We are back on the record.  The time is              11:58:31

21   11:58.

22           MS. GONDEIRO:  Dan, can you please pull up

23   Exhibit 9?

24           THE VIDEOGRAPHER:  Sure.

25           (Exhibit 9 was marked for identification.)           11:58:42

1    MS. GONDEIRO:  And, Dr. Cody, it is al- --

2  provided in the chat; so you can pull that up.

3    THE WITNESS:  Thank you.

4    MR. WALL:  Thanks.  Thanks, Mariah.

5    MS. GONDEIRO:  Uh-huh.                    11:58:53

6  BY MS. GONDEIRO:

7    Q.  Dr. Cody, do you remember getting a thank

8  you letter via email around -- or on April 30th,

9  2020, from the Associated Builders and Cons- --

10  Contractors Northern California Chapter?        11:59:11

11    A.  I don't recall receiving the email, but I do

12  see it here.

13    Q.  Okay.  Do you know why you received a thank

14  you letter from the Associated Builders and

15  Contractors Northern California Chapter and its   11:59:29

16  nearly 500 essential construction and

17  construction-related firms?

18    A.  I do not.

19    Q.  Okay.  Did the County consider construction

20  to be essential during the COVID-19 pandemic or   11:59:43

21  starting in March of 2020?

22    MR. WALL:  Objection.  Vague as to

23  "essential."  Objection to the extent it calls for a

24  legal conclusion.

25    You can answer the question, Dr. Cody.     11:59:53

1          THE WITNESS:  Can you restate your question?

2   BY MS. GONDEIRO:

3      Q.   Yes.

4          Did the County consider construction to be

5   essential anytime on or around March of 2020?          12:00:02

6          MR. WALL:  Same objections.

7          THE WITNESS:  No.

8   BY MS. GONDEIRO:

9      Q.   Do you know why, then, this -- this email

10  says "essential construction"?                          12:00:20

11     A.   No.

12     Q.   Do you know why you were included on this

13  email?

14     A.   I'm a Bay Area health officer.

15     Q.   Okay.  So at no point -- did the -- did the    12:00:40

16  County consider construction or any

17  construction-related firms to be essential in April

18  of 2020?

19          MR. WALL:  Objection.  Vague as to meaning

20  of "essential."  Vague to the extent it calls for a    12:00:54

21  legal conclusion.

22          THE WITNESS:  Ask your -- restate your

23  question.

24  BY MS. GONDEIRO:

25     Q.   Yes.                                            12:01:05

1        Did the County ever consider any con- -- any

2    construction-related firm to be essential in April of

3    2020?

4            MR. WALL:  Same objections.

5            THE WITNESS:  At some time, and I would have          12:01:17

6    to refer to my documents to tell you exactly,

7    construction that would support, like, basic needs

8    was allowed.  Right.  So if there was a project that

9    was, again, within the -- as I spoke before, that

10   would support a basic need, as I recall, we enabled          12:01:43

11   some of that to take place with safety measures in

12   place.

13   BY MS. GONDEIRO:

14       Q.    When you say "safety measures," what were

15   those safety measures that were required to be in          12:01:58

16   place?

17       A.    Specific to?

18       Q.    Specific to the construction sites.

19       A.    So anything that we allowed, we would have

20   been requiring implementation of the safety measures          12:02:19

21   that we knew to be protective at the time, which

22   would have fallen under categories of how to improve

23   ventilation, how to ensure proper mask use.

24       Q.    Uh-huh.

25       A.    Later, testing.  Symptom checks.          12:02:38

1      Q.    Uh-huh.

2      A.    Exclusion of people who were ill.

3      Q.    Uh-huh.

4      A.    Maintaining a distance between people.

5   Safety measures.                                             12:02:56

6      Q.    Were construction workers that -- that were

7   deemed essential, starting in April of 2020, required

8   to follow social distancing and masking requirements

9   at all times while they were working?

10          MR. WALL:  Objection.  Assumes facts.               12:03:12

11          THE WITNESS:  Any entity that was

12   functioning to support, you know, basic health and

13   safety would have been required to implement the

14   safety measures that we knew to be protective at the

15   time.  So any -- and that would be to protect the       12:03:37

16   workers and protect the community around them.  So

17   distancing, masking, improving ventilation, excluding

18   ill workers, that sort of thing.

19   BY MS. GONDEIRO:

20      Q.    If an essential construction company or --       12:03:58

21   or firm decided that it was just not feasible for

22   them to be able to perform their job function while

23   wearing a mask and/or social distancing, were they

24   given the discretion to remove their mask or not

25   socially distance?                                         12:04:19

1      MR. WALL:  Objection.  Assumes facts.

2   Incomplete hypothetical.  Calls for speculation and

3   calls -- and to the extent it calls for a legal

4   conclusion.

5      But you can answer, Dr. Cody.                    12:04:28

6      THE WITNESS:  So we would have had specific

7   instructions for safety for -- and if a particular

8   sector needed more specific instructions as to how to

9   stay safe, they would have been required to implement

10  those instructions.                                 12:04:46

11  BY MS. GONDEIRO:

12    Q.   And so you're saying "instructions."

13      Were they required?  Were essential

14  construction companies, starting in April of 2020,

15  required to always socially distance and wear a mask?  12:05:00

16      MR. WALL:  Objection.  Assumes facts.  Calls

17  for a legal conclusion as addressed in the orders.

18      But you can answer the question, Dr. Cody.

19      THE WITNESS:  Yes, they would have been

20  required to adhere to the guidance that pertained to   12:05:18

21  their sector.

22  BY MS. GONDEIRO:

23    Q.   So did the guidance that pertained to

24  construction companies, starting in April of 2020,

25  require essential construction companies at all times  12:05:30

1    to wear a mask and socially distance?

2            MR. WALL:  Same objections.

3            THE WITNESS:  Yes.  I -- I -- those

4    instructions changed over time.  And I believe, by

5    April, they would have required masking, social          12:05:51

6    distancing, handwashing, sanitation, and other

7    measures to keep the workers and those around them

8    safe.

9    BY MS. GONDEIRO:

10        Q.   Were you aware, starting in April of 2020,      12:06:06

11   that there were COVID-19 outbreaks occurring at

12   construction sites?

13           MR. WALL:  Objection.  Assumes facts.

14           THE WITNESS:  There were outbreaks reported

15   from multiple sectors, and I don't recall timing.        12:06:20

16   BY MS. GONDEIRO:

17        Q.   I'm asking specific to construction sites.

18   Were you aware that there were COVID-19 outbreaks

19   occurring at construction sites starting in March --

20   or April of 2020?                                        12:06:38

21           MR. WALL:  Same objection.

22           THE WITNESS:  I don't specifically recall

23   when I became aware of outbreaks at construction

24   sites.  There were outbreaks at many, you know --

25   many different places.                                   12:06:50

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1   BY MS. GONDEIRO:

2       Q.    Well, at any time after April of 2020, did

3   you become aware that there were outbreaks occurring

4   at construction sites -- or COVID-19 outbreaks

5   occurring?                                              12:07:04

6       A.    At any time after April 2020, were there

7   outbreaks at construction sites --

8       Q.    Were you --

9       A.    -- that I was aware of?

10      Q.    Yes.                                          12:07:09

11      A.    Yes.

12            (Exhibit 10 was marked for identification.)

13  BY MS. GONDEIRO:

14      Q.    Okay.  Can we move on to the Exhibit --

15  actually, before we move on to Exhibit 10, Dr. Cody,   12:07:14

16  do you know what a seroprevalence study is?

17      A.    Yes.

18      Q.    What is it?

19      A.    It's a measure -- a study to draw blood and

20  measure antibodies in a population to see what -- as   12:07:35

21  a marker of what the prevalence of the disease might

22  be.

23      Q.    Were you aware of the seroprevalence study

24  Dr. Bhattacharya conducted in April of 2020, or

25  sometime around that time, regarding COVID-19 in       12:07:55

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1   Santa Clara County?

2       A.   Yes.

3       Q.   What was the conclusion of

4   Dr. Bhattacharya's seroprevalence study?

5       A.   I don't recall the -- the -- the specific          12:08:09

6   conclusions of the study.

7       Q.   Well, what do you recall about the study?

8       A.   The study was looking at what was the

9   seroprevalence at a point in time in the County.  I

10  recall they were trying to -- I don't recall about       12:08:34

11  their -- I think there was an issue with their

12  sampling, which would make it difficult to draw

13  conclusions.  I recall that the seroprevalence that

14  they documented in their sample was fairly low.

15      Q.   And so what does that mean?                       12:08:57

16      A.   That would mean that only a small portion of

17  people in the study and, by extension, people in the

18  County, would have been infected with COVID at that

19  time.

20      Q.   Okay.  Did you agree with the findings in         12:09:19

21  Dr. Bhattacharya's seroprevalence study?

22      A.   I can't -- I can't -- I can't speak to the

23  findings.  I don't know what you mean by "agree."

24  They found what they found.

25      Q.   Well, did you agree with it, or did you --         12:09:38

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    did you have any issue with it?  Did you think there

2    were issues with the studies?  Did you think it was

3    inaccurate?

4         A.   I actually didn't think it was particularly

5    relevant.                                              12:09:53

6         Q.   Okay.  That didn't answer my question.

7              Did you think the study was inaccurate?

8              MR. WALL:  Objection.  Asked and answered.

9    Argumentative.

10             THE WITNESS:  So the -- the -- I can't       12:10:07

11   remember about how they chose their sample.  I think

12   there were some questions around the sampling, and

13   there may have been questions -- at that time, there

14   was a lot of work going on regarding antibody tests

15   and what we could conclude from antibody tests, but    12:10:28

16   depending on what kind of antibody tests.  So I

17   remember there was discussion around that, and I

18   remember there was discussion around the sampling.

19             But the -- the purpose, as I recall, was to

20   understand the prevalence of COVID in the population.   12:10:45

21   BY MS. GONDEIRO:

22        Q.   So you mentioned "relevant" earlier.

23             Why did you believe that the seroprevalence

24   study was not -- that Dr. Bhattacharya conducted was

25   not relevant?                                          12:11:01

1      A.   The issue at the time was that most of the

2   population was not immune to COVID, was susceptible,

3   meaning that they were at risk, potentially, of

4   severe illness and death.  And so whether it was

5   2 percent of the population had evidence of infection        12:11:25

6   or 4 percent or 6 percent or 8 percent didn't matter

7   as much as the fact that the vast majority of people

8   living in the County at that time were not protected

9   from COVID, that had not been infected, were

10  susceptible and at risk.                                      12:11:52

11     Q.   Did you have evidence from other sources

12  that -- around this time Dr. Bhattacharya conducted

13  this study, that the vast majority of individuals in

14  Santa Clara County were not infected?

15     A.   I don't recall any other seroprevalent          12:12:05

16  studies at that time apart from the one that you

17  reference.

18     Q.   Do -- do you recall any other seroprevalence

19  studies that were conducted in California regarding

20  COVID-19?                                                  12:12:22

21          MR. WALL:  Object.  Vague as to time frame.

22          You can answer the question, Dr. Cody.

23          THE WITNESS:  Yeah.

24          Can you tell me a time frame?

25  /////                                                     12:12:33

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    BY MS. GONDEIRO:

2        Q.    Yeah.

3              Starting in April of 2020, did you become

4    aware of any other seroprevalence studies that were

5    conducted in California?                                12:12:41

6        A.    April 2020 through when?

7        Q.    Since April of 2020.

8        A.    Through present?

9        Q.    Yes, through -- through present.

10       A.    There certainly have been seroprevalence     12:12:52

11   studies since then in California, and -- but it

12   depends on the time; right?  Because now, in

13   California, the seroprevalence looks quite different

14   than it would have in the spring of 2020.

15       Q.    Uh-huh.  Okay.  So what -- what studies do    12:13:17

16   you remember?

17       A.    There's a study looking at seroprevalence

18   among dialysis patients, and I believe part of the

19   sample includes California.  I don't specifically

20   recall.                                                 12:13:38

21       Q.    And what was the -- when was that study

22   conducted?

23       A.    It was conducted after April of 2020.  It

24   may have been conducted at several points in time.

