UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

**CERTIFIED TRANSCRIPT**

-oOo-

| | |
|---|---|
| CALVARY CHAPEL SAN JOSE, a California Non-Profit Corporation; PASTOR MIKE MCCLURE, an individual; SOUTHRIDGE BAPTIST CHURCH OF SAN JOSE CALIFORNIA dba SOUTHRIDGE CHURCH, a California Non-Profit Corporation; PASTOR MICAIAH IRMLER, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> GAVIN NEWSOM, in his official capacity as the Governor of California; TOMAS ARAGON, M.D., in his official capacity as the Acting California Public Health Officer; SANTA CLARA COUNTY; SARA H. CODY, M.D., in her official capacity as Santa Clara County Public Health Officer; MIKE WASSERMAN, in his official capacity as Santa Clara County Supervisor; CINDY CHAVEZ, in her official capacity as a Santa Clara County Supervisor; DAVE CORTESE, in his official capacity as a Santa Clara County Supervisor; SUSAN ELLENBERG, in her official capacity as a Santa Clara County Supervisor; and JOE SIMITIAN, in his official capacity as a Santa Clara County Supervisor, <br><br> Defendants. | Case No.: <br> 20-cv-03794-BLF |

DEPOSITION OF
SANTA CLARA COUNTY'S PERSON MOST KNOWLEDGEABLE PURSUANT
TO RULE 30(B)(6) - SARAH RUDMAN, M.D.

Sarah Rudman, M.D. - 08-19-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

```
 1   DATE:              Friday, August 19, 2022

 2   TIME:              9:13 A.M. to 2:39 P.M.

 3   LOCATION:          Remote Via Zoom Videoconference

 4

 5   REPORTED BY:
     Michelle D. Knowles,
 6   CSR No. 8979, RPR, CRR, CRC, CCRR
     File No. 22-0819
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Q.   Oh, you have multiple.

2         Well, let's -- medical.

3    A.   Oh.

4    Q.   What type of medical degree do you have?

5    A.   So it's a doctor of medicine, an M.D.

6    Q.   And where did you get that degree?

7    A.   At Cornell.

8    Q.   Okay.  What other degrees do you have?

9    A.   So I have my Bachelor of Arts, and then I have

10   a master's in public health.

11   Q.   And where did you get your master's of public

12   health from?

13   A.   At University of California, Berkeley.

14   Q.   Do you have -- when you got your doctor of

15   medicine, did you focus on epidemiology?

16   A.   Not at that point in my training.

17   Q.   Okay.  So when in your training did you focus

18   on epidemiology?

19   A.   As part of both my infectious disease

20   fellowship, which is the medical training that came

21   after my residency, and in my master's of public health,

22   which was really a degree in epidemiology.

23   Q.   And where did you do your fellowship regarding

24   infectious diseases?

25   A.   At University of California, San Francisco.

1    Q.    And when did you do that?

2    A.    Let's see.  That would have been 2013 to 2015.

3    Q.    And when did you get your master's in public

4    health?

5    A.    In 2015.  I think 2014 to 2015.

6    Q.    When did Santa Clara County first implement its

7    contact tracing system related to COVID?

8    A.    There were several iterations of it.  I would

9    say very early, as early as our first case in January

10   2020, we had a small manual system for contact tracing.

11        Very quickly, within the next several weeks and

12   certainly by early March, we were overwhelmed and didn't

13   have a system for contact tracing just because of the

14   volume of cases compared to the systems set up to

15   respond to them.

16        And then we reimplemented a new system, I

17   believe, at mid-to-late May 2020.

18   Q.    Let's start with the first system.

19   A.    Please.

20   Q.    Well, let's start, actually, when -- when did

21   the County first learn about a COVID-19 case in the

22   County?

23   A.    End of January 20- -- no.  Sorry.  I'm -- I'm

24   misremembering when our first case is.

25        My memory is end of January 2020.  It may have

Sarah Rudman, M.D. - 08-19-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1   been January 20th or 27th, but I don't remember exactly.

2       Q.   And so, at this time, you had a manual system.

3   Is that what you said?

4       A.   Uh-huh.  Yes.

5       Q.   Okay.  How did that man- -- how was that manual

6   system applied?

7       A.   Sure.

8       Q.   Can you explain to me that manual system?

9       A.   So a -- a unit -- a standard practice for

10  response to communicable diseases of public health

11  consequence is to have public health employees trained

12  to speak with the case, confirm that that individual

13  does meet criteria as a case for whatever disease -- in

14  this case, COVID -- try to understand where they may

15  have gotten sick, and then try to understand who they

16  may have exposed during the period we understand them to

17  be contagious.

18      Q.   Uh-huh.

19      A.   So, in January 2020, when we had one and then

20  two and then five cases, there were individuals who

21  would call up a case and then -- originally, on a piece

22  of paper -- write down the name of every person we

23  thought they may have come in contact with during the

24  period we thought they were contagious.  And that

25  information then may have been transcribed into

1   individual Excel documents that were stored on our

2   shared secure drives.

3           And then the -- the final step of that contact

4   tracing is then calling those individuals we believe

5   could have been exposed to notify them of that exposure,

6   see how they're feeling, and direct them to other

7   resources as appropriate.

8       Q.   So do the county attorneys have access to those

9   Excel documents?

10      A.   Yes.  My understanding is yes.

11      Q.   And do you know if the attorney -- attorneys

12   reviewed those documents in response to our office's

13   document requests?

14      A.   I don't know.

15      Q.   Okay.  So after January, let's say February --

16      A.   Uh-huh.

17      Q.   -- of 2020, what was the contact tracing system

18   then?

19      A.   My best memory is sometime during that period,

20   we would have stopped contact tracing entirely.

21      Q.   And why is that?

22      A.   Because, at that time, the resources we had to

23   call people who were getting sick were -- were far

24   overwhelmed by the number of people -- actually, I guess

25   that was more into early March -- overwhelmed by the

1    number of people who were getting sick.   Yeah.

2        Q.   So is it possible that you -- the County may

3    not know the amount of people who could have been

4    infected in February of 2020 because you guys didn't

5    have the resources to -- to trace or investigate

6    COVID-19 cases?

7            MR. WALL:   Objection to the extent it calls for

8    speculation.

9            You can answer the question, Dr. Rudman.

10           THE WITNESS:   Sure.

11           Well, I want to say I -- my opinion is there

12   have been many points throughout the pandemic, including

13   today, when we are likely significantly undercounting

14   how many cases there are.   And the reasons why have

15   evolved throughout the pandemic:   whether it had to do

16   with access to testing, especially early on; whether

17   folks get tested if they're feeling sick or have been

18   exposed, as well as some of the nuances of the reporting

19   system for us receiving reports and being able to

20   respond to them.

21   BY MS. GONDEIRO:

22       Q.   Okay.   So, to be clear, in February, as you can

23   recall, the County wasn't implementing any type of

24   contact tracing system because they were just so

25   overwhelmed?

1          MR. WALL:  Objection.  Misstates testimony.

2          THE WITNESS:  I would -- my best memory is,

3   actually, it was in March when we stopped attempting to

4   contact trace every case.  I believe in February we

5   still had a low enough number of cases we were able to

6   do that, call each case and speak with them.

7   BY MS. GONDEIRO:

8     Q.   During February, were you still using your

9   manual system?

10    A.   Yes, as best I remember.

11    Q.   And how many employees at that time were

12  helping with this manual system?

13    A.   I don't remember exactly.

14    Q.   Do you recall, at that time, feeling like you

15  didn't have enough employees to help with the manual

16  system?

17    A.   I know we reached a point somewhere between

18  February and March where we didn't have enough people to

19  reach out to every case.  I don't remember at what point

20  we made that determination.

21    Q.   Okay.  But it was somewhere in between February

22  or March?

23    A.   That's my best memory, yes.

24    Q.   February to March?

25    A.   Yes.  It could have been more like middle of

1    March.

2         Q.   But it could -- but -- okay.

3              So it could -- so could it have been

4    anywhere -- it could have been anywhere from March -- or

5    no.

6              Could it have been anywhere from February to

7    the middle of March?

8         A.   Yes, that's my best memory.

9         Q.   Okay.  So, in March, what type of contact

10   tracing system did the County implement?

11        A.   So, in March, I would describe us as not

12   implementing a system specifically for contact tracing

13   but continuing to use a State system for case --

14   documentation of cases.  And it wasn't until, I believe,

15   May that we implemented a new system for contact

16   tracing.

17        Q.   So in -- from March to -- actually, can you

18   describe to me the State system --

19        A.   Sure.

20        Q.   -- you were using?

21        A.   So the State, prior to the pandemic, has been

22   using a system called "CalREDIE," which is an acronym --

23   and I apologize; I can't remember what it stands for --

24   that allows two methods of documenting people who are

25   sick with a disease of public health importance:  One is

1   that laboratories can electronically submit positive

2   test results directly into the system in an automatic

3   way, and the other is that public health employees can

4   manually input information they have about somebody who

5   is sick with a disease of public health importance.

6          That CalREDIE system is the means by which we

7   comply with our regulatory requirements to collect

8   information about public health im- -- diseases of

9   public health importance and report them to the State.

10         And so that was the system we were utilizing

11  prior to COVID for other diseases and throughout the

12  pandemic, including until today, to document cases.

13         The period I was describing in February and

14  March, I know we continued to use that system to

15  document what we did know about cases, but it did not

16  include what I would consider contact tracing, which is

17  the information about people who might have been exposed

18  to those cases.

19     Q.    Okay.  Gotcha.

20         Did the State of California implement this

21  CalREDIE system throughout the entire COVID-19 pandemic?

22     A.    Yes.  It was up and running throughout the

23  entire COVID pandemic and able to receive information

24  about COVID cases certainly as early as January 2020.

25  I'm not sure exactly when.

Sarah Rudman, M.D. - 08-19-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    Q.   Did they have any other type of contact tracing

2  system that they applied during the COVID-19 pandemic?

3  And if so -- oh, first, I'll just have you answer that

4  question.

5    A.   Yes.

6    Q.   Did they have another type of contact tracing

7  system?

8    A.   Yes, they did.

9    Q.   And when -- when did they apply that different

10  system?

11    A.   So that different system, which was called

12  "CalCONNECT," was the one I alluded to that went live

13  around May -- the end of May 2020.

14    Q.   So both the County and the State of California

15  started using CalCONNECT in May --

16    A.   Yes.

17    Q.   -- of 2020?

18    A.   Yes.

19        MS. GONDEIRO:  Okay.  Can you please pull up

20  Exhibit 30?

21        (Exhibit 30 was marked for identification.)

22        MR. WALL:  Annette, can you drop a copy into

23  the chat, too, so that I can pull up a copy on my end?

24        EXHIBIT TECHNICIAN:  I think I can, yeah.  But

25  I'm in Ignite, so let me just see if I can share that

```
 1   into the chat.
 2           MR. WALL:  And then if it's dropped into the
 3   chat, Dr. Rudman, you should be able to pull up a copy.
 4           THE WITNESS:  I can scroll through?
 5           MR. WALL:  Yeah.
 6           EXHIBIT TECHNICIAN:  Let's see here.  Hold on.
 7   BY MS. GONDEIRO:
 8       Q.  Dr. Rudman, does this PowerPoint look familiar
 9   to you?
10       A.  I apologize.  What I'm seeing on my screen, it
11   looks like a chat window; so I can't -- I saw it for a
12   moment, but I can't --
13           EXHIBIT TECHNICIAN:  Sorry.  Let me get out of
14   there.
15           THE WITNESS:  Oh, okay.
16           MS. GONDEIRO:  Yeah, that's much better for me
17   too.
18           EXHIBIT TECHNICIAN:  Okay.  Do I need to zoom
19   in more?  Is that better?
20           MR. WALL:  Mariah, can you drop copies of the
21   exhibits into the chat?  Because I want the -- the
22   witness has the right to review the documents --
23           MS. GONDEIRO:  Yes.
24           MR. WALL:  -- and I would like to as well.
25           MS. GONDEIRO:  I -- I don't know how to -- I
```

1  don't know how to do that.  I sent them over to -- to --

2       MR. WALL:  If you have copies on your laptop,

3  you can just open the chat and drag and drop them in,

4  and it will publish them to the group.

5       EXHIBIT TECHNICIAN:  And I can do that.

6       MS. GONDEIRO:  Can you -- can you do that?

7  Because I'm tech- --

8       EXHIBIT TECHNICIAN:  Yeah, but I'm going to get

9  out -- yeah.  Let me just get out of this real quick,

10  and then I'll do that.

11       MR. WALL:  Thank you.  I appreciate it.

12       EXHIBIT TECHNICIAN:  No problem.

13       Let me just stop sharing for a second here.

14       I apologize.  Just -- okay.

15       I'm so sorry.  I took it out of that folder,

16  and now I'm just trying to look for it.  So...

17       Okay.  So I'm going to have to -- I'll get it

18  from the email again.  Just give me one second.

19       MR. WALL:  Thank you, Annette.  I appreciate

20  it.

21       EXHIBIT TECHNICIAN:  No problem.

22       There you go.

23       MR. WALL:  Oh, great.  Thank you.

24       EXHIBIT TECHNICIAN:  Now, let me get -- let me

25  go in to share the screen also with this other one.

```
 1            MR. WALL:  Okay.

 2            Dr. Rudman, you should be able to download and

 3   open it from the chat.  If you have any issues, let me

 4   know.

 5            EXHIBIT TECHNICIAN:  Okay.  Is that too zoomed

 6   out, or is that okay for everybody on the screen?

 7            MR. WALL:  It's okay for me.

 8            MS. GONDEIRO:  Yeah.

 9            THE WITNESS:  I haven't actually been able to

10   open it, though; so it's -- let me see.

11            MR. WALL:  The way it works -- I don't know how

12   familiar with Zoom --

13            THE WITNESS:  Oh, I have to save it and then

14   open it.  I've got it.

15            MR. WALL:  Yeah.

16            THE WITNESS:  Thank you.

17            Okay.  Thank you.  Yes, I've got it open, and I

18   can scroll through.  Thank you.

19   BY MS. GONDEIRO:

20       Q.  Dr. Rudman, does this PowerPoint look familiar

21   to you?

