1  JAMES R. WILLIAMS, County Counsel (S.B. #271253)
   MELISSA R. KINIYALOCTS, Lead Deputy County Counsel (S.B. #215814)
2  ROBIN M. WALL, Deputy County Counsel (S.B. #235690)
   XAVIER M. BRANDWAJN, Deputy County Counsel (S.B. #246218)
3  OFFICE OF THE COUNTY COUNSEL
   70 West Hedding Street, East Wing, Ninth Floor
4  San José, California 95110-1770
   Telephone: (408) 299-5900
5  Facsimile: (408) 292-7240

6  Attorneys for Defendant
   COUNTY OF SANTA CLARA

7

8

9                    UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
10                        (San José Division)

11

12  CALVARY CHAPEL SAN JOSE, et al.,          No. 20-CV-03794 BLF

13              Plaintiffs,                    **DEFENDANT COUNTY OF SANTA
                                               CLARA'S OPPOSITION TO PLAINTIFFS'
14  v.                                         MOTION FOR PARTIAL SUMMARY
                                               JUDGMENT**
15  COUNTY OF SANTA CLARA,
                                               Date:     January 26, 2023
16              Defendant.                     Time:     9:00 a.m.
                                               Crtrm:    3, 5th Floor
17                                             Judge:    The Hon. Beth Labson Freeman

18

19

20

21

22

23

24

25

26

27

28

1

2

## TABLE OF CONTENTS

3

I.     INTRODUCTION ................................................................................1

II.    BACKGROUND ................................................................................2

    A.    The Public Health Orders.................................................................2

    B.    Calvary Violated the Public Health Orders on an Ongoing Basis..........4

    C.    Calvary's Appeal to the Office of the County Hearing Officer..............5

    D.    The Status of this Case....................................................................5

III.    ARGUMENT ....................................................................................6

    A.    The Summary Judgment Standard......................................................6

    B.    The County Is Not Seeking Fines for Violations of Capacity Mandates...............6

    C.    The Face Covering and Social Distancing Requirements Are Constitutional.........6

        1.    Calvary is estopped from re-litigating this claim..........................7

            a.    The underlying OCHO hearing had the requisite judicial character ................................................................7

            b.    The appeal of the OCHO decision involved the same parties ........8

            c.    The appeal of the OCHO decision involved the same cause of action ................................................................8

            d.    The Superior Court's decision is a final judgment on the merits ..10

        2.    Calvary's claim fails, even if considered anew .........................10

            a.    The requirements are neutral and generally applicable ................10

            b.    The face covering and social distancing rules pass strict scrutiny.........................................................................12

    D.    The Social Distancing Protocol Requirement Is Constitutional ...........14

    E.    The Singing Restrictions Are Constitutional .....................................15

    F.    Calvary Has Not Shown a Substantial Burden on Its Religious Exercise ............16

    G.    The Urgency Ordinance Did Not Discriminate Against Religion.........20

    H.    The Public Health Orders Do Not Violate the Fourteenth Amendment...............21

    I.    The Fines Sought Against Calvary Do Not Violate the Eighth Amendment ........21

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1.  Even on the merits, the fines are not unconstitutionally excessive............21

    a.  Calvary has—and always had—the ability to pay the fines ..........22

    b.  Calvary's high degree of culpability renders the fines not excessive .......................................................................................23

    c.  The fines are reasonably related to the harm .................................23

    d.  The fines are in line with penalties imposed in similar statutes ....25

IV.   CONCLUSION...........................................................................................25

ii

1

## TABLE OF AUTHORITIES

2

## CASES

3

*Allen v. McCurry*,
    449 U.S. 90 (1980)............................................................................................................... 7

4

5

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................................................. 6

6

7

*Ass'n of Christian Sch. Int'l v. Stearns*,
    679 F. Supp. 2d 1083 (C.D. Cal. 2008) .............................................................................. 17

8

*Balice v. U.S. Dep't of Agric.*,
    203 F.3d 684 (9th Cir. 2000) .............................................................................................. 22

9

10

*Boeken v. Philip Morris USA, Inc.*,
    48 Cal. 4th 788 (2010) ......................................................................................................... 9

11

12

*Bols* v. Newsom,
    515 F. Supp. 3d 1120 (S.D. Cal. 2021)............................................................................... 15

13

*Brentwood Rod & Gun Club, Inc. v. Cty. of Contra Costa*,
    No. C 06-04237 MHP, 2008 U.S. Dist. LEXIS 78909 (N.D. Cal. Oct. 7, 2008) ..................... 9

14

15

*Brodheim v. Cry*,
    584 F.3d 1262 (9th Cir. 2009) .............................................................................................. 8

16

17

*Burcham v. City of L.A.*,
    562 F. Supp. 3d 694 (C.D. Cal. 2022) ................................................................................ 14

18

19

*C.D. Anderson & Co. v. Lemos*,
    832 F.2d 1097 (9th Cir. 1987) .............................................................................................. 7

20

*Calvary Chapel of Ukiah v. Newsom*,
    524 F. Supp. 3d 986 (E.D. Cal. 2021)............................................................................ 15, 16

21

22

*Canell v. Lightner*,
    143 F.3d 1210 (9th Cir. 1998) ............................................................................................ 17

23

24

*Catholic Charities of Sacramento, Inc. v. Superior Ct.*,
    32 Cal. 4th 527 (2004) ........................................................................................................ 17

25

26

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................................................. 6

27

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)........................................................................................................... 10

28

iii

*Crowley v. Katleman,*
    8 Cal. 4th 666 (1994) .......................................................................................................... 8

*Cty. of Humboldt v. App. Div. of Superior Ct.,*
    46 Cal. App. 5th 298 (2020) ............................................................................................ 10

*Denver Bible Church v. Azar,*
    494 F. Supp. 3d 816 (D. Colo. 2020).......................................................................... 11, 12

*Does v. Bd. of Regents of the Univ. of Colo.,*
    No. 21-cv-2637-RM-KMT, 2022 U.S. Dist. LEXIS 15144 (D. Colo. Jan. 27, 2022)........... 12

*Eichman v. Fotomat Corp.,*
    147 Cal. App. 3d 1170 (1983) ............................................................................................ 9

*Employment Div., Dept. of Human Resources of Ore. v. Smith,*
    494 U.S. 872 (1990).......................................................................................................... 16

*Fulton v. City of Philadelphia, Pennsylvania,*
    141 S. Ct. 1868 (2021)...................................................................................................... 17

*Furnace v. Giurbino,*
    No. C 12-0873 LHK (PR), 2013 U.S. Dist. LEXIS 166648 (N.D. Cal. Nov. 22, 2013).......... 9

*Gonzales v. Cal. Dep't of Corr.,*
    739 F.3d 1226 (9th Cir. 2014) ............................................................................................ 9

*Gonzales v. California Dep't of. Corrs.,*
    782 F. Supp. 2d 834 (N.D. Cal. 2011) ................................................................................ 7

*Guild Wineries & Distilleries v. Whitehall Co.,*
    853 F.2d 755 (9th Cir. 1998) .............................................................................................. 8

*Gutierrez v. City of Long Beach,*
    No. CV 19-9941-DMG (Ex), 2021 U.S. Dist. LEXIS 221668 (C.D. Cal. Nov. 15, 2021) .... 24

*Harvest Rock Church, Inc. v. Newsom,*
    985 F.3d 771 (9th Cir. 2021) ........................................................................................ 13, 15

*Holt v. Hobbs,*
    574 U.S. 352 (2015).......................................................................................................... 16

*Int'l Evangelical Church of Soldiers of the Cross of Christ v. Church of Soldiers of the Cross of Christ of State of Cal.,*
    54 F.3d 587 (9th Cir. 1995) ................................................................................................ 7

*Kay v. City of Rancho Palos Verdes,*
    504 F.3d 803 (9th Cir. 2007) .............................................................................................. 9

iv

*Kremer v. Chem. Const. Corp.*,
   456 U.S. 461 (1982) ........................................................................................................ 7

*Lemmon v. Pierce Cty.*,
   No. C21-5390RSL, 2021 U.S. Dist. LEXIS 156164 (W.D. Wash. Aug. 18, 2021) ............... 22

*Lent v. California Coastal Com.*,
   62 Cal. App. 5th 812 (2021) ........................................................................................... 24

*Malik v. Brown*,
   16 F.3d 330 (9th Cir. 1994) ........................................................................................... 17

*Migra v. Warren City Sch. Dist. Bd. of Educ.*,
   465 U.S. 75 (1984) ........................................................................................................... 7

*Morris v. Kuehl*,
   No. 2:20-cv-11508-VBF-PD, 2021 U.S. Dist. LEXIS 69621 (C.D. Cal. Apr. 8, 2021) ........ 15

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984) .................................................................................................. 15, 18

*Pimentel v. City of Los Angeles*,
   974 F.3d 917 (9th Cir. 2020) ..................................................................................... 22, 23

*Porter v. Gore*,
   354 F. Supp. 3d 1162 (S.D. Cal. 2018) ........................................................................... 15

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2020) ....................................................................................................... 13

*Rouse v. Whitmer*,
   No. 20-12308, 2022 U.S. Dist. LEXIS 118673 (E.D. Mich. June 13, 2022) ....................... 12

*Rouser v. White*,
   944 F. Supp. 1447 (E.D. Cal. 1996) ............................................................................... 17

*Runyon v. Bd. of Trustees*,
   48 Cal. 4th 760 (2010) ..................................................................................................... 8

*San Diego Police Officers' Ass'n v. San Diego City Emples. Ret. Sys.*,
   568 F.3d 725 (9th Cir. 2009) ........................................................................................ 7, 9