25   I -- I don't have those details.  I don't recall       12:13:52

1    those details.

2        Q.   Was it around the summer of 2020?

3        A.   I think it would have been later.

4        Q.   What were the findings of that dialysis

5    seroprevalence study?                                12:14:09

6        A.   As I mentioned, I don't recall specific

7    details.

8        Q.   Are you aware of any other seroprevalence

9    study that was conducted around the summer of 2020

10   regarding COVID-19?                                  12:14:23

11       A.   I -- I -- I don't recall any at the -- at

12   the moment.

13            MS. GONDEIRO:  Okay.  We're going to skip

14   Exhibit 10 and move on to Exhibit 11.

15            (Exhibit 11 was marked for identification.)  12:14:44

16            MR. WALL:  Dr. Cody, that's in the chat too.

17   If you -- if you look, you'll be able to pull up a

18   copy.

19            THE WITNESS:  Okay.  Hold on.  This is

20   Exhibit -- what number?                              12:15:05

21            MS. GONDEIRO:  Well, Exhibit 11.

22            And, Dan, while she's pulling that up, can

23   you please put the next three exhibits in the chat

24   box just so we can conserve time?

25            THE VIDEOGRAPHER:  Sure.                     12:15:23

```
 1            MS. GONDEIRO:  Okay.

 2            THE VIDEOGRAPHER:  I'll need to get out of

 3    chat here to do that -- I mean the share.

 4            THE WITNESS:  I have the exhibit.

 5            MS. GONDEIRO:  Okay.  You can pull it up,      12:16:04

 6    Dan, the...

 7            Okay.  Can you scroll down to -- there we

 8    go.

 9    BY MS. GONDEIRO:

10        Q.   Dr. Cody, do you remember receiving a --       12:16:20

11            MS. GONDEIRO:  Actually, this is not the

12    correct -- is this Exhibit 11 or Exhibit 12?

13            THE VIDEOGRAPHER:  This is --

14            MR. WALL:  This is -- this is -- what I have

15    is Exhibit 11, Mariah.                                  12:16:43

16            THE VIDEOGRAPHER:  This is 11.  It's the one

17    that you sent me earlier.

18            MS. GONDEIRO:  Okay.

19            THE VIDEOGRAPHER:  Is there a new version?

20            MS. GONDEIRO:  Well, there was a -- there       12:16:53

21    was a corrected version of the let- -- of Exhibit 11.

22            THE VIDEOGRAPHER:  After the ones you sent

23    to me?

24            MS. GONDEIRO:  Yeah, but --

25            MR. WALL:  Okay.  I can get out and track it    12:17:03
```

1   down if you want me to.

2        MS. GONDEIRO:  Yeah, but I guess in the --

3   in the meantime, we can -- we can talk about this

4   specific email.

5   BY MS. GONDEIRO:                                    12:17:14

6        Q.   Dr. Cody, around April 3rd or on April 3rd,

7   2020, do you recall getting this email from Sandy

8   Schwarcz?

9        A.   I don't -- I don't recall this email.  I can

10  see the email, but I would not have been able to      12:17:28

11  recall it.

12       Q.   Okay.  Who is Sandy Schwarcz?

13       A.   I don't know.  Someone at Alameda County.

14       Q.   Okay.  It reads -- she -- she writes to you

15  that, "If controls were left through March, then the  12:17:45

16  second wave would start in August and peak in

17  October.  Earlier lifting means a second wave in June

18  and peak at end of August."

19            Did you agree -- or did you agree at that

20  time with that conclusion?                            12:18:08

21       A.   So this email wasn't sent to me by Sandy.

22  It looks like it was sent to me by Erica Pan.  And it

23  looks like she is summarizing some studies that she

24  reviewed and sending along Sandy -- and I don't know

25  whether Sandy is a him or her -- their conclusions    12:18:40

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1   based on the -- based on the studies.

2      Q.   So during Octo- -- or April of 2020, did you

3   believe that if you delayed in lifting your

4   shelter-in-place order, that you could delay a

5   resurgence?                                        12:19:09

6      A.   What -- what I knew from various models and

7   discussions and observations about the way the virus

8   was behaving in other, you know, places was that

9   anything that allowed more contact between people --

10  more opportunity to share air space and additional   12:19:30

11  contacts between people would create more infections

12  and a resurgence.

13     Q.   Why did the County extend their April

14  shelter-in-place -- or their March shelter-in-place

15  order?                                              12:19:54

16     A.   To prevent a resurgence of COVID and to

17  prevent spread and to prevent severe illness and to

18  prevent death and to prevent long-term disability

19  among our residents.

20     Q.   So to delay a -- you mentioned -- just so I   12:20:11

21  get this right, you extended the shelter-in-place

22  order to delay a resurgence.

23         And when did you expect a resurgence to

24  occur?

25         MR. WALL:   Objection.   Misstates testimony.   12:20:31

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    Vague as to "resurgence."

2            But you can answer the question, Dr. Cody.

3            THE WITNESS:  Can you restate your question?

4    BY MS. GONDEIRO:

5        Q.  Starting -- so you said that you extended          12:20:40

6    the shelter-in-place order to delay another

7    resurgence.

8            When did you want to delay the resurgence

9    by, or when did you expect the delay to expire?

10           MR. WALL:  Objection.  Misstates testimony.        12:20:56

11           THE WITNESS:  In -- in spring of 2020, in

12   March and April, there were very few tools to protect

13   the public.

14           MS. GONDEIRO:  Uh-huh.

15           THE WITNESS:  We didn't have widespread            12:21:11

16   testing.  We had a nationwide shortage of masks.

17   We -- we didn't understand a lot of properties of the

18   virus, and there were very few tools available to

19   protect the public and to prevent disease and

20   hospitalization, overwhelm of the hospitals, death,       12:21:36

21   and long-term disability.

22           So we lacked a lot of information, and we

23   lacked a lot of tools.  And so our job was to protect

24   the public from these very bad outcomes until such

25   time as we could reasonably put in other mitigation       12:21:55

1   measures and protect them.

2   BY MS. GONDEIRO:

3       Q.   By extending the shelter-in-place order in

4   April of 2020, was it the County's goal to delay

5   another resurgence -- resurgence after -- until after        12:22:11

6   the summer of 2020?

7       A.   Our -- we did not know what would happen

8   next as that was unknowable; however, what we did

9   know was, at that time, we had very few resources or

10  tools or strategies available.  We had no treatments.        12:22:37

11  We had no vaccines.  We had a nationwide shortage of

12  masks.  We had no -- very few tests available.

13           There were very few tools to ensure people's

14  protection and to ensure that our hospitals wouldn't

15  be overrun with COVID, and we -- people need access          12:22:59

16  to medical care for COVID and for any other things,

17  and we had very, very few tools.

18           What we did know was that the more that

19  people interacted with each other without protections

20  in place, the more infections, the more                      12:23:18

21  hospitalizations, and the more deaths would result.

22           MS. GONDEIRO:  Okay.  Dan, I would like to

23  go to Exhibit 12.

24           (Exhibit 12 was marked for identification.)

25           MR. WALL:  And, Dr. Cody, that's in the             12:23:32

1    chat.

2         MS. GONDEIRO:  Can you go -- can you scroll

3    down to the bottom, Dan?

4    BY MS. GONDEIRO:

5         Q.   Okay.  Dr. Cody, do you recall reviewing a          12:23:55

6    study by the Johns Hopkins University showing that

7    COVID-19 was spreading rapidly and easily?

8         A.   I don't remember this particular one, but I

9    remember seeing a lot of data showing rapid spread.

10        Q.   Well, what studies do you recall, during           12:24:26

11   January of 2020, demonstrating that COVID-19 was

12   spreading rapidly and easily?

13        A.   I'm having a hard time opening this exhibit,

14   so just give me a minute.

15             Okay.  I've got the exhibit up.  Can you            12:24:59

16   restate your question?

17        Q.   Yes.

18             What -- what studies did you review in

19   January of 2020 showing that COVID-19 was spreading

20   rapidly and easily?                                           12:25:11

21        A.   I recall looking at reports from Northern

22   Italy where they were seeing exponential growth and

23   an overwhelming number of hospitalizations and, just

24   in general, reports from around the world where COVID

25   was spreading.  Where there were reports, you could          12:25:43

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    see the -- it was behaving in a very worrisome

2    fashion.  The viral spread was very worrisome with

3    exponential growth.

4         Q.   When you became aware of this knowledge in

5    January of 2020, why didn't you implement your          12:26:01

6    shelter-in-place order then?

7         A.   We -- in January 2020, we lacked a lot of

8    information, primarily because we didn't have testing

9    available --

10        Q.   Uh-huh.                                        12:26:22

11        A.   -- to understand what the scope and

12   magnitude of the problem was.

13        Q.   Sure.

14             Earlier it was your testimony that

15   Santa Clara County had become an early hot spot for     12:26:32

16   COVID-19.

17             Do you remember saying that?

18        A.   Yes.

19        Q.   And that was in January of 2020?

20        A.   Yes.                                           12:26:43

21        Q.   And how did you -- what studies did you rely

22   upon or what evidence did you rely upon to show that

23   Santa Clara County had become an early COVID-19 hot

24   spot in January 2020?

25        A.   What I was referring to when I used that       12:26:59

1   word was that we were one of the first jurisdictions

2   in the country to report cases.

3       Q.   Uh-huh.

4       A.   So one of the first jurisdictions to report

5   a case, and then we had subsequent cases after that.          12:27:11

6   But I also just want to underline there was --

7   testing was not widely available, so it was very

8   difficult to understand how many infections they were

9   and what the pattern looked like.  So this was a

10  little bit of information with -- that was very              12:27:36

11  worrisome.

12      Q.   But in January of 2020, you were aware that

13  COVID-19 was a disease that spread rapidly and

14  easily; correct?

15      A.   By January 2020, we were getting reports          12:27:50

16  from other places in the world, and those patterns

17  looked quite worrisome, that's correct.

18      Q.   You didn't answer my specific question.

19           I'm asking, were you aware in January of

20  2020 that COVID-19 was a disease that spread rapidly        12:28:04

21  and easily?

22           MR. WALL:  Objection.  Asked and answered.

23           THE WITNESS:  Yeah.  By late January, there

24  was so much that was unknown.  I think there was

25  still a lot of uncertainty about how rapidly it             12:28:24

1  spread and how it spread, a lot of uncertainty at

2  that time.

3  BY MS. GONDEIRO:

4     Q.   You mentioned, though, in January of 2020

5  you reviewed a report from Northern Italy showing        12:28:35

6  that COVID-19 was spreading rapidly and easily.

7        Do you re- -- recall?

8     A.   No.  Actually, I -- if I can just correct

9  that.  I don't think that would have -- I can't

10 remember, but that probably wasn't January.  That was    12:28:50

11 probably later that things really took off in

12 Northern Italy.  So I -- I -- I think that may have

13 been later and not in January.  I'm trying to recall

14 what we knew in January.

15    Q.   So regarding this Johns Hopkins study that       12:29:07

16 was sent to you in January of 2020, do you re- -- do

17 you recall reviewing this study?

18    A.   So this was not a study.  This was a map

19 that Johns Hopkins was producing.

20    Q.   Uh-huh.  And what did the map demonstrate?       12:29:31

21    A.   The map -- the -- it was mapping where cases

22 were occurring in the United States and in other

23 places in the world.

24    Q.   Did it demonstrate that COVID-19 was fast --

25 was growing rapidly and easily?                          12:29:52

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1      A.    At what -- in what time?

2      Q.    At the time this was published.

3      A.    At the time this was -- so at the time that

4   I got this email on Thursday, January 23rd, what did

5   the map show?                                          12:30:09

6      Q.    Yeah.

7            Did -- did the map -- you were just telling

8   me that you're clearly aware that -- you know, that

9   this was a map showing COVID-19 cases.

10           And what I'm -- what I'm asking is, at the    12:30:20

11  time that this map was published, did it demonstrate

12  that COVID-19 was spreading rapidly and easily?