22       A.  I don't remember the specific PowerPoint, but

23   I'm familiar with the information that's in it.

24       Q.  Okay.

25            MR. WALL:  Let the record reflect this is part
```

1   of a larger presentation.

2           THE WITNESS:  Ah.

3           MR. WALL:  But go ahead, Ms. Gondeiro.

4   BY MS. GONDEIRO:

5       Q.   Okay.  So it's -- this PowerPoint is titled

6   "Case Investigation and Contact Tracing."

7           Do you know when this PowerPoint would have

8   been put together?

9       A.   I don't remember specifically, but at the time

10  we were proposing the changes described here would have

11  been around May 2020.

12      Q.   So it says here, on the first page,

13  "Implemented new technology to increase the efficiency,

14  consistency, and effectiveness of our investigations as

15  we scale."

16          Was that new technol- -- what did that new

17  technology refer to?

18      A.   So it -- it -- I don't remember exactly.  It

19  could have been CalCONNECT.

20      Q.   Uh-huh.

21      A.   We were also trying to work with a different

22  company called "Dimagi" to create something similar on

23  our own, and so it could have been alluding to that one

24  instead.

25      Q.   But was it -- but when you refer to

1    "technology," it was either Dimagi -- did I pronounce

2    that right?

3         A.    Yes.

4         Q.    -- Dimagi or CalCONNECT?

5         A.    That's -- yes.  To the best I remember, yes.  I

6    don't remember any other system this could have referred

7    to.

8         Q.    What is Dimagi?

9         A.    So similar to what CalCONNECT did for us

10   eventually, it was designed to be a system -- and it may

11   have been -- the company was called "Dimagi," and I

12   think the system was called "CommCare" -- was designed

13   to allow us to pull information from CalREDIE about who

14   had tested positive for COVID, assign each case out to

15   an investigator electronically as opposed to having to

16   hand them a piece of paper, and have them enter

17   information from an interview with the case into the

18   platform.

19            And then that information would include the

20   names and contact information for anyone they might have

21   exposed while they were contagious, and then those

22   considered contacts would also be assigned out to

23   investigators to notify those contacts that they had

24   been exposed.

25        Q.    Did the County ultimately decide at this time

1  to not use Dimagi and instead use CalCONNECT?

2      A.   Yes.  I know that we went live with CalCONNECT

3  at the end of May.  I don't remember exactly at what

4  time we made the decision to make that transition.

5      Q.   Okay.  Why did the County choose not to use

6  Dimagi?

7      A.   The best I remember is that the benefits of

8  switching to the CalCONNECT system were:  (1) that it

9  was already integrated with CalREDIE, which we were

10  required to use and which was already set up to ingest

11  automatic information from laboratories; (2) it was

12  supported by the State and as best we anticipated at the

13  time.

14          And what did happen is it was adopted by, I

15  believe, all, if not nearly all, California

16  jurisdictions, which also allowed us to, you know, pass

17  a case between jurisdictions if somebody turned out to

18  actually live in a neighboring county or to notify a

19  neighboring jurisdiction if we -- a case in our county

20  had exposed a contact in their jurisdiction.  So it

21  allowed interoperability throughout California.

22      Q.   So, just to be clear, you believe that CalREDIE

23  was adopted by all jurisdictions in California?

24      A.   CalCONNECT.

25      Q.   Or CalCONNECT.

1    A.    Or nearly all.

2    Q.    Do you know who created CalCONNECT?

3    A.    Who created it?  My best understanding is a

4  large team across California.  Department of Public

5  Health gave input to create it, but we were also offered

6  the chance to give input to the State of California

7  about changes needed that they would utilize to change

8  it or adopt it -- adapt it.

9    Q.    But, I mean, I'm assuming CalREDIE had to have

10  been invented by someone; correct?

11    A.    I'm sorry.  Can I ask you to clarify if you

12  mean CalREDIE or CalCONNECT?

13    Q.    I'm sorry.

14    A.    Confusing to us too sometimes.

15    Q.    Let's go back to CalCONNECT.

16    A.    Yes.

17    Q.    I'm getting the two mixed up.

18          Who invented CalCONNECT?

19    A.    I don't know.  What I do understand is it is

20  built on a platform made by the company Salesforce, and

21  so I think it was an existing data product for housing

22  data of any kind that was then adapted with input from

23  the State Health Department to serve the contact tracing

24  purpose.

25    Q.    Uh-huh.  Do you know if CalCONNECT was invented

1    by multiple people?

2        A.   I -- I don't know.

3        Q.   Was it invented by anyone -- was it invented by

4    a public health officer?

5        A.   Can I ask you to clarify what you mean by

6    "invented"?

7        Q.   Who created it?  I mean --

8        A.   Uh-huh.

9        Q.   -- someone had to have had the idea to put

10   together this technology; right?

11       A.   Right.  So, yes, my best understanding --

12            MR. WALL:  Objection to the extent it calls for

13   speculation.

14            But you can answer, Dr. Rudman.

15            THE WITNESS:  Okay.

16            So -- yeah.  My understanding is the technology

17   existed -- and this is my personal understanding because

18   I don't work for either Salesforce or the State:  That

19   the technology existed because it was technology for

20   collating data and sharing it with people in a secured,

21   protected way.

22            And then the State -- I don't have knowledge

23   who had the idea or refined the idea or executed the

24   idea, but it was the State of California Public Health

25   Department who said we will use this technology for this

1  purpose and gave input to set it up to be used for that

2  purpose.

3         Does that answer your question?

4  BY MS. GONDEIRO:

5     Q.   Yes.

6     A.   Okay.

7     Q.   That's helpful.

8         Do you know why other jurisdictions in

9  California decided to use CalCONNECT and not Dimagi?

10    A.   I don't know the decision-making process in

11 other jurisdictions.

12    Q.   So before May, before you guys implemented

13 CalCONNECT, just to be clear, you didn't really have

14 a -- a -- or did you have a technology platform to help

15 you investigate cases?

16    A.   For that brief period just prior to CalCONNECT,

17 we did have the option of using Dimagi.

18    Q.   Did you use Dimagi?

19    A.   I believe we were live in it for about two

20 weeks, so for a very short period.

21    Q.   Okay.  So before Dimagi, though --

22    A.   Uh-huh.

23    Q.   -- were you primarily using a manual system

24 to --

25    A.   Yes.

1    Q.   Okay.  And so that manual system, then, was put

2    in place from the end of January to April?

3    A.   Yes.  But as I tried to say, we effectively

4    stopped using it for the purpose of what I consider

5    contact tracing, which is documenting the name and

6    information for everyone who has been exposed and trying

7    to reach them, when we reached that threshold where we

8    felt that we couldn't keep up with the volume needed for

9    that.  And, again, my best memory is I think that was

10   early March, but I don't recall exactly.

11   Q.   So then what did you start using after March?

12        MR. WALL:  Objection.  Asked and answered.

13        THE WITNESS:  I'm sorry.  Do I --

14   BY MS. GONDEIRO:

15   Q.   If you stopped using the manual system that

16   you're referring to, what did you use after March?

17        MR. WALL:  Objection.  Asked and answered.

18        Dr. Rudman, if I don't tell you not to answer

19   the question --

20        THE WITNESS:  Okay.

21        MR. WALL:  -- you should just answer after my

22   objection.

23        THE WITNESS:  Okay.

24        MR. WALL:  I apologize.

25        THE WITNESS:  That's okay.

1            Yeah, we -- I would say we were not doing

2    contact tracing, as I define it, from whenever that

3    period is in, I think, March until May.

4    BY MS. GONDEIRO:

5        Q.    Okay.  So back to the PowerPoint.  The first

6    PowerPoint in this Case Investigation and Contact

7    Tracing, it reads, "Currently, we have capacity to

8    investigate 25 new cases a day."

9            Was that because the County had this new

10   technology --

11       A.    The --

12       Q.    -- the CalCONNECT?

13       A.    It -- it may have been, in part, because of

14   that, yes.

15       Q.    Well, what would have also contributed to the

16   County being able to investigate 25 new cases a day?

17            MR. WALL:  Objection.  Vague as to time frame.

18            This is an excerpt from a presentation that has

19   a date.

20            MS. GONDEIRO:  Yes.  I think earlier Ms. Rudman

21   had testified that she believed this -- this PowerPoint

22   presentation was put together probably around May.

23   BY MS. GONDEIRO:

24       Q.    Is that correct, Dr. Rudman?

25       A.    That's my best memory of when these types of

1   decisions were either happening or coming to fruition.

2          If you're -- am I able to ask what the date is,

3   like, you know, if there are pages from this PowerPoint

4   I can't see?  Was there a date on it that would help me

5   answer the questions?

6      Q.   Okay.  I don't think there's a date on this

7   PowerPoint, but to the best of your recollection, you

8   believe it was sometime around May?

9      A.   I think so.

10         MR. WALL:  There is a date on this PowerPoint.

11  It's at page 44 of the County's production.

12         MS. GONDEIRO:  Okay.

13         MR. WALL:  I can tell you what it is, if you

14  want, but if you don't want -- if you want the witness

15  to testify without the date --

16         MS. GONDEIRO:  Yes.  If you know the date,

17  I'm --

18         MR. WALL:  Sure.  It's a presentation to the

19  County of Santa Clara Board of Supervisors meeting,

20  May 5th, 2020.

21         MS. GONDEIRO:  Okay.

22         THE WITNESS:  Okay.  Thank you.

23  BY MS. GONDEIRO:

24     Q.   So I'm going to just try to go back and repeat

25  my last question.

1     A.    Uh-huh.

2     Q.    So what enabled the County at this time, in

3  May, to be able to investigate 25 new cases a day?

4     A.    My best memory is it may have been a

5  combination of the Dimagi system to document into, the

6  data that would already be coming into CalREDIE via the

7  mechanisms I described, and the assignment of staff to

8  help with those investigations.

9          MS. GONDEIRO:  Can you please scroll down?

10         Oh, wait.  No.  Up.  Up a little.

11  BY MS. GONDEIRO:

12    Q.    So on the next page --

13         EXHIBIT TECHNICIAN:  Down further?

14         MS. GONDEIRO:  No.  That -- this is perfect.

15         EXHIBIT TECHNICIAN:  Okay.

16  BY MS. GONDEIRO:

17    Q.    -- it reads, "The expanded team will likely

18  include approximately 1,000 team members, but we will be

19  continuing" -- "continuously assessing staff needs," and

20  then it lists different -- or additional -- additional

21  employees.

22         So were -- was this expanded team put into

23  place to help investigate more cases every single day?

24    A.    Yes.

25         MR. WALL:  Objection.  Assumes facts.

```
1              And, Dr. Rudman, if you would give just one
2    second after the question so I have a chance to make my
3    objections and we don't talk over each other and make
4    the court reporter's job impossible.
5              MS. GONDEIRO:  Sure.
6              How about, just to be smooth here, can you just
7    repeat my question -- or can you read off my question?
8              Then, Robin, you can object.
9              MS. GONDEIRO:  Thank you.  Thank you, Mariah.
10             (Record read.)
11             MR. WALL:  Objection.  Assumes facts.
12             And you can answer, Dr. Rudman.
13             THE WITNESS:  Yes, we -- we put in place an
14   expanded team to respond to increasing cases.
15   BY MS. GONDEIRO:
16        Q.   But just to be clear, this expanded team was
17   not put in place -- was not in place prior to May?
18        A.   Correct.
19        Q.   What is the role of the program and project
20   managers?
21        A.   So at the time that I remember this information
22   being shared, our vision for that role was overseeing
23   everything from the onboarding of a contractor and a
24   cadre of volunteers to support this work, vetting them,
25   training them, supervis- -- or supervising their
```

1  supervisors as well as setting up the systems -- in this

2  case, the transition into CalCONNECT -- that would allow

3  this team to operate.  And -- and we did carry that out.

4  Whether it was three program or project managers varied

5  throughout the period that we were doing this work.

6      Q.   Did the County have three project managers

7  starting in May, or did they ultimately employ more

8  project managers?

9      A.   People with the exact title "project manager"

10  would have varied throughout the, you know, two years

11  after this.

12           At the time, my best memory is there were two

13  people with the title of project manager, and we ended

14  up utilizing the contractor described here.  Heluna

15  Health had their own project manager who was sort of a

16  complement to that leadership structure.

17           So at that time, yes, there were three, and

18  then the exact roles evolved later.

19      Q.   What was the role of the team clinicians?

20      A.   That also varied, to some extent, throughout

21  the use of this Case Investigation and Contact Tracing

22  infrastructure.  In general, we felt that there -- there

23  could be a wide number of questions that could come from

24  the cases or contacts that we were asking the staff to

25  call that would be outside their expertise.  And we

1    would want somebody with anywhere from a nurse to a

2    physician level of clinical knowledge to be able to

3    answer those questions and ensure they're accurate.

4         Specific use cases I remember we had in mind at

5    this point was, for example, helping decide whether

6    somebody's symptoms, in the context of their medical

7    history, meant that they could leave isolation after

8    being sick or not or whether somebody's symptoms, as a

9    contact, were worrisome that they should test or not.

10   Those types of clinical advice or interpretation that

11   was beyond the scope of our -- our general contact

12   tracers.

13   Q.   Were the team clinicians volunteers, or did you

14   have to employ 140 new clinicians?

15   A.   So my best memory is our clinician team never

16   actually reached anywhere near 140.  This was our best

17   estimate at the time of what the breakdown of different

18   roles would look like.  The actual eventual team was

19   somewhat different; and, in particular, the team

20   clinicians were many fewer.  I don't remember exact

21   numbers but on the order of 20 to 40 at various times.

22   Q.   Okay.

23   A.   That was a mix of volunteers, reassigned County

24   staff members who were designated as disaster service

25   workers and assigned to this role, and I believe there

Sarah Rudman, M.D. - 08-19-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    may have been a number of individuals hired to serve in

2    this role.

3        Q.    Were the project managers volunteers?

4        A.    The -- the individuals I can remember who

5    served in the project manager role, no.  Two were county

6    employees redirected to this work; and then one, as I

7    mentioned, was a contractor for Heluna Health, served as

8    project manager on their side.

9        Q.    What is Heluna Health?

10       A.    As best I understand, a -- an entity that

11   serves as a -- what's the word I'm looking for? --

12   public health staffing agency.  So I was familiar with

13   them prior to this because there were specific

14   individual roles at the State Health Department that

15   were filled by Heluna Health staff.  But this was my

16   first direct interaction with them as an entity, and we

17   utilized them to -- as a contractor to hire and

18   supervise both the -- a large number of the contact

19   tracer team members as well as the leads.

20       Q.    So the County paid Heluna Health to --

21       A.    Yeah.  Yes.

22       Q.    -- help them with the system?

23       A.    Yes.

24       Q.    Where is Heluna Health located?

25       A.    I actually don't know where their sort of base

1  of operations is.

2      Q.   Do you know who directs Heluna Health or who is

3  in charge of Heluna Health?

4      A.   I -- I don't know the ultimate leadership

5  structure.  Yeah, we had specific leaders that we were

6  working with in the organization.

7      Q.   Who were the specific leaders in the Heluna

8  Health organization that you were working with?

9      A.   Our primary contact was someone named Peter

10  Dale, and I believe his title was chief project officer.

11  And then our other primary point of contact was when

12  they hired that project manager shortly after initiating

13  the contract, and her name was Sara Stahlberg.

14      Q.   Sara -- sorry.  Can you repeat the last name?

15      A.   Last name is Stahlberg, S-t-a-h-l-b-e-r-g.

16      Q.   Did any -- are you aware if anyone else -- any

17  other local agencies used Heluna Health or relied on

18  Heluna Health throughout the COVID-19 pandemic?

19          MR. WALL:  Objection.  Vague.  And to the

20  extent it calls for speculation.

21          THE WITNESS:  Can I ask you to repeat the

22  question, please?

23  BY MS. GONDEIRO:

24      Q.   Are you aware if any other local agency in the

25  state of California relied on Heluna Health during the

1   COVID-19 pandemic?

2       A.   I know that others did but not to what extent.

3   For example, I was recently interacting with a physician

4   who mentioned that she was hired by Heluna Health to

5   support San Francisco's COVID response, but I don't know

6   how indicative that might be of other jurisdictions'

7   interactions with them.

8       Q.   And who was that physician?

9       A.   Oh, her name is Dr. Yeuen Kim.

10      Q.   Doctor what?

11      A.   Her last name is Kim, K-i-m, and first name is

12  Yeuen, Y-e-u-e-n.

13      Q.   And where --

14           MR. WALL:  Mariah, we've been going for about

15  an hour.

16           MS. GONDEIRO:  Okay.

17           MR. WALL:  So if we could take a break soon.

18           MS. GONDEIRO:  Sure.  This is the last

19  question.

20  BY MS. GONDEIRO:

21      Q.   Where does she work again?

22      A.   Oh, I actually don't know where she's working

23  right now.  It was an interaction in which I was aware

24  that she had previously worked for Heluna --

25      Q.   Okay.

Sarah Rudman, M.D. - 08-19-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

```
 1        A.    -- in collaboration with San Francisco.

 2              MS. GONDEIRO:  Yes, we can stop here.

 3              MR. WALL:  Thanks, Mariah.

 4              THE WITNESS:  Thank you.

 5              (Recess taken from 10:18 a.m. to 10:35 a.m.)

 6              MR. WALL:  Mariah, we're ready to go back on

 7        the record whenever you're ready.

 8              MS. GONDEIRO:  Yes, I'm ready.

 9              Court Reporter, can you please remind me where

10        we left off?

11              THE REPORTER:  Sure.

12              (Record read.)

13              MS. GONDEIRO:  Okay.

14        BY MS. GONDEIRO:

15        Q.    Dr. Rudman, did Santa Clara County hire 680

16        case investigators on or around May of 2020?