*Sherbert v. Verner*,
   374 U.S. 398 (1963) .................................................................................................. 16, 17

*South Bay United Pentecostal Church*,
   985 F.3d 1128 (9th Cir. 2021) ....................................................................................... 15

1

2

*S. Bay United Pentecostal Church v. Newsom,*
    141 S. Ct. 716 (2021) ............................................................... 13, 15, 16

3

*Stormans, Inc. v. Wiesman,*
    794 F.3d 1064 (9th Cir. 2015) ................................................... 12

4

5

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,*
    809 F.2d 626 (9th Cir. 1987) ..................................................... 6

6

7

*Takahashi v. Bd. of Trustees,*
    783 F.2d 848 (9th Cir. 1986) ................................................... 7, 9

8

9

*Tandon v. Newsom,*
    141 S. Ct. 1294 (2021) ............................................................. 10

10

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.,*
    450 U.S. 707 (1981) ................................................................... 19

11

12

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir. 2022) ................................................... 17

13

14

*United States ex rel. Jones v. Sutter Health,*
    499 F. Supp. 3d 704 (N.D. Cal. 2020) ...................................... 13

15

16

*United States v. Bajakajian,*
    524 U.S. 321 (1998) ................................................................... 22

17

*United States v. Mackby,*
    339 F.3d 1013 (9th Cir. 2003) ................................................... 22

18

19

*United States v. Nev. Power Co.,*
    No. CV-S-87-861-RDF, 1990 U.S. Dist. LEXIS 18998 (D. Nev. June 1, 1990) ................... 24

20

21

*Vasudeva v. United States,*
    214 F.3d 1155 (9th Cir. 2000) ............................................... 21, 22

22

*White v. City of Pasadena,*
    671 F.3d 918 (9th Cir. 2012) ..................................................... 7

23

24

25

26

27

28

Defendant County of Santa Clara's Opposition to Plaintiffs'                    20-CV-03794 BLF
Motion for Partial Summary Judgment

1

**FEDERAL STATUTES**

2

United States Constitution

3

8th Amendment.................................................................................. 5, 21, 24, 25

4

14th Amendment.................................................................................... 5, 21

5

U.S. Code

6

28 U.S.C. section 1738 ............................................................................. 7

7

42 U.S.C. section 1983 ............................................................................ 7, 9

8

9

**RULES**

10

Federal Rules of Civil Procedure

11

Rule 56(a)........................................................................................... 6

12

Federal Rules of Evidence

13

Rule 402 ............................................................................................ 20
Rule 602 ...................................................................................... 6, 19, 20
Rule 802 ............................................................................................ 20

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.     INTRODUCTION

This Court needs no reminder of the havoc COVID-19 wreaked on communities, especially in 2020—before effective vaccines, easily accessible testing, and lifesaving treatments were widely available.  In those precarious times, County health officials issued a series of public health orders— grounded in the best available, consensus scientific evidence—to control the spread of COVID-19. Businesses throughout the county rallied together and made difficult sacrifices to keep the community safe by implementing these common-sense health measures.  But not Plaintiffs Calvary Chapel San Jose and its Senior Pastor, Michael McClure (collectively, "Calvary"), who steadfastly refused to comply, even after being repeatedly warned and fined.  And now, in this Motion, Calvary asks the Court to summarily excuse its months-long noncompliance on myriad constitutional grounds that ignore the law, the record, or both.  The Court should not let Calvary off the hook.

At the outset, the Court need not wade into the constitutional thicket of preliminary, concurring, and dissenting Supreme Court opinions to decide this Motion.  Res judicata precludes the re-litigation in this Court of Calvary's previous, unsuccessful challenge—in state court—to the constitutionality of both (1) the County's public health orders regarding face coverings, social distancing, and the submission of a Social Distancing Protocol; and (2) the proportionality of the fines imposed for Calvary's violations.  In October 2020, the Office of the County Hearing Officer (OCHO) considered arguments, live witness testimony, and other evidence, and ruled that Calvary was required to pay the several hundred thousand dollars in fines that had accrued by that time. Calvary challenged the OCHO order in state court, raising many of the same constitutional arguments that Calvary repeats here.  The Superior Court for the County of Santa Clara reviewed and affirmed the OCHO decision on the merits in April 2021, with the benefit of the Supreme Court opinions on which Calvary relies in this Motion.  Calvary noticed—*but then abandoned*—an appeal of the Superior Court's order to the California Court of Appeal, thereby rendering the Superior Court's ruling a final judgment with preclusive effect.  As a result, in this case, Calvary is foreclosed from seeking to vindicate the same primary right that was adjudicated to finality in state court.

Nor would re-litigation change the result.  The County's public health orders were neutral and generally applicable and supported by the legitimate—indeed, compelling—interest in slowing

1

1    the spread of a deadly virus, and thus withstand constitutional scrutiny.  Calvary's citation to non-
2    controlling or effectively overruled opinions does not alter this analysis.

3          Calvary's attacks on two health order requirements not addressed by the Superior Court's
4    final decision—the County's capacity mandates and the State's singing ban—do not fare better.
5    Following the County's commitments made in other litigation to which Calvary was not a party, the
6    County is not seeking to collect fines for capacity mandate violations.  And Calvary's attempt to
7    challenge the State singing ban—after the dismissal of the State defendants, and ignoring the Eastern
8    District's rejection of an identical challenge brought, just last year, by the same lawyers on behalf of
9    another Calvary Chapel church—is equally pointless.

10         Even setting aside the legal impediments to Calvary's claims, evidentiary shortcomings also
11   foreclose Calvary's request for summary judgment.  The public health orders did not burden
12   Calvary's religious beliefs and practices; indeed, the size of Calvary's congregation *tripled* while the
13   public health orders were in effect.  Calvary did not require either its staff or its believers to follow
14   the beliefs it now professes—in fact, Calvary facilitated conduct inconsistent with those professed
15   beliefs.  Nor was Calvary's mission financially burdened by fines that Calvary never had any
16   intention of paying despite ample resources.  Calvary was flush with cash from the increased tithes
17   and offerings it collected from the influx of new attendees who shared Calvary's political, legal, and
18   personal comfort objections to the COVID-19 related health orders.  Calvary chose to use that
19   money to pay off millions of dollars in loans, leaving millions more available.

20         The Court should deny Calvary's Motion in its entirety.

21                              **II.     BACKGROUND**

22   **A.     The Public Health Orders**

23         The County Health Officer, Dr. Sara Cody, issued a series of Public Health Orders[1] to curtail

24   _____

25   [1] "Public Health Orders" refers in this opposition to the July 2, 2020 Risk Reduction Order, October
26   5, 2020 Revised Risk Reduction Order, May 18, 2021 Safety Measures Order, June 21, 2021 Phase
27   Out Order, May 18, 2021 Mandatory Directive on Face Coverings, and any applicable directives and
28   guidance referenced within the foregoing.

1   COVID-19 and protect the public health.  Cody Decl., ¶¶30-44.

2          On July 2, 2020, Dr. Cody issued a Risk Reduction Order applicable to all individuals and

3   businesses in the county, including non-profit organizations and religious institutions.  ECF 212-10.

4   This Order required, *inter alia*, that all individuals wear face coverings when entering business

5   facilities or using public transportation.  *Id.* at §10.  The Order also required businesses to submit a

6   Social Distancing Protocol (SDP) attesting to steps taken to protect the health and safety of those on

7   or entering their premises.  *Id.* at §12(c).  The SDP required each business to certify that it was

8   taking protective measures—including training its employees on preventing COVID-19,

9   appropriately reporting COVID-19 cases to the County Public Health Department, and agreeing to

10  follow any applicable Public Health Orders, guidance, or directives.  *Id.*; Cody Decl., ¶37.

11         On August 11, 2020, the County adopted Urgency Ordinance No. NS-9.921 (the "Urgency

12  Ordinance") to civilly enforce the Public Health Orders.  ECF 212-28.  The Urgency Ordinance set a

13  range of fines for violations of public health orders, including for "commercial activities."  *Id.* at

14  §6(b).  "Commercial activities" encompassed activities conducted by any business, including any

15  "non-profit . . . entity, . . . and regardless of the nature of the service, the function it performs, or its

16  corporate or entity structure."  *Id.* at §§2(b), 6(b)(2).

17         On October 5, 2020, Dr. Cody issued a Revised Risk Reduction Order.  ECF 212-5; Cody

18  Decl., ¶39.  This Order required compliance with the California Department of Public Health's

19  (CDPH) mandatory guidance on face coverings.  ECF 212-5 at §10; County's Request for Judicial

20  Notice (RJN), Exs. A-C.  The October 5, 2020 Order still required all businesses to submit an SDP

21  safety plan.  ECF 212-5 at §12(c); RJN, Ex. D at 46-55, Ex. E.