13           MR. WALL:  Objection.

14           THE WITNESS:  Um --

15           MR. WALL:  Objection.  Vague.                  12:30:31

16           You can answer the question, Dr. Cody.

17           THE WITNESS:  Yeah.

18           So I don't remember -- I remember looking --

19  I remember following the maps that Johns Hopkins

20  produced.  I remember -- I remember them.  I do not    12:30:41

21  remember what the map would have looked like on

22  Thursday, January 23rd, 2020, to have known what I

23  would have concluded from the pattern I saw on the

24  map.  This would have been before we reported our

25  first travel-associated case.                          12:31:02

1   BY MS. GONDEIRO:

2     Q.  Were you aware at -- from -- in early

3   February or around February that COVID-19 was

4   spreading rapidly and easily?

5         MR. WALL:  Objection.  Vague.        12:31:17

6         THE WITNESS:  By early February 2020, we had

7   reported two travel-associated cases and our first

8   case of community transmission, an individual who got

9   COVID and we didn't know where they got it.

10        So by early February, we were seeing some    12:31:46

11   very concerning signals.  Unfortunately, there was

12   very little testing in the United States and very

13   little available to us to be able to document just

14   how it was spreading.  So we had early bad signs and

15   a lot of missing data.                  12:32:11

16   BY MS. GONDEIRO:

17     Q.  Okay.  But this -- this map from Johns

18   Hopkins University demonstrates that -- based upon

19   this email, it demonstrated that COVID-19 was growing

20   faster than -- than people had expected; is that   12:32:28

21   correct?

22         MR. WALL:  Objection.  Assumes facts.  The

23   document speaks for itself.

24         THE WITNESS:  So it looks like the news

25   article concludes that the numbers may be growing   12:32:45

1    faster than national sources had known.  And, again,

2    this would have been cases that we could ascertain,

3    and you could only ascertain a case if you can test

4    for it.  So it would have been concerning.

5    BY MS. GONDEIRO:                                        12:33:10

6        Q.    Were you concerned when you read this --

7    when you looked over this map by the Johns Hopkins

8    University at this time?

9        A.    Yes, I -- I would have been concerned.

10       Q.    And why were you concerned?                   12:33:23

11       A.    That we had a novel virus that seemed to be

12   spreading quickly across the world and that we had a

13   lot of -- a lot of missing information.

14       Q.    Okay.  So then that -- so you -- so you

15   stated that it was spreading rapidly.                   12:33:45

16            So your -- you believed, in January of 2020,

17   COVID-19 was spreading quickly?

18            MR. WALL:  Objection.  Vague.

19            THE WITNESS:  Yeah.

20            MR. WALL:  Asked and answered.                 12:34:01

21            You can answer the question, Dr. Cody.

22            THE WITNESS:  Yeah.

23            In January 2020, there was a lot of

24   information that we did not have and -- because there

25   wasn't very much testing.  We looked at the            12:34:15

1    information that we did have to try to discern what

2    the patterns were and to try to understand what this

3    meant and what the impact would be.

4              MS. GONDEIRO:  Sure.  Earlier you -- you

5    mentioned that the -- that it was spreading quickly,          12:34:32

6    but we'll -- we'll move on to the next exhibit.

7              (Exhibit 13 was marked for identification.)

8    BY MS. GONDEIRO:

9        Q.  This is a field report regarding "Crisis

10   decision-making at the speed of COVID-19."                    12:34:50

11            Dr. Cody, do you recall putting together

12   this field report with other county health officers

13   in the Bay Area?

14       A.  Yes.

15       Q.  What was the purpose of this field report?           12:35:10

16       A.  To share our experience with -- with others

17   primarily in the public health community.

18       Q.  Did you want to be able to provide insight

19   to people in the future as to what to do when there

20   is another -- or if there is ever another pandemic?          12:35:33

21       A.  Our goal was really to share -- share our

22   experience in the Bay Area with others in the public

23   health community.

24            MS. GONDEIRO:  Okay.  Dan, can you scroll

25   down to 031198?  That's the Bates number page.               12:35:52

1          Okay.  I think -- go up a little bit.

2          Okay.  That's -- that's good.  Actually, up

3    a little bit more.  There we go.

4    BY MS. GONDEIRO:

5       Q.   So about the third paragraph, it starts          12:36:20

6    with, "As a team, we decided to issue

7    shelter-in-place orders within 24 hours."

8          Do you see that paragraph?

9       A.   Yes.

10      Q.   And it said, "The shelter-in-place orders        12:36:35

11   achieved important objectives:  flatten the curve of

12   cases, hospitalizations; provide time for hospital

13   systems to prepare for future sur-" -- "surges;

14   provide time to learn about SARS-CoV-2; (4) provide

15   time to build capacity for wide-" -- "widespread       12:36:54

16   testing, case investigation, contact tracing; and (5)

17   provide time for study and development of

18   pharmaceutical therapeutics and" -- "and vaccines."

19          Does this summarize the -- the County's goal

20   for their shelter-in-place order that was implemented   12:37:14

21   in March of 2020?

22      A.   For the most part.

23      Q.   Is there any other goal, aside from the --

24   the factors that were listed here, that -- that the

25   County hoped to achieve through their                   12:37:32

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1   shelter-in-place order?

2       A.   I -- I think -- I think this is -- you know,

3   pretty -- pretty much -- pretty much covers it.  It's

4   a lot of that there was so much unknown, and there

5   needed to be more time to ensure that we could          12:37:55

6   effectively protect the public, and this -- this

7   details it.

8       Q.   Okay.  Did the County have a backup if

9   that -- the vaccines did not work?

10           MR. WALL:  Objection.  Vague.              12:38:11

11           You can answer the question, Dr. Cody, to

12   the extent you understand it.

13           THE WITNESS:  Yeah.  I don't -- I don't

14   think I quite understand your question.

15   BY MS. GONDEIRO:                                   12:38:20

16       Q.   It says here -- on number 5, it says,

17   "provide time for study and development of

18   pharmaceutical therapeutics and vaccines."

19           Was the County prepared for the event that

20   vaccines were not able to be developed or were not   12:38:32

21   effective at curtailing the spread of COVID-19?

22       A.   Well, I think it's important to remember

23   that we weren't man- -- the entire country was at

24   risk, the entire state, the entire country.  It was

25   not a -- unfortunately, County can't develop        12:38:51

1    pharmaceuticals or vaccines.

2        Q.   Okay.  That didn't answer my question.

3            I'm asking, did you -- did the County have a

4    backup in the event that the COVID-19 vaccines were

5    never developed?                                         12:39:09

6        A.   Our goal at the County was to protect the

7    people living and working in Santa Clara County with

8    the tools that we had available and to learn as much

9    as we could about how the virus was evolving and

10   behaving and adjusting as necessary to ensure          12:39:31

11   protection of the population.

12       Q.   Okay.  You're still not answering my

13   question.

14           I'm asking, did the County have a backup

15   plan in the event that the State or whoever was not    12:39:42

16   able to develop a COVID-19 vaccine?

17           MR. WALL:  Objection.  Asked and answered.

18   Argumentative.

19           THE WITNESS:  The County and the entire

20   country didn't know what was ahead, you know.  This    12:40:03

21   virus was spreading everywhere.

22   BY MS. GONDEIRO:

23       Q.   That doesn't answer my question.

24           I'm just asking, did you -- did you have a

25   backup plan if the COVID-19 vaccines did not work?     12:40:13

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1          MR. WALL:  Objection.  Asked and answered.

2     Argumentative.

3          MS. GONDEIRO:  Well, she -- she hasn't

4     answered my question yet.

5          THE WITNESS:  The other nonpharmaceutical          12:40:27

6     interventions to protect the population:  testing,

7     masking, ventilation, social distancing, improving

8     ventilation.  All of those things were what we would

9     have had available to use and would have -- would

10    have had to continue to use, in some form or fashion,    12:40:49

11    to protect the population absent other measures to

12    protect people.

13         MS. GONDEIRO:  We can move on to the next

14    slide -- or the next exhibit.

15         (Exhibit 14 was marked for identification.)      12:41:09

16         MS. GONDEIRO:  You can scroll down.

17    BY MS. GONDEIRO:

18    Q.    This is an email from Sara Cody to Tomas

19    Aragon and other health officials.

20         So, in the middle of paragraph 2, it            12:41:22

21    reads -- or you write, Dr. Cody, "Done early, we

22    could maximize benefit.  Done even a little bit

23    later, we would get the same harms but much less

24    benefit.  So if we were going to do something that

25    drastic, the sooner the better."                     12:41:42

1      What did you mean when you -- when you said

2  that?

3      A.   So the novel coronavirus, COVID -- the

4  SARS-CoV-2 virus, we were seeing exponential growth;

5  and with exponential growth and few tools, a shelter          12:41:57

6  in place would protect people the most.

7      Q.   Uh-huh.

8      A.   And asking the population to shelter in

9  place would have social and economic harms.  If you

10 do a shelter in place early, if you have exponential          12:42:19

11 growth, you can save many lives.  If you do it later,

12 you will save fewer lives, and you will have the same

13 economic and social harms as if you had done it even

14 a few days earlier.

15      So the point I was making was that the harms          12:42:38

16 would be the same, and the benefit would be much

17 greater done earlier given that we were seeing

18 exponential growth.

19      Q.   Looking back in --

20      MR. WALL:  Ms. -- Ms. Gondeiro, just one               12:42:53

21 ques- -- it's -- as we're speaking about exponential

22 growth, my hunger is growing exponentially.

23      MS. GONDEIRO:  Sure.  Yeah.  We're --

24      MR. WALL:  It's about 12:45.

25      MS. GONDEIRO:  We -- we --                              12:43:01

```
 1              MR. WALL:  So if we could find a lunch --

 2              MS. GONDEIRO:  We can stop after this --

 3              MR. WALL:  -- an appropriate lunch break.

 4              MS. GONDEIRO:  Yeah, after this exhibit.

 5    I'm almost done.                                       12:43:06

 6              MR. WALL:  Thanks.

 7    BY MS. GONDEIRO:

 8         Q.    In hindsight, because hindsight is to 20/20,

 9    do you believe the County should have been

10    implemented their shelter-in-place order earlier?      12:43:14

11         A.    There was a balance of -- of data.  There

12    needed to be enough data and enough evidence in order

13    to act.

14         Q.    Do you believe if the County implemented

15    their shelter-in-place order earlier, they would have  12:43:34

16    saved more lives?

17              MR. WALL:  Objection to the extent it calls

18    for speculation.

19              But you can answer the question, Dr. Cody.

20              THE WITNESS:  Uh-huh.                         12:43:49

21              Restate your question.

22    BY MS. GONDEIRO:

23         Q.    Do you believe, looking back and with the

24    information you have now, that if -- that if the

25    County implemented their shelter-in-place order        12:43:58
```

1    earlier, let's say in January when -- when you were

2    aware that COVID-19 was a disease that spread

3    rapidly, would it have prevented more deaths?

4            MR. WALL:  Same objection.  Assumes facts.

5    Misstates testimony.                                    12:44:16

6            THE WITNESS:  Yeah, this is -- this is --

7    what -- what -- I would -- I would just be

8    speculating.  There has to be weighing, ha- -- having

9    evidence to do something in order to do it.  So there

10   was, as I mentioned --                                  12:44:37

11   BY MS. GONDEIRO:

12       Q.   I'm just asking for your opinion.

13       A.   There was no testing available to know what

14   was happening in January of Feb- --

15       Q.   Well --                                        12:44:44

16       A.   -- or February.

17       Q.   Sure.

18            But looking back, you know --

19       A.   Uh-huh.

20       Q.   -- you had stated earlier that you were       12:44:47

21   aware that COVID-19 was a disease that spread

22   quickly.

23            Did you state that earlier?

24       A.   Yes.  We have learned that COVID-19 spreads

25   quickly.                                                12:45:00

1    Q.   Okay.  So with that knowledge, do you

2    believe that -- if you had implemented your

3    shelter-in-place order in January of 2020, would you

4    have prevented more deaths?

5    A.   Possibly.  We would not have been able to          12:45:17

6    implement a shelter in place with having only

7    identified one or two travel-associated cases.  It

8    would have been impossible to implement, so it's just

9    a hypothetical.  We would not be able to implement

10   without evidence to show as to why it was necessary.    12:45:34

11   We could not see those patterns in January of 2020.

12   Q.   Sure.  I'm not asking what you saw in 2020.

13   I'm asking what you know now.

14       What you know now, if you would have

15   implemented a shelter-in-place order in 20- --          12:45:54

16   January of 2020, would you have prevented more

17   deaths?