17        A.    No.

18        Q.    Do you know what the number was?

19        A.    So we eventually got to a total population --

20        you know, members of these teams, between the leads and

21        the investigators, approaching 900 over a couple of

22        months.  But it was a mix of Heluna Health employees --

23        Q.    Okay.

24        A.    -- redirected existing County employees,

25        redirected State employees who were being utilized in
```

1    their disaster service worker capacity and lent out to

2    various counties, and a group of volunteers.

3         Q.   Okay.  Did the County have to pay for

4    additional workers to conduct their case investigations?

5         A.   Yes, via their contract with Heluna Health.

6         Q.   Did the County hire 68 additional new data

7    entry support staff --

8         A.   No.

9         Q.   -- on or around May of 2020?

10        A.   No.

11        Q.   How many?

12        A.   We both discovered we didn't need that many

13   people devoted purely to data entry.  I think at our

14   peak, over the next year, we probably had up to 25 or

15   30 people supporting various elements of data entry and

16   data cleaning.  But that, again, was a mix of, I think,

17   mostly redirected County staff and potentially some

18   Heluna staff or redirected State workers.

19        Q.   Okay.  Did the County hire two epidemiologists?

20        A.   My best memory is we received one

21   epidemiologist funded by the CDC Foundation.  So this

22   was not hired by the County but by an outside

23   foundation.

24        Q.   Who is in charge of the CDC Foundation?

25        A.   I don't know.

1    Q.   Why did the CDC Foundation decide to hire an

2    epidemiologist for this county?

3            MR. WALL:  Object to form.

4            THE WITNESS:  I -- I don't know the internal

5    processes of CDC Foundation, but my understanding is we

6    were one of a number of locations in the country where

7    they hired and sort of assigned epidemiologists or other

8    roles to support our activities.

9    BY MS. GONDEIRO:

10    Q.   Okay.  So they were -- the CDC Foundation was

11    particular in who they assign epidemiologists for?

12    A.   I -- I --

13            MR. WALL:  Object to form.

14            THE WITNESS:  Oh.

15            I don't know how that process worked.

16    BY MS. GONDEIRO:

17    Q.   Okay.  Did the County seek external funding to

18    help fund their contact tracing system on or around May

19    of 2020?

20    A.   Seek external funding?  I don't believe so, no.

21    Q.   Well, the County had to hire additional staff;

22    correct?

23    A.   Yes, with the distinction that they were

24    technically not County staff but contractors via Heluna.

25    Q.   Okay.  Was your -- was the County's contact

1   tracing system that began on or around May of 2020 used

2   as a template for other governmental entities in

3   California?

4           MR. WALL:  Object.  Object to form.

5           You can answer.

6           THE WITNESS:  I don't know.

7   BY MS. GONDEIRO:

8       Q.   Okay.  Did other local jurisdictions seek

9   Santa Clara County's advice as to how to implement their

10  contact tracing system?

11      A.   Yes.  My -- I don't remember specific

12  instances, but I know that, for example, we were asked

13  to -- to share at a statewide discussion how our system

14  worked.

15      Q.   Okay.  When was that statewide discussion?

16      A.   I don't remember.

17      Q.   Do you know the general time frame of when that

18  discussion would have occurred?

19      A.   No.  I can't remember.

20      Q.   Was it in 2020?

21      A.   It may have been late 2020 or early 2021.

22      Q.   Okay.  So I'd like you to kind of just explain

23  to me how the case investigation works.

24           So what happens when the County receives a

25  reported COVID-19 case -- or what happened starting in

1    May of 2020?

2        A.    Sure.  So those reports usually came in to

3    CalREDIE via the preexisting system where laboratories

4    can send a positive test result for a certain disease

5    into CalREDIE.  We had staff related to that data entry

6    team who would review that positive test, confirm that

7    it was somebody who lived in Santa Clara County and that

8    it was a new incident of COVID-19 and not somebody who

9    was testing for a second or third time after their

10   diagnosis, and then transfer that data into CalCONNECT.

11   This was via a system the State had set up that allowed

12   the two databases to talk to each other.

13          That case coming into CalCONNECT would then be

14   assigned by that group of team leads to an individual --

15   first to a team and then, by their lead, to an

16   individual case investigator who would, using the

17   contact information that came out with that case report,

18   try to contact the case and say, first, "Are you aware

19   that you've been diagnosed with COVID-19?" assess

20   whether they had immediate, especially emergent, health

21   needs, and did they need assistance getting health care

22   or other, you know, support services like emergency

23   housing or food or rental support.

24          We would ask a series of questions to try to

25   collect basic information about their demographics and

1    the circumstances of their COVID case, and then we'd

2    collect information on anyone they may have had close

3    contact with during the period we think that they were

4    contagious.

5           All of that information was documented in

6    CalCONNECT, and then we'd conclude that call by offering

7    them the instructions for isolation to help prevent

8    further spread of their disease while they're

9    infectious.

10          Then the contact information that was

11   generated -- so let's say I said I was in contact with

12   Mr. Wall during the period I was contagious.  There

13   would be a contact record created for Mr. Wall with his

14   phone number.  That would be assigned to a different

15   investigator who would call the contact, notify them

16   that we believe that they were exposed to an active case

17   of COVID, provide them the instructions and

18   recommendations for quarantine when those applied, and

19   similarly offer them resources and information to help

20   respond to any immediate health or safety concern.

21        Q.   So going back to the first case investigator --

22        A.   Uh-huh.

23        Q.   -- who was tasked -- or who was assigned to

24   talk to that person who -- who had COVID-19.

25        A.   Yes.

1    Q.    What types of questions did that case

2    investigator ask the -- the person who was infected with

3    COVID-19?

4    A.    The set of questions varied throughout the

5    pandemic.   In general, they would always verify the

6    name, date of birth, sex and gender, address to make

7    sure it was really someone who lived in Santa Clara

8    County.

9          And then, throughout the pandemic, we collected

10   a range of information on things like were they

11   experiencing symptoms, when did the symptoms start,

12   verifying when they had tested positive, and, you know,

13   the severity of their illness, had they been

14   hospitalized, had they had certain complications.

15         And then again, varying throughout the

16   pandemic, there were sometimes questions asked about

17   places they might have gotten sick, especially settings

18   that might have had large groups of people together.

19   That might include their workplace, their school, or any

20   large gatherings they might have been part of.

21         And then, as I mentioned, collect -- and sort

22   of the primary focus was collect names and contact

23   information for anyone they might have had close contact

24   with during the period we believed they were contagious.

25   And that best understanding of what is close contact

1    evolved during the pandemic as well.

2    Q.   Were these lines of questionings memorialized

3    in any document or training material at any point before

4    May of -- or May of 2020?

5    A.   I'm sorry.  They wouldn't have been in any

6    documents prior to May of 2020.

7    Q.   Okay.  During May of 2020, was there any

8    training material?

9    A.   Yes.  Yes.

10    Q.   Okay.  Was there any other type of document

11    where these questions would have been memorialized?

12    A.   So the -- the main place the questions lived

13    was built into the CalCONNECT system.

14    Q.   Okay.

15    A.   Part of what a case investigator would see when

16    they were assigned a new case is it would pop up,

17    "You've got a new case," say, "Dr. Sarah Rudman is your

18    case to call," and when they open the system in

19    CalCONNECT, it would show the information we'd already

20    received, including a phone number, but also the list of

21    questions that we were hoping for the case investigator

22    to collect.

23    Q.   So as the case investigator is gathering all of

24    this information, how did the County ultimately

25    determine where they believed that person became

1    infected with COVID-19?

2            MR. WALL:  Objection.  Assumes facts.

3            THE WITNESS:  So the County actually usually

4    did not -- I'm not sure I have your words exactly --

5    confirm the location where somebody contracted COVID

6    both because that was not the primary focus of this

7    contact tracing effort but, instead, to focus on who

8    might not yet be sick but be exposed and respond to

9    those folks' needs and safety but also because of the --

10   the limita- -- several limitations in collecting

11   information and understanding how -- where somebody

12   might have gotten sick.

13   BY MS. GONDEIRO:

14       Q.   So the goal of the contact tracing system that

15   was implemented in or around May of 2020 was -- was more

16   of a preventive measure.  You wanted to prevent more

17   people from getting sick; is that correct?

18       A.   Yes.

19       Q.   But I guess I'm a little bit confused because

20   you ultimately have traced cases to various industries;

21   correct?

22       A.   I actually would say no, or at least it's

23   extremely rare, especially among the thousands and

24   millions of cases we've -- well, thousands -- hundreds

25   of thousands in Santa Clara County, to have actually

1    traced where an individual got sick.

2            So -- so, yeah, I would disagree.  I would

3    say -- so, no, for the vast, vast majority of cases, we

4    did not ever trace, meaning, I think as you're using it,

5    come to an agreed understanding of where they contracted

6    COVID.

7        Q.   Okay.  Did the County, starting in May of 2020,

8    keep track of the different reasons why someone may have

9    contracted COVID-19?

10       A.   Can you say what you mean by reasons they

11   contracted?

12       Q.   Okay.  I'll be more specific.

13           Starting in May of 2020, did the County keep

14   track of when they -- when they were investigating

15   cases, did they ask questions like, "Were you wearing a

16   mask?"

17       A.   There were various times in the pandemic where

18   we asked that question; but, in general, it was not

19   actually a standard question asked of all cases.  And

20   for the majority of the pandemic, when we were doing

21   contact tracing, we often did not go into that level of

22   detail.

23       Q.   Why would the County not ask whether that

24   person who contracted COVID-19 was not wearing a mask?

25           MR. WALL:  Objection.  Assumes facts.

 1  Incomplete hypothetical.  And to the extent it calls for

 2  speculation.

 3          But, Dr. Rudman, you can answer the question.

 4          THE WITNESS:  So there were times and

 5  situations when we would have assessed whether someone

 6  was wearing a mask and times when we didn't, and the

 7  reasons why we might not have might have been varied.

 8          But I would reiterate that the primary

 9  objective of those conversations was prevention of

10  future cases.  So we did, to that end, for example,

11  counsel people on the importance of wearing masks

12  once -- now that we knew that they were sick or had been

13  exposed and were likely to get sick.

14  BY MS. GONDEIRO:

15      Q.   Starting in May of 2020, can you describe the

16  circumstances where the County was direct- -- or the

17  case investigators would have been directed to ask

18  whether that person was wearing a mask?

19      A.   The only instance that comes to mind right now

20  where I remember directing -- or knowing that staff

21  members were directed to ask about masking, sort of

22  retrospectively, was during a period -- I think it was

23  around November to Jan- -- November 2020 to January '21

24  when we were specifically trying to focus -- trying to

25  understand better about where people were going in the

1    period before they got sick.

2         And in that process, we had a subset of

3    investigators with a subset of cases who were asking,

4    "For each of those places you went or interactions you

5    had, do you remember whether you wore a mask or not?"

6    Q.    Okay.  Prior to November of 2020, did the

7    County case investigators ask if someone was wearing a

8    mask who may have contracted COVID-19?

9    A.    There may have been specific questions at

10   various times that were followed up by whether someone

11   was masked, but I don't remember exactly how that was

12   embedded into the case investigation interview script or

13   at what times it might have been utilized or not.

14   Q.    Can you remind me?  You are the -- you were

15   the -- you were in charge of the COVID-19 contact

16   tracing system; correct?

17   A.    Yes.  For the period from June to -- June 2020

18   to December 2020.

19   Q.    Okay.  During that time period, did you direct

20   contact investigators at all times to ask whether

21   someone was wearing a mask who may have contracted

22   COVID-19?

23        MR. WALL:  Objection.  Asked and answered.

24        But you can answer the question, Dr. Rudman.

25        THE WITNESS:  Thank you.

Sarah Rudman, M.D. - 08-19-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

```
 1            I -- I don't remember giving that specific
 2    general directive to the entire team or for all cases.
 3            MS. GONDEIRO:  Okay.  We can go on to the next
 4    exhibit.
 5            EXHIBIT TECHNICIAN:  Moving down or to 31?
 6            The next page, you mean?
 7            MS. GONDEIRO:  Oh, sorry.  31.
 8            EXHIBIT TECHNICIAN:  31.  Okay.
 9            (Exhibit 31 was marked for identification.)
10            MS. GONDEIRO:  I'm going to try to get you out
11    early, Ms. Rudman.
12            THE WITNESS:  Thank you.
13            EXHIBIT TECHNICIAN:  Let me go ahead and take a
14    moment just to put the -- put that into the chat box
15    also.
16            MR. WALL:  Thank you.
17            EXHIBIT TECHNICIAN:  Yes.  So I don't mess it
18    up here, I should do that first.
19            You should have it.
20            THE WITNESS:  I have it open.  Thank you.
21            EXHIBIT TECHNICIAN:  Yeah.  Let me just put
22    this up here.
23            MS. GONDEIRO:  Are you able to put it on the
24    screen?
25            EXHIBIT TECHNICIAN:  Yes, I am.
```

```
 1              MS. GONDEIRO:  Okay.

 2              EXHIBIT TECHNICIAN:  I am, yes.  I'm sorry.

 3    Just having to get to the right server here.

 4              There we go.  Let me just share it.

 5              Okay.  There you go.

 6    BY MS. GONDEIRO:

 7       Q.    Ms. Rudman, did you put together these

 8    Santa Clara County Daily Case Counts graphs?

 9       A.    No.

10       Q.    Who -- who put these graphs together?

11       A.    There was a team called "the situational

12    analysis branch."  And so, best of my understanding,

13    they are responsible for putting together documents like

14    this one and so I assume this one as well.

15       Q.    Okay.  So starting in or around March -- or May

16    of 2020, did the -- did the County put together a

17    situational analysis branch for the specific reason of

18    recording daily case counts in Santa Clara County?

19       A.    No, that's not quite right.

20       Q.    Okay.  When did the County put together the

21    situational analysis team?

22              MR. WALL:  Objection.  Out- -- I think it's

23    outside the scope.

24              But you can answer the question, Dr. Rudman.

25              THE WITNESS:  My best memory is there's been
```

1    some version of the situational analysis branch since

2    potentially as early as February of 2020, but I don't

3    remember exactly.

4    BY MS. GONDEIRO:

5        Q.   What was the -- did -- was the situational

6    branch a branch of the Santa Clara County Public Health

7    Department?

8        A.   This also would have evolved during the

9    pandemic.  There may have been portions at which this --

10   there was a situational analysis branch within the

11   Public Health Department's response and a portion of

12   which it might have been the entire County's response

13   had its -- a situational analysis branch with

14   individuals who -- whose daily work reported to the

15   Public Health Department.

16       Q.   Okay.  So I'm just trying to understand what

17   these different words mean here.  So the light -- the

18   light yellow is "LTCF-Resident."

19            Can you tell me what that represents?

20       A.   That's an abbreviation we use for long-term

21   care facility.

22       Q.   Okay.

23       A.   And so, presumably, residents in long-term care

24   facilities.

25       Q.   Okay.  So then the yellow in the graph

1  represents the percentage of cases that were traced to

2  residents in long-term care facilities?

3      A.   I would say no.  These were individuals who

4  were, at the time of their diagnosis, residents in

5  long-term care facilities.  The assessment of whether --

6  whether we would say that they were traced to or got

7  sick because of that status is more complicated and may

8  not necessarily apply.

9      Q.   Okay.  What does "Other Outbreak" encompass?

10     A.   Again, depending on the time of this -- and I

11 assume maybe late August 2020 based on the date here --

12 I -- I don't recall exactly what definition we might

13 have been using or the situational analysis branch might

14 have been using for this graph.  They may have been

15 cases who did not live or work in a long-term care

16 facility but had been linked to a cluster in some other

17 setting -- any other setting, I believe.

18     Q.   What do you mean by "cluster"?

19     A.   So this would be where, even in the absence of

20 being able to prove, for example, that somebody got sick

21 in a school or at their workplace, there were so many

22 cases associated with their school or workplace without

23 specific other more likely places they got sick that we

24 presumed and clustered them together as most likely

25 considered an outbreak.

1           And at various times throughout the pandemic,

2    there were specific definitions of the number of cases

3    that would meet a threshold as an outbreak, usually set

4    by the State Public Health Department.

5        Q.   So the number that was -- that determined

6    whether it was an outbreak changed throughout the

7    COVID-19 pandemic?

8        A.   Yes.

9        Q.   Why is that?

10       A.   I can't speak to the exact decision-making for

11   California Department of Public Health when they were

12   setting these thresholds, or, at times, I think CDC was

13   making recommendations about these thresholds.

14           My sort of professional understanding is that,

15   depending on the setting, there may be different

16   likelihoods that people could get exposed outside the

17   setting versus inside it.  So, for example, in a

18   long-term care facility, for a resident, most residents

19   in long-term care facilities rarely leave that setting.

20           So when you have a small number of cases in

21   that setting, it's likely that most of them got sick

22   there --

23       Q.   Uh-huh.

24       A.    -- and we can feel pretty confident saying

25   there's likely spread happening in this setting.  Or

1  sometimes we knew that someone had literally not left

2  the setting at all for the entire period when they could

3  have gotten sick, so we feel quite confident saying they

4  got sick here.

5         For other settings like a school or a worksite,

6  people come in and out of it, and you may need a higher

7  number of cases associated with that setting to feel

8  confident there's spread happening there as opposed to

9  it's just a group of people who just as likely might

10  have gotten sick at home but happen to work together.

11     Q.   Okay.  And what did "Community," which is the

12  dark blue -- what did that encompass?

13     A.   My best memory from this time is it would have

14  been everyone else.

15     Q.   Okay.

16     A.   So, as I was describing before, it was

17  incredibly hard and much more rare than not that we

18  would actually feel like we could attribute a case to a

19  particular setting.  And so here, the "Community" bucket

20  is describing everyone else where we don't know or

21  weren't able to ascertain where they were likely to get

22  sick or they weren't specifically known to be part of a

23  cluster under investigation.

24     Q.   Okay.

25         MS. GONDEIRO:  Okay.  We can move on to

1    Exhibit 32.

2            (Exhibit 32 was marked for identification.)

3    BY MS. GONDEIRO:

4        Q.   Dr. Rudman, does this graph look familiar?

5        A.   Not specifically, no.

6        Q.   Okay.  Do you know who would have put together

7    a graph that reported cases based off of job titles in a

8    restaurant?

9        A.   Very generally, the situational analysis branch

10   was responsible for creating visual representation of

11   our COVID data, but I don't know specifically for -- for

12   this analysis.

13       Q.   So the -- this graph states different job

14   titles.  Were these -- did the County have similar

15   graphs like this that depicted COVID-19 cases based upon

16   business types or business settings?

17           MR. WALL:  Objection.  Vague.

18           THE WITNESS:  I'm aware of some graphs the

19   County had that represented COVID cases by business

20   types.

21   BY MS. GONDEIRO:

22       Q.   Does the graph -- does the County have a graph

23   similar to this that keeps track of the reasons for

24   whether someone may have contracted COVID-19?  For

25   instance, they were not wearing a mask or they were

1  singing or they were in a large gathering.

2      A.   I'm not aware of any graph or document that

3  would fit what you just described.

4      Q.   Why would the County -- why did the County not

5  think to keep track of the different reasons why someone

6  may have contracted COVID-19?

7           MR. WALL:  Objection.  Assumes facts.  Calls

8  for speculation.

9           THE WITNESS:  So I would say the County

10  actually put extensive effort in trying to understand

11  where populations, in general, were getting sick or why,

12  modifiable things that people could do to prevent

13  getting sick.

14           MS. GONDEIRO:  Uh-huh.

15           THE WITNESS:  A lot of the information that we

16  had to base those understandings on was not specifically

17  coming from our own data collection but from national

18  publications, peer-reviewed journals, you know, expert

19  advice and sort of CDPH, California Department of Public

20  Health, and CDC recommendations.

21           But I would say that the County -- well, what I

22  would say is that we recognized and I, in my role

23  overseeing the contact tracing work, recognized that it

24  was incredibly difficult, if not often impossible, to

25  understand what single modifiable factor caused someone

```
 1    to get sick or could have prevented them to get sick.