22         On May 18, 2021, given the success of the County's public vaccination campaign and falling

23  COVID-19 case numbers, Dr. Cody issued the Safety Measures Order, under which businesses were

24  no longer required to submit SDPs.  RJN, Ex. F.  But individuals and businesses were still required

25  to follow the County's May 18, 2021 Mandatory Directive on Face Coverings, which required

26  compliance with the May 3, 2021 CDPH mandatory guidance regarding face coverings.  *Id.* at §8;

27  RJN, Exs. G, H; Cody Decl., ¶41.  By June 21, 2021, due to improved conditions in the county, Dr.

28  Cody issued an order rescinding the provisions of the May 18, 2021 Order relevant here.  RJN, Ex. I.

3

**B.    Calvary Violated the Public Health Orders on an Ongoing Basis**

Calvary decided early on that the Public Health Orders were, in their own words, "recommendations" (Brandwajn Ex. A at 141:5-142:5)—not "law[s] that had to be particularly kept" (*id.*, Ex. B at 35:10- 15).  *See also id.*, Ex. C at 64:20-65:23, Ex. D at 231:23-233:5.  Calvary's conduct reflected that notion:

- Beginning in May 2020, Calvary hosted regular large indoor events at which its personnel and attendees were not required to wear face coverings.  *See, e.g.*, *id.*, Ex. I at 18:14-18, 19:10-19, 41:25-42:1; Gonzalez Decl., ¶¶11-46; Sircar Decl., ¶¶10-86; Nguyen Decl., ¶¶9-22; Mackey Decl., ¶¶4-24, 26-70 & Exs. 27-41, 43-132; Brandwajn Ex. A at 102:18-21, 103:7-104:17, Ex. B at 33:7-11.

- Calvary refused to submit an SDP.  Gonzalez Decl., ¶¶12, 47; Sircar Decl., ¶¶20-22, 24-27, 31, 34-36, 39, 40, 45, 46, 81, 84, 86; Nguyen Decl., ¶¶9, 11, 12, 19; Brandwajn Ex. A at 258:5-259:1; *id.*, Ex. E at 19:1-3, 83:2-5, 84:11-23, 85:12-23, 87:2-18, 91:7-19.

- Calvary staff refused to wear face coverings themselves or to require attendees to wear them. Brandwajn Ex. A at 38:16-39:20, 86:15-87:6, 114:9-13, 119:21-121:7,141:24-142:5, 147:17-22, 258:5-259:1, Ex. B at 33:7-35:15, 37:5-12, Ex. F at 93:3-10, Ex. G at 79:9-25.

After receiving complaints from the public about Calvary, the County initiated enforcement of the Public Health Orders.  Between August 2020 and May 2021, County enforcement officers regularly inspected Calvary, verified violations, and issued numerous notices of violation (NOVs) to Calvary for, *inter alia*, failing to require face coverings, failing to require social distancing, permitting singing without face coverings, and refusing to submit an SDP.  Gonzalez Decl., ¶¶12, 13, 15, 16, 21, 24, 29, 36, 40-44; Sircar Decl., ¶¶11, 13-18, 27-29, 40-42, 44-45, 49-50, 60-62, 64-83; Nguyen Decl., ¶¶17, 20-22.

The NOVs did not secure Calvary's compliance; instead, its violations were open and notorious.  Mackey Decl., ¶¶4-79, Exs. 1-41, 43-149; Gonzalez Decl., ¶¶11-46; Sircar Decl., ¶¶10-86; Nguyen Decl., ¶¶9-22.  Calvary refused to comply despite knowing that (1) its attendees had contracted COVID-19 (Brandwajn Ex. G at 91:2-19, Ex. B at 98:23-99:17, 102:8-24, Ex. C at 36:21-42:18, 49:15-23, 51:4-8, 52:23-53:10, Ex. H at 41:14-19, 42:20-43:24) and at least one died of

4

1   COVID-19 (*id.*, Ex. A at 221:9-225:1, Ex. C at 53:4-10); and (2) a COVID-19 outbreak in Winter

2   2020 at the school run by Calvary Chapel and on its campus had spread "aggressively" among

3   students and teachers, many of whose families attended church at Calvary Chapel (Brandwajn Ex. F

4   at 17:1-23, 19:25-20:2, Ex. G at 19:20-22, 20:8-13, 39:16-40:4, 43:3-45:4, 46:24-47:8, 53:16-54:10,

5   54:23-55:9, 58:24-62:5, 67:8-21, 71:10-72:4, 93:8-21, Ex. A at 68:24-69:5, 201:5-205:17, 209:4-8,

6   Ex. H at 57:7-16, Ex. B at 26:18-24, 29:1-7, 54:6-58:20, 69:6-70:16, 85:1-86:6, 87:6-89:7).

7         In total, Calvary was assessed $4,303,925 in fines and late fees for its ten months of

8   documented ongoing violations.  Brandwajn Decl., ¶28.  In an exercise of prosecutorial discretion, in

9   the related state court action, the People and County seek to collect only $2.87 million.  RJN, Ex. J.

10  Specifically, the People and County do not seek to recover fines against Calvary for gathering

11  indoors in violation of capacity restrictions.  *Id.*, Ex. K at 20-21; ECF 233 at 17:15-20.

12        **C.      Calvary's Appeal to the Office of the County Hearing Officer**

13        Calvary appealed the August 23, 2020 NOV and other NOVs issued through October 18,

14  2020 to the OCHO.  RJN, Ex. L.  At an administrative hearing, the Hearing Officer sustained the

15  violations and fines in the amount as of October 21, 2020—$327,750.  *Id.*  Calvary challenged the

16  decision to the Superior Court, asserting *inter alia,* First Amendment, Eighth Amendment, and other

17  constitutional defenses.  RJN, Ex. M.  On April 8, 2021, the Superior Court upheld the Hearing

18  Officer's decision in its entirety, rejecting Calvary's arguments.  RJN, Ex. N at 6-8.

19        On May 7, 2021, Calvary filed a notice of appeal of the Superior Court's ruling (RJN, Ex. O)

20  but, on June 24, 2021, voluntarily abandoned its appeal (*id.*, Ex. P).  The Superior Court's ruling is

21  therefore final and binding.

22        **D.      The Status of this Case**

23        After several challenges to the pleadings, the County is now the only remaining defendant.

24  ECF 222.  And on October 13, 2022, the Court granted a stipulation (pursuant to settlement)

25  dismissing plaintiffs Southridge Baptist Church of San José California (dba Southridge Church) and

26  Micaiah Irmler from this case.  ECF 227.  Trial is scheduled to begin on May 22, 2023.  ECF 72.

27  //

28  //

5

1

## III.    ARGUMENT

2

### A.    The Summary Judgment Standard

3      Summary judgment is proper where the pleadings and evidence show that there is "no

4  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

5  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit under governing

6  law, and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for

7  the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

8      The moving party bears the initial burden of identifying those portions of the record which

9  demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S.

10  317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must

11  affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.

12  The burden then shifts to the nonmoving party to, "by [its] own affidavits, or by the 'depositions,

13  answers to interrogatories, and admissions on file,' designate specific facts showing that there is a

14  genuine issue for trial."  *Id.* at 324 (citations omitted).  The evidence presented and the inferences to

15  be drawn from the facts must be viewed in a light most favorable to the nonmoving party.  *See T.W.*

16  *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

17

### B.    The County Is Not Seeking Fines for Violations of Capacity Mandates

18      Calvary spills much ink on the capacity mandates.  *See* ECF 208 at 7-8, 13-15, 20.  But, as

19  Calvary knows, *the County is not seeking and will not seek to enforce fines for any violations of*

20  *those capacity mandates*.  *See* RJN Ex. K at 20-21; ECF 233 at 17:15-20.  Neither the NOVs

21  themselves nor counsel's declaration—speculating (*cf.* Fed. R. Evid. 602) that the $2.87 million in

22  fines at issue in the State court case includes fines for capacity limit violations—supports Calvary's

23  contrary assertions (ECF 208 at 7-8, 19).  The County's position is consistent with its stipulated

24  court order in *Gateway City Church v. Newsom*—compelled by a then-recently issued Supreme

25  Court preliminary ruling—not to enforce "[a]ny capacity or numerical restrictions that affect

26  religious worship services and/or religious gatherings at places of worship."  RJN, Ex. Q at 2.

27

### C.    The Face Covering and Social Distancing Requirements Are Constitutional

28      Calvary erroneously argues that the requirements for face coverings and social distancing

6

1 violate the Free Exercise Clause and the Equal Protection Clause.  ECF 208 at 12-13, 15-20.

2 **1.      Calvary is estopped from re-litigating this claim**

3 As an initial matter, the doctrine of res judicata precludes Calvary from re-litigating the

4 alleged unconstitutionality of the face covering and social distancing requirements.

5 Res judicata, or claim preclusion, "bars all grounds for recovery which could have been

6 asserted, whether they were or not, in a prior suit between the same parties . . . on the same cause of

7 action." *C.D. Anderson & Co. v. Lemos*, 832 F.2d 1097, 1100 (9th Cir. 1987).  State rules of

8 preclusion apply in determining the preclusive effect of a state administrative decision or a state

9 court judgment.  *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 482 (1982).  Under California law,

10 claim preclusion applies when: (1) the party to be precluded was a party or in privity with a party to

11 the previous adjudication; (2) the second lawsuit involves the same "cause of action" as the first; and

12 (3) there was a final judgment on the merits in the first lawsuit.  *San Diego Police Officers' Ass'n v.*

13 *San Diego City Emples. Ret. Sys.*, 568 F.3d 725, 734 (9th Cir. 2009).  Thus, a "plaintiff cannot avoid

14 the bar of claim preclusion merely by alleging conduct by the defendant not alleged in the prior

15 action, or by pleading a new legal theory."  *Gonzales v. California Dep't of Corrs.*, 782 F. Supp. 2d

16 834, 838 (N.D. Cal. 2011).  Each of the res judicata elements is met here.