18       MR. WALL:  Objection.  Incomplete

19   hypothetical.  Assumes facts.  Calls for speculation.

20       You can answer the question, Dr. Cody.            12:46:08

21       THE WITNESS:  Yeah.

22       The reason I'm having difficulty answering

23   your question is because there is an interplay of an

24   action and then what you can tell people so they

25   understand why you're doing the action.                12:46:25

1    So if everyone would have acted as they did

2  in March and acted the same way as they did in

3  January, yes, more lives could -- would have been

4  saved.  But I don't know that people would have acted

5  the same way without having documented that there was          12:46:39

6  ex- -- that there was exponential growth occurring.

7  BY MS. GONDEIRO:

8    Q.   Okay.  When you refer to "social harms" in

9  this email, what social harms are you referring to?

10    MR. WALL:  Objection.  Misstates the email          12:47:02

11  which speaks for itself.

12    MS. GONDEIRO:  The email doesn't speak for

13  itself.  I -- she doesn't list what social harms

14  she's talking about.

15    MR. WALL:  It says -- it says "same harms."          12:47:11

16    MS. GONDEIRO:  Or -- or -- sorry.

17  BY MS. GONDEIRO:

18    Q.   Well, what do you mean by "harms"?

19    A.   When people shelter in their place of

20  residence, they can't participate in, you know, other          12:47:22

21  activities in life apart from those that are, you

22  know, the very basic necessities.

23    Q.   Okay.  When you -- when you refer to

24  "harms," are you also referring to mental harms?

25    A.   Well, people who -- the -- humans like to be          12:47:46

1    with other humans.

2        Q.    Uh-huh.

3        A.    And so keeping -- you know, not being able

4    to be with other humans is -- is -- is difficult.

5    The trade-off is that being with other humans can put          12:48:02

6    people at risk of hospitalization and death.  So --

7        Q.    Uh-huh.

8        A.    -- it was a very, very, very difficult --

9    difficult time.

10       Q.    Were you concerned at this time, when you          12:48:18

11   implemented the shelter-in-place order, that there

12   would be a spike in -- in mental health issues in the

13   County?

14       A.    My -- my concern was that without shelter in

15   place, there would be a sharp uptick in          12:48:39

16   hospitalizations and death, and that would have quite

17   significant harm in addition to the hospitalizations

18   and deaths because of what family and community and

19   loved ones would experience when so many people were

20   so sick or -- or dying.  So that -- that was          12:49:00

21   certainly a concern that I was quite worried about.

22       Q.    Were you concerned that the shelter-in-place

23   orders would increase depression in the County?

24       A.    I was concerned -- and I understood that we

25   were making a very difficult decision and very          12:49:19

1   difficult trade-offs and that our -- my top concern

2   was about immediate loss of life from infection in a

3   population that had really essentially no -- no

4   protection at all and that it felt -- it felt urgent

5   and extraordinarily difficult.                        12:49:51

6       Q.   When the County implemented their

7   shelter-in-place order in March of 2020, did they

8   implement any measures to combat any -- any mental

9   health issues that may be -- have been increasing

10  because of the shelter-in-place orders?               12:50:07

11      A.   You know --

12           MR. WALL:  Objection.  Outside the scope.

13           But you can answer the question.

14           And -- and, Mariah, again, the urgency of

15  our lunch needs are growing as well.                  12:50:17

16           MS. GONDEIRO:  Okay.  Yeah, and I'm almost

17  done.  I just -- I want to end off on this exhibit.

18           THE WITNESS:  I'm sorry.  Just one more time

19  with your question.

20  BY MS. GONDEIRO:                                       12:50:27

21      Q.   Yes.

22           When the County implemented their

23  shelter-in-place order in March of 2020, did they

24  implement any -- any measures to combat the increase

25  in mental health issues?                               12:50:35

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1          MR. WALL:  Same objection.  Outside the

2    scope.

3          THE WITNESS:  We were mindful of the many

4    different impacts of shelter in place and sought to

5    do whatever we could to mitigate those impacts to the          12:50:53

6    extent that we had ability to do so.

7    BY MS. GONDEIRO:

8       Q.   Okay.  Well, what did you do to mitigate the

9    impacts of a rise in mental health issues?

10          MR. WALL:  Same objection.                              12:51:08

11          THE WITNESS:  At -- at the time that we

12    issued the shelter in place, I don't recall that we

13    had a -- a knowledge of a rise in mental health

14    issues specifically.

15    BY MS. GONDEIRO:                                              12:51:22

16       Q.   Sure.

17          But I think earlier didn't you say that you

18    were -- you were concerned about mental health

19    issues?

20       A.   No.  I -- I was concerned broadly about a             12:51:29

21    whole host of impacts that -- that people would

22    experience when they were not doing their usual

23    activities that they're accustomed to broadly.  So

24    mental health would be part -- you know, potentially

25    part of that.                                                 12:51:53

1    Q.   Okay.  So -- and specific to mental health,

2    were you concerned that there would be an increase in

3    mental health issues when you implemented the

4    shelter-in-place order?

5          MR. WALL:  Objection.  Asked and answered.          12:52:05

6          THE WITNESS:  I would have been concerned

7    about mental health as well as other impacts that

8    people would experience as a result of sheltering in

9    place.

10   BY MS. GONDEIRO:                                          12:52:18

11   Q.   Okay.  What other impacts in addition to

12   mental health were you worried about?

13   A.   How people behave when they are at home and

14   not able to do their usual activities, people -- just

15   all the usual activities of daily living that people    12:52:41

16   are not able to do with the, you know, enormous

17   change.

18   Q.   Sure.

19        Were -- were you concerned that there

20   would -- that people would feel lonely due to the        12:52:51

21   shelter-in-place orders?

22   A.   I was concerned about these extraordinarily

23   difficult trade-offs.  I was concerned that people

24   would be -- were feeling afraid of a virus and of

25   people who were ill and dying.  I was concerned about    12:53:12

```
 1  people not being able to do their daily routines and

 2  daily activities.  You know, there were many, many

 3  extremely -- it was a very, very difficult time.

 4       Q.   Okay.

 5            MR. WALL:  Mariah, can we take our lunch      12:53:32

 6  break now?  I don't --

 7            MS. GONDEIRO:  I just want an answer because

 8  she hasn't --

 9            MR. WALL:  I hate to ask for -- three times.

10  I know, but I --                                       12:53:35

11            MS. GONDEIRO:  I know, but she hasn't

12  answered my question.

13  BY MS. GONDEIRO:

14       Q.   So, Dr. Cody, you --

15            MR. WALL:  She's answered about a dozen       12:53:39

16  questions.

17            MS. GONDEIRO:  No.

18            MR. WALL:  I'm concerned about the lack of

19  courtesy here when we need breaks on this side.

20            MS. GONDEIRO:  Robin --                       12:53:46

21            MR. WALL:  We're entitled to the courtesy of

22  a break.

23            MS. GONDEIRO:  -- I'm going to give you a

24  break after this -- I'm going to give you a break

25  after this email.  I would like to finish this email.   12:53:51
```

```
 1              MR. WALL:  This -- this is --
 2              MS. GONDEIRO:  So the next -- so -- and the
 3    next exhibit, we can move on to the next exhibit.
 4              MR. WALL:  How many more questions do you
 5    have?                                                    12:53:58
 6              MS. GONDEIRO:  Well, she keeps --
 7              MR. WALL:  I'm asking you a question:  How
 8    many more questions?
 9              MS. GONDEIRO:  Well, she's not directly
10    answering my question.                                   12:54:05
11    BY MS. GONDEIRO:
12       Q.   Dr. Cody --
13              MR. WALL:  So answer your -- ask your
14    question one more time, and then we're taking a lunch
15    break.                                                   12:54:08
16    BY MS. GONDEIRO:
17       Q.   Dr. Cody --
18              MR. WALL:  It's almost 1:00.
19    BY MS. GONDEIRO:
20       Q.   Dr. Cody, early -- okay.  You had just --       12:54:10
21    you stated earlier that among the things that you
22    were concerned about, you were concerned about mental
23    health issues.
24              So what measures did the County put in place
25    to address the mental health issues that you were       12:54:25
```

1    concerned about?

2            MR. WALL:  Objection.  Vague as to time

3    frame.  Asked and answered.  Beyond the scope.

4            You can answer the question, Dr. Cody.

5            THE WITNESS:  As I mentioned, we were          12:54:37

6    concerned about a whole host of impacts in addition

7    to COVID, and the County, as part of responding to

8    COVID, sought to mitigate some of those impacts

9    broadly.

10   BY MS. GONDEIRO:                                       12:54:58

11       Q.   How did they -- what measures did they put

12   in place to mitigate the impacts of mental health

13   issues starting in March of 2020?

14           MR. WALL:  Same objections.

15   BY MS. GONDEIRO:                                       12:55:10

16       Q.   You're not answering my question.

17           MR. WALL:  Add argumentative to the list.

18   Same objections.

19   BY MS. GONDEIRO:

20       Q.   I'm not asking -- asking you to restate the  12:55:18

21   fact that the County generally put in measures to

22   mitigate impacts.

23           I'm asking you, what specific measures did

24   the County put in place to mitigate the effects of

25   mental health issues?                                  12:55:30

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    MR. WALL:  Same objections.

2    THE WITNESS:  I -- I -- I would observe that

3    in our shelter-in-place order, we enabled health care

4    operations broadly construed so that people could

5    continue to receive mental health care if -- if they        12:55:50

6    sought it and -- and needed it, among -- among other

7    measures.

8    BY MS. GONDEIRO:

9        Q.    Sure.

10            And did you consider that religious services        12:56:02

11    would be important for people's mental health?

12        A.    People would be able to consult with

13    their -- with their religious community.  There was

14    nothing to keep them from doing that if that was

15    going to be helpful to them.                                 12:56:23

16        Q.    But were religious services considered

17    essential in your shelter-in-place order?

18        A.    We sought to ensure that everyone was safe.

19    People could -- many activities were conducted

20    remotely to ensure everyone's safety.  So a lot of          12:56:41

21    activities continued in remote fashion.  They just

22    couldn't occur in person.

23        Q.    We can -- we can get to lunch if you just

24    answer my question.

25            MR. WALL:  No, Mariah.  You've gone three           12:56:55

1    questions beyond your question.

2         MS. GONDEIRO:  No, because the problem is --

3         MR. WALL:  The deposition -- let me --

4         MS. GONDEIRO:   -- is that Dr. Cody is not

5    answering my question.                          12:57:01

6    BY MS. GONDEIRO:

7      Q.   Dr. Cody, I'm asking you, were religious

8    services considered essential in your

9    shelter-in-place order?  It's a very simple question.

10        MR. WALL:  Ms. Gondeiro, asked and answered.   12:57:08

11   It's three --

12   BY MS. GONDEIRO:

13     Q.   It's "yes" or "no."

14        MR. WALL:  Are you going to let me talk on

15   the record and state my objection for the record?   12:57:11

16   And you're not going to interrupt me, both because

17   it's impolite, it's unprofessional, and because the

18   reporter needs to take this down.

19        This deposition is not an endurance contest

20   for counsel or the witness.  It's inappropriate to   12:57:23

21   drag us past a polite and professional request for a

22   break until you've decided that we should stop.  It's

23   almost 1:00 now.

24        Dr. Cody can answer the question that she's

25   answered before, and then we are going to take a   12:57:38

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    break.

2    BY MS. GONDEIRO:

3        Q.   Okay.  Dr. Cody, in March of 2020, in the

4    shelter-in-place order, were religious services

5    considered essential?                                    12:57:50

6            MR. WALL:  Asked and answered.

7    BY MS. GONDEIRO:

8        Q.   It's a simple question.

9        A.   Right.  In the shelter-in-place order, we

10   define the basic services that everyone living in the   12:58:00

11   County needs to have for food, for shelter, and for

12   medical care.  And medical care is construed very

13   broadly to include physical and mental health care,

14   and there was nothing that would prevent anyone from

15   seeking health care for their body or for their         12:58:26

16   mental health.