 2             MS. GONDEIRO:  Uh-huh.

 3             THE WITNESS:  And, in general, it wasn't going

 4    to be possible to attribute every illness to a single

 5    modifiable factor; and, instead, that's why we focused

 6    on advising multiple layers and methods of protection

 7    for everybody.

 8    BY MS. GONDEIRO:

 9        Q.   I understand why it would be difficult to

10    understand, like, the reason why someone got COVID-19.

11             But regardless of that, did the County have or

12    document anywhere -- keep a record for each individual

13    who contracted COVID-19, whether that person was singing

14    or whether that person was wearing a mask or whether

15    that person was in a large gathering or whether that

16    person --

17        A.   Uh-huh.

18        Q.   -- was outside or inside, those types of

19    questions?

20             MR. WALL:  Object to form.

21             THE WITNESS:  Do you mind if I just ask you to

22    repeat that question?

23    BY MS. GONDEIRO:

24        Q.   Yes.  I'll be more specific, and I'll just go

25    down the line.
```

1   A.   Uh-huh.

2   Q.   So earlier you testified that you did not

3   specifically direct contact tracers to, at all times,

4   ask whether the person who contracted COVID-19 wore a

5   mask; is that correct?

6   A.   I don't remember giving that general directive,

7   correct.

8   Q.   Okay.  Did you ever give a directive to the

9   contact tracers telling them to keep track of the

10   individuals who contracted COVID-19, whether they were

11   in an indoor setting where they were singing?

12   A.   The nature of my directives would have been to

13   conduct the interview as described in CalCONNECT, and

14   what questions they would have asked would have been

15   varying throughout the pandemic based on what is in

16   CalCONNECT.

17        But to your question, I think there were

18   periods when one of the questions included, "Did you

19   attend a gathering?"  I don't recall whether there were

20   any follow-up questions that assessed things like

21   whether singing was happening at that gathering.

22   Q.   Okay.  At what point during the COVID-19

23   pandemic were contact tracers directed to ask whether

24   they were in a gathering?

25   A.   I believe the question was included in the

Sarah Rudman, M.D. - 08-19-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    CalCONNECT script and sort of list of questions I think

2    as early as May and I think maybe continues to this day

3    to be there.  There were periods during the pandemic

4    where we created lists of highest priority questions --

5         Q.    Uh-huh.

6         A.    -- that, again, were much more focused on

7    preventing spread of COVID.

8         Q.    Uh-huh.

9         A.    So focused on who might you have exposed and

10   preventing complications of COVID:  "Do you need

11   assistance with health care right now?"

12            So during those periods, especially during the

13   winter of 2020 to 2021, I believe folks may have been

14   directed to ignore that question or to not spend time

15   focused on it in order to prioritize other questions.

16        Q.    Okay.

17        A.    So I think throughout the entire existence of

18   the contact tracing, folks were generally directed to

19   complete the interview that included that question but,

20   at times, were advised to not focus on it or skip it if

21   they needed to focus on other questions.

22        Q.    Okay.  Beginning on or around March of 2020,

23   how often did you consult with Dr. Cody regarding the

24   locations of COVID-19 cases?

25        A.    Consult with her regarding the locations?  Can

1    I ask what you mean by consult with her regarding the

2    locations?

3        Q.   Did you -- did you guys have periodic meetings

4    with each other, starting in March of 2020, where you

5    were discussing where you believed COVID-19 cases were

6    occurring?

7        A.   Not specifically.  We did have recurring

8    meetings to discuss -- and not just the two of us but

9    various groups of members of the COVID response --

10   during which one of the topics may have been at almost

11   any time where -- where we thought COVID transmission

12   was happening, either locally or where we understood

13   nationally or internationally new data to suggest where

14   it could be happening.

15       Q.   When did you start having these discussions

16   with Dr. Cody and others?

17       A.   The discussions in which we might have dis- --

18   like, one of the items that might have come up would

19   have been where transmission is happening, could have

20   started as early as January of 2020.  Yeah, we had

21   near-daily briefings for almost the entire pandemic.

22   And if at any point anybody had a question about or a

23   specifically notable example of transmission in a

24   setting, that might have become a topic of discussion.

25       Q.   Starting on or around January, when these

1    discussions started happening, did the County use this

2    information to target their COVID-19 orders towards the

3    business sectors where they believed to be the most

4    risky?

5           MR. WALL:  Objection.  Beyond the scope of the

6    designated topics for this 30(b)(6) witness.

7           Dr. Rudman, you can answer the question.

8           THE WITNESS:  Okay.  So I wasn't the ultimate

9    decision-maker in what the orders entailed, and I don't

10   know when -- when I was asked for particular

11   information, when Dr. Cody might have specifically

12   utilized it.

13          MS. GONDEIRO:  Uh-huh.

14          THE WITNESS:  Actually, can I ask you to repeat

15   the question to see if I have anything to add to that?

16   BY MS. GONDEIRO:

17   Q.   So I was asking, starting in January of 2020,

18   the information that you guys were gathering

19   regarding -- through your contact tracing efforts, did

20   you use this information to target the -- the County

21   COVID-19 public health orders towards the business

22   sectors where you believed were the most risky?

23          MR. WALL:  Same objection.

24          THE WITNESS:  So, yeah, I'll reiterate.  I was

25   not the decision-maker for how the County orders were

1    structured or any of the details within them.  And I

2    don't know, of any of the information I provided, how it

3    would have been specifically used to create those

4    orders.

5            But, in general, sort of my professional

6    knowledge tells me that when we make decisions about

7    what activities are -- certainly, to the extent of a

8    legal order, are going to be protective for health, it

9    may include anything from local understanding of where

10   disease is being transmitted but also national data or

11   published data or expert opinion or sort of pure

12   scientific data about how we understand the disease to

13   spread that might be extrapolated to -- to various

14   settings.

15           So any of those may have been utilized in some

16   of the decision-making.

17   BY MS. GONDEIRO:

18       Q.   During the COVID-19 pandemic, did you ever have

19   discussions with anyone on the County's enforcement team

20   as to where you believed the COVID-19 outbreaks were

21   occurring?

22       A.   It was not usually within my role to talk

23   directly to the enforcement team.  Yes, I think I can

24   remember one or two instances where I was sort of

25   covering for other team members where I may have spoken

1  to them directly about specific clusters or locations of

2  concern.

3       Q.   Sure.

4            But, generally, it wasn't part of your duty to

5  have periodic conversations with the enforcement team

6  for Santa Clara County --

7       A.   No.

8       Q.   -- as it related to COVID-19?

9       A.   No, it was not.

10       Q.   Why -- why were you not -- why was it not part

11  of your duty to talk with the enforcement team regarding

12  where you believed COVID-19 outbreaks were occurring?

13            MR. WALL:  Object to form.

14            THE WITNESS:  Why was it not part of my duty?

15  Well, I'll explain it.  My duties were to create, build,

16  sustain, you know, adapt the system that performed the

17  contact tracing mission I described, which was collect

18  some basic data, put them into the centralized database

19  of CalCONNECT around cases, and then focus on getting

20  those folks who were sick the resources they need,

21  understanding who was exposed, and getting those

22  contacts to be aware of their exposure and understand

23  steps to protect their health.

24            In the context of building that system, there

25  were various times in which -- well, there was not a

1  direct link between creating that system and the

2  enforcement process.  Not being part of this process, my

3  understanding that that enforcement process was

4  complaint-driven, was not specifically driven by the

5  contact tracing data collection.

6         And so because I was not part of the complaint

7  process, I wasn't part of the chain of conversation of

8  notifying enforcement or working with them.

9  BY MS. GONDEIRO:

10     Q.   At any point during the COVID-19 pandemic, did

11  you have any role in -- as it relates to COVID-19

12  enforcement?

13     A.   Not -- yeah.  Not that I can think of, no.

14         MS. GONDEIRO:  Okay.  We can go to Exhibit 33.

15         What time is it?

16         (Exhibit 33 was marked for identification.)

17  BY MS. GONDEIRO:

18     Q.   Dr. Rudman, does this graph look familiar?

19     A.   Generally, yes.  I am familiar with the fact

20  that we generated graphs like this one.  I can see it's

21  Slide 4, and I don't know Slide 4 of what --

22     Q.   Okay.

23     A.   -- presentation.

24     Q.   But, generally, you recall reviewing graphs

25  like this one that display the disparities of COVID-19

1    cases by race/ethnicity?

2        A.    Yes.

3        Q.    Did the County put together these graphs

4    throughout the entire COVID-19 pandemic?

5        A.    Yes.

6        Q.    Okay.  So starting at the beginning of the

7    COVID-19 pandemic, was there a pattern where

8    Hispanic/Latinos were reporting more COVID-19 cases than

9    other races and ethnicities?

10       A.    It's -- the beginning of the pandemic is not

11   reflected on this graph, but my memory is --

12       Q.    Yeah.

13       A.    -- yes, from fairly early on, there was a

14   pattern in which the number of cases being reported

15   among Hispanic and Latinx residents was higher than

16   among other races and ethnicities.

17       Q.    Okay.  Do you recall the pattern being,

18   starting at the beginning of the pandemic, that

19   African-Americans were reporting more COVID-19 cases

20   than White ethni- -- the White?  It says "White" here.

21   Caucasians.

22       A.    I actually don't -- I want to amend my prior

23   sentence that I don't remember exactly at what point

24   rates may have been higher or case numbers may have been

25   higher among Hispanic and Latinx residents.  So it

1    was -- it was fairly early in 2020 and clearly predating

2    this graph, but I don't remember how early.

3            As to your second question, I also don't

4    remember specifically when we started seeing rates among

5    African-American community members to be higher than

6    among White community members.  I do see from this

7    graph, and it matches what I remember, that that was

8    certainly the case by the winter of 2020.

9        Q.   Okay.  Did that -- did the trend continue

10   through early 2021 as well where you saw more COVID-19

11   cases or a higher rate of COVID-19 cases with

12   African-Americans than Caucasians?

13       A.   In general, yes, but I -- I don't remember

14   specifically how much that may have fluctuated or if it

15   was always the case during the --

16       Q.   Okay.

17       A.   -- well, the rest of -- or up until now.

18       Q.   Do you recall it being the pattern that the

19   rate of COVID-19 cases was greater among Hispanics and

20   Latinos in early 2021 than Caucasians?

21       A.   It -- can you say what you mean by "early

22   2021"?  It actually -- I think it fluctuated fairly

23   early on.

24       Q.   Early 20- -- from January, let's say, to March

25   of 2021.

```
 1      A.    Oh, '21.  Thank you.

 2      Q.    Yeah, '21.

 3      A.    Yes, I do recall during that period that the

 4   rates among Latinx community members was higher than

 5   White community members.

 6      Q.    Did the County ever do an analysis or -- to

 7   help them determine why the rate of COVID-19 cases was

 8   greater among African-Americans and Hispanics than

 9   Caucasians?

10      A.    You know --

11            MR. WALL:  Object to form.  Outside the scope.

12            But you can answer the question, Dr. Rudman.

13            THE WITNESS:  Yeah.  I'll say it wouldn't have

14   been my purview to request such an analysis or an

15   analysis for that purpose.

16            To the extent -- again, more in my professional

17   opinion, what our understanding was and what data we

18   might have been trying to gather around this disparity,

19   it would have relied as much on our understanding of how

20   disease is spread, how COVID is spread, and the living

21   and working conditions of Hispanic and Latinx community

22   members compared to White community members that we

23   might have been relying on to understand this disparity.

24            But, yeah, I can't think of a specific analysis

25   or study that would fit what you described.
```

1   BY MS. GONDEIRO:

2       Q.   Was anyone in the County Public Health

3   Department in charge of trying to understand why the

4   rate of COVID-19 cases was greater among

5   African-Americans and Hispanics than Caucasians?

6           MR. WALL:  Object to form and object to the

7   question as outside the scope of the designated topics

8   for this witness.

9           I'll just -- for shorthand purposes, I'll just

10  object on the -- as to outside the scope going forward,

11  and that will be the objection.

12          But, Dr. Rudman, you can answer the question.

13          THE WITNESS:  Okay.

14          But I'm not aware of any role that I understand

15  to be dedicated to or include in their scope that

16  specific purpose.

17  BY MS. GONDEIRO:

18      Q.   Do you understand why the rate of COVID-19

19  cases among African-Americans and Hispanics was greater

20  than Caucasians?

21      A.   I think I have some general understanding of,

22  like, agreed-upon expert opinion that likely contributed

23  to it.

24      Q.   What is that expert opinion?

25      A.   So I think some of the things we know

1    contribute to spread of COVID may include dense housing,

2    sort of number of people in a household; ability to

3    shelter in place or reduce movements outside the

4    household as it was either required or recommended

5    throughout the pandemic; and some factors based on

6    things like just age of a population and, therefore, how

7    likely they were to be in school or working or leaving

8    the home or not.

9         And my understanding of the -- some of those

10   same demographic features of our Latinx and

11   African-American communities in Santa Clara compared to

12   White and Asian communities would suggest that we may

13   see, for example, denser housing or more people in a

14   household in the average Latinx household than the

15   average White household or more people in service

16   professions who were required to leave the home to work

17   during the pandemic in Latinx and African-American

18   households compared to White households, or there may

19   have been more likelihood, for example, to be able to

20   adapt to working fully from home.

21        So I think -- I understand and I believe the

22   sort of expert opinion that those were factors that

23   impacted populations generally, and then I -- I believe

24   that they played out here in Santa Clara County.

25   Q.   No, that makes sense.

1           And so, just to be clear, you mentioned one of

2    the factors was the ability to shelter in place; right?

3        A.    Uh-huh.

4        Q.    When you said that, did you mean that the

5    Afri- -- a lot of people in the African-American and

6    Hispanic communities -- their work requires them to be

7    outside the home?

8        A.    Yes, that was what I meant by that statement.

9        Q.    Uh-huh.

10       A.    Or work or family care requirements.

11       Q.    Uh-huh.  What efforts did the County make to

12   mitigate this disparity among COVID-19 rates?

13       A.    Uh-huh.  The --

14           MR. WALL:  Objection.  Outside the scope.

15           You can answer, Dr. Rudman.

16           THE WITNESS:  Again, from -- it was not

17   specifically my role to oversee that work, but from

18   meetings I joined as a participant, discussions I joined

19   as a participant, my understanding is this was a major

20   focus of our activities throughout the entire pandemic.

21           And some of those activities would have

22   included the County -- not specifically the Public

23   Health Department but the County setting up increased

24   access to testing in communities that were

25   disproportionately Latinx and African-American; setting

1   up vaccination sites, once that became available in

2   2021, in, again, neighborhoods that may have had more

3   Hispanic or Latinx community members; and also trying to

4   ensure that all of the resources, whether it was

5   information or health care or testing or eventually

6   vaccination, was available in Spanish and then, finally,

7   working with community groups to try to share

8   information and access to resources, especially with any

9   population that was being disproportionately impacted,

10  including Latinx and African-American communities.

11  BY MS. GONDEIRO:

12      Q.    Throughout the COVID-19 pandemic, did

13  Santa Clara County experience more COVID-19 cases in

14  South San Jose than North San Jose?

15      A.    Can you spec- -- I believe so, in general, but

16  I believe that varied throughout the pandemic.

17      Q.    Okay.  As you recall, when did the County

18  experience more COVID-19 cases in South San Jose than

19  North San Jose throughout the COVID-19 pandemic?

20      A.    I don't know exactly when that inflection point

21  would be, but I believe it -- the pattern increased

22  throughout the pandemic such that that was more so

23  towards the later we got compared to very early.

24      Q.    So later throughout the COVID-19 pandemic, you

25  saw a trend where more COVID-19 cases were being

1    reported in South San Jose than North San Jose; is that

2    correct?  Or -- yes.

3        A.    I believe so.

4        Q.    I think I accidentally also limited it to North

5    San Jose.

6              Was there a trend where you saw more COVID-19

7    cases in north -- in south Santa Clara County --

8        A.    Ah.

9        Q.    -- than north Santa Clara County throughout the

10   COVID-19 pandemic?

11       A.    So I would reply to say the rates -- because

12   the population in South County, especially sort of

13   Gilroy/San Martin area, is less dense.

14       Q.    Uh-huh.

15       A.    But the rates -- the proportion of the

16   population being impacted by COVID was higher in

17   South County than North County, which I'm considering

18   north of San Jose.  So exclusive of San Jose.

19              Yes, that's my understanding, is that

20   South County, for the majority of the pandemic, has been

21   experiencing higher rates than North County, but that

22   also varied throughout the pandemic.

23       Q.    But, in general, did south Santa Clara County

24   experience higher rates of COVID-19 throughout the

25   COVID-19 pandemic?