17 a.      *The underlying OCHO hearing had the requisite judicial character*

18 Under the Federal Full Faith and Credit Statute, 28 U.S.C. § 1738, "a federal court must give

19 to a state-court judgment the same preclusive effect as would be given that judgment under the law

20 of the State in which the judgment was rendered."  *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465

21 U.S. 75, 81 (1984); *accord Int'l Evangelical Church of Soldiers of the Cross of Christ v. Church of*

22 *Soldiers of the Cross of Christ of State of Cal.*, 54 F.3d 587, 590 (9th Cir. 1995).  There is no

23 exception to claim preclusion for federal civil rights actions under 42 U.S.C. § 1983.  *See Allen v.*

24 *McCurry*, 449 U.S. 90, 97-98 (1980); *Takahashi v. Bd. of Trustees*, 783 F.2d 848, 850-51 (9th Cir.

25 1986) (citation omitted).  These same principles apply here, even though the dispute began in an

26 administrative proceeding.  "Under California law, a prior administrative proceeding, if upheld on

27 review (or not reviewed at all), will be binding in later civil actions to the same extent as a state

28 court decision if 'the administrative proceeding possessed the requisite judicial character.'"  *White v.*

7

1  *City of Pasadena*, 671 F.3d 918, 927 (9th Cir. 2012) (quoting *Runyon v. Bd. of Trustees*, 48 Cal. 4th

2  760, 773 (2010)).  An administrative agency has the requisite judicial character when it "acts in a

3  judicial capacity and resolves disputed issues of fact properly before it which the parties have had an

4  adequate opportunity to litigate."  *Guild Wineries & Distilleries v. Whitehall Co.,* 853 F.2d 755, 759

5  (9th Cir. 1998) (quotation omitted).

6        Here, Calvary's appeal of the OCHO decision—an administrative hearing process[2]—had the

7  requisite judicial character for claim preclusion purposes.  Calvary was represented by the same

8  counsel as in this case, and it had a hearing at which it was allowed to make opening statements and

9  arguments, submit documentary evidence, and examine and cross-examine witnesses under oath.

10 *See* Brandwajn Ex. I; RJN, Ex. N.  A court reporter recorded a transcript of the hearing, and the

11 hearing officer issued a written decision on disputed issues of fact that the parties had an opportunity

12 to litigate, including through review by the Superior Court.  *Id.*

13                              b.     *The appeal of the OCHO decision involved the same parties*

14        Given the dismissal of the Southridge plaintiffs (ECF 227), this case now involves the same

15 parties as in the OCHO hearing and Calvary's subsequent appeals to the Superior Court and Court of

16 Appeal.  Although McClure was not a petitioner in those proceedings but is a plaintiff here, he is

17 effectively part of Calvary, or at least in privity therewith, because he is Calvary's Senior Pastor and

18 Rule 30(b)(6) designee.  *See* Brandwajn Ex. D at 10:5-7, 19:17-19, 33:10-13.

19                              c.     *The appeal of the OCHO decision involved the same cause of action*

20        In California, a final state court judgment "precludes further proceedings if they are based on

21 the same cause of action."  *Brodheim v. Cry*, 584 F.3d 1262, 1268 (9th Cir. 2009) (quotation

22 omitted).  Under California's "primary rights theory," a "cause of action is (1) a primary right

23 possessed by the plaintiff, (2) a corresponding primary duty devolving upon the defendant, and (3) a

24 harm done by the defendant which consists in a breach of such primary right and duty."  *Id.* at 1268

25 (citation omitted).  "The most salient characteristic of a primary right is that it is indivisible: the

26 violation of a single primary right gives rise to but a single cause of action."  *Crowley v. Katleman*, 8

27

28 [2] *See* https://countyexec.sccgov.org/office-county-hearing-officer.

Cal. 4th 666, 681 (1994) (quotation omitted).  "[U]nder the primary rights theory, the determinative factor is the harm suffered."  *Gonzales v. Cal. Dep't of Corr.*, 739 F.3d 1226, 1233 (9th Cir. 2014) (quoting *Boeken v. Philip Morris USA, Inc.*, 48 Cal. 4th 788, 798 (2010)).

"[I]f two actions involve the same injury to the plaintiff and the same wrong by the defendant then the same primary right is at stake even if in the second suit the plaintiff pleads different theories of recovery, seeks different forms of relief and/or adds new facts supporting recovery."  *San Diego Police Officers' Ass'n*, 568 F.3d at 734 (quoting *Eichman v. Fotomat Corp.*, 147 Cal. App. 3d 1170, 1174 (1983)).  Therefore, so long as the same primary right is at issue, res judicata "prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding."  *Kay v. City of Rancho Palos Verdes*, 504 F.3d 809 (9th Cir. 2007) (internal quotation marks and citations omitted); *see also Takahashi*, 783 F. 2d at 849-52.

Calvary seeks to vindicate in this action the same primary right as in its appeals of the OCHO decision—freedom from governmental interference in the exercise of religion.  Both the prior proceedings and this case arise from the same or similar Public Health Order restrictions, allege the same injury (NOVs and related fines), and involve the same County actors enforcing those restrictions.  *See, e.g.*, *Furnace v. Giurbino*, No. C 12-0873 LHK(PR), 2013 U.S. Dist. LEXIS 166648, **1-21 (N.D. Cal. Nov. 22, 2013) (dismissing section 1983 civil rights complaint on res judicata grounds).  That this case challenges additional NOVs and fines for ongoing violations of the same or similar Public Health Orders does not mean that different primary rights are at stake.  *See, e.g.*, *Brentwood Rod & Gun Club, Inc. v. Cty. of Contra Costa*, No. C 06-04237 MHP, 2008 U.S. Dist. LEXIS 78909, **6-18 (N.D. Cal. Oct. 7, 2008) (granting summary judgment to county on constitutional claims because, *inter alia*, "Plaintiff could undoubtedly characterize itself as having suffered three or four or a dozen separate injuries for the various costs incurred in the permitting process" but "[t]his does not mean that three, four, or a dozen primary rights would be at issue").  Indeed, Calvary expressly challenged the constitutionality of the face covering and social distancing requirements in its Superior Court action.  RJN, Exs. M, N.

1

d.      _The Superior Court's decision is a final judgment on the merits_

2      The Superior Court's decision upholding the OCHO decision is a final judgment.  The

3 OCHO sustained the violations—including of face covering and social distancing rules—and the

4 County's fine structure for violations, as well as the amount of fines accrued as of October 21, 2020.

5 RJN, Ex. L.  Upon Calvary's petition, the Superior Court affirmed, after considering and rejecting

6 Calvary's constitutional arguments.  RJN, Exs. M, N.  Calvary noticed _but then abandoned_ a

7 subsequent appeal to the Court of Appeal.  RJN, Exs. O, P.  Under the authorities discussed above,

8 the Superior Court's ruling is therefore a final judgment.  _See also Cty. of Humboldt v. App. Div. of_

9 _Superior Ct._, 46 Cal. App. 5th 298, 309-11 (2020).

10      As a result, Calvary is estopped from relitigating here any constitutional or other ground that

11 it raised or could have raised in the final Superior Court judgment affirming the OCHO decision.

12      **2.      Calvary's claim fails, even if considered anew**

13      Even if not barred, Calvary is not entitled to summary judgment on its challenge to the face

14 covering and social distancing requirements.

15      a.      _The requirements are neutral and generally applicable_

16      Under the Free Exercise Clause, a law that is neutral and of general applicability need only

17 be supported by a rational basis "even if the law has the incidental effect of burdening a religious

18 practice." _Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah_, 508 U.S. 520, 531 (1993).

19 Strict scrutiny applies only where a law treats religious exercise less favorably than "comparable

20 secular activit[ies]." _Tandon v. Newsom_, 141 S. Ct. 1294, 1296 (2021).  "Comparability is

21 concerned with the risks various activities pose, not the reasons why people gather." _Id._

22      Here, the face covering and social distancing requirements were neutral, generally applicable,

23 and amply supported by the legitimate—and, indeed, compelling—governmental interest in

24 controlling the spread of COVID-19.  Those requirements applied to "_all_ individuals, businesses,

25 and other entities in the County."  ECF 212-10 at §2; ECF 212-5 at §2; RJN, Ex. F at §2 (emphasis

26 added).  The Risk Reduction Orders—upon which the fines are based—also required that all

27 individuals wear face coverings in indoor public spaces, subject to limited context-specific

28 exceptions for the very young, those with medical conditions or disabilities, or while actively eating

10

1   and drinking if socially distanced.  ECF 212-5 at §10; RJN, Ex. F at §8; Exs. A-C.

2          Calvary nevertheless argues that the face covering and social distancing requirements were

3   not neutral or generally applicable because, unlike for "essential religious functions," they exempted

4   government entities and their contractors from wearing masks "to the extent that such requirements

5   would impede or interfere with an essential government function."  ECF 208 at 15.  But the essential

6   government function exception did not apply to private actors, could not have exempted Calvary

7   from any public health order requirement, and thus is not relevant.  *See* ECF 212-10 at 3.  And

8   Calvary offers no evidence that any comparable activities by a governmental entity were exempted

9   from the public health requirements at issue.  Indeed, the only exception in the record—response

10  personnel exempted from travel quarantine rules to fight California wildfires (Brandwajn Ex. J at

11  270:11-272:6)—has no bearing here.

12         Calvary also argues that face covering and social distancing requirements exempted several

13  industries, including youth programs, construction workers, sporting events, and personal care

14  services like hair salons and cosmetology services.  But Calvary ignores the fact that these other

15  activities were subject to *additional*, sometimes more stringent, public health restrictions that did not

16  apply to churches or other gatherings—reflecting that they were *not* comparable from a public health

17  perspective.  *See, e.g.*, ECF 211-2—211-35, ECF 212—212-3.  For example, the County's personal

18  care services directives allowed face coverings to be removed by patrons only for the minimum time

19  and degree necessary to receive treatment to their face, but required personal protective equipment

20  for workers, the installation of physical barriers where feasible, and social distancing by customers

21  in certain situations.  ECF 211-5, 211-8.