17       Q.   Was religious services considered to be

18   health care pursuant to the shelter-in-place order?

19           MR. WALL:  Objection.  Asked and answered.

20           Let's take a break, Mariah, and you can come    12:58:39

21   back and ask this question four more times after the

22   break.  But she's -- you've asked it three times,

23   she's answered it as many times, and it's time for a

24   lunch break.  It's 1:00.

25           MS. GONDEIRO:  No.  This -- no.                  12:58:50

1    BY MS. GONDEIRO:

2        Q.   Dr. Cody, I've asked you this question, and

3    you're not answering it.

4            Were religious services considered health

5    care in the shelter-in-place order?  This is a really      12:58:57

6    simple question.

7            MR. WALL:  It's also the sixth new question.

8    You can ask it after --

9            MS. GONDEIRO:  No, it's not because she's

10   not answering the question.                                12:59:05

11   BY MS. GONDEIRO:

12       Q.   Are religious services considered health

13   care in the shelter-in-place order?

14           MR. WALL:  Please mark the transcript as --

15   please mark this section of the transcript.  This is       12:59:13

16   inappropriate behavior.

17           I'm instructing the witness not to answer.

18   She can answer after we take a lunch break.  Thank

19   you.

20           MS. GONDEIRO:  Robin, that is inappropriate.       12:59:23

21   You cannot instruct her not to answer a question.

22           MR. WALL:  Mariah, this is not an endurance

23   contest.  You -- you need --

24           MS. GONDEIRO:  Robin, this deposition would

25   go by easier if she answered the questions.  These         12:59:33

1  are very simple questions.

2        MR. WALL:  And she's been answering them

3  question after question.

4        Fifteen minutes ago, you said we were ready

5  to break.  You've now departed far beyond the email.    12:59:47

6  You've departed far beyond the one additional

7  question that you wanted an answer to.  You've

8  departed on a new track, which is fine, and we have

9  no objection to you asking these questions.  I have

10 object- --                                               12:59:58

11       MS. GONDEIRO:  I just -- I just want her to

12 answer.

13       Okay.  Here's the thing:  We can go on lunch

14 break if she answers whether religious services were

15 considered health care.                                  13:00:04

16       MR. WALL:  You can ask that when she gets

17 back.

18       MS. GONDEIRO:  Do you get to decide when the

19 breaks are?  Is that how this works?

20       MR. WALL:  Yes.  In part, yes.  Absolutely.        13:00:14

21 Absolutely, in part.  Counsel on both sides and the

22 witness, the court reporter, the videographer, we all

23 get to decide when there are breaks when we need

24 them.

25       MS. GONDEIRO:  No.  I have --                       13:00:25

```
1              MR. WALL:  It's 1:00.

2              MS. GONDEIRO:  I am asking her to come back

3    on and answer this question, and then we can go on

4    break.  I just want an answer to the question.

5              MR. WALL:  Take it up with the judge if you      13:00:29

6    need to, Mariah.  The witness is not coming back.

7    We're taking a lunch break now.  It's 1:00.  I've

8    been asking for 15 minutes.  Come on.

9              MS. GONDEIRO:  Okay.

10             THE VIDEOGRAPHER:  We can go off the record?      13:00:45

11             MS. GONDEIRO:  Yes.

12             THE VIDEOGRAPHER:  All right.  This -- we

13   are going off the record.  The time is 1:00.

14             (Lunch recess taken.)

15             (Exhibit 15 was marked for identification.)      13:48:55

16             THE VIDEOGRAPHER:  Okay.  We're back on the

17   record.  The time is 1:49.

18   BY MS. GONDEIRO:

19      Q.   Dr. Cody, in the March 2020 shelter-in-place

20   order, were in-person worship gatherings considered       13:49:24

21   essential?

22      A.   The March 2020 shelter-in-place order

23   describes functions that can occur regardless of who

24   is doing them, and gatherings are not -- not allowed

25   because of the risk of -- of COVID in the community       13:49:48
```

1    at the time.

2        Q.    Okay.   And when you say "gatherings," does

3    that include religious gatherings?

4        A.    It includes gatherings of any type for

5    any -- for any reason.                                      13:50:04

6        Q.    Okay.   How effective was the suppression

7    strategy in March of 2020 in protecting Santa Clara

8    County during the summer of 2020?

9        A.    How protective was the March order?

10       Q.    How effective was that suppression strategy   13:50:26

11   that you applied in the -- in the March

12   shelter-in-place order in protecting Santa Clara

13   County during the summer of 2020?

14           MR. WALL:   Objection.   Vague as to which

15   March shelter-in-place order.                              13:50:38

16           But you can answer the question, Dr. Cody.

17           THE WITNESS:   Right.   That -- the time frame

18   between, like, a shelter-in-place order and when you

19   would see an effect is generally a few weeks.   So

20   it's -- I'm not -- that's why I'm having a hard time      13:50:56

21   answering your question because you're talking about

22   an action in March and what would happen in the

23   summer because you would see the effect from a March

24   action within the weeks that followed rather than the

25   months.                                                    13:51:12

1  BY MS. GONDEIRO:

2      Q.   Okay.  Did you extend the -- the March 2020

3  shelter-in-place order to prevent a surge during the

4  summer of 2020?

5      A.   I extended the March shelter-in-place                  13:51:26

6  order -- the March 16th was extended the end of

7  March, and the March orders were extended in April

8  and then again in -- in May.

9           MS. GONDEIRO:  Madam Court Reporter, can you

10  please repeat my question?                                     13:51:43

11           (Record read.)

12           THE WITNESS:  I extended the March

13  shelter-in-place order to pre- -- to prevent a surge

14  in the following weeks.  I would not have -- it would

15  have been difficult to project out much further than   13:52:13

16  that.

17  BY MS. GONDEIRO:

18      Q.   How effective was the shelter-in-place

19  orders you implemented in April and May at protecting

20  people in South San Jose?                                      13:52:28

21      A.   The shelter-in-place orders, of course, were

22  issued broadly across the population.  The population

23  in Santa Clara County is highly variable depending on

24  where, a different makeup of the population, and so

25  we could see -- you know, the patterns were not            13:52:52

1    exactly equal across -- I -- I cannot recall

2    specifically at that time what the patterns looked

3    like with respect to location.

4        Q.    Well, regarding the -- the patterns, what --

5    what do you recall seeing during March and April of        13:53:09

6    2020?

7        A.    Well, there were many different patterns

8    that we were looking at in our data to understand

9    specific populations that were seeing higher case

10   rates or higher positivity rates or higher              13:53:32

11   hospitalization rates.  And we would look at it by

12   age, race, ethnicity, location, and sometimes other

13   variables.

14       Q.    Okay.  Well, what -- what ethnicities were

15   experiencing more COVID-19 cases during March and        13:53:55

16   April of 2020?

17       A.    A pattern that we began to see -- I think it

18   wasn't totally clear until April, maybe late March,

19   early April.  I don't recall exactly where -- was a

20   disproportionate impact among Hispanic/Latino           13:54:19

21   communities in the County.

22       Q.    Was there inequality between wealthy

23   neighborhoods and less privileged neighborhoods

24   regarding COVID-19?

25       A.    Many of the patterns of COVID-19 that we saw   13:54:40

1   reflected what we call "social determinants of

2   health."  And with COVID, a lot reflected housing.

3   So more crowded housing would put a community at

4   risk, or multigenerational households where there are

5   a lot of people working and living with other                13:55:04

6   household members who are particularly vulnerable,

7   particularly those who may have an underlying illness

8   or vulnerable because of their age.  So we did tend

9   to see higher rates in -- in -- in those communities.

10      Q.   When you implemented your shelter-in-place         13:55:24

11  orders in April and -- or in March and then the

12  extended shelter-in-place order in April of 2020, did

13  you consider the fact that poor working-class

14  families could not work from home?

15      A.   Yes.                                                13:55:39

16      Q.   And in what -- did you allow them to work?

17      A.   One of the extraordinarily difficult parts

18  of the pandemic was that some people needed to work

19  outside and couldn't shelter at home because they

20  needed to run things like health care operations or       13:56:00

21  food operations or some basic services, and they

22  would be, you know, without other protections in

23  place, at greater risk of COVID.

24          And that, I would say, is one of the reasons

25  why keeping the overall prevalence in the community        13:56:24

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    as low as possible was one and a very important way

2    of protecting everyone, including and especially

3    those types of workers.

4        Q.   Were you concerned, at the time you

5    implemented your shelter-in-place orders in March and        13:56:43

6    April, that child abuse would increase?

7        A.   I was concerned about all kinds of impacts

8    of the shelter -- of the shelter in place and mindful

9    of those as well as the impact on transmission if we

10   weren't sheltering in place, which would include        13:57:08

11   hospitalization, deaths, and long-term disability.

12           MS. GONDEIRO:  Madam Court Reporter, can you

13   please repeat my question?

14           (Record read.)

15           MR. WALL:  Is there --        13:57:32

16           THE WITNESS:  You're asking --

17           MR. WALL:  Is there a question?

18           THE WITNESS:  Well, I'm just -- the --

19           MR. WALL:  Dr. Cody, you only have to -- you

20   need to ask -- respond to Ms. Gondeiro's questions.        13:57:46

21           I'm asking Ms. Gondeiro if there's a

22   question --

23           MS. GONDEIRO:  Yes.  She --

24           MR. WALL:  -- to the witness.

25           MS. GONDEIRO:  She just an- -- asked it.        13:57:54

1    MR. WALL:  You just -- so you're asking her

2  to -- to answer the question that the reporter just

3  read?

4    MS. GONDEIRO:  Uh-huh.

5    MR. WALL:  Objection.  Asked and answered.          13:57:59

6    But you can go ahead and answer again,

7  Dr. Cody.

8    THE WITNESS:  Yeah.  The -- we were and I

9  was concerned about a whole host of issues that would

10  arise with the shelter in place and with the          13:58:13

11  requirement that people stay isolated in their place

12  of residence.  And -- and we had to weigh all of

13  those concerns against the concern of spread of

14  COVID, hospitalizations, deaths from COVID, and

15  long-term disability from COVID.  So there are a lot   13:58:35

16  of extraordinarily difficult trade-offs and impacts.

17    MS. GONDEIRO:  Madam Court Reporter, can you

18  please repeat the question again?

19    (Record read.)

20    MR. WALL:  Objection.  Asked --                     13:59:06

21    THE WITNESS:  So --

22    MR. WALL:  Objection.  Asked and answered.

23    You can answer it for a third time,

24  Dr. Cody.

25    THE WITNESS:  Right.  So at the time that I          13:59:11

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1   issued the shelter in place on March 16th, 2020,

2   COVID was -- seemed to be moving rapidly.  My top

3   concern was the immediate need to prevent people from

4   dying, and I also understood that there would be

5   many, many other impacts, some of which I could think        13:59:34

6   of, some of which I could not think of, some of which

7   would be measurable, many of which would not be

8   measurable, especially at that time.

9          My overwhelming concern when I issued the

10  shelter in place was to prevent death and               13:59:50

11  hospitalization and any disabilities or other things

12  unknown about the virus.

13  BY MS. GONDEIRO:

14     Q.   And regarding the many issues that you were

15  concerned about, did that happen to include an          14:00:02

16  increase in child abuse?

17     A.   I -- I don't recall at that time which of

18  those issues I was thinking about.  It's difficult

19  because, as the pandemic progressed, of course, we

20  learned about, you know, many different aspects and     14:00:20

21  trade-offs.  I do not specifically recall what I did

22  and didn't know at the time that I issued the shelter

23  in place.

24     Q.   Regarding the many issues you were concerned

25  about, were you concerned about domestic violence?      14:00:34

1    A.   Again, at the time that I issued the shelter

2  in place, I can't specifically recall which issues I

3  was thinking about and worrying about at the -- you

4  know, at the moment that I issued the -- the

5  shelter-in-place order.                              14:00:53

6    Q.   Earlier you had stated that there were many

7  issues that you were concerned about; correct?