```
 1        A.    Higher than other parts of the County and
 2   less -- and lower than some.
 3        Q.    Okay.  Why did south Santa Clara County
 4   experience higher rates of COVID-19?
 5             MR. WALL:  Objection.  Beyond the scope.
 6             You can answer the question, Dr. Cody.
 7             THE WITNESS:  I -- I don't know, but I -- I
 8   would really just hypothesize that some of the same
 9   features I described as impacting Latinx community
10   members could come into play with describing disparities
11   affecting South County versus North County, some of
12   those housing conditions as well as working and family
13   care responsibilities.
14   BY MS. GONDEIRO:
15        Q.    Sure.
16             So I'm actually not familiar with Santa Clara
17   County or as much as you are.
18             Are there more Hispanics and African-Americans
19   in south Santa Clara County?
20        A.    I actually don't know.  Not than all areas of
21   the County, but I -- I don't know with respect to the
22   African-American population.  That may be true with
23   respect to Hispanic/Latinx population.
24             MS. GONDEIRO:  Okay.  How long have we been
25   going?
```

 1          MR. WALL:  About another hour.  We could use a

 2   break if you want to take one.

 3          MS. GONDEIRO:  Yeah, let's take a break.

 4          (Recess taken from 11:35 a.m. to 11:52 a.m.)

 5          MS. GONDEIRO:  Are we ready?

 6          MR. WALL:  Dr. Rudman?

 7          THE WITNESS:  Yes.  Thank you.

 8          MS. GONDEIRO:  Are we on the record?

 9          THE REPORTER:  Yes, we're back on the record.

10          MS. GONDEIRO:  Okay.

11          Can you please turn to Exhibit 34?

12          (Exhibit 34 was marked for identification.)

13   BY MS. GONDEIRO:

14      Q.   Dr. Rudman, do you see the exhibit?

15      A.   Yes.

16      Q.   Okay.  Do you recall reviewing weekly special

17   investigation summaries?

18      A.   Yes, I do.

19      Q.   Okay.  Did you assist in putting together these

20   weekly special investigation summaries?

21      A.   In general, no.

22      Q.   Who was in charge of that?

23      A.   The ultimate responsibility would have lived

24   with the situational analysis branch.  I was sometimes

25   asked for feedback on the final report:  Would we like

1  to see different information in the future?

2      Q.   Okay.  Were these special investigation reports

3  always sent to you?

4      A.   To the best of my knowledge, yes, I was always

5  one of the recipients.

6      Q.   Okay.  And who else were they sent to?

7      A.   I may not know everyone, and it also varied

8  throughout the pandemic.  I believe Dr. Cody received

9  these.  We sometimes had somebody in the title of EOC

10  director, emergency operations director, for the entire

11  county, coordinating public health as well as other

12  county response to COVID.  They may have received this.

13     Q.   And who would that person be in the Emergency

14  Operations Center?

15     A.   It would have varied throughout the pandemic.

16  Most recently, it was Miguel Marquez, our chief

17  operating officer.  I'm actually not -- not sure whether

18  they received these, but they may have.

19     Q.   May have.  Okay.

20     A.   And then I believe individual team members on

21  either the contact tracing team or the special

22  investigations team would have received these as well.

23     Q.   Every time you received these weekly special

24  investigation summaries, what did you do with this

25  information?

1     A.    It varied depending on my role throughout the

2   pandemic.  Is there a specific time frame?

3     Q.    At the -- let's say from the time you were in

4   charge of the contact tracing system, which was from

5   June to December of 2020, what did you do with these

6   special investigation weekly summaries?

7     A.    At that time, I mostly didn't have an action I

8   was responsible for in reaction to this except to say

9   that sometimes one of the categories of information we

10  would collect would be things like, "Do you live in a

11  long-term care facility or another congregate setting?

12  Do you attend school, or do you" -- "Do you work, and

13  what is your workplace?"

14        And so there may have been times where I, you

15  know, sort of used this to feed back to my understanding

16  of -- of what data my team were collecting that was

17  going into the CalCONNECT database and, in part, being

18  used to -- to generate this information.

19    Q.    Okay.  So I want to direct you to Table 1,

20  which reads the "Number of Cases by Residential

21  Congregate Setting Type."

22    A.    Yes.

23    Q.    In the section where it says "Cumulative," did

24  that include the total number of hospitalizations up

25  until October 21st or just for that week of October 15th

1    through October 21st of 2020?

2        A.   I don't recall specifically, but my -- and I

3    wasn't responsible for the code that was used to

4    generalize -- to create this document or the

5    decision-making that was used to build that code.

6            Purely based on my review right now, I believe

7    it would have been cumulative from the beginning of the

8    pandemic --

9        Q.   Okay.

10       A.   -- but limited by our knowledge of who was

11   hospitalized and whether they were associated with any

12   of these types of facilities.

13       Q.   Okay.  And then right of the "Cumulative," it

14   says "Weekly New."

15           Would that have included the new

16   hospitalizations in the week of October 15th through

17   October 21st, 2020?

18       A.   I -- I don't know whether that would have been

19   people who were previously known to be cases associated

20   with these entities and newly hospitalized or cases who

21   were newly found to be associated with these entities

22   who we also knew to be hospitalized.

23           My best understanding reading this now is it's

24   the latter, cases that we've just become aware of that

25   are associated with these facilities who also happen to

1    be hospitalized at -- we also know to be hospitalized

2    based on the information we have at that time.

3         Q.    Okay.  And so on the first column, it says

4    "LTCF."  Can you remind me what that stands for?

5         A.    Long-term care facilities.

6         Q.    It has a number -- a total number of

7    hospitalizations.

8               Are those numbers -- were those numbers traced

9    to long-term care facilities, or were those numbers just

10   representative of people in long-term care facilities

11   who were hospitalized?

12        A.    So I did not directly oversee the team that

13   generated these specific data, but my best understanding

14   is that we would have included any patient who was both

15   a resident of a long-term care facility at any point

16   during their illness, either the period where -- before

17   they got sick, when they might have been exposed,

18   through the period where they were sick, whether or not

19   we had any evidence or believed that they got sick in

20   their facility.

21              MR. WALL:  Mariah, can you hold on for one

22   second?  There's some noise near me in the office.  I

23   just need to tell people to be quiet for a sec, and then

24   I'll be right back.

25              MS. GONDEIRO:  Sure.

1        MR. WALL:  Thank you.  I appreciate that.

2        Go ahead, Mariah.

3        MS. GONDEIRO:  Can we scroll down to Table 6?

4   BY MS. GONDEIRO:

5        Q.   Okay.  Table 6 reads, "Number of worksite

6   investigations by Setting Type."

7             In the column where it says "N," does that

8   represent the total number of worksite investigations

9   since the beginning of the pandemic until October 21st

10  of 2020?

11       A.   Not quite.  My understanding is that would be

12  the total number we were aware of and were gathering in

13  this data repository and had sort of categorized as an

14  investigation.

15       Q.   From what period was this data gathered?

16       A.   Ah.  Oh, my best understanding is it would have

17  been from the beginning of the pandemic, but our ability

18  to gather this type of data fluctuated especially early

19  in the pandemic.

20       Q.   Okay.

21       A.   There may have been very limited data gathering

22  at all in the beginning.

23       Q.   Okay.  Does this table represent actual cases

24  that were traced to these setting types or people who

25  reported COVID-19 cases from these setting types?

1    A.    First, I'll say, you know, we've -- I've

2  responded as you've used the word "traced" previously

3  that that was -- that's not quite how we'd use the term

4  or used contact tracing.  Again, we are focusing much

5  more on that forward prevention of cases.

6          So if you're using it to mean attributed to

7  transmission in these locations, no, that's not what

8  this describes.  This describes clusters or

9  investigations of clusters either reported by these

10 entities or these types of entities or where individuals

11 have indicated that their -- their work location is

12 these entities.

13   Q.    Okay.  So in the next column where it says

14 "Active Investigations," does that represent the active

15 investigations for the week specified in this Special

16 Investigations Weekly Summary?

17   A.    That's my best understanding, yes.

18   Q.    Okay.  So, based off of this table, the most

19 reported settings were construc- -- was construction; is

20 that correct?

21   A.    I would amend that to say the setting in which

22 there were the most cases reported among employees by

23 those entities that had high enough numbers among them

24 to be considered a cluster and need investigation was

25 among construction --

1      Q.    Okay.

2      A.    -- overall throughout the entire pandemic.

3      Q.    Why were -- why was construction the highest?

4      A.    I think, in short, I don't know.  And I think

5   it's likely due to a number of complex factors that this

6   was the most reported or identified loca- -- type of

7   location that resulted in investigation.

8      Q.    What type of factors do you think contributed

9   to sites reporting -- construction reporting so many

10  COVID-19 cases?

11          MR. WALL:  Objection.  Beyond the scope.

12          But you can answer, Dr. Rudman.

13          THE WITNESS:  Okay.

14          I think some of the factors that played in

15  here, to help us -- or that led to us identifying what

16  we thought might be a cluster needing investigation was

17  in what employment setting people were getting tested,

18  which was sometimes impacted by whether they were

19  required to be tested as part of their job, which would

20  therefore make them more likely to come to our awareness

21  if they were positive than people who worked in settings

22  that didn't require testing, as well as what work

23  settings had more people working in them as opposed to

24  fewer, what work settings required people to come

25  together physically versus not.

1           The regulations for reporting by the work

2    settings also varied throughout the pandemic such that,

3    you know, I believe -- you know, various entities such

4    as Cal/OSHA required employers to report among employees

5    but not necessarily among patrons of a retail setting,

6    for example.  And then further data gathering also was

7    limited by whether those entities complied with either

8    those reporting requirements or recommendations.

9           MS. GONDEIRO:  Uh-huh.

10          THE WITNESS:  So should an entity choose not to

11   tell us that they're aware of a cluster of cases or a

12   case among an employee, we usually had no way of knowing

13   that.

14          MS. GONDEIRO:  Okay.

15          THE WITNESS:  So what this reflects to me is a

16   combination of construction, you know, manufacturing,

17   retail, at this time in this past week on this report,

18   having all of those factors.  Their employees were both

19   getting sick and getting tested and notifying their

20   employers, and their employers were notifying us, and

21   they were disclosing full information to us about the --

22   the numbers of employees getting sick and the details of

23   those enough for us to identify that an investigation

24   was needed.

25   /////

1    BY MS. GONDEIRO:

2        Q.   Okay.  Throughout the COVID-19 pandemic, what

3    business or setting types were the most -- were the most

4    reported COVID-19 cases?

5            MR. WALL:  Object to form.

6            You can answer, Dr. Rudman.

7            THE WITNESS:  Yeah.

8            Maybe -- well, I'm sorry.  Can you ask the

9    question again?

10   BY MS. GONDEIRO:

11       Q.   Yeah.  Sorry.

12       A.   That's okay.

13       Q.   It wasn't a good question.

14           During the COVID-19 pandemic, what business

15   types reported the most COVID-19 cases?

16       A.   I don't know the answer to that sort of for the

17   entire pandemic.  I would rely on documents like this

18   one to help me answer that.

19           But it would often, again, be based on the

20   regulatory requirements to report cases, the

21   likelihood -- or frequency with which people go to those

22   or work at those locations and their ability to comply

23   with those reporting regulations such that, for

24   example -- you know, we sort of share the total numbers

25   here, but the numbers for schools and long-term care

1    facilities, I think if we were applying it on a

2    case-by-case basis, might have been much higher.

3           And that may be because at times in the

4    pandemic, you know, almost every child was in a school,

5    and almost every school was required to report cases and

6    was engaged in doing so.

7       Q.    Uh-huh.

8       A.    So there may have been periods, for example,

9    where the highest number of case reports were coming

10   from schools.

11      Q.    Gotcha.

12      A.    And so it was often reflective of those

13   regulations and just the likelihood that somebody was

14   affiliated with that type of entity.

15      Q.    Okay.

16           MS. GONDEIRO:  I actually don't need Exhibit 35

17   anymore.  So if I can just go to the next exhibit, which

18   would be Exhibit 36, but it -- we can number it as

19   Exhibit 35 now.

20           (Exhibit 35 was marked for identification.)

21   BY MS. GONDEIRO:

22      Q.    Okay.  So this is a Special Investigations

23   Weekly Summary from May 20 through 2021 -- or May 20

24   through May 26, 2021.

25           Can you please scroll down, I think, to

1    Table 6?

2        A.   I'm just -- I'm reviewing the full report.

3        Q.   Okay.

4        A.   I'll be there in a sec.

5            MS. GONDEIRO:  Okay.  You can actually stop

6    here.  You can go up, yeah.  Thanks.

7            THE WITNESS:  Okay.  Thank you.  I'm back.

8            I'm sorry.  You said Table 6 or Figure 6?

9    BY MS. GONDEIRO:

10       Q.   Figure 6.

11       A.   Oh, got it.  Thank you.

12       Q.   So this figure is -- represents the number of

13   cases reported by worksites by on-site date and business

14   type.

15           So I just want to be clear here again.  These

16   number of cases do not represent cases that were

17   attributed to these business types but cases where these

18   business types reported cases; is that correct?

19       A.   Yes.

20       Q.   Okay.

21       A.   Either because they're required to or -- or

22   raised concern and felt the need to.

23       Q.   Gotcha.

24       A.   Actually, I would amend that, that I think by

25   May 2021, if an individual, who we reached them on the

1  phone and they were completing the full case

2  investigation, said, "And by the way, I work at this

3  worksite," that may have been flagged for inclusion here

4  even if their worksite did not mention them.

5      Q.   Starting in May of 2021?

6      A.   I think it was closer to January 2021 when we

7  started that process.

8      Q.   Okay.

9      A.   Could be February.

10      Q.   Okay.  But, generally, based upon this figure,

11  would you -- would you say that it represents that

12  retail space was a -- among the business types that

13  reported a lot of COVID-19 cases?

14          MR. WALL:  Object to form.

15          THE WITNESS:  Yes.  You know, at this time,

16  everybody was reporting a lot of cases.  But yes, I

17  would say, depending on the timing, retail spaces were

18  reporting cases.

19  BY MS. GONDEIRO:

20      Q.   What does "Other" encompass?

21      A.   I'll say I didn't remember specifically, but

22  based on reviewing the document, I'm seeing here it

23  includes accommodations, agricultural operations, beauty

24  salons and barbershops, distribution warehouse, fire,

25  EMS, or law enforcement, gym or fitness center,

1   laboratories, entertainment venues, food processing,

2   office space/workspace, place of worship, public

3   transit, local park, rideshare, shelter, shipping,

4   transit, and waste facilities.

5        Q.   That's a lot.

6             Why did the County decide to lump all of those

7   business types into an "Other" category?

8        A.   I don't recall that specific decision.

9        Q.   Did the "Other" category -- would it have

10  included cases that were reported from protests?

11       A.   My understanding is -- again, based on the

12  document in front of me, is that this was reported by

13  worksites or employers.

14            So to the extent if there were a protest by

15  some sort of agency that had employees, I -- I imagine

16  it could have been included here, but I don't see that

17  listed in the -- yeah.  I don't know what type of agency

18  that would be that would have employees or be considered

19  a workplace that might have reported it here.

20       Q.   Do you recall the protests that occurred during

21  the summer of 2020?

22       A.   Yes.

23       Q.   Okay.  Did the County ever conduct any type of

24  contact tracing to determine whether there were any

25  cases that were attributed to protests that were

1  occurring in the summer of 2020?

2       MR. WALL:  Object to form.

3       You can answer.

4       THE WITNESS:  Oh.

5       Yes, with the limitations I described earlier,

6  that our contact tracing work was focused on prevention

7  of future cases.

8       MS. GONDEIRO:  Uh-huh.

9       THE WITNESS:  So, you know, if somebody said,

10  "I'm" -- if we reached a case and they said, "I'm sick

11  and planning to attend a protest," we would explain to

12  them the, you know, dangers of doing so to others they

13  might interact with.

14       In addition, I've sort of described how we

15  collected general information that gave suggestions as

16  to where somebody may have been exposed, and one of

17  those was asking about whether folks had attended

18  gatherings.  I believe one of the answers somebody could

19  select to that question could be "Attended a protest."

20       So we would have gathered -- you know,

21  especially at the times when we -- when we reached

22  somebody and they were willing to conduct the entire

23  interview with us, we would have asked them that

24  question, and they would have been given that option as

25  a type of gathering they might have attended.

1    Q.    Uh-huh.  Is this information -- was this

2    information collected through CalCONNECT?

3    A.    Yes.

4    Q.    Okay.  Is this information documented anywhere

5    else?

6    A.    Not that I specifically know of.

7    Q.    Before the summer of 2020, and in anticipation

8    of the protests, did the County implement any specific

9    type of contact tracing specifically designed for the

10   protests -- the upcoming protests?

11          MR. WALL:  Object to form.  Assumes facts.

12          THE WITNESS:  Yeah, I -- I would say I don't

13   think the County anticipated the protests happening at

14   all.  And, generally, we were constantly trying to

15   create systems that anticipated the information we would

16   need in the future but often having to adapt in

17   realtime.

18   BY MS. GONDEIRO:

19   Q.    When the County knew that the protests were

20   happening, did they design a specific contact tracing

21   system designed for the protests?

22   A.    No.  And I'll add that the contact tracing

23   system, CalCONNECT, was never designed by the County of

24   Santa Clara.  But to the effect that we were using that

25   system, we -- we -- and that system added a question --

1    or added the ability to choose protest as a type of

2    gathering, we would have made our staff aware of that --

3    or I recall making my staff aware of that, that that was

4    an option for the type of gathering somebody might have

5    attended so that we could gather that information.

6        Q.   Based upon your recollection, were there

7    cases -- COVID-19 cases that were traced to the protests

8    that occurred during the summer of 2020?

9        A.   So my general recollection is we struggled

10   throughout the entire pandemic to trace cases to

11   anything and say, "The most likely" -- if, by that, you

12   mean, "This is the most likely place you got sick."