22         In addition, by merely pointing to these non-church activities, Calvary has not met its

23  burden of showing them to be analogous to the Colorado public health restrictions found invalid in

24  *Denver Bible Church v. Azar*, 494 F. Supp. 3d 816, 833 (D. Colo. 2020).  In *Denver Bible*: (1) the

25  state did not dispute that plaintiffs' challenge was "driven by their religious rather than social or

26  secular needs" (*id.* at 832); (2) the court rejected Colorado's explanation for face masks—that

27  interpersonal contact in indoor worship is closer and longer than transient contact in other settings—

28  because the church observed the social distancing mandates that the court found constitutional (*id.* at

11

833-34); and (3) the evidence showed that the exempted secular settings "pose[d] similar threats of prolonged exposure . . . [as] houses of worship" (*id.* at 834-35).

Here, none of these facts guiding the non-controlling *Denver Bible* decision are present.  As addressed below, the County *does* dispute Calvary's assertion that its challenge is religiously driven.  Unlike the church in *Denver Bible*, Calvary admits it did not impose social distancing on its congregation—and in fact argues that it should not be subject to social distancing.  And Calvary proffers no evidence that the secular activities it identifies are, in fact, comparable—in terms of risk of spread—to indoor, close contact, maskless church services.  *See, e.g.*, *Does v. Bd. of Regents of the Univ. of Colo.*, No. 21-cv-2637-RM-KMT, 2022 U.S. Dist. LEXIS 15144, **8-16 (D. Colo. Jan. 27, 2022) (plaintiff students were not likely to succeed on claim that university's refusal to grant them religious exemptions violated free exercise because, *inter alia*, offering employees' ability to request a religious accommodation could not amount to treating comparable secular activity more favorably, given that "Plaintiffs have not shown that employees and students are comparable in this context" or that the result was a mechanism for individualized exceptions); *Rouse v. Whitmer*, No. 20-12308, 2022 U.S. Dist. LEXIS 118673, *37 n. 10 (E.D. Mich. June 13, 2022) (in Equal Protection context, finding that "Plaintiffs fail to satisfy the threshold showing that the 'religious activities' in question are similarly situated in any respect to the 'secular activities' they identify, much less that they are similarly situated in all relevant respects" to be valid comparators).  On the contrary, the evidence shows the opposite.  *See* Cody Decl., ¶¶45-52; Brandwajn Ex. Y at 11-16.

Therefore, the face covering and social distancing requirements are neutral and generally applicable, and they pass rational basis review.  *See, e.g.*, *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1083-1085 (9th Cir. 2015) (rejecting free exercise challenge because plaintiffs did not meet their "burden to negat[e] every conceivable basis which might support [the rules]") (quotation omitted).

                          b.    *The face covering and social distancing rules pass strict scrutiny*

Even if strict scrutiny applied, these requirements still pass muster because they are narrowly tailored to a compelling government interest.  The interest behind these requirements was to combat the spread of COVID-19, which is "unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).  And "social distancing requirements [and] masks"

12

1   were "narrower options" to a ban on indoor gatherings and "routine in religious services across the

2   country [at the time]." *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 718-19 (2021)

3   (Gorsuch, J., conc.); *see also Roman Catholic Diocese*, 141 S. Ct. at 69 (Gorsuch, J., conc.)

4   (capacity restrictions were unconstitutional where they failed to account for other precautions,

5   including "wearing masks").  The Ninth Circuit agrees.  *See, e.g.*, *Harvest Rock Church, Inc. v.*

6   *Newsom*, 985 F.3d 771, 773 (9th Cir. 2021) ("The obvious conclusion should be that, because the

7   [government] has found measures like [face masks, physical distancing, . . . and penalties . . . for

8   failure to comply] sufficient to safeguard indoor activities as varied as running a daycare center,

9   shopping in a mall, working in a warehouse or factory, riding public transportation, practicing a

10  professional sport, attending a college class, or filming a movie, then surely some combination of

11  similar measures might work for indoor religious worship as well.")

12          In its Motion, Calvary relies on two dissenting opinions to argue that "a majority *on* the

13  Supreme Court" has "rejected" any contention that church services can constitute a super spreader

14  event that is inherently more dangerous than gatherings by other entities subject to the Public Health

15  Orders.  ECF 208 at 18-19 (emphasis added).  But a "dissent is not controlling precedent."  *United*

16  *States ex rel. Jones v. Sutter Health*, 499 F. Supp. 3d 704, 715 (N.D. Cal. 2020).  Nor could it decide

17  a factual (and expert) issue regarding COVID-19 transmission and infection risk.

18          Here, the science shows that activities defined as a gathering were spreading COVID-19 at a

19  higher rate—and thus presented a greater *risk* of harm—than those defined as a non-gathering.  *See,*

20  *e.g.*, Brandwajn Ex. K at 208:2-209:1, 247:20-248:2; *see also* Cody Decl., ¶¶45-52; Brandwajn Ex.

21  Y at 1-16.  Citing the testimony of County Deputy Health Officer Dr. Sarah Rudman, Calvary argues

22  that the "County cannot demonstrate that Calvary's Sunday gatherings or small prayer gatherings

23  and bible studies posed a greater threat of COVID-19 transmission than the entities and activities

24  exempted from the public health orders . . . ."  ECF 208 at 19.  Not so.  While Dr. Rudman explained

25  that tracing the source of positive cases can be challenging, she also highlighted the evidence of

26  cases at Calvary Christian Academy (Brandwajn Ex. L at 140:3-141:7, 146:5-147:15), which is

27  "under the church" (*id.*, Ex. D at 87:12-88:12, *see also* Ex. A at 54:14-55:3).

28          Crucially, Calvary's focus on actual transmission or confirmed positive cases is misplaced.

13

1    To protect the public health, the County had to legislate to reduce transmission and infection risk,

2    not just confirmed cases.  And Calvary cannot credibly use its refusal to test for or report cases of

3    COVID-19 infection to now argue that the evidence tracing positive cases to Calvary is limited.

4         Therefore, even if strict scrutiny applied, Calvary has not shown its entitlement to summary

5    judgment on the face covering and social distancing requirements.

6         **D.    The Social Distancing Protocol Requirement Is Constitutional**

7         Under a heading that the Public Health Orders violated the Free Exercise Clause (ECF 208 at

8    12), Calvary argues that the requirement to submit an SDP was an unconstitutional condition

9    because it required Calvary's agreement to capacity restrictions ultimately ruled unconstitutional by

10   the Supreme Court (*id.* at 16).  Calvary's arguments fail irrespective of their constitutional moniker.

11        First, the Superior Court—with the benefit of the Supreme Court's opinions on indoor

12   gatherings upon which Calvary relies—already considered and rejected these arguments.  *See* RJN

13   Ex. M at 9; Ex. N at 7-8.  The Superior Court's order has claim preclusive effect, as shown above.

14   *See* §III(C)(1), *supra*.  In abandoning its appeal, Calvary waived any argument about any alleged

15   defect in the Superior Court's ruling or reasoning.

16        Second, reconsidering the merits does not change the result.  The SDP requirement was

17   neutral and generally applicable to "[a]ll businesses" (ECF 212-10 at §12(c), ECF 212-5 at §12(c);

18   *see also* RJN, Ex. D at 46-55) and supported by the legitimate interest of curbing the spread of

19   COVID-19.  Nor was the requirement an unconstitutional condition—and Calvary cites no case

20   indicating otherwise.  Courts have rejected similar challenges to COVID-related laws.  *See, e.g.*,

21   *Burcham v. City of L.A.*, 562 F. Supp. 3d 694, 707 n.4 (C.D. Cal. 2022) (city requirement for police

22   officers to vaccinate or test for COVID-19 as an employment condition was not unconstitutional).

23   Calvary likewise does not identify any County benefit withheld for failure to submit a complete

24   SDP.  And far from "requir[ing] Calvary to agree to all conditions, including unconstitutional" ones,

25   the face of the SDP expressly allowed Calvary "to explain why any measure that is not implemented

26   is inapplicable to [Calvary]" (ECF 210-20 at 1)—which includes constitutional reasons.  Ultimately,

27   Calvary's concern is academic because it never intended to comply with most requirements listed in

28   the SDP (e.g., face masks).  *See* Brandwajn Ex. A at 261:22-262:7; Ex. E at 87:6-88:3.

1

**E.     The Singing Restrictions Are Constitutional**

2

Calvary's misleading recitation of the law and the record does not satisfy its burden.

3

First, despite challenging the "State Guidance" on singing, Calvary cites only *County*

4

directives to show the purported absence of singing restrictions in childcare, day camps, sporting

5

event, and entertainment settings.  ECF 208 at 14-15.  But each cited County directive expressly

6

directed readers—in bold font, at the top—to any applicable, corollary State Order and stated that

7

"the more restrictive order must be followed."  *E.g.,* ECF 211-2 at 1; *see also, e.g.*, ECF 211-35

8

("The State also has specific guidance for certain facilities and activities that must be followed in

9

addition to this mandatory Directive.").  In those orders, the State imposed singing restrictions in the

10

very settings that Calvary erroneously claims were "favored."  *See Calvary Chapel of Ukiah v.*

11

*Newsom*, 524 F. Supp. 3d 986, 994-99 (E.D. Cal. 2021) (discussing California's COVID-19

12

regulations of singing and chanting in churches and other activities and industries).