8    A.   Yes.

9    Q.   Okay.  Well, among those many issues that

10 you were concerned about and that you recall, did    14:01:02

11 that also -- did that happen to include increase in

12 alcoholism?

13   A.   Again, I don't -- I cannot enumerate for you

14 the specific issues I was thinking about in mid-March

15 because they are mixed up with all the issues that   14:01:21

16 then presented over the course of the pandemic.  So I

17 don't -- I cannot tell you which specific issues I

18 was thinking about in mid-March.

19   Q.   Well, at any time from, let's say, March of

20 2020 through July of 2021, were you concerned        14:01:39

21 about -- let's start with child abuse?

22   A.   Of -- of course.  And we learned during the

23 pandemic that there was all of the challenges that

24 humans have when they are staying at home and

25 particularly when it's more difficult -- you know,   14:02:01

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    lots of things are more difficult during the

2    pandemic, and there's enormous stress because people

3    are concerned about illness and health and a whole

4    host of other things.

5          And so, you know, we -- we -- we -- we would          14:02:15

6    be learning about those, and of course we were

7    concerned about all of the impacts of -- of the

8    pandemic, you know, very broadly.

9    Q.   Were you aware throughout the COVID-19

10   pandemic that child abuse was increasing in                 14:02:36

11   Santa Clara County?

12         MR. WALL:  Objection.

13         THE WITNESS:  Um --

14         MR. WALL:  Objection.  Assumes facts.

15         But you can answer, Dr. Cody.                          14:02:43

16         THE WITNESS:  Yeah.

17         I don't recall getting specific reports

18   about child abuse, you know, specific reports in the

19   County or, you know, spec- -- yeah, I don't recall

20   getting specific reports.                                   14:02:58

21   BY MS. GONDEIRO:

22   Q.   Do you -- do you recall alcoholism

23   increasing during the COVID-19 pandemic?

24         MR. WALL:  Same objection.

25         THE WITNESS:  We don't have a way to measure          14:03:11

1   alcoholism.  We don't have a surveillance system for

2   alcoholism, per se; so I wouldn't have a way to get

3   those reports.

4   BY MS. GONDEIRO:

5       Q.   Okay.  Were you aware of mental health                14:03:26

6   issues increasing during COVID-19?

7            MR. WALL:  Same objection.

8            THE WITNESS:  What -- what time period are

9   you asking about?

10  BY MS. GONDEIRO:                                                14:03:42

11      Q.   Through the COVID-19 pandemic.  So from when

12  COVID-19 started in January of 2020 until the

13  present.

14      A.   At any time during the pandemic?

15      Q.   Uh-huh.                                                14:03:52

16      A.   An increase in mental health issues?

17      Q.   Yes.

18      A.   With the -- with the available data that we

19  had, yes.

20      Q.   Okay.  And -- and where did that -- was that          14:04:04

21  County data that you put -- that the -- did the

22  County put that together, or did another entity put

23  that together?

24      A.   The County data that would have been

25  available to us would have been related to emergency          14:04:16

1  department visits, potentially hospitalizations.

2  Those are the kinds of data that we would have had

3  available to us in the County.

4      Q.   Did this data show that there was an

5  increase in suicidal ideation?                      14:04:39

6      A.   I don't recall, and I would need to see the

7  data and look at the particular time period.

8      Q.   Is this -- is this data put together in,

9  like, reports?

10     A.   The data would be data that's accessible     14:04:59

11 County data that might be put together in a -- you

12 know, some kind of consolidated fashion where we

13 could look at it and review it.  There's not a formal

14 cadence of reports that I can think of.

15     Q.   Okay.  But it's -- it's documented somewhere  14:05:20

16 that the County has access to?

17     A.   These are the -- the -- a subset of these

18 data are ones that are available and we would be able

19 to access.  And that would include reasons for

20 emergency department visits, hospitalizations,        14:05:36

21 although those data lag quite a bit and often are not

22 quite as timely so can be less -- less useful, but we

23 would look at those as well.

24     Q.   Okay.  What other -- what other data were

25 you looking at outside of the -- the County?          14:05:51

1    MR. WALL:  Objection.  Vague.

2    THE WITNESS:  So I would have access to data

3  collected by the County, and those would be the data

4  that would be most likely -- most -- you know, most

5  easily accessible and most likely that I'd be looking          14:06:11

6  at.

7  BY MS. GONDEIRO:

8    Q.   Did you review any other data conducted by

9  anyone outside of the County regarding mental health

10  issues during the COVID-19 pandemic?                           14:06:21

11    MR. WALL:  Objection.  Vague.  Overbroad.

12    But you can answer the question, Dr. Cody.

13    THE WITNESS:  I would have looked, you know,

14  broadly again at CDC reports and the MMWR that might

15  have measured these sorts of impacts, and that would          14:06:40

16  have been, you know, nationwide data or a report on a

17  particular location and -- you know, just in general,

18  those would be the kinds of places that I -- that I

19  would have looked.

20  BY MS. GONDEIRO:                                               14:06:53

21    Q.   Do you remember the specific authors of any

22  of those studies?

23    A.   (Shaking head.)

24    Q.   Okay.  Do you -- do you remember the title

25  of any of the studies?                                         14:07:04

1     A.   I do not.

2     Q.   Do you remember the content of any of the

3   studies?

4     A.   Not specifically.

5     Q.   Do you remember anything about the studies?          14:07:13

6     A.   Well, what I can tell you is that these

7   types of questions about the -- the overall health

8   impact of the pandemic would have been likely to have

9   been published in CDC publications.  Those CDC

10  publications might have national data, or they might    14:07:36

11  document the experience of a particular geographic

12  location or jurisdiction.

13          MS. GONDEIRO:  Okay.  Dan, can we pull up

14  the next exhibit?

15          THE VIDEOGRAPHER:  Yep.                             14:07:58

16          16?

17          MS. GONDEIRO:  Yes.

18          THE VIDEOGRAPHER:  Okay.

19          (Exhibit 16 was marked for identification.)

20          MS. GONDEIRO:  This is the Mandatory               14:08:08

21  Directive for Gatherings.  It was issued in July --

22  July 14th, 2020.

23          Can you please scroll down to Section 5?

24          THE WITNESS:  And I'm having a difficult

25  time opening this from the chat for some reason.          14:08:25

1       MS. GONDEIRO:  Can you -- can you see -- can

2   you see it on the screen, Sara -- or Dr. Cody?

3       THE WITNESS:  I can only see what's

4   scrolling past, but I cannot -- I'm not able to open

5   the exhibit from the chat.                        14:08:39

6       MS. GONDEIRO:  Okay.  Well, can you go to

7   the first page, Dan?  Because --

8       THE WITNESS:  Which exhibit is this?  I'll

9   see if I can try one more time.

10      MS. GONDEIRO:  This is the exhibit.  It     14:08:49

11  says, "Mandatory Directive for Gatherings."

12      THE WITNESS:  Okay.

13      MR. WALL:  And, Dr. Cody, it's Exhibit 16.

14      THE WITNESS:  Right.  I'm just clicking on

15  the exhibit in the chat, and it's not popping up,   14:08:57

16  which is --

17      MS. GONDEIRO:  Okay.

18      THE WITNESS:  -- challenging.

19      MR. WALL:  If you don't pull it up, I

20  just --                                            14:09:18

21      THE WITNESS:  Okay.

22      MR. WALL:  I just printed a copy if you

23  can't pull it up.

24      THE WITNESS:  Okay.  I've -- I've got it.

25  No, I've got it.                                   14:09:23

1           Okay.  I'm ready.

2           MS. GONDEIRO:  Can you please scroll down to

3   Section 5, Dan?

4   BY MS. GONDEIRO:

5       Q.   So under Section 5, under the -- on -- in          14:09:42

6   bullet point 2 -- or the second bullet, it says, "No

7   singing or shouting is allowed at gatherings because

8   these activities significantly increase the risk of

9   COVID-19 transmission."

10          Did day camps constitute a gathering             14:10:04

11  pursuant to this gatherings directive?

12          MR. WALL:  Objection.  Vague as to "day

13  camps."

14          But you can answer if you understand,

15  Dr. Cody.                                               14:10:18

16          THE WITNESS:  I'm -- I'm not quite sure I

17  understand -- I'm not sure that day camps were

18  considered -- met the definition of "gatherings."

19          MS. GONDEIRO:  You know what?  I think what

20  I'm going to do, if you guys don't mind, I'm just        14:10:35

21  going to go off the record and have you review the

22  next three exhibits so that we're not wasting time on

23  the record having you review them and familiar [sic]

24  yourself.  I had thought, you know, you had probably

25  reviewed these orders.                                  14:10:49

| | | |
|---|---|---|
| 1 | So why don't we just take a short | |
| 2 | five-minute break.  You review the next exhibits. | |
| 3 | Okay? | |
| 4 | THE WITNESS:  You would like me to review | |
| 5 | Exhibits -- which exhibits? | 14:11:01 |
| 6 | MS. GONDEIRO:  The next three, so 16 -- | |
| 7 | 16 -- actually, let's do 16, 17 -- | |
| 8 | MR. WALL:  No, no, no.  If you want us to do | |
| 9 | something on break, this is going to be deposition | |
| 10 | time.  If you want to show the exhibit -- a witness | 14:11:14 |
| 11 | an exhibit, then she has a chance to look at the | |
| 12 | exhibit.  You can ask her questions.  She either | |
| 13 | recalls or she doesn't recall. | |
| 14 | MS. GONDEIRO:  Hey, Dan, can you please take | |
| 15 | us off the record real -- so we can talk about this? | 14:11:24 |
| 16 | THE VIDEOGRAPHER:  Okay.  We are going off | |
| 17 | the record.  The time is 2:11. | |
| 18 | (Recess taken.) | |
| 19 | THE VIDEOGRAPHER:  We're back on the record. | |
| 20 | The time is 2:14. | 14:14:23 |
| 21 | MS. GONDEIRO:  Can you pull up Exhibit 16 | |
| 22 | and scroll down to Section 5? | |
| 23 | BY MS. GONDEIRO: | |
| 24 | Q.  So we'll just start off where we left off. | |
| 25 | It says, "No singing or shouting is allowed at | 14:14:46 |

1    gatherings."

2          Dr. Cody, did day camps constitute a

3    gathering pursuant to this gatherings directive?

4          A.    So I know the gathering directive did not

5    apply to school classrooms.  I believe that we --          14:15:00

6    that we had a separate direct- -- a separate

7    directive to help describe the safety measures for

8    youth programs and camps separate than the gathering

9    directive.

10         Q.    Was -- was singing allowed at these -- at      14:15:22

11   day camps at this time --

12              MR. WALL:  Objection.  Vague as to time

13   frame.

14   BY MS. GONDEIRO:

15         Q.    -- during -- during July of 2020?             14:15:30

16         A.    So could we look at that directive?

17         Q.    I guess we'll have to pull it up later.  I

18   don't have that specific directive as a exhibit.

19              Do you recall whether singing and -- or --

20   or shouting was allowed at recording studios during      14:15:58

21   July of 2020?

22         A.    That's not within the gathering directive.

23         Q.    Yes.  I'm just -- I --

24         A.    Your --

25         Q.    Were -- were recording studios -- did they    14:16:14

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1   constitute a gathering pursuant to this gatherings

2   directive?

3      A.   No.  Recording studios would not have been a

4   gathering because they would not have been gathering

5   a number of people in the same place for an organized          14:16:28

6   event.

7      Q.   Okay.  Did you have separate guidance for

8   recording studios at any --

9      A.   Did we have separate --

10     Q.   -- during the COVID-19 pandemic?                         14:16:38

11     A.   Did we have a specific directive for

12  recording studios?  They may have -- I -- I don't

13  recall.  They would have had guidance.  I can't

14  recall whether it was guidance specific just for them

15  or whether they would have fallen under -- I don't      14:16:56

16  recall which -- which they would have fallen under.

17          What I can tell you about is the general --

18  the general intent about how these directives work,

19  if that would be helpful.

20     Q.   No, that's okay.                                          14:17:14

21          Was singing or chanting allowed at recording

22  studios in July of 2020?