13           But with that limitation, no, I don't recall

14   specific cases that were traced to a protest or specific

15   outbreaks or specific events of protest where we knew or

16   learned information that spread had definitely happened.

17       Q.   Okay.  Can you estimate how many COVID-19 cases

18   were reported where someone did attend a protest during

19   the summer of 2020?

20       A.   I -- I -- no, I don't have an estimate of

21   how -- what proportion or how many cases that would be.

22           MS. GONDEIRO:  Okay.  Can we move on to the

23   next exhibit?

24           (Exhibit 36 was marked for identification.)

25   /////

1    BY MS. GONDEIRO:

2        Q.   This is a COVID-19 graph of case counts from

3    January -- January 27th, 2020, through March 20th of

4    2021.

5             Dr. Rudman, does this graph look familiar?

6        A.   Yes.  I am just scrolling through the rest of

7    the exhibit just to make sure there's nothing else I

8    need to see.

9             Thank you.

10            Sorry.  Your question, is it familiar?  Yes.

11       Q.   Yes, on the first page here.

12            Was the County -- did the County anticipate

13   that the COVID-19 surges would ebb and flow as

14   illustrated in this graph?

15       A.   Hmm.  I can't speak for sort of the County as

16   an entity.  I don't know if I anticipated -- yeah, I

17   don't -- I don't know.

18       Q.   Yeah.

19            So would you say, based upon this graph, that

20   the County experienced a surge in COVID-19 cases

21   beginning -- in the beginning of November of 2020?

22       A.   Yes.

23       Q.   And did the County experience a rapid decline

24   in COVID-19 cases starting in the -- around the

25   beginning of January of 2021?

1        A.    I think "rapid" is subjective.  But certainly,

2   yes, a decline in the daily number of cases starting

3   around January 2021.

4        Q.    So, on the last date here -- I believe it's

5   like March 20th of 2021 -- would you say that the total

6   daily case counts are about the same as what they were

7   at the beginning of October 2020?

8        A.    Yes, with the limitation that that -- our

9   knowledge of cases was always somewhat delayed.  So to

10  really comment on -- and I don't remember specifically.

11  So to really comment on end of March 2020, I would kind

12  of want to see the data as we knew of it several weeks

13  or months later.  But it appears that way from this

14  graph and that -- yeah.  Yes, it appears that way from

15  this graph.

16       Q.    Okay.  Is it your recollection that the

17  COVID-19 cases continued to decline throughout March of

18  2020 -- of 2021 I mean?

19            MR. WALL:  Just object to --

20            THE WITNESS:  Generally --

21            MR. WALL:  Object to form.

22            But you can answer, Dr. Rudman.

23            THE WITNESS:  Generally, my recollection is,

24  yes, that between March and, I think, June of 2021, we

25  were seeing an overall decline.  Whether that -- what

1    the minor changes were throughout March, I don't

2    remember.

3    BY MS. GONDEIRO:

4        Q.   Okay.  But, generally, cases were declining --

5    continuing to decline in March of 2021; right?

6        A.   I --

7             MR. WALL:  Object to form.

8             THE WITNESS:  I believe so.

9             MS. GONDEIRO:  Okay.  Can we go to the next

10   exhibit?

11            (Exhibit 37 was marked for identification.)

12   BY MS. GONDEIRO:

13       Q.   So this exhibit represents the number of

14   COVID-19 hospitalizations from April 1st, 2020, through

15   March 7th of 2021.

16            Dr. Rudman, do you recognize this graph?

17       A.   Generally, yes, but not what specific

18   presentation this came from.

19       Q.   Okay.  But do you recall reviewing these types

20   of graphs throughout the COVID-19 pandemic?

21       A.   Yes.

22       Q.   Okay.  Would you say, based upon this graph,

23   that hospitalizations were declining starting in the

24   beginning of January of 2021?

25       A.   Based on this graph, yes.

1    Q.    Okay.  Would you consider that decline to be a

2  rapid decline in hospitalizations?

3    A.    Somewhat.  And I think, for the individuals

4  hospitalized, not rapid enough --

5    Q.    Yes.

6    A.    -- or the people working in the hospital.

7  But --

8    Q.    How would you describe that decline?

9    A.    Consistent, although, you know, that's with a

10  retrospective lens from, in this case, March 2021.

11        I do remember sort of -- for example, if you

12  can see the small uptick right around January 20th or

13  just after, those kinds of upticks, at the time they

14  occur, I remember wondering, have we turned around and

15  headed back in the wrong direction or again back around?

16        Somewhere between 2/3 and 2/17, there's another

17  uptick.  But I think, by March, we could look back and

18  say things have been improving with respect to

19  hospitalizations from January.

20    Q.    Okay.  But even though there were slight

21  upticks in -- in January and February, generally, the

22  trend was that hospitalizations were declining; is that

23  correct?

24    A.    Yes.

25        MR. WALL:  Objection to form.

1          THE WITNESS:  Although my -- that's my

2    retrospective view of that now.  I don't recall exactly

3    sort of how -- how confident I was feeling in that

4    pattern at the time.

5    BY MS. GONDEIRO:

6        Q.    Okay.  Do you recall that hospitalizations

7    continued to decline through March of 2021, similar to

8    the COVID-19 cases that were continuing to decline in

9    March of 2021?

10          MR. WALL:  Object to form.

11          THE WITNESS:  My best memory is that they may

12   have, or, at the very least, we didn't -- I don't

13   remember a specific increase at that time.

14   BY MS. GONDEIRO:

15       Q.    Uh-huh.  Was it common, though, during the

16   COVID-19 pandemic to see COVID-19 hospitalizations

17   decline as COVID-19 cases declined?

18       A.    Generally, yes, with some limitations, most

19   importantly that hospitalization patterns often

20   significantly occurred later than case patterns.

21       Q.    Okay.

22          MS. GONDEIRO:  Okay.  I think we can end here,

23   and then we can take a lunch break.

24          Does that work for everyone?

25          MR. WALL:  Works for us.

1          MS. GONDEIRO:  Okay.  We can go off the record.

2          (Recess taken from 12:31 p.m. to 1:23 p.m.)

3          (Exhibit 38 was marked for identification.)

4          MR. WALL:  Dr. Rudman, are you ready to go back

5     on the record?

6          THE WITNESS:  Yes.  Thank you.

7          MR. WALL:  Ready when you are, Mariah.

8          MS. GONDEIRO:  Okay.  We can go on.

9          THE REPORTER:  We're on the record.

10    BY MS. GONDEIRO:

11         Q.  Dr. Rudman, do you recognize this Quantitative

12    Retrospective Contract -- Contact Tracing Survey?

13         A.  Yes.

14         Q.  Okay.

15         A.  The exhibit in front of me?

16         Q.  Yes.

17         A.  Yes.

18         Q.  Who prepared this survey?

19         A.  I don't remember which individual -- oh, sorry.

20              The -- the report or the survey the report was

21    based on?

22         Q.  Who -- who prepared the survey?

23         A.  I oversaw a team of people who designed the

24    survey, developed the process for collecting the

25    information, and sort of oversaw the team while they

Sarah Rudman, M.D. - 08-19-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1    were collecting the study.

2        Q.   Okay.  And who was a part of this team?

3        A.   Hard to remember.  I know there was somebody

4    named Alexis D'Agostino who -- I'm trying to remember

5    her exact role or title at this time but was sort of

6    helping with all contact tracing-related data issues.

7        Q.   Okay.

8        A.   And her role was specifically to help design

9    the data system that would collect this information.

10           At the point we went live with this, CalCONNECT

11   did not have the ability to collect this type of

12   information; so we had to build a separate system, and

13   Alexis was the person who helped to do that.  But then

14   there would have been a number of team leads and

15   individual team members who actually conducted the

16   calls, and I don't recall exactly who was assigned to do

17   that at that time.

18       Q.   Okay.  Does Alexis work for the County Public

19   Health Department?

20       A.   Yes.

21       Q.   What is her job title?

22       A.   Oh, I believe it's senior research and

23   evaluation specialist.

24       Q.   Okay.  And does she report to you?

25       A.   Not in her usual role, no.

1    Q.    Do you supervise her in any way?

2    A.    Not at this time.

3    Q.    Okay.  Did you supervise her from June of 2020

4    through December of 2020?

5    A.    At -- at points during that time, I believe she

6    reported directly to me and certainly indirectly to me.

7    She may have reported to other contact tracing project

8    managers who reported to me.

9    Q.    Okay.  When was this survey conducted?

10   A.    So based on the document in front of me, we

11   were certainly collecting data from November 16th

12   through December 14th.  I think the data collection may

13   have continued for a few weeks after that --

14   Q.    Okay.

15   A.    -- into early January 2021.

16   Q.    Did you conduct similar surveys like this at

17   any other point during the COVID-19 pandemic?

18   A.    Not under my supervision and not that I'm aware

19   of.

20   Q.    Why did the County choose to conduct the survey

21   in November and December of 2020?

22   A.    The purpose of conducting the survey was to try

23   to augment the information that we recognized that we

24   didn't get very well from the contact tracing work of

25   understanding where people were potentially being

1    exposed.

2         So the goal of the survey was to try to

3    understand -- was to try to document everywhere somebody

4    went during the period they could have gotten sick and

5    then look at patterns to see if it taught us anything

6    about where people were likely getting sick.

7         Q.   Okay.

8         A.   And the reasoning for that was because we

9    didn't have other information that was a great way to

10   assess that.

11        Q.   Okay.  So this survey was designed to help --

12   to help the County figure out where cases may be

13   attributed to?

14        A.   That was our goal.

15        Q.   That was your goal.  Okay.

16        MS. GONDEIRO:  Can you scroll down to -- so,

17   actually, go up a little bit.  One more.

18   BY MS. GONDEIRO:

19        Q.   It says, "Risk level definition.  High-risk

20   exposure:  close contact plus no mask."

21        In this survey, did you keep track of the

22   individuals who were or were not wearing a mask?

23        A.   Yes.  So I think I alluded to this earlier,

24   that this is the only scenario I remember specifically

25   directing an operation that included collecting

1   information about masking in certain settings.  And,

2   yes, as a part of this study, in addition to collecting

3   what setting somebody was in, we also asked about

4   whether they wore masks in that setting.

5        Q.   Okay.  Is that information regarding whether

6   someone wore a mask or not documented somewhere as it

7   relates to this specific survey?

8        A.   We -- we collected it and documented it, I

9   bel- -- so I don't know whether that documentation

10  persists, whether we maintained it after we concluded

11  the study.  But at the time that it was being collected,

12  yes, it was documented.

13       Q.   Do you recall whether the individuals who were

14  reporting COVID-19 cases were wearing a mask during the

15  time that this survey was conducted?

16       A.   I'm sorry.  I didn't understand the question.

17  Can you --

18       Q.   Yeah.

19            Do you recall -- in regards to the individuals

20  in the survey who reported a COVID-19 case, do you

21  recall whether more individuals reported that they were

22  not wearing a mask at the same time that they reported a

23  COVID-19 case?

24       A.   I think, if I understand your question, it's

25  whether the -- the people who were cases, the people who

1    tested positive who we were interviewing for this,

2    whether -- are you asking whether more of them said they

3    did wear a mask versus whether they didn't?

4        Q.   Yes.

5        A.   Okay.  I don't know the answer to that.  But I

6    will add that a major limitation we grew to understand

7    as we did the study and evaluated it was that we didn't

8    have a comparison group of people who did not get sick,

9    and so we couldn't say whether the people who got sick

10   were more or less likely to wear a mask than people who

11   don't get sick because this study only included people

12   who did get sick.

13       Q.   Okay.  Can you scroll down to the "Key

14   findings"?

15            So it says the most reported sectors were

16   retail and in private/social settings.  Then it says --

17   below that, it says, "Retail had more low-risk reports."

18            So does that mean that they had more reports of

19   individuals who -- who were wearing a mask at the time

20   that they reported a COVID-19 case?

21       A.   No, that's not what this says.

22       Q.   Okay.  So what does that mean, that retail had

23   more low-risk reports?

24       A.   So if you scroll back up a slide to the

25   definition of "low-risk exposure," what I recall and, in

1   reviewing this, interpret it to mean was that while --

2   of all of the cumulative -- number of places people

3   went, a -- the most commonly reported sector was retail

4   or private and social.

5       Q.   Uh-huh.

6       A.   But in retail, more or most of them were

7   low-risk exposure, and that definition is that there was

8   no close contact with any others.

9            Now, at this time --

10      Q.   Okay.

11      A.   Oh, excuse me.

12      Q.   Oh, no.  You can -- you can continue.  Sorry.

13      A.   Yeah.  So the -- the -- that -- the reason we

14  did not assess masking for no close contact was that was

15  deemed the lowest -- even lower risk than having close

16  contact with a mask was having no close contact at all.

17  So what we're saying is, in the retail setting, whether

18  or not somebody wore a mask, they were actually never

19  even within 6 feet of somebody for 15 minutes.

20      Q.   Okay.

21      A.   So we were saying they were -- yeah.  So what

22  this says is they were meeting that lowest-risk group.

23      Q.   Okay.  In regards to the private/social

24  setting -- social settings, it said they had more

25  high-risk reports.

1        So that means they had more reports of close

2   contacts plus no masks; is that correct?

3        A.   Correct.

4        Q.   Okay.  Can you scroll down to -- yeah, this

5   is...

6        So when you -- so this graph says, "Most

7   reported sectors were retail and private/social," and

8   then it demonstrates the number of reports by the

9   business -- or by sectors.

10        I want to be clear again.  These -- these

11   numbers, do they represent actual cases that are

12   attributed to these settings?

13        A.   No.  They represent people who are a case that

14   we know because we received a positive case report for

15   them, we were able to reach them by phone, and they

16   said, "At some point during the period before I got

17   sick," when we think people get exposed in a way that

18   translates to illness, "I indeed went to one of these

19   settings."

20        So, for example, somebody might have responded,

21   "Let's see.  During the" -- at that point, I think we

22   were evaluating 14 days prior to disease onset as our

23   best understanding of when you can get an exposure that

24   results in an illness -- "I might have gone grocery

25   shopping twice, to the doctor once, dropped my kid off

1    at school every day, and been to one athletic event."

2    Q.    Uh-huh.

3    A.    And I believe the way these data are displayed,

4    although I don't -- I'm not positive, that would show up

5    as 14 school exposures and, you know, two retail

6    exposures and one sports/athletic exposure.

7    Q.    Okay.  But after conducting the survey, were

8    you ultimately able to attribute any reported cases to

9    specific sectors?

10   A.    No.  My recollection of after reviewing this

11   survey, this report of the data and another report that

12   came after concluding the survey, was that it did not

13   meaningfully change our understanding based on other

14   science about what kinds of activities were causing

15   people to get sick or putting people at greatest risk of

16   getting sick.

17          And the reasons for that were that we -- again,

18   somebody -- it was -- we couldn't differentiate between

19   multiple exposures that somebody had, which one of them

20   caused them to get sick.  And the patterns of how

21   frequently people attended different types of

22   exposure -- or different sectors and locations before

23   they got sick seemed to be much more related to what

24   activities were open at the time and what kinds of

25   typical day-to-day patterns people tend to have --

1      Q.    Uh-huh.

2      A.    -- more than what kinds of patterns cause

3  illness.

4      Q.    Uh-huh.   Okay.

5            Okay.   I think we can move on from this

6  exhibit.

7            When did the County first start testing

8  individuals for COVID-19?

9      A.    So the County operates a public health lab --

10     Q.    Okay.

11     A.    -- that was able to start performing their own

12  tests for COVID-19, I believe, in February 2020.   Prior

13  to that, the County had a role in facilitating

14  individuals' access to testing by the CDC I think as

15  early as January 2020.

16     Q.    Starting in February of 2020, what type of test

17  did the County -- or what type of COVID-19 test did the

18  County administer?

19     A.     In February 2020, that would have been a PCR,

20  or polymerase chain reaction, test.

21     Q.    Okay.   And did the County administer these

22  types of tests throughout the entire COVID-19 pandemic?

23     A.    To various extents, yes.

24     Q.    Okay.   Was there any other type of test that

25  the County administered during the COVID-19 pandemic?

1     A.    So, to my knowledge, the County had several

2    roles in administering tests:  as a health-care provider

3    in collecting tests; as a laboratory, both a clinical

4    laboratory and the public health lab, two labs operated

5    by the County perform tests; and then facilitating

6    testing by other agencies.

7          In all of those capacities, the County used

8    both the PCR-based test as well as later on, once they

9    became available, an antigen-based test.

10    Q.    At any point during the COVID-19 pandemic, did

11    the -- did the County ever report cases from at-home

12    tests?

13    A.    Report cases from at-home tests?

14          Can you specify report to whom or report --

15    Q.    Yeah.

16    A.    -- via what mechanism?

17    Q.    Did they document at-home tests as confirmed

18    COVID-19 cases?

19    A.    So they -- they may have, but that's -- yeah.

20    Q.    You're not sure?

21    A.    No.  It's just that it's more complicated.

22          So there are two kinds of at-home tests -- or

23    two ways in which folks refer to at-home tests.  The

24    antigen test may be performed at home.  There are also

25    PCR or similar tests that look like gen- -- look for

1    genetic material of the virus that can be collected at

2    home but sent to a laboratory.

3        Q.    Uh-huh.

4        A.    The latter, collected at home but sent to a

5    laboratory, the County would almost definitely and

6    certainly had systems set up to receive those reports.

7    So I would not say the County was reporting them; the

8    County was receiving those reports and documenting them

9    and responding to them.

10            For the former, when somebody performs an

11   antigen test at home, it would have varied based on in

12   what setting that might have translated to a report that

13   came to the County.  Most notably, it may have been some

14   of the requirements for employers to report to the

15   County when employees tested positive that -- or schools

16   reporting to the County that included when school --

17   students or faculty tested positive, that may have

18   included home-based antigen tests in their reports.

19       Q.    So you mentioned earlier that the County had a

20   public health lab where they tested for COVID-19

21   patients; is that correct?

22       A.    Correct.

23       Q.    Did the County contract with specific companies

24   to help them administer the COVID-19 tests?

25       A.    Yes.  Yes.

1    Q.    And who -- and what were those companies?

2    A.    So depending on what you mean by -- actually,

3    can you specify what you mean by administer the test?

4    Q.    I guess conduct the test.