13

Second, Calvary should not be allowed to challenge a singing ban of statewide application in

14

the absence of the State, an indispensable party.  And the Eleventh Amendment bars claims against

15

county officials for enforcing state law, where the relief requested would invalidate that state law

16

and thus operate against the State.  *See Porter v. Gore*, 354 F. Supp. 3d 1162, 1179-81 (S.D. Cal.

17

2018) (dismissing claims that County sheriff's enforcement of state law was precluded by California

18

constitution) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)); *see also Bols*

19

*v. Newsom*, 515 F. Supp. 3d 1120, 1134-35 (S.D. Cal. 2021) (distinguishing *Porter*, where county

20

official was enforcing state law and enjoyed immunity, from instant case where county officials

21

were enforcing county orders that were alleged to violate the state constitution).

22

Third, citing only concurring opinions in *South Bay*, Calvary suggests that whether the

23

State's singing restrictions violated the Free Exercise Clause is undecided.  ECF 208 at 14.  It is not.

24

"In two recent opinions, the Ninth Circuit upheld the State's ban on indoor singing and chanting."

25

*Morris v. Kuehl*, No. 2:20-cv-11508-VBF-PD, 2021 U.S. Dist. LEXIS 69621, **4-5 (C.D. Cal. Apr.

26

8, 2021) (citing *South Bay United Pentecostal Church*, 985 F.3d 1128, 1152 (9th Cir. 2021); *Harvest*

27

*Rock Church, Inc. v. Newsom*, 985 F.3d 771 (9th Cir. 2021)).  In *South Bay*, the Supreme Court

28

*affirmed* the Ninth Circuit's decision with respect to the indoor singing ban.  141 S. Ct. at 716.

15

1    *Calvary Chapel of Ukiah* is instructive because it rejected another Calvary Chapel church's

2    challenges, on the same constitutional grounds Calvary raises here through overlapping counsel, to

3    the same State singing ban.  Considering evidence of the risk of COVID-19 spread through

4    singing—and the State restrictions on singing and chanting in protests, schools and daycare centers,

5    restaurants and bars, entertainment production, and other gatherings—the court found that the State

6    singing ban was neutral, generally applicable, and met rational basis review.  524 F. Supp. 3d at 993-

7    1003.  "Given the Ninth Circuit's decisions in *South Bay* and *Harvest Rock*, and the Supreme

8    Court's decision with respect to indoor singing and chanting in *South Bay*, plaintiffs cannot succeed

9    on their free exercise claim here."  *Id.* at 1003.  "The record," the court reasoned, "is consistent with

10   these controlling decisions.  Beginning in . . . Summer 2020, the State imposed a ban on indoor

11   signing and chanting across a range of activities, with some tailoring depending on the precise nature

12   of the activity . . . The State's allowing of this indoor activity is consistent with its evaluation of

13   public health data regarding the risks of singing . . . and effective management of those risks."  *Id.*

14   Further, "the State has now issued protocols allowing those who serve as performers during church

15   services . . . to sing indoors subject to masking and distancing."  *Id.* at 1004.  The court also rejected

16   arguments that the State singing ban violated the Equal Protection Clause (*id.* at 1005-06), a

17   contention Calvary repeats here (ECF 208 at 19-20).

18        *Calvary Chapel of Ukiah* directs the rejection of Calvary's copycat Free Exercise

19   challenge—devoid of new evidence or contrary authority—to the same State singing restrictions.

20        **F.    Calvary Has Not Shown a Substantial Burden on Its Religious Exercise**

21        Calvary argues that the Public Health Orders substantially burdened its religious exercise, in

22   violation of the Free Exercise Clause of the United States and California Constitutions.  ECF 208 at

23   17-19.  Besides being foreclosed by res judicata, this argument fails for two additional reasons.

24        *First*, Calvary incorrectly premises its argument on the effectively overruled test for strict

25   scrutiny articulated in *Sherbert v. Verner*, 374 U.S. 398, 402-03 (1963).  But *Employment Div., Dept.*

26   *of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990) "largely repudiated the method of

27   analysis used in prior free exercise cases like . . . *Sherbert* . . ."  *Holt v. Hobbs*, 574 U.S. 352, 357

28   (2015); *see also Ass'n of Christian Sch. Int'l v. Stearns*, 679 F. Supp. 2d 1083, 1111 (C.D. Cal.

16

1    2008) ("In 1990, the Supreme Court radically changed course, effectively overruling *Sherbert* in

2    [*Smith*]."). *Smith* remains good law. *See Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct.

3    1868, 1877 (2021); *Tingley v. Ferguson*, 47 F.4th 1055, 1084 (9th Cir. 2022).

4         No case cited by Calvary supports applying the *Sherbert* test here, to neutral and generally

5    applicable health requirements.  Not the *concurring* opinions in *Fulton* that Calvary cites as a

6    holding.  ECF 208 at 17; *cf. Fulton*, 141 S. Ct. at 1876-77 ("CSS urges us to overrule *Smith*, and the

7    concurrences . . . argue in favor. . . [b]ut we need not revisit that decision here.").  Nor *Catholic*

8    *Charities of Sacramento, Inc. v. Superior Ct.*, 32 Cal. 4th 527, 562 (2004), which—contrary to

9    Calvary's assertion (ECF 208 at 17)—expressly did "not hold that the state free exercise clause

10   requires courts to apply the *Sherbert* test to neutral, generally applicable laws that incidentally

11   burden religious practice."  *Catholic Charities*, 32 Cal.4th at 566.  Nor the inapposite cases about

12   public accommodation laws, religious schools, and same-sex weddings that Calvary cites without

13   meaningful analysis or discernible relation to the issues at hand.  ECF 208 at 17-18.

14        *Second*, Calvary has not established an actionable burden on its religious practices.  To

15   establish a violation of the right to free exercise, a plaintiff must prove that its "proffered belief" is

16   "sincerely held."  *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994).  This "includes the testimony of

17   plaintiff, plaintiff's conduct, a demonstrated willingness to forego privileges by virtue of religious

18   commandment, the consistency of plaintiff's adherence, and other evidence reasonably having a

19   tendency to prove or disprove the issue."  *Rouser v. White*, 944 F. Supp. 1447, 1455 n.14 (E.D. Cal.

20   1996) (denying cross-motions for summary judgment on Free Exercise Clause claim).  "[R]elatively

21   short-term and sporadic" intrusions do not constitute a substantial burden.  *Canell v. Lightner*, 143

22   F.3d 1210, 1215 (9th Cir. 1998).

23        Here, Calvary cannot establish a substantial burden on sincerely held religious beliefs.  First,

24   McClure concedes that it is his spiritual obligation—enshrined in Calvary's bylaws—as Calvary's

25   Senior Pastor, to teach the word of God both by word and example.  Brandwajn Ex. M at

26   CCSJ000853 at §4, Ex. D at 29:5-30:10, 31:14-33:13.  Although Calvary outlines the scriptural

27   bases of its religious beliefs (ECF 208 at 18), the evidence reveals that these beliefs were neither

28   sincerely held nor consistently followed:

17

1      •      Calvary told its staff and believers *they should decide on their own* whether to comply

2      with health order requirements—without the church's correction based on any alleged inconsistency

3      with religious beliefs or practices.  Brandwajn Ex. D at 36:6-8, 30:9-33:13, 36:20-22, 175:2-176:7,

4      189:11-24, 231:4-233:5, 234:18-239:13; *id.*, Ex. N at 28:4-29:21, 50:20-51:13; Ex. O at 43:24-

5      47:22; *id.*, Ex. P at 59:18-60:9, 61:6-14, 66:6-15, 67:4-68:6.

6      •      Despite the stated belief of coming to God with unveiled faces, Calvary made face

7      masks available at the door.  *Id.*, Ex. D at 253:14-255:22.  Calvary's Assistant Pastor testified that

8      Calvary *encouraged* the use of face masks.  *Id.*, Ex. E at 74:11-14.  One Calvary congregant—and

9      declarant in support of Calvary's Motion—admitted that wearing a mask does not stifle fellowship;

10     "It's a choice."  *Id.*, Ex. N at 31:22-32:6, 33:3-13.

11     •      With McClure's blessing, Calvary's Assistant Pastor, Brit Grim, wore a mask in front

12     of the congregation during some Sunday services.  *Id.*, Ex. D at 235:8-22.  Grim admitted that

13     wearing a mask did not offend his religious beliefs.  *Id.*, Ex. E at 60:22-61:1.  Other church staff also

14     masked without objection from Calvary.  *Id.*, Ex. D at 235:8-22; *id.*, Ex. Q at 40:13-19. 42:2-43:22.

15     •      Despite the professed belief that only close contact worship, including "laying of the

16     hands," begets fellowship, "[p]eople were free to do it if they want to" and it was up to each

17     congregant's individual choice.  *Id.*, Ex. N at 28:19-29:21; *see also id.*, Ex. P at 66:6-68:6.  Further,

18     Calvary allowed or encouraged social distancing during Sunday services.  *Id.*, Ex. E at 38:12-39:25,

19     42:15-17, 46:15-17; *id.*, Ex. R at CCSJ000804.  Calvary did "not . . . police two congregants who

20     want to pray for one another . . . Sure, they can pray apart."  *Id.*, Ex. D at 193:15-17; *see also id.* at

21     202:19-205:16.  Calvary offered before COVID-19—and still offers—several *remote* ways to attend

22     its religious services.  *Id.* at 197:13-202:18; *id.*, Ex. E at 39:2-40:21.