23     A.   When we did allow activity, it would have

24  been with everyone masked and distanced except for

25  the person who was performing --                                 14:17:36

1    Q.   Okay.

2    A.   -- to en- -- to ensure safety.  So it

3  wouldn't -- it would only have been quite -- it would

4  have been quite limited, not -- not like a gathering.

5    Q.   Okay.  So if it was -- okay.  So if it was          14:17:49

6  not a gathering, there could be singing or chanting

7  as long as other safety measures were followed --

8         MR. WALL:  Objection.  Vague as to time

9  frame.

10        You can answer.                                      14:18:03

11  BY MS. GONDEIRO:

12    Q.   -- in July of 20- -- in July of 2020?

13    A.   So the -- the -- the gatherings directive,

14  of course, applied to groups of people from various

15  different households all coming together for some         14:18:14

16  sort of organized activity.

17        And some of the other more specific

18  directives would have had many more mitigation

19  measures in place to ensure protection such as fewer

20  people, longer distances, masks, testing, illness         14:18:31

21  reporting, ventilation, things of -- things of that

22  nature.  So they were, you know, quite -- quite

23  different than -- than -- than the activities that

24  would have fallen under the gatherings directive.

25    Q.   In July of 2020, were non-gatherings allowed        14:18:53

1    to sing or chant so long as other safety measures

2    were followed?

3        A.   I think it would depend on the directive.

4        Q.   Okay.  The directive for schools, I believe

5    you had mentioned earlier you reviewed that.                    14:19:13

6             Did it allow singing and chanting as long as

7    safety measures were followed?

8        A.   So we --

9             MR. WALL:  Vague as to time frame.

10            THE WITNESS:  We didn't have a -- so after          14:19:31

11   July, we did not have specific requirements for

12   schools.  We relied on the State's guidance for

13   schools.

14   BY MS. GONDEIRO:

15       Q.   Okay.  What about restaurants?  After -- or        14:19:45

16   in July of 2020 or anytime after that, was -- was

17   live music allowed or singing or chanting so long as

18   other safety measures were followed?

19       A.   We did not allow live music or entertaining

20   at dining establishments.                                   14:20:09

21       Q.   At any point after July of 2020?

22       A.   There were times -- so for the most part --

23   so we did have dining directives to provide guidance

24   for dining establishments.  Initially, it was just

25   outdoor dining.  Much later, and I would have to            14:20:30

1  refresh my memory to remember the exact timing,

2  briefly indoor -- indoor dining.

3        But the overall intent was to not have any

4  activity that would put diners -- that would increase

5  risk.  So there were -- we would not -- it -- you          14:20:50

6  know, having -- having entertainment would not have

7  been part of that.

8        Q.   Okay.  Was any type of singing or chanting

9  allowed after July of 2020 at dining establishments?

10       A.   Was any singing allowed at any time?  Like     14:21:11

11  up till -- up till present, or up till when?

12       Q.   Yes.  Since -- since July of 2020 to the

13  present.

14       A.   So at present, we don't have any

15  restrictions.                                             14:21:27

16       Q.   So let's start in July, then.

17            Was any type of singing or chanting allowed

18  at dining establishments?

19       A.   In July 2020, we would not have allowed

20  singing or chanting at dining establishments, and        14:21:43

21  dining establishments were not open.

22       Q.   Uh-huh.  Okay.  When they were allowed to be

23  open or at any time during the fall of 2020, were --

24  was any type of singing or chanting allowed at dining

25  establishments?                                           14:22:04

1    A.   So, if I may, we had many, many directives,

2  and they changed over time depending on their risk in

3  the community.

4         And so that I can be precise for you, if you

5  could display the directive that you're referring to,    14:22:21

6  I can be much more specific in answering your

7  questions.

8    Q.   We will -- we will come back to those

9  specific directives.

10        MS. GONDEIRO:  Dan, can you please pull up     14:22:35

11  the next exhibit?

12        (Exhibit 17 was marked for identification.)

13        MS. GONDEIRO:  This is a Public Health

14  Department response to the George -- George Floyd

15  protests.                                               14:22:54

16        MR. WALL:  I'm sorry.  I don't mean to

17  interrupt, Mariah.  What exhibit number is this?

18        MS. GONDEIRO:  It should be Exhibit 17.

19        MR. WALL:  Okay.  Oh, thank you.

20  BY MS. GONDEIRO:                                        14:23:10

21    Q.   I'll give you a moment to read it, Sara.

22    A.   Okay.  I'm just trying to pull it up.

23        MR. WALL:  If it's -- if you're having

24  trouble, Dr. Cody, the -- the full -- it's a one-page

25  exhibit, and the full text aside from the address --    14:23:38

```
 1            THE WITNESS:  Yeah.

 2            MR. WALL:  -- information is on the screen.

 3            THE WITNESS:  Okay.  I'll just read it on

 4      the screen because it's --

 5            MR. WALL:  Okay.                                    14:23:46

 6            THE WITNESS:  -- it's giving me trouble.

 7            Yes, I do see the exhibit.

 8      BY MS. GONDEIRO:

 9         Q.   Did this summarize -- did this email

10      summarize the County's response to the protests that    14:23:52

11      occurred during the summer of 2020?

12            MR. WALL:  Objection.  Vague.

13            THE WITNESS:  This email summarizes the

14      Public Health Department's response.

15      BY MS. GONDEIRO:                                         14:24:13

16         Q.   Okay.  Was there any specific guidance or

17      orders that Santa Clara County issued in response to

18      the protests that were occurring during the summer of

19      2020?

20         A.   We were -- we -- I can't remember exactly        14:24:33

21      how, but we were encouraging testing and

22      mask-wearing --

23         Q.   Uh-huh.

24         A.   -- to ensure safety.

25         Q.   Did the County require everyone attending a      14:24:50
```

1   gathering to wear a mask -- or let me repeat the

2   question.

3        Did the County require people attending a

4   protest, during the summer of 2020, to wear a mask?

5        A.   So coming together for an organized activity        14:25:09

6   would be a gathering; and -- and any activity like

7   that that is a gathering, they would need to follow

8   the gatherings rules.

9        Q.   So -- so did you req- -- did you require

10  protesters to wear a mask, or did you just encourage       14:25:31

11  them to wear a mask during the summer of 2020?

12       A.   So, during the summer of 2020, we would

13  have -- if any -- like, we would have -- I'm trying

14  to remember.  Indoors, absolutely masking was

15  required.  And, as I recall, outdoors, when people         14:25:50

16  were close together, masking would also be required

17  because of the -- the concerns of -- for people's

18  safety.

19       Q.   Sure.

20       So if masking was required for these                   14:26:03

21  protests, why did the County release to the public

22  that they encouraged those to follow the orders

23  instead of saying, "You are required to wear a mask"?

24       MR. WALL:  Object to form.

25       THE WITNESS:  Can you repeat the question?             14:26:28

1    I'm trying to match the question to the exhibit.

2    BY MS. GONDEIRO:

3        Q.    Sure.

4            So on the second-to-last sentence, it says,

5    "We also encourage those who are in" -- or, actually,            14:26:38

6    it's the -- the third to last:  "As residents of the

7    County exercise this right, we respectfully remind

8    everyone that COVID-19 is still present and to keep

9    in mind the important practices, such as face

10   coverings and, to the extent possible, maintaining               14:26:59

11   social distancing."

12       A.    Right.  So this is -- this is reminding that

13   they need to use face coverings.  So reminding them

14   that face coverings are required and also encouraging

15   testing and maintaining social distancing.                       14:27:23

16       Q.    But instead of saying the -- "to keep in

17   mind the important practices," why didn't the County

18   say, "You are required to wear a face covering at

19   protests," during the summer of 2020?

20            MR. WALL:  Object to form.                               14:27:40

21            THE WITNESS:  So this document is not a

22   public health order outlining requirements.  This

23   document is a statement of response to the incidents

24   occurring at the time.  It's -- it's not a -- it's

25   not an order listing requirements.                               14:27:58

1   BY MS. GONDEIRO:

2       Q.   And so it says here that you -- that the

3   County was encouraging, to the extent possible,

4   social distancing.

5            So the County was okay with the fact that        14:28:10

6   there would be some protesters who would be within

7   6 feet of distance during the summer of 2020?

8            MR. WALL:  Object to form.

9            Can you also show the witness the date of

10  this email, Ms. Gondeiro?  It's not visible on the        14:28:21

11  screen.

12           MS. GONDEIRO:  It's --

13           MR. WALL:  Thank you.

14           MS. GONDEIRO:  It's -- it's June 2nd.

15           THE WITNESS:  June 2nd.                           14:28:39

16           MS. GONDEIRO:  Yes.

17           THE WITNESS:  And -- and so can you repeat

18  your question?

19  BY MS. GONDEIRO:

20      Q.   It says here that, to the extent possible,        14:28:48

21  protesters must maintain social distancing.

22           Did you intend for this to mean that if --

23  if -- that there -- that protesters could be within

24  6 feet of distance during the summer of 2020?

25           MR. WALL:  Object to form, including the          14:29:08

1    "you."

2            THE WITNESS:  So at this time -- this is

3    before July, and I think the gatherings directive

4    didn't become effective until July.  So this is in

5    June.                                                  14:29:27

6            MS. GONDEIRO:  Uh-huh.

7            THE WITNESS:  And so this is during the time

8    that -- so there wouldn't have been a directive

9    that's -- that's defining this as a gathering and

10   outlining exactly the requirements.  So there        14:29:42

11   wouldn't have been a way to reference the

12   requirements because we didn't have the gathering

13   directive until July, as I recall.  Right.  This is

14   in early June.

15   BY MS. GONDEIRO:                                       14:29:57

16       Q.   Okay.  So at this time, in June of 2020,

17   protesters were not required to socially distance?

18       A.   We -- protesters should protect themselves

19   by wearing face coverings and by -- by keeping a

20   distance from each other.                              14:30:14

21       Q.   Yeah.  I'm not asking "they should."

22           Were they required to socially distance in

23   June of 2020?

24       A.   I believe that, at this time, they would

25   have been under the last shelter-in-place order,       14:30:26

1   which would have required everyone to use face

2   coverings and maintain social distancing especially

3   indoors, and outdoors as well, to the extent that

4   they could.

5       Q.   Okay.  To the extent that they could.                    14:30:50

6            Okay.  Why did the County consider these

7   protests to be a fundamental right but did not ever

8   consider religious gatherings to be a fundamental

9   right --

10           MR. WALL:  Objection.  Assumes facts.              14:31:08

11  BY MS. GONDEIRO:

12      Q.   -- during the COVID-19 pandemic?

13           MR. WALL:  Objection.  Assumes facts.

14           THE WITNESS:  I -- this exhibit that you

15  have up is the Public Health Department's response to   14:31:21

16  George Floyd.  It's not a countywide response -- a

17  countywide statement.  It's coming from the Public

18  Health Department leadership team.

19  BY MS. GONDEIRO:

20      Q.   Did you ever -- did you ever publicly say        14:31:39

21  that protesters had a fundamental right to protest

22  during the summer of 2020?

23           MR. WALL:  Object.  Outside the scope.

24           You can answer the question, Dr. Cody.

25           THE WITNESS:  So I don't -- I don't -- I         14:31:53

Sara H. Cody, M.D. - 08-18-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    don't recall whether I made public comments about

2    protesting and -- I don't recall.

3    BY MS. GONDEIRO:

4        Q.    In June of 2020, were you concerned that

5    these protests were going to significantly increase          14:32:09

6    the spread of COVID-19?

7        A.    In June of 2020, we -- we were concerned

8    that any event that brought people together in close

9    proximity could be a risk.

10       Q.    Uh-huh.                                            14:32:31

11       A.    In June of 2020, we were also beginning to

12   understand that outdoors was much safer than indoors

13   because of the natural ventilation outdoors.

14       Q.    Uh-huh.  Were you specifically concerned

15   that the protests that were occurring in the summer          14:32:48

16   of 2020 would significantly increase the transmission

17   of COVID-19?  And I'm talking specifically in regards

18   to the protests.

19       A.    So the protests in early June, we were

20   concerned, which is why we were urging people to get         14:33:07

21   tested and to watch for symptoms because of the

22   potential for spread given that there were groups of

23   people from different households that were together.