5    A.    Okay.  Well, so -- so there were different

6    contracts for collecting the test, systems set up to

7    have somebody come to us or come to a clinical setting,

8    and we swab what was usually their nose, sometimes the

9    back of their throat, sometimes collect saliva.  So

10   there were -- there were contracts set up to facilitate

11   that test collection.  And then I'm aware of one major

12   contractor who facilitated the laboratory test

13   performance.

14   Q.    And who was that major contractor?

15   A.    A laboratory called "Fulgent."

16   Q.    Fulgent.

17         Are you aware of the cycle threshold used by

18   Fulgent during the COVID-19 pandemic?

19   A.    I'm aware of what cycle threshold is and that

20   there are cutoffs for specific PCR lab tests.  I would

21   have to verify exactly which one Fulgent used.

22   Q.    Okay.  Do you have an idea?

23   A.    My understanding is most labs were somewhere

24   between 32 and 42 and often were a cutoff at 40, but I

25   don't know for sure that Fulgent was using -- which test

1    they used and whether it was the same 40 cutoff.

2        Q.   Okay.  Were you ever involved in deciding what

3    cycle threshold Fulgent should use when testing for

4    COVID-19?

5        A.   No.  My understanding, that's an FDA

6    determination.

7        Q.   Okay.  Has Santa Clara County ever received

8    money from outside sources to implement their PCR

9    testing?

10        A.   Can you specify --

11             MR. WALL:  Object to form.

12             But you can answer.

13             THE WITNESS:  Sorry.

14             Can you specify PCR testing for COVID or in

15    general?

16    BY MS. GONDEIRO:

17        Q.   Specifically as it relates to COVID-19.

18             So let me ask the question again.

19        A.   Okay.

20        Q.   Throughout the COVID-19 pandemic, has

21    Santa Clara County received money from outside sources

22    to implement its COVID-19 PCR testing?

23             MR. WALL:  Object to form.

24             THE WITNESS:  Yes, I'm aware of at least one

25    source of outside funding that, in part, supports PCR

1    testing for COVID.

2    BY MS. GONDEIRO:

3        Q.   And who is that source?

4        A.   That would be the federal government grant that

5    I believe is administered by the CDC called "ELC" --

6    what does that stand for?  I think it's Epidemiology and

7    Laboratory Capacity grant -- that we receive via the

8    State Public Health Department that has been used

9    throughout the pandemic to support an array of public

10   health response activities including laboratory testing.

11       Q.   Okay.  Were there any other outside sources

12   that you're aware of?

13       A.   I'm aware that, at times, some of the testing

14   performed was reimbursable by third-party health

15   insurance, whether that's Medi-Cal or Medicare or

16   private health insurance.  So that would be, I guess, an

17   additional source of funding that supported the testing

18   structure.

19       Q.   Okay.  Any other sources?

20       A.   I can't think of any specifically, but it would

21   be typical for other federal or state grant funds to be

22   allowable for that purpose.

23       Q.   Okay.  What were -- what were the requirements

24   to receive these types of grants?

25       A.   Those would vary dramatically grant to grant.

1    Q.   Okay.  Well, the federal grant by the CDC, what

2  were the requirements in order to get the grant?

3          MR. WALL:  Object to form.

4          THE WITNESS:  Can you specify what you mean by

5  to get the grant?  Is it to be a recipient or to claim

6  it?

7  BY MS. GONDEIRO:

8    Q.   To be a recipient of the grant, what were the

9  requirements that one -- that the County had to fill in

10  order to receive, you know, the federal grant from

11  the -- by the CDC?

12          MR. WALL:  Object to form.

13          THE WITNESS:  So if you're referring

14  specifically to the ELC federal grant I mentioned, which

15  actually has multiple components, but my understanding

16  is -- I think all governmental, state, and local

17  agencies may have been eligible for some proportion of

18  the funding, but how that's determined, I don't know.

19  BY MS. GONDEIRO:

20    Q.   Okay.  Are you aware at any point in the --

21  during the COVID-19 pandemic that Fulgent may have

22  changed the cycle threshold?

23    A.   I wouldn't have been -- that wouldn't have been

24  part -- no, I'm not aware, and that wouldn't have been

25  part of my role to be aware.

1     Q.   Okay.  Are you aware of the current cycle

2   threshold that is used for vaccinated patients in

3   Santa Clara County?

4          MR. WALL:  Object to form.

5          THE WITNESS:  While it may vary by test to test

6   as the tests are approved by FDA, I -- I don't know

7   exactly what's being used in different settings by

8   different labs for different tests.  To my knowledge,

9   there are not different thresholds for vaccinated and

10  unvaccinated patients.

11  BY MS. GONDEIRO:

12     Q.   Did -- I don't want to misstate your testimony,

13  but earlier did you say that Fulgent was following the

14  cycle thresholds that was advised by the CDC?

15     A.   This is not my specific area of expertise, but

16  I believe it's the FDA --

17     Q.   Okay.

18     A.   -- who approves tests -- approves laboratory

19  tests and the details.  I know there's also a -- CLIA,

20  C-L-I-A, is another -- I don't know if its an entity or

21  a set of regulations under which lab tests are approved.

22          What is within my purview is that we intend to

23  work with laboratories or evaluate tests based on their

24  FDA approval.  So -- or CLIA approval.  So we would set

25  up systems to receive results from FDA-approved or

Sarah Rudman, M.D. - 08-19-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

1  authorized tests where we would not act in the same way

2  for a test that was not FDA-approved or authorized.

3      Q.   Okay.  Are you aware if Fulgent ever followed

4  any cycle threshold calibration that was set by the

5  World Health Organization?

6          MR. WALL:  Object to form.

7          THE WITNESS:  I -- I don't know.  I don't know

8  whether -- or how the systems work between what the

9  World Health Organization sets versus the FDA for a

10  given test.  And it's also sort of not within my purview

11  to know that level of detail of how Fulgent is choosing

12  their CT, their cycle threshold.

13  BY MS. GONDEIRO:

14      Q.   Okay.  What is -- during the COVID-19 pandemic,

15  what is the most effective COVID-19 test that was used?

16          MR. WALL:  Object to form.

17          THE WITNESS:  Can you specify what you mean by

18  "effective"?

19  BY MS. GONDEIRO:

20      Q.   I guess "accurate" would be a better word.

21          MR. WALL:  Again, object to form.

22  BY MS. GONDEIRO:

23      Q.   What COVID-19 test is the most accurate?

24          MR. WALL:  Object to form.

25          You can answer, Dr. Rudman.

1            THE WITNESS:  Thank you.

2            So I would say it depends.  Accurate to what?

3    PCR testing is considered sort of the gold standard in

4    COVID diagnostic testing because it is the most

5    sensitive.  So -- and because it is designed to detect a

6    current or very recent infection, by comparison, antigen

7    testing has a lower threshold for picking up virus and

8    so therefore is considered, in some ways, less accurate.

9    Because somebody with a mild or brand-new or very early

10   or very late infection may test positive by PCR but not

11   by antigen.

12           On the other hand, you could interpret that the

13   antigen test is more accurate if what you're trying to

14   say is how contagious is a person at a given time.

15           Finally, there's a third type of test called "a

16   serology" which looks for a human response to an

17   infection, current or past.  That test is not helpful

18   for understanding, necessarily, is someone sick right

19   now, but it may be the most accurate for telling us have

20   they ever been sick with COVID.

21   BY MS. GONDEIRO:

22   Q.   Okay.  Was it ever a policy in the County that

23   only COVID-19 tests that were produced by -- or through

24   a PCR testing, that those tests be documented and only

25   those types of tests?

1     A.   No.  It was never a policy that only PCR tests

2   would be documented; however, the -- a federal group

3   called "the CSTE" -- I think it's Council of State and

4   Territorial Epidemiologists -- is considered the expert

5   group that defines what an illness is for surveillance

6   and public health purposes, and they have determined,

7   and we have followed that determination, that a

8   confirmed case is somebody with a positive PCR test

9   whereas a probable case, sort of a lower threshold, is

10   somebody with a positive antigen test.

11        So I would say that the County policy would be

12   to follow that definition as put forth by CSTE --

13     Q.   Okay.

14     A.   -- that differentiates between those two test

15   types.

16     Q.   Okay.  But during the COVID-19 pandemic, the

17   County was documenting COVID-19 cases from antigen

18   tests; correct?

19     A.   Yes, but the systems for doing so were

20   different than for PCR tests.

21     Q.   Can you explain?

22     A.   Sure.  Because all PCR tests, really, are

23   conducted by a laboratory, and laboratories are required

24   to electronically submit positive and now -- and

25   negative COVID test results into the County -- into

1   CalREDIE, which the County then receives and acts on, we

2   felt confident, to the best of our ability, that we were

3   receiving the vast majority of all reports of positive

4   PCR tests.

5            For antigen tests, which may be performed in an

6   individual's private home or in a laboratory setting or

7   in a clinical setting or sometimes in a peri-clinical

8   setting or other -- other -- we were performing them at

9   schools or at other drive-through clinics, the systems

10  set up to receive that information varied throughout the

11  pandemic and were less consistent overall than for PCR.

12           I would say that for the vast majority of tests

13  conducted at home, we usually don't ever receive that

14  information.  For the vast majority of tests conducted

15  in a laboratory, we do receive that information.  And

16  then these sort of either -- like, in a clinic or in a

17  specific test site set up for antigen testing, it may --

18  it varied throughout the pandemic and continues to vary

19  whether we get that information.

20  Q.    Okay.  During the COVID-19 pandemic, was there

21  ever a point where you were keeping track of false

22  positive COVID-19 tests?

23           MR. WALL:  Object to form.

24           THE WITNESS:  I'll first add that identifying

25  that a test is a false positive is complex -- is

1   somewhat subjective and had an evolving definition and

2   understanding throughout the pandemic.

3           I would say no, there was not a system that was

4   set up for the purpose of documenting false positives,

5   but in the systems in which we received results, acted

6   on them either for contact tracing or other purposes, if

7   we were to become aware that the best evidence was that

8   it was a false positive, we might document in those same

9   systems that our new understanding was that this was a

10  false positive for the purpose of acting on it, whether

11  that's contacting the patient and giving them new

12  information or any other adjustment to our understanding

13  of how we were previously acting on the case.

14          MS. GONDEIRO:  Okay.  I think we're -- we can

15  stop here.  I actually only have maybe like 15 more

16  minutes left, but I haven't had lunch yet.  So we can

17  take a ten-minute break, we'll come back, and we'll

18  finish.

19          MR. WALL:  Sounds great.  Thanks, Mariah.

20          MS. GONDEIRO:  Okay.  Bye.

21          (Recess taken from 1:56 p.m. to 2:06 p.m.)

22          MS. GONDEIRO:  Okay.

23          THE REPORTER:  Back on the record?

24          MS. GONDEIRO:  Yes.

25          (Exhibit 39 was marked for identification.)

1    MS. GONDEIRO:  So this is Exhibit 39.  It is

2  Defendant Sara Cody's Response to Plaintiff Mike

3  McClure's Interrogatories (Set One).

4    MR. WALL:  I think this is Exhibit 40,

5  Ms. Gondeiro.

6    MS. GONDEIRO:  Is it Exhibit 40, or is it

7  Exhibit 39?

8    EXHIBIT TECHNICIAN:  Exhibit 39.

9    THE REPORTER:  Counsel, we're --

10    MR. WALL:  Oh, we skipped one.  That's right.

11    THE REPORTER:  Yes.

12    MR. WALL:  Okay.  So it's Exhibit 39.  Thank

13  you.  My mistake.  I stand corrected.

14  BY MS. GONDEIRO:

15    Q.   Dr. Rudman, do you recall reviewing these

16  interrogatories?

17    A.   I'm flipping through now.

18         Yeah, I definitely recall that the document

19  existed and I was aware of that and that there are

20  portions I've reviewed.

21    Q.   Okay.  Was this one of the documents that you

22  reviewed before this deposition?

23    A.   Yes.

24    MS. GONDEIRO:  Okay.  Can you please scroll

25  down?  Keep going.

1        EXHIBIT TECHNICIAN:  Okay.

2        MS. GONDEIRO:  Keep going.

3        EXHIBIT TECHNICIAN:  Okay.  Tell me when to

4   stop.  Oh, here we go.

5        MS. GONDEIRO:  Keep going.  Sorry.  I should

6   have --

7        EXHIBIT TECHNICIAN:  Okay.

8        MS. GONDEIRO:  Keep going.

9        EXHIBIT TECHNICIAN:  All right.

10        MS. GONDEIRO:  Keep going.  Just keep

11   scrolling, and I'll tell you when to stop.

12        EXHIBIT TECHNICIAN:  Okay.  Hopefully, I'm not

13   ruining your eyes by doing this.

14        MS. GONDEIRO:  Okay.  Oh, go up.

15        Oh, Interrogatory Number 18.

16        EXHIBIT TECHNICIAN:  Okay.

17        MS. GONDEIRO:  Okay.

18        EXHIBIT TECHNICIAN:  Let me get it -- there.

19   BY MS. GONDEIRO:

20     Q.   Interrogatory Number 18 asks, "Identify all

21   COVID-19 cases traced to Calvary Chapel San Jose."

22        The County responded with -- or Dr. Cody

23   responded with, "The County has conducted more in-depth

24   outbreak investigations that have provided information

25   about the potential sources of COVID-19 cases in the

1  County.  Additionally, Calvary Chapel San Jose staff

2  members have admitted under oath that there have been

3  suspected and confirmed COVID-19 cases among Calvary

4  staff and congregants."

5       Do you recall reviewing this specific

6  interrogatory?

7       A.   Yes.

8       Q.   Okay.  What did the County mean by -- when it

9  said that "The County has conducted more in-depth

10  outbreak investigations"?

11      A.   The data that we reviewed earlier in the

12  special investigations report sort of rolled up or

13  combined together more detailed investigations into

14  certain apparent clusters.  At times, those clusters,

15  through focused investigations or other circumstances of

16  the cluster, made it clear or made it very likely that

17  certain cases were attributed to transmission in those

18  settings.

19      One of the clearest examples of these was when

20  we had a resident of a long-term care facility like a

21  nursing home who had not left the nursing home during

22  the entire period when they could have been exposed and

23  gotten sick.  It would become quite clear that the

24  source of their infection was in their nursing home.

25      Q.   Uh-huh.

1    A.   And so those types of in-depth outbreak

2  investigations, while, again, were focused on preventing

3  future spread and stopping any spread happening in those

4  settings, were some of the few investigations where we

5  were able to really have information about where the

6  source of COVID was for that case.

7    Q.   In regards to Calvary Chapel San Jose, was the

8  County able to attribute any COVID-19 cases to the

9  church?

10       MR. WALL:  Object to form.

11       THE WITNESS:  Can I first ask to clarify if the

12  school is independent from the church.

13  BY MS. GONDEIRO:

14    Q.   Calvary Christian Academy is a -- is a branch

15  of Calvary Chapel San Jose, but they are operated

16  separately.  So I'm -- right now, I'm just talking about

17  the church.

18    A.   Okay.  So indi- --

19       MR. WALL:  Object.  Object to form and

20  misstates the discovery record.

21       But you can answer the question as posed by

22  Ms. Gondeiro, Dr. Rudman.

23       THE WITNESS:  So, if I understand, your

24  question is, am I aware of cases traced to the church

25  exclusive of the school?

1   BY MS. GONDEIRO:

2       Q.   Are you aware of confirmed COVID-19 cases that

3   were attributed to Calvary Chapel San Jose, the church,

4   not --

5            MR. WALL:  Object to form.  Oh, sorry.

6   BY MS. GONDEIRO:

7       Q.   -- not the school?

8            MR. WALL:  Object to form.

9            THE WITNESS:  So with the limitation I

10  described earlier, that for the vast majority of cases,

11  we did not ever find a way to attribute them to any

12  specific setting, no, I'm not aware of any cases that we

13  specifically attributed to having gotten sick in the

14  church or that was clearly where they got their

15  infection.

16           MS. GONDEIRO:  You can scroll down to

17  Interrogatory Number 19.

18  BY MS. GONDEIRO:

19      Q.   Interrogatory Number 19 reads, "Identify all

20  COVID-19 cases traced to Southridge Baptist Church of

21  San Jose."

22           Do you recall reviewing this specific

23  interrogatory?

24      A.   Yes.

25      Q.   Okay.  Did you help prepare a response to this

1    interrogatory?

2         A.    Yes.

3         Q.    Okay.  Are you aware of any confirmed COVID-19

4    cases that were attributed to Southridge Baptist Church

5    of San Jose?

6    A.    No, I'm not.

7              MR. WALL:  Object to form.  Oh.

8              THE WITNESS:  Sorry.  Sorry.

9              No, I'm not.

10             MS. GONDEIRO:  Okay.  I don't think I have any

11   more questions.

12             MR. WALL:  If we could just take a short break,

13   Ms. Gondeiro.  We'll come back.  I may or may not have

14   some questions, but if we could take a short break.

15             MS. GONDEIRO:  Okay.  That's fine.

16             MR. WALL:  Thanks.

17             (Recess taken from 2:14 p.m. to 2:17 p.m.)

18             MR. WALL:  Okay.  Are we back on the record,

19   Ms. Knowles?

20             THE REPORTER:  Yes, we're back on the record.

21             MR. WALL:  Thank you.

22                         EXAMINATION

23   BY MR. WALL:

24        Q.    Dr. Rudman, thank you for your time today.

25   Just a couple quick follow-up questions.

1       Is there any way to -- let me ask -- scratch

2   that.

3       Is it possible to determine the source of a

4   particular COVID-19 infection?

5   A.   So sometimes, and it's actually quite rare,

6   either because -- we can attribute a specific infection

7   or a specific transmission event.  The two circumstances

8   where that's usually possible are either because

9   somebody really only had one possible exposure.  They

10  were a young child who never left the home during the

11  entire period of exposure and therefore must have

12  acquired at home or a long-term care facility resident

13  who never left the facility and must have acquired in

14  the facility.

15      The other circumstance is sometimes genetic

16  sequencing information from the virus itself that is --

17  that caused the illness in an individual can be matched

18  to or very closely matched to genetic sequencing of a

19  virus from another individual who is sick who came in

20  contact with that first case.  And that is also

21  sometimes enough evidence to say it is very likely this

22  individual got sick from the other who has matching

23  genetic fingerprint of their virus.

24      In the absence of either of those

25  circumstances, it's almost impossible to know where

1   somebody got sick, and the best we can do is look at

2   patterns of where they were likely to have gotten sick.

3        Q.   Are you aware of any reported positive COVID-19

4   cases where someone reported or it was known that they

5   had attended either Calvary Chapel or its school?

6        A.   Yes.  I'm aware of cases where it was reported

7   that they attended the school.

8        Q.   And was there any -- did the County conduct any

9   genomic sequencing or analysis of the virus that those

10  individuals had to determine the potential source or

11  sources of the infection?

12       A.   Not to my knowledge, no.

13            MR. WALL:  Thank you, Dr. Rudman.  Those are

14  all -- that's all I have.

15            THE WITNESS:  Okay.

16            MS. GONDEIRO:  I don't have any follow-up

17  questions.

18            MR. WALL:  Thank you.

19            THE REPORTER:  Anything further, Counsel?

20            MR. WALL:  Just we would like to request,

21  pursuant to the federal rules, an opportunity to review

22  and make corrections to the transcript.

23            MR. TYLER:  I'm sorry.  This is Robert Tyler

24  here.  Mariah, I would like to confer with you very

25  briefly because there may be one follow-up question.