23     Second, there is no evidence of a substantial burden on Calvary's practice of its religion:

24     •      Calvary did not force anyone to follow the Public Health Orders, which it viewed as

25     mere recommendations.  *See, e.g.,* Brandwajn Ex. D at 30:9-33:13, 36:6-8, 36:20-22, 175:2-176:7,

26     189:11-24, 231:4-233:5, 234:18-239:13; *id.*, Ex. N at 15:25-16:13, 28:4-29:21, 32:1-6, 55:19-56:17;

27     *id.*, Ex. P at 66:6-68:6; *id.*, Ex. O at 43:24-47:22, 131:18-132:14.

28     •      The ranks of Calvary's religious congregation *tripled* while the Public Health Orders

18

Defendant County of Santa Clara's Opposition to Plaintiffs'                                          20-CV-03794 BLF
Motion for Partial Summary Judgment

1    were in effect (*id.*, Ex. D at 63:6-64:13), which is the antithesis of a burden on religion.

2           •    Two Calvary congregants and declarants, Stenehjem and Fraboni, admitted that they

3    have never worshipped, sung, or even been at Calvary while wearing a mask (*id.*, Ex. N at 42:23-

4    43:21; *id.*, Ex. P at 54:3-25, 57:6-20)—rendering their attestations in this Motion about the burden

5    on their religion "*if*" they had to mask during church service (ECF 208-4 at ¶5; ECF 208-5 at ¶4)

6    mere speculation not based on personal knowledge. *See* Fed. R. Evid. 602.

7         In addition, although Calvary argues that the fines burdened its "ability to pursue church-

8    related projects and ministries" (ECF 208 at 18 (citing ECF 208-1 at ¶¶19-20)), the evidence tells a

9    different story.  Calvary was flush with cash from the increased tithing and offerings revenue

10    generated from being the only church in the county openly defying the Public Health Orders; and it

11    had no financial difficulties funding its ministries. *See* §III(I)(1), *infra*.  Calvary's Board minutes

12    stated that the "the church is financially healthy" and reflected no burden—including from the

13    fines—on the Josiah Project that Calvary now identifies. *See* Brandwajn Ex. S at CCSJ000878, 879;

14    Ex. D at 148:4-152:5.  At deposition, Calvary could not identify any delays or financial burdens

15    imposed by the County fines on the Josiah Project or any other "mission's trips, camps, and outreach

16    programs" (ECF 208-1 at ¶19)—nor could Calvary, given its decision to use increased revenue not

17    to fund projects, but to pay off outstanding loans.  Brandwajn Ex. D at 144:3-146:23, 148:4-173:10.

18         The fact that Calvary's objections to the Public Health Orders are based on political, health,

19    or personal comfort concerns—rather than religious views—might explain the tension between the

20    record and Calvary's litigation position.  But objections that are "nonreligious in motivation" do not

21    implicate the Free Exercise Clause. *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 715-16

22    (1981).  Ample evidence betrays Calvary's nonreligious motivations:

23           •    Calvary's comparisons of the Public Health Orders to Adolf Hitler's political tactics

24    (Brandwajn Ex. D at 178:1-180:11, 258:3-259:16);

25           •    the admissions by Calvary's declarants that they joined Calvary only after reading

26    "negative" press about the church's political and legal opposition to the Public Health Orders (*id.*,

27    Ex. N at 20:6-21:18; Ex. P at 19:10-22:17, 76:25-77:24, 79:21-80:13; Ex. T at 9:19-12:5);

28           •    one Calvary declarant's testimony that wearing a mask "feels like punishment" because

19

1    "the County is certainly mandating them" (*id.*, Ex. N at 44:8-45:20, 46:5-14);

2        •       another Calvary declarant's testimony that "the final straw" making him leave his

3    church of 45 years (for Calvary) was that church's announcement that it would "do whatever Dr.

4    Cody tells us" (*id.*, Ex. T at 29:20-30:12, 34:7-35:1, 36:2-14); and

5        •       Calvary's declarants' admissions that they dislike wearing face mask for comfort or

6    medical reasons (*id.* at 60:4-62:9; Ex. P at 54:3-57:20, 61:16-62:25; Ex. N at 44:8-47:21)—including

7    Shepherd's irrelevant and hearsay testimony about *his workers' comfort and work-related* reasons

8    for not masking—(1) the practical needs at loud construction sites he did not visit, and (2) requests

9    by contractors or customers that he refused to identify in deposition—in breach of his own

10   company's COVID-19 advisory (*id.*, Ex. O at 57:20-60:24, 61:9-62:15, 66:14-75:10, 79:2-80:18,

11   84:2-87:24; *cf.* Fed. R. Evid. 402, 602, 802).

12       In sum, Calvary cannot show a substantial burden on its religious exercise.

13       **G.    The Urgency Ordinance Did Not Discriminate Against Religion**

14       Calvary argues that the fines imposed pursuant to the Urgency Ordinance discriminate

15   against religion because the County "never cited non-commercial activities like graduation parties or

16   private gatherings," which Calvary asserts are "comparable secular activities."  ECF 208 at 20-21.

17   At the outset, however, res judicata bars this same argument that Calvary already advanced—and the

18   Superior Court rejected.  RJN Ex. M at 7-8, Ex. N.

19       The argument is also unsupported.  The County's civil enforcement program was complaint-

20   based, and Calvary offers no evidence of unenforced complaints about graduation parties, protests,

21   or private gatherings.  *Cf.* Brandwajn Ex. J at 47:13-50:14, 67:9-25, 174:1-4.

22       And the distinction between commercial and non-commercial activities has nothing to do

23   with religion.  Private gatherings can be secular or religious—*e.g.*, a neighborhood book or bible

24   club—just as non-profit corporations can have a secular or religious purpose.  The County's

25   enforcement priorities between these classifications cannot support a discrimination claim.  Indeed,

26   Calvary's argument is effectively one of selective prosecution, which the Court has already ruled

27   "the operative complaint does not expressly claim" (ECF 200 at 4) and is thus not properly raised.

28       Further, the "non-commercial" activities Calvary identifies are simply not comparable—

20

1    either in terms of risk of spread or statutory interpretation.  As a non-profit organization, Calvary is

2    considered a business—and its activities "commercial"—under the Urgency Ordinance.  *See* ECF

3    212-28 at §§2(b), 6(b)(2).  The County's recognition of the content of Black Lives Matter outdoor

4    protests in Summer 2020 (ECF 208 at 21)—before the passage of the Urgency Ordinance and the

5    establishment of the County's civil enforcement program—is no less availing to Calvary, since the

6    County clearly reminded attendees to "keep . . . using face coverings and, to the extent possible,

7    maintaining social distancing" (ECF 210-22)—which Calvary was never willing to require.

8              **H.        The Public Health Orders Do Not Violate the Fourteenth Amendment**

9              Calvary's seven-line argument does not establish an Equal Protection violation.  ECF 208 at

10   19-20.  Calvary had the opportunity to raise this constitutional theory in the state courts, did not, and

11   is precluded from doing so here for the same reasons addressed above.  Moreover, as Calvary

12   recognizes, its Fourteenth Amendment argument is predicated solely on a finding of an underlying

13   violation of the Free Exercise Clause, which—as shown above—Calvary has not established.

14             **I.        The Fines Sought Against Calvary Do Not Violate the Eighth Amendment**

15             This Court has twice held that it cannot rule on the alleged excessiveness of the fines until

16   the state court, in the parallel action, decides the amount of the fines.  ECF 156 at 24; ECF 178 at 7-

17   8.  Because there has been yet no such ruling, Calvary's motion on this point is premature.

18             But even if the excessiveness issue were presently resolvable, claim preclusion mandates a

19   ruling in the County's favor.  The Superior Court "reject[ed] [Calvary's] contention that the total

20   fines . . . imposed for its violations [of face covering and social distancing rules] are excessive.

21   [Calvary's] maximalist approach to violation of the public health orders warrants an equally

22   expansive approach to sanctions, including the $5,000 for each day that [Calvary] refused to produce

23   a safety protocol of any kind."  RJN, Ex. N at 8.  Calvary may not repeat here, under an Eighth

24   Amendment veneer, its same excessiveness challenge.  *See* §III(C)(1)d), *supra*.

25             **1.        Even on the merits, the fines are not unconstitutionally excessive**

26             "A fine is unconstitutionally excessive if it is 'grossly disproportional to the gravity of the

27   defendant's offense.'"  *Vasudeva v. United States*, 214 F.3d 1155, 1161 (9th Cir. 2000) (quoting

28   *United States v. Bajakajian*, 524 U.S. 321, 334 (1998)).  In making this determination, a court may

21

1    consider: (1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3)

2    the penalties imposed in similar statutes; and (4) the defendant's ability to pay. *Bajakajian*, 524 U.S.

3    at 337-38.  A court, however, is not bound by "the consideration of any rigid set of factors." *United*

4    *States v. Mackby*, 339 F.3d 1013, 1016 (9th Cir. 2003).  Thus, a violator's "income earned from the

5    illegal activity can be considered when deciding whether a fine is excessive." *Vasudeva*, 214 F.3d at

6    1161; *see also Balice v. U.S. Dep't of Agric.*, 203 F.3d 684, 699 (9th Cir. 2000) (fine that was "less

7    than [the fined party's] potential profit" from unlawful activity was "not grossly disproportionate");

8    *see also* ECF 206 at 3-4.  Further, the culpability analysis properly considers the recklessness of the

9    violator's behavior (*Pimentel v. City of Los Angeles*, 974 F.3d 917, 922-25 (9th Cir. 2020)) and

10   ability to pay "where punishment is meted out for a failure to pay" (*Lemmon v. Pierce Cty.*, No.