24       Q.    Sure.

25            Do you remember -- or do you recall that            14:33:33

1    COVID-19 cases significantly increased during the

2    months of June and July of 2020?

3        A.   I would need to look at our epidemic curve,

4    but I recall that cases did not begin to increase

5    until July.  We began to see a rise in July.          14:33:57

6             MS. GONDEIRO:  Dan, can you please pull up

7    the next exhibit?

8             (Exhibit 18 was marked for identification.)

9    BY MS. GONDEIRO:

10       Q.   Does this protest -- or does this graph look   14:34:16

11   familiar, Dr. Cody?

12       A.   Yes, it does.

13       Q.   Okay.  And does this graph display that

14   COVID-19 cases were significantly increasing,

15   starting in the beginning of June of 2020?           14:34:34

16       A.   Yes.  This graph shows that cases were

17   beginning to increase from the previous baseline

18   beginning in, you know, early/mid-June.

19       Q.   Okay.  And what did -- what do you believe

20   contributed to that significant increase in COVID-19  14:34:58

21   cases starting in mid-June of 2020?

22            MR. WALL:  Object to form.

23            THE WITNESS:  I think that there were a

24   number of factors.  One, it had -- we were then five

25   months into the pandemic.  People's behavior was      14:35:26

1  beginning to change.  People were traveling.  It was

2  summertime, and people were having social gatherings

3  in spite of the risks and in spite of the

4  requirements.  And there was, in general, increases

5  in activity, not just in our county but in                      14:35:56

6  surrounding counties and states as well, which, of

7  course, impacts our county.

8  BY MS. GONDEIRO:

9      Q.   When did the County lift their second

10  shelter-in-place order?                                         14:36:12

11     A.   In early July, I rescinded the last

12  shelter-in-place order and put in place a risk

13  reduction order.

14     Q.   Okay.  So -- I actually wasn't aware of

15  that.  I was not aware the shelter-in-place order     14:36:39

16  lasted through July.

17     A.   It lasted through -- until early July.

18     Q.   It lasted through early July.

19          Did the County expect, considering they had

20  the shelter-in-place order in effect, that there     14:36:56

21  would be a resurgence starting in June of 2020?

22     A.   There were a number of challenges, and among

23  them -- not an exhaustive list -- is that

24  jurisdictions around us were allowing more

25  activities, and residents of our county were         14:37:22

1   traveling because we live in a -- in a region, not

2   just in a county.  And there -- so we couldn't, of

3   course, control the amount of activity and the

4   opportunities for exposure that everyone living in

5   our county may have.  And that was occurring in --          14:37:46

6   in -- you know, in many different sectors and in --

7   and in many different ways.

8            MS. GONDEIRO:  Okay.  Dan, can you pull up

9   the next exhibit?

10           THE VIDEOGRAPHER:  Okay.  I'm going to have      14:38:05

11  to load that up in chat here.  That's going to be

12  Exhibit 19.

13           MS. GONDEIRO:  Yes.  We're just whipping

14  through.

15           MR. WALL:  Thank you.                             14:38:13

16           (Exhibit 19 was marked for identification.)

17           THE VIDEOGRAPHER:  Do you want me to add any

18  more while I'm here?

19           MS. GONDEIRO:  And, Dan, while you're

20  doing -- once you do this, can you -- can you -- can     14:38:27

21  you please include the next exhibit, Exhibit 20?

22           THE VIDEOGRAPHER:  Sure.

23           (Exhibit 20 was marked for identification.)

24  BY MS. GONDEIRO:

25      Q.   Dr. Cody, you can go ahead and just download    14:38:39

1   that exhibit as well.  You can download both 19 and

2   20.

3       A.    Yeah.  Unfortunately, I'm having difficulty

4   downloading from the chat, but I am going to try.

5             Okay.  Got it.                              14:38:59

6       Q.    Dr. Cody, do you remember doing an interview

7   with Paul Costello in October of 2020?

8       A.    Yes.

9       Q.    What did you mean when you said it was an

10  extraordinarily humbling event?                       14:39:17

11      A.    What I meant was that responding to the

12  pandemic was an ex- -- was extraordinarily humbling

13  because there were so many difficult decisions and

14  difficult trade-offs and that it was humbling.  I

15  was --                                                14:39:45

16      Q.    Sure.

17      A.    -- felt enormous responsibility, and I was

18  concerned and trying to make the best decisions that

19  I could to protect our hospitals and to make sure

20  that people didn't die and didn't lose family.  It    14:39:58

21  was very difficult.

22      Q.    Okay.  Understood.

23            Was it also humbling because you were not

24  prepared for a June resurgence in 2020?

25      A.    No.  That is not what I was referring to in  14:40:14

1    this interview at all.

2             MS. GONDEIRO:  Okay.  Dan, can you scroll

3    down to page 2?

4    BY MS. GONDEIRO:

5         Q.   Costello asks, "Is this moment an inflection          14:40:34

6    point of COVID-19?"

7             You respond, "It certainly is.  I have to

8    tell you, to be candid, June was an incredibly

9    depressing month for us here in the local response

10   because I had my set" -- "my heart set on full              14:40:47

11   containment."

12            What did you mean by that?

13        A.   That, in our county, our community, for the

14   most part, really came together and did many

15   extraordinarily difficult things to protect each           14:41:05

16   other and to protect families and to protect the

17   community.  And we did work really, really well

18   together and got our rates really, really low.

19            But it was really the realization that we

20   were not an island, and we could do everything we          14:41:21

21   could, but we couldn't control what people around us

22   were doing or not doing.

23        Q.   Uh-huh.

24        A.   And that was having an influence on our case

25   rates.                                                     14:41:36

1    Q.   Sure.

2    A.   So...

3    Q.   So you said here, you know, "I had my heart

4    set on full containment."

5         So with you reviewing this answer, did --          14:41:43

6    did you anticipate a June resurgence in 2020?

7    A.   Did I in 2020?  I mean, did I antici- --

8    Q.   Yep, yep.

9         Did you anticipate a June resurgence in

10   2020?                                                    14:42:03

11   A.   As I -- as I mentioned earlier, it was

12   always difficult to look ahead around the corner and

13   to know how this pandemic was going to be moving.

14   Q.   Uh-huh.

15   A.   And so, you know, we had done -- our              14:42:18

16   community had done, you know, very well given the

17   tools that we had, and so to see cases rise again was

18   very difficult to see.  You know, I had hoped that we

19   could hold things low and not have that resurgence.

20   Q.   Yeah.  So your goal was that there would not     14:42:43

21   have been a resurgence starting in June of 2020?

22   A.   That had been my goal, yes.

23   Q.   Okay.  Can you go to the bottom of page 2,

24   please?

25        Costello asks -- or states that, you know,      14:43:06

1   "Nursing homes and assisted living facilities have

2   been hit hard in Santa Clara County and" --

3   "and around the country."

4          What measures did Santa Clara County put

5   into place to protect the most vulnerable like          14:43:20

6   nursing homes?

7       A.   What measures did we put in place during

8   which time period?

9       Q.   Starting in -- I guess that would be April.

10      A.   Right.  So starting in April 2020, what       14:43:41

11  measures did we have in place to protect vulnerable

12  people in nursing homes and assisted living?

13      Q.   Yes.

14      A.   That's your question?  Okay.

15      Q.   Yes.                                           14:43:55

16          MR. WALL:  Objection.  Outside the scope.

17          Dr. Cody, you can answer the question.

18  Sorry to interrupt.

19          THE WITNESS:  Yeah.

20          We worked incredibly hard to do everything     14:44:01

21  that we could to protect people in nursing home and

22  assisted living facilities by providing -- by

23  collecting data to understand what was happening; by

24  providing guidance and technical assistance on

25  infection control, on testing policies, on policies    14:44:21

1  around personal protective equipment, around

2  visitors, protections for staff, staffing; and by --

3  I can't recall what month, but we had a team that was

4  dedicated to working directly with long-term care

5  facilities with vulnerable residents to -- to protect        14:44:56

6  them.

7  BY MS. GONDEIRO:

8     Q.  Okay.  Were there a lot of -- or were there

9  COVID-19 cases occurring in nursing homes starting in

10  April of 2020?                                              14:45:14

11     A.  Yes.

12     Q.  Okay.  Would you say that that was a hot bed

13  for COVID-19 transmission starting in April of 2020?

14        MR. WALL:  Object to form.

15        You can answer the question.                          14:45:27

16        THE WITNESS:  The pattern that we saw in

17  long-term care facilities, which includes skilled

18  nursing facilities, assisted living facilities, and

19  it's, you know, a large group, was people vulnerable

20  to severe illness, hospitalization, and death are          14:45:47

21  clustered in those facilities.

22        So any introduction of infection into a

23  facility like that can be quite serious.  And so, you

24  know, keeping the overall prevalence in the community

25  as low as possible was one of the best ways to             14:46:10

1  protect infection coming into a facility

2  inadvertently.

3  BY MS. GONDEIRO:

4      Q.   Do you recall ever -- or in -- during the

5  summer of 2020 ever publicly saying that protests        14:46:23

6  probably contributed to the rise in COVID-19 cases?

7          MR. WALL:  Object.  Object to form.

8          THE WITNESS:  In the summer of 2020, we did

9  not have evidence or a way to discern which -- which

10  activities were contributing, and I don't believe       14:46:46

11  other jurisdictions did either.

12  BY MS. GONDEIRO:

13      Q.   Did you ever publicly say, though, that --

14  in COVID-19 cases?

15      A.   You froze there for a moment.  You're --       14:47:07

16  you're back on.  But you were frozen, so I didn't

17  catch --

18      Q.   Can you hear me now?

19      A.   I can hear you now.  I didn't -- you cut out

20  in the middle of your question.                         14:47:20

21      Q.   Okay.  Thank you.

22          During the summer of 2020, do you recall

23  ever publicly saying that you believed the protests

24  contributed to the rise in COVID-19 cases?

25          MR. WALL:  Object to form.  Object as           14:47:30

 1   outside the scope.

 2          You can answer the question.

 3          THE WITNESS:  I don't recall.

 4   BY MS. GONDEIRO:

 5      Q.   Okay.  Do you recall, during the summer of       14:47:35

 6   2020, speaking to reporters about the protests?

 7          MR. WALL:  Same objections.

 8          THE WITNESS:  I don't specifically recall,

 9   but -- but I -- I may have answered a question from a

10   reporter if -- if asked.                                14:47:49

11   BY MS. GONDEIRO:

12      Q.   Do you remember the company that this

13   report- -- that the reporter worked from?

14      A.   I -- I don't remember ask- -- answering a

15   question, so I don't remember who the reporter would    14:48:02

16   have been or where they were from.

17      Q.   Do you --

18      A.   I may have.  I don't recall.

19      Q.   Okay.  Do you recall speaking to any

20   reporter about the protests during the summer of        14:48:11

21   2020?

22      A.   I don't recall.  I may have, but I don't

23   recall.

24      Q.   Okay.  We're going to go to the next

25   exhibit.                                                 14:48:23

1    MR. WALL:  While we're pulling that up,

2    Mariah, we've been going for about an hour; so if you

3    could keep an eye on the clock and give us a break in

4    the next few minutes, that would be great.

5    MS. GONDEIRO:  Okay.  Sure.  I think we can        14:48:40

6    get through this exhibit.

7    THE WITNESS:  And which exhibit is this?

8    MS. GONDEIRO:  This is Exhibit 20.  It's the

9    revised risk reduction order.

10    THE WITNESS:  Okay.  I've got it.        14:48:55

11    MS. GONDEIRO:  Could you scroll down to

12    Section 2?

13    And, actually, can you scroll down to the

14    next page?  I think -- okay.

15    So scroll up a little bit because the --        14:49:25

16    the -- the sentence is between page 2 and 3.

17    There we go.

18    BY MS. GONDEIRO:

19    Q.  It says, "Governmental entities and their

20    contractors are not required to follow these        14:49:36

21    requirements to the extent that such requirements

22    would inter-" -- "would impede or interfere with an

23    essential government function, as determined by the

24    governmental health [sic] entity, unless otherwise

25    specifically directed in the Order or by the Health        14:49:52