```
 1            Can we go off the record for five minutes?  Not
 2     even five.  Give us two minutes.
 3            MS. GONDEIRO:  Okay.
 4            MR. WALL:  That's fine.
 5            MR. TYLER:  Thank you, Mariah.
 6            (Recess taken from 2:20 p.m. to 2:26 p.m.)
 7            MS. GONDEIRO:  I just have a few follow-up
 8     questions.
 9            MR. WALL:  Sure.
10            MS. GONDEIRO:  Okay.
11            THE REPORTER:  We're back on the record.
12                     FURTHER EXAMINATION
13     BY MS. GONDEIRO:
14         Q.   Dr. Rudman, was it your testimony that there
15     are two ways that you can determine whether a COVID-19
16     case is attributed to a specific setting?
17            MR. WALL:  Object to form.
18            THE WITNESS:  I'm not sure if those were my
19     exact words, but those are -- those are the two highest
20     levels of evidence to feel most confident that a case is
21     attributed to a specific setting.
22     BY MS. GONDEIRO:
23         Q.   Okay.  So your testimony was that there are
24     two -- two situations that can show or demonstrate that
25     it is very likely that a business -- or a setting would
```

1    have contributed to a specific COVID-19 case; is that

2    correct?

3         A.   Yes.  Those are two major settings I can think

4    of right now -- or situations.

5         Q.   Okay.  And the first example you gave was

6    genetic sequencing; correct?

7              MR. WALL:  Object to form.

8              THE WITNESS:  That is one of the two examples I

9    gave.

10   BY MS. GONDEIRO:

11        Q.   Okay.  And then the other example you gave was

12   a situation -- or was the other example you gave a

13   situation where someone is basically just enclosed in a

14   specific space and doesn't have, like, a -- like,

15   contact with other people?  Is that correct?

16        A.   That's not exactly how I stated it.

17        Q.   Okay.  Can you explain the other way that --

18        A.   I think -- yeah, as best I stated it before.

19   Another situation we feel very confident attributing a

20   certain location as the place of exposure is when

21   somebody has only been in that location for the entirety

22   of the period when they could have been exposed,

23   resulting in their illness.

24        Q.   Okay.  Did the County conduct genetic

25   sequencing of COVID-19 cases that were reported from

1  Calvary Christian Academy?

2      A.   I don't know of any genetic sequencing results

3  specific to cases from Calvary Christian Academy.

4      Q.   Did the County determine that the COVID-19 --

5  that any of the COVID-19 cases that were reported from

6  Calvary Christian Academy may have came from someone who

7  was only in close -- or who was only in contact with

8  people within Calvary Christian Academy?

9          MR. WALL:  Object to form.  Outside the scope.

10 Incomplete hypothetical.

11         You can answer the question, Dr. Rudman.

12         THE WITNESS:  I don't know of any cases

13 associated with Calvary Christian Academy in which that

14 case was only in that location for the entirety of their

15 exposure period.

16 BY MS. GONDEIRO:

17     Q.   So you mentioned earlier that the County may be

18 able to determine the location of where someone may have

19 gotten COVID-19 if they were on that location and only

20 that location for a period of time.

21         How long is that period of time?

22         MR. WALL:  Object to form.  Incomplete

23 hypothetical.

24         THE WITNESS:  Earlier when I referred to the

25 exposure period or the period during which, prior to an

1    illness onset, we think their exposure that led to that

2    illness most likely occurred, our knowledge of that has

3    evolved somewhat over the pandemic, but we've usually

4    treated it as a period of up to 14 days.

5            MS. GONDEIRO:  Uh-huh.

6            THE WITNESS:  With more recent variants, we

7    think that that is usually a much shorter period on the

8    number of -- maybe three to seven days.

9    BY MS. GONDEIRO:

10       Q.    For the COVID-19 --

11       A.    Uh-huh.

12       Q.    -- was the exposure period 14 days?

13       A.    There were periods of the pandemic for which

14   our best understanding of the exposure period for the

15   circulating variants was 14 days; and because of that,

16   for many investigations, we would ask about exposures

17   during the 14 days prior to disease onset.

18       Q.    Okay.  During the time when cases were -- that

19   Calvary Christian Academy reported COVID-19 cases, was

20   the exposure period then, which was in January of 2021,

21   14 days?

22       A.    To the best of my -- oh.

23            MR. WALL:  Object to form.

24            You can answer the question.

25            THE WITNESS:  To the best of my memory, we were

1    using a definition of the exposure period for

2    investigation purposes of 14 days at that time, January

3    2021.

4    BY MS. GONDEIRO:

5        Q.   Okay.  So you have no way to know that persons

6    infected -- that there was anyone infected at Calvary

7    Christian Academy?

8            MR. WALL:  Object to form.

9            THE WITNESS:  No, I would disagree with that

10   statement.

11   BY MS. GONDEIRO:

12       Q.   Do you have any evidence that there were

13   COVID-19 cases reported from Calvary Chapel -- or

14   Calvary Christian Academy that were attributed to

15   Calvary Christian Academy?

16           MR. WALL:  Object to form.  Asked and answered.

17           THE WITNESS:  So, yes, I do have evidence in

18   that we had data that I believe came from both Calvary

19   Christian Academy and individual either cases or their

20   family members sharing that those cases had potential

21   exposures at Calvary Christian Academy during their

22   exposure period or were contagious and were present at

23   Calvary Christian Academy during their infectious period

24   such that they might have exposed other people as well

25   as a cluster, a number of cases occurring around the

1  same time, in the same location, and who would have come

2  in contact with each other, which both I and the County

3  as well as CDPH and CDC, throughout that period, would

4  consider enough of a -- enough cases in the same place

5  at the same time to suggest some level of evidence that

6  there was transmission happening.

7          So while I don't feel I can say I have proven

8  that a given case must have come from Calvary Christian

9  Academy, I do feel the County had evidence that there

10  was transmission or likely transmission happening in

11  that setting enough to investigate further and enough to

12  attempt -- as we did with other such clusters, without

13  proving transmission, where we would reach out to try to

14  offer guidance to reduce the likelihood of further

15  transmission in that setting.

16  BY MS. GONDEIRO:

17      Q.   Are you aware of whether the individuals who

18  reported COVID-19 cases from Calvary Christian Academy

19  were in contact with others in the public outside of

20  Calvary Christian Academy?

21          MR. WALL:  Object to form.  Outside the scope.

22          But you can answer the question, Dr. Rudman.

23          THE WITNESS:  Sure.

24          I -- I don't know the individual details of the

25  case interviews of the families of the cases we are

1  aware of who tested positive and disclosed to us or the

2  academy disclosed to us that those students or staff

3  were affiliated with the academy.  So I don't know well

4  enough to know what other exposures they had around the

5  same time or potential exposures or interactions they

6  had around the same time.

7  BY MS. GONDEIRO:

8      Q.   Is it possible that the individuals who

9  reported COVID-19 cases from Calvary Christian Academy

10 could have acquired the COVID-19 from clusters in other

11 community settings?

12          MR. WALL:  Object to form.  Outside the scope.

13 Speculative.  Incomplete hypothetical.

14          But you can answer the question, Dr. Rudman.

15          THE WITNESS:  Okay.

16          Is it possible?  Yes, and I think that's the

17 difficulty of some of what we've discussed today with

18 respect to contact tracing.  Knowing exactly where

19 somebody got sick was very difficult, and so it was

20 often based on other information that we set our

21 guidance and recommendation about how to reduce spread.

22 BY MS. GONDEIRO:

23     Q.   Are you aware if the individuals who reported

24 COVID-19 cases from Calvary Christian Academy -- are you

25 aware if they were in contact with anyone who went to

1    church at Calvary Chapel San Jose?

2            MR. WALL:  Object.  Object to scope -- object

3    to form.  Outside the scope.

4            You can answer, Dr. Rudman.

5            THE WITNESS:  I -- I don't recall and don't

6    know if I ever would have reviewed the specific

7    interview data closely enough to know what other

8    interactions they had, including interactions with

9    members of the chapel.

10   BY MS. GONDEIRO:

11       Q.   Are you aware if any of the individuals who

12   contracted COVID -- or who reported COVID-19 cases from

13   Calvary Chapel -- or Calvary Christian Academy -- are

14   you aware if those individuals were in contact with --

15   with any employee from Calvary Chapel San Jose during

16   their exposure period?

17           MR. WALL:  Same objections.

18           THE WITNESS:  Again, I don't recall and don't

19   know if I ever would have reviewed the specific

20   interview data to this detail to have knowledge of who

21   else they came in contact with --

22           MS. GONDEIRO:  Okay.

23           THE WITNESS:  -- including whether members of

24   the chapel.

25   /////

1    BY MS. GONDEIRO:

2        Q.   So these interviews -- you had -- you

3    documented these interviews of reported cases from

4    Calvary Chapel -- from Calvary Christian Academy; is

5    that correct?

6        A.   No.  I would say I supervised a team of a

7    hundred leads who supervised a total of about 900

8    contact tracers who conducted on the order of sometimes

9    up to a thousand interviews a day all combined into the

10   CalCONNECT database.  And so whether I -- yeah.  So, no,

11   I did not conduct those interviews or collect those

12   data, but I supervised the system of data collection and

13   staff doing so.

14       Q.   Okay.  But someone within the team did document

15   those interviews of reported COVID-19 cases from Calvary

16   Christian Academy; correct?

17       A.   What -- what the system was set up to document,

18   and I presume and believe was documented, was any

19   reports from Calvary Christian Academy of cases within

20   their system, as was required by regulation for them to

21   report anytime they became aware of a case or a cluster.

22            And then, in addition, anybody who tested

23   positive who we attempted to reach and were successfully

24   able to interview would have been asked, if a child, "Do

25   you attend school, and where?" or, if an adult, "Do you

1    work, and where?"  And if that question was answered and

2    answered fully by the patient or their family and they

3    disclosed Calvary Christian Chapel or Calvary -- I'm

4    sorry -- Calvary Christian Academy, that would have been

5    documented in that CalCONNECT system.

6            Was that your question?

7    Q.    Yeah.  That's helpful.

8    A.    Okay.

9            MS. GONDEIRO:  Okay.  I think I'm done.

10           MR. WALL:  No further questions.

11           And just to reiterate the request for an

12   opportunity to review and correct the transcript,

13   Ms. Knowles.

14           THE REPORTER:  Thank you.

15           And same transcript order?

16           MR. WALL:  Same transcript order for the

17   Defendants.

18           THE REPORTER:  Anything further?

19           MS. GONDEIRO:  No.  We're good.

20           THE REPORTER:  Okay.  Then the deposition is

21   concluded.

22           (The deposition proceedings were

23            concluded at 2:39 P.M.

24            Declaration under Penalty of Perjury on

25            the following page hereof.)

1        DECLARATION OF WITNESS UNDER PENALTY OF PERJURY

2

3            I, SARAH RUDMAN, M.D., hereby declare I am the

4    deponent in the within matter; that I have read the

5    foregoing transcript and made any corrections,

6    additions, or changes, if any, on the errata sheet.  The

7    testimony is now a full, true, and correct transcript of

8    my testimony.

9            I declare under the penalties of perjury of the

10   State of California that the foregoing is true and

11   correct.

12

13

14            Executed this _____ day of _____

15   20_____, at _____, _____.
                        (City)              (State)

16

17

18        _____
                         SARAH RUDMAN, M.D.
19

20

21

22

23

24

25

Sarah Rudman, M.D. - 08-19-2022
CALVARY CHAPEL SAN JOSE vs GAVIN NEWSOM

```
 1    STATE OF CALIFORNIA     )
                              )   ss.
 2    COUNTY OF SANTA CLARA   )

 3

 4          I, MICHELLE D. KNOWLES, CSR No. 8979 and

 5    Deposition Officer in the State of California, do hereby

 6    certify that prior to being examined, the witness in the

 7    foregoing deposition was duly sworn to testify the

 8    truth, the whole truth, and nothing but the truth;

 9          That the testimony of the witness and all

10    objections made at the time of the examination were

11    recorded stenographically by me;

12          That the foregoing transcript is a true record

13    of the testimony given and all objections made at the

14    time of the examination.

15          Pursuant to Rule 30(e) of the Federal Rules of

16    Civil Procedure, a request was made for review and

17    signature by the witness.

18

19    Dated:  September 1, 2022

20

21    _____

22    Michelle D. Knowles, California CSR No. 8979

23

24

25
```