11   C21-5390RSL, 2021 U.S. Dist. LEXIS 156164, *19 (W.D. Wash. Aug. 18, 2021)).  Here, each of

12   these factors precludes the entry of summary judgment in Calvary's favor.

13          a.      *Calvary has—and always had—the ability to pay the fines*

14          Despite alleging in April 2022 that the fines imposed against it were "bankruptcy inducing"

15   (ECF 167 at ¶101), Calvary omits any argument under this *Bajakajian* factor in its summary

16   judgment papers (ECF 208 at 21-23).  Wisely so: Calvary always had the ability to pay the fines.

17          At the end of 2019, Calvary had collected tithes and offerings of $973,443, yielding cash

18   assets of $574,186.  Brandwajn Ex. U at CCSJ000874-75.  Against this pre-COVID baseline, by the

19   end of 2020 Calvary had cash assets of $1,676,903—including tithes and offerings revenue of

20   $2,174,310, more than double that of 2019—and total liabilities of $2,208,503.  *Id.* at CCSJ000876-

21   77.  By the end of 2021, after choosing to pay off over $2 million in loan liabilities (*id.*, Ex. V at

22   CCSJ1001), Calvary still had $2,268,492.69 in cash (*id.* at CCSJ000999)—including from its

23   remarkable $5,451,006.82 in tithes and offerings revenue that year (*id.* at CCSJ000975, 982, 989,

24   996).  With these increased contributions, Calvary *chose* to pay off mortgage and car loans instead of

25   bearing any financial accountability for its health order violations.  *Id.*, Ex. D at 124:20-22 ("Our

26   priority was try to pay the mortgage and stay alive . . . You know, the fines, that wasn't even a

27   thought."); *see also id.* at 76:8-78:25, 125:11-128:18.  Calvary did not disclose the fines to its

28   auditors as even a contingent liability.  *Id.* at 68:20-22.  And its 2022 financial documents show cash

22

1   assets of almost $4.45 million and no liabilities (*id.*, Ex. W at CCSJ001146, 1148)—much more than

2   the $2.87 million that the County seeks to collect and re-distribute to businesses that complied with

3   the Public Health Orders (*see* RJN, Ex. V).

4                    b.       *Calvary's high degree of culpability renders the fines not excessive*

5           As shown above, Calvary blatantly and openly violated the health restrictions relating to face

6   masks, social distancing, and the SDP—for several months, even while attendees to its in-person

7   services contracted or died of COVID-19.  Accordingly, its culpability is unquestionably high.

8   Calvary's argument that it acted in good faith adherence to sincerely held religious beliefs (ECF 208

9   at 21) rings hollow given that, as addressed above, Calvary *facilitated* deviations from those

10  professed beliefs by its staff and congregants.  *See* §III(F), *supra*.

11                   c.       *The fines are reasonably related to the harm*

12          As Calvary notes, "if culpability is high or behavior reckless, the nature and extent of the

13  underlying violation is more significant.  Conversely, if culpability is low, the nature and extent of

14  the violation is minimal."  ECF 208 at 21 (quoting *Pimentel*, 974 F. 3d at 923).  Calvary argues that

15  "the County cannot trace one COVID-19 case to Calvary."  *Id.* at 22.  But this argument ignores that

16  the best measure of harm is the increase in *risk of spread* that Calvary's admitted violations

17  created—which risk is well documented.  *See, e.g.*, Cody Decl., ¶¶45-52; Brandwajn Ex. Y at 1-16.

18          Even under Calvary's myopic view of harm limited to confirmed positive cases—which it

19  failed to report—the testimony Calvary cites *does show* COVID-19 cases traced to Calvary Christian

20  Academy (ECF 210-11 at 137-38), which is "under the church" (Brandwajn Ex. D at 87:12-88:12;

21  *see also* Ex. A at 54:14-55:3).  As shown above, that school was forced to close because of a major

22  COVID-19 outbreak among students and teachers.  Further, Calvary knew that at least one of its

23  congregants died of COVID-19.  *Id.*, Ex. A at 221:9-225:1; *id.*, Ex. C at 53:4-10.  And, as shown

24  above, Calvary knew about church attendees who had contracted COVID-19 or displayed COVID-

25  19 symptoms.  Calvary's own declarants in this Motion contracted what they believed was COVID-

26  19 and were aware of other congregants experiencing the same, during the times they were attending

27  in-person religious services at Calvary.  *Id.*, Ex. N at 56:18-57:3; *id.*, Ex. P at 73:19-74:18.  This is

28  merely the evidence available *despite* Calvary's failure to test for—or report—cases among staff,

1   students, and congregants.  *Id.*, Ex. H at 44:5-7, 44:17–45:2, 46:11–46:25; *id.*, Ex. X at 95:20–96:19;

2   *id.*, Ex. C 42:9–42:18, 45:24–46:4; *id.*, Ex. G at 35:16–36:15, 39:13–15; 43:3–45:10, 46:24–47:10,

3   61:9-12.  Expert mobility data also allows the reasonable tracing of COVID-19 cases to Calvary's

4   in-person gatherings.  *See* Brandwajn Ex. Z at 3-8.

5         Calvary also argues that "a daily $10,000 fine" is excessive because it treats any weekday the

6   same as Sunday services, "even though an enforcement officer did not investigate Calvary every

7   day."  ECF 208 at 22.  To be precise, Calvary was fined a maximum of $5,000 a day per violation.

8   *See*, *e.g.*, RJN, Ex. N at 8.  In any event, Calvary admittedly did not require face masks on *any* day

9   of the week.  Brandwajn Ex. D at 255:16-259:5; *id.*, Ex. E at 83:20-22.  And Calvary may not

10  complain that the cumulative fine amount is excessive when it deliberately continued to violate the

11  Public Health Orders for months, thereby accruing daily fines.  *See, e.g.*, *Gutierrez v. City of Long*

12  *Beach*, No. CV 19-9941-DMG (Ex), 2021 U.S. Dist. LEXIS 221668, **7-8 (C.D. Cal. Nov. 15,

13  2021) (rejecting Eighth Amendment claim of excessive fines and holding that "[b]ecause Plaintiff

14  had it within his control to stop the accumulation of penalties but chose not to do so, his culpability

15  is greater, which justifies an increase in those penalties") (citing *Lent v. California Coastal Com.*, 62

16  Cal. App. 5th 812, 857 (2021) ("courts routinely consider a person's unwillingness to comply with

17  the law when considering whether a fine is excessive under the Eighth Amendment")).

18        Additionally, Calvary argues, the face covering-related fines were duplicative of those for

19  failure to submit an SDP because the SDP lists face covering use as one of the many requirements.

20  ECF 208 at 22.  But this argument ignores that the fines cover distinct violations: for example, one

21  might submit an SDP—and thereby avoid fines associated with that requirement—yet nonetheless

22  violate the face covering rules and be fined for that separate violation.  And Calvary cites no case

23  holding that such a *de minimis* potential overlap renders the fines excessive.  *See, e.g.*, *United States*

24  *v. Nev. Power Co.*, No. CV-S-87-861-RDF, 1990 U.S. Dist. LEXIS 18998, **15-16 (D. Nev. June 1,

25  1990) (granting summary judgment on Eighth Amendment defense because "[a] finding that any

26  [civil] penalty in this case would be 'excessive' does not follow from Defendant's argument that this

27  proceeding duplicates the [state agency] proceedings [that imposed fines for the same conduct]").

28        The fines imposed are proportional to the risk of harm created by Calvary's reckless conduct.

1                d.     *The fines are in line with penalties imposed in similar statutes*

2           Calvary argues that it was improperly classified as a "business" and subject to higher fines

3 for commercial activities.  ECF 208 at 22-23.  Calvary then compares those fines to those imposed

4 by other counties against *non-commercial activities*.  *Id.*  This is unpersuasive for two reasons.

5           First, as shown above, under the Urgency Ordinance even non-profit entities like Calvary

6 were treated as "businesses" and their activities "commercial."  ECF 212-28 at §§2(b), 6(b)(2).

7 Comparisons to other county fines for non-commercial activities are therefore inapt.

8           Second, when analyzed against proper comparators, the Urgency Ordinance's fines are in

9 line with those imposed by other counties' similar COVID-19 ordinances.  *See, e.g.*, RJN, Ex. R at

10 §7.99.05(D), (F) (Marin County: up to $10,000 for commercial entities, including fines that double

11 daily up to that amount); Ex. S at §VI(E) (Sonoma County: $1,000 for a first violation, $5,000 for a

12 second violation, and $10,000 for each additional violation for commercial entities); Ex. T at

13 §8.85.050(D)(2) (Napa County: $5,000 for commercial activities); Ex. U at §6 (San Mateo County:

14 up to $3,000 for each violation).  Other Santa Clara County provisions impose similar fine amounts

15 for analogous violations.  *See* Ordinance Code §§A1-37, A1-42(b)(2), B11-345.

16           In sum, Calvary cannot carry its summary judgment burden on its Eighth Amendment claim.

17                           **IV.**     **CONCLUSION**

18           For the above reasons, the Court should deny Calvary's Motion in its entirety.

19 Dated:  November 18, 2022                 Respectfully submitted,

20                                   JAMES R. WILLIAMS
                                  County Counsel

21

22                        By:    */s/ Xavier M. Brandwajn*

23                               XAVIER M. BRANDWAJN
                              Deputy County Counsel

24                               Attorneys for Defendant
                              COUNTY OF SANTA CLARA

25 2721939

26

27